## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAZY DAYS' R.V. CENTER, INC., et al.,[1] | ) | Case No. 09-13911 (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING FROM BANK OF AMERICA, N.A., AS AGENT, AND BANK OF AMERICA, N.A., AND KEYBANK NATIONAL ASSOCIATION, AS LENDERS; (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (C) AUTHORIZING USE OF CASH COLLATERAL; (D) MODIFYING THE AUTOMATIC STAY; AND (E) SCHEDULING THE FINAL HEARING ON THE DEBTORS' MOTION

Lazy Days' R.V. Center, Inc. ("Lazy Days") and its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this motion (the "Motion") for entry of an interim order (the "Interim DIP Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final DIP Order," together with the Interim DIP Order, the "DIP Orders"), (a) authorizing the Debtors to obtain postpetition financing on a superpriority administrative claim and first-priority lien basis, (b) authorizing the Debtors to use cash collateral, (c) modifying the automatic stay, (d) scheduling the time for the final hearing on the Motion and (e) granting related relief. In support of this Motion, the Debtors respectfully states as follows:

### Jurisdiction

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Lazy Days' R.V. Center, Inc. (4794); LD Holdings, Inc. (1834); LDRV Holdings Corp. (6915); and RV Acquisition Inc. (1630). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 6130 Lazy Days Boulevard, Seffner, Florida 33584-2968.

2. The statutory bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

3. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases. No committees have been appointed or designated. Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases.

4. A description of the Debtors' businesses, the reasons for commencing these Chapter 11 Cases and the relief sought from this Court to allow for a smooth transition into chapter 11 are set forth in the *Declaration of Randall Lay, Chief Financial Officer of Lazy Days' R.V. Center, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") filed contemporaneously herewith, and incorporated by reference as though fully set forth herein.

## Relief Requested

5. By this Motion, the Debtors request entry of the DIP Orders granting, without limitation, the following relief:

   a. authority to (i) obtain loans, advances and other financial accommodations in the aggregate principal amount of up to $65 million under a postpetition financing facility (the "DIP Facility"), and access up to $45 million

thereof on an interim basis on the terms and conditions in the Interim DIP Order;

b.    authority to enter into, execute and deliver that certain Post-Petition Credit Agreement, substantially in the form attached hereto as **Exhibit B** and incorporated by reference herein (together with any other agreements, documents and instruments related thereto, including with respect to certain Existing Letters of Credit and an Epayables Program (as defined therein), as each of the same may be amended, supplemented or modified from time to time, collectively, the "DIP Credit Agreement"), by and among the Debtors, Bank of America, N.A. ("BoA"), as administrative and collateral agent (in such capacity, the "DIP Agent"), and BoA and KeyBank National Association (a national banking association), as lenders (in such capacity, together, the "DIP Lenders");

c.    authorizing the financing under the DIP Credit Agreement to: (i) have priority over any and all administrative expenses, including, without limitation, the kinds specified in sections 105, 326, 330, 331, 503(b), 506(c) (subject to approval in the Final DIP Order), 507(b), and 726 of the Bankruptcy Code, except for the Carve-Out (as defined below) (the "DIP Facility Superpriority Claims"), and (ii) be secured by first priority security interests in, and liens on (collectively, the "DIP Facility Liens") the assets of the Debtors constituting "Collateral" as defined in the DIP Credit Agreement (but excluding any actions or proceeds of actions under Chapter 5 of the Bankruptcy Code and subject to any prior permitted liens under the Prepetition Credit Agreement), as provided for by section 364(c) and (d) of the Bankruptcy Code (all of the foregoing, collectively, the "Collateral");

d.    authority to use "cash collateral" within the meaning of section 361 of the Bankruptcy Code (the "Cash Collateral"), pursuant to sections 361 and 363 of the Bankruptcy Code;

e.    modification of the automatic stay to the extent set forth in the DIP Orders and the DIP Credit Agreement, pursuant to section 362 of the Bankruptcy Code;

f.    scheduling the final hearing on the Motion to consider entry of the Final DIP Order authorizing and granting the relief requested herein, pursuant to Bankruptcy Rule 4001; and

g.    granting related relief and such other and further relief as the Court deems just and proper.

6.    In further support of this Motion, the Debtors submit the First Day Declaration

and the *Declaration of Ford R. Phillips in Support of the Motion of The Debtors For Entry of*

*Interim And Final Orders (A) Authorizing The Debtors To Obtain Postpetition Financing From Bank of America, N.A., As Agent, And Bank of America, N.A., and KeyBank National Association, As Lenders; (B) Granting Liens And Superpriority Claims; (C) Authorizing Use of Cash Collateral; (E) Modifying The Automatic Stay; And (F) Scheduling The Final Hearing On The Debtors' Motion* (the "Phillips Declaration"), which is attached hereto as **Exhibit C** and incorporated herein by reference.

## Concise Statement Pursuant to Bankruptcy Rule 4001

7.      In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the material provisions of the DIP Credit Agreement and the proposed DIP Orders are summarized below:[2]

| Provision | Summary Description |
|---|---|
| Borrower: | Lazy Days' R.V. Center, Inc. (the "Borrower"), a debtor-in-possession under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. |
| Guarantors: | All obligations under the DIP Facility will be unconditionally guaranteed (the "Guarantee") by the Borrower's parent companies, RV Acquisition, Inc. ("RV Acquisition") and LD Holdings, Inc. ("LD Holdings"), and the Borrower's subsidiary, LDRV Holdings Corp. ("LDRV Holdings"), with certain exceptions to be agreed upon and subject to obtaining necessary regulatory approvals (each a "Guarantor" and, together with the Borrower, the "Loan Parties"). |
| DIP Agent: | Bank of America, N.A. |
| DIP Lenders: | Bank of America, N.A. and KeyBank National Association |
| Type and Amount of Facilities: | The DIP Facility consists of a $45,000,000 senior floor plan facility (the "Floor Plan Facility"), with a $20,000,000 seasonal limit increase from October 1, 2009 through March 31, 2010 at advance rates set forth in the definitive documentation. |
| Borrowing Conditions: | Customary borrowing conditions, including requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, the absence of any default or potential event of default and other conditions customary and appropriate for financings of this type. **See DIP Agmt., at § 4.** |

---

[2]     This summary is qualified in its entirety by the provisions of the DIP Agreement and the DIP Orders. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement. To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Moreover, to the extent there are any conflicts between the DIP Agreement and the DIP Orders, the terms of the DIP Orders shall govern. All defined terms used but not otherwise defined herein shall have the means ascribed to them in the DIP Credit Agreement.

| Provision | Summary Description |
|---|---|
| Maturity: | The maturity date of the DIP Facility will be (and all loans and obligations under the DIP Facility shall be repaid in full on) the earliest of: (a) 60 days after the Petition Date, (b) upon 15 days' advance written notice by the Company, (c) the acceleration of the loans and termination of the commitments in accordance with the terms of the Facility, (d) the date that is 30 days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court by that date, unless the Interim DIP Order has been extended with the Agent's written consent to a date that is acceptable to the Agent, (e) the date upon which the Interim Order expires, unless the Final DIP Order has been entered and becomes effective by that date, and (f) the date a plan of reorganization in the Chapter 11 Cases becomes effective. **See DIP Agmt., at Schedule B "Termination Date" definition.** |
| Use of Funds: | The proceeds of the DIP Facility will be used to (a) provide floor plan financing for the Debtors, (b) pay the prepetition loans and other prepetition claims and obligations owed to the Prepetition Agent (as defined below) and the Prepetition Lenders (as defined below) under the Prepetition Credit Facility (as defined below), (c) pay all fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Agent and the DIP Lenders under the DIP Facility, (d) fund ongoing working capital needs of the Debtors (e) provide for the Company to secure the obligations of BoA under the Existing Letters of Credit (as defined below) by a security interest in the "L/C Security Account" (as defined in the DIP Credit Agreement)[3] and indemnify BoA for losses arising from the Existing Letters of Credit and (f) permit the Debtors to participate in the "Epayables Program" (as defined in the DIP Credit Agreement)[4] offered by BoA, secure the Debtors' obligations under the Epayables Program with a security interest in the "Epayables Security Account" (as defined in the DIP Credit Agreement)[5] and indemnify BoA for losses arising from the Epayables Program. **See Int. DIP Ord., at Preamble and ¶ 2.** |
| Interest Rate: | All amounts outstanding under the Facility will bear interest, at the Borrower's option, as follows: <br>     (i) at Libor Rate plus 5.00% *per annum*; or <br>     (ii) at Prime Rate plus a margin *per annum* to be agreed upon. <br> **See DIP Agmt., at § 2.1.** |
| Default Rate: | The Default Rate equals the interest rate then applicable to the relevant Borrowing of Loans plus an amount equal to 2.50% per annum. **See DIP Agmt., at § 2.3 and definition of "Overdue Rate".** |
| Fees: | The Debtors have agreed to pay the following fees: <br><br> • *Origination Fee*: $412,500 as consideration for the origination of the Floor Plan Loans under the terms and conditions of the DIP Credit |

---

[3] The L/C Security Account was established by the Debtors with BoA and funded prior to the Petition Date and is described in more detail in the *Motion For Entry of An Order Authorizing The Debtors To Continue To Use Existing Cash Management System*, filed contemporaneously herewith.

[4] The Debtors use the "Epayables Program" as part of their accounts payables process as a substitute for check disbursements. Approximately $92,000 is owed under the Epayables Program as of the Petition Date.

[5] The Epayables Security Account was established by the Debtors with BoA and funded prior to the Petition Date and is described in more detail in the *Motion For Entry of An Order Authorizing The Debtors To Continue To Use Existing Cash Management System*, filed contemporaneously herewith.

| Provision | Summary Description |
|---|---|
| | Agreement<br><br>• _Letter of Credit Fee_: An issuance fee equal to 2.0% per annum of the amount of the Letter of Credit<br><br>• _Covenant Violation Fee_: $25,000 per calendar month or portion thereof during which any Loan Party is in violation of any of its covenants in Section 10 of the DIP Credit Agreement;<br><br>• _Agent Fee:_ all administrative fees required in the Fee Letter and any other agreement executed by the Debtors and the Agent in connection with the DIP Credit Agreement;<br><br>• _Renewal Letter of Credit Fee_: an annual renewal fee equal to 2.0% per annum of the amount of the Existing Letter of Credit for the continuance of each Existing Letter of Credit. Upon the occurrence and during the continuation of an Event of Default, the foregoing Existing Letter of Credit fee will be increased to 4%<br><br>**See DIP Agmt., at § 3.** |
| <u>Liens and Priority</u>: | The DIP Facility will (i) have priority over any and all administrative expenses, including, without limitation, the kinds specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(b), and 726 of the Bankruptcy Code, except for the Carve-Out (as defined below) and fees payable pursuant to 28 U.S.C. § 1930 and to the Clerk of Court as provided for in the DIP Orders, and (ii) be secured by first priority security interests in, and liens on the Collateral (as defined in the DIP Credit Agreement) (but excluding any actions or proceeds of actions under Chapter 5 of the Bankruptcy Code), as provided for by section 364(c) and (d) of the Bankruptcy Code. **See Int. DIP Ord., at ¶¶ 3, 4.** |
| <u>Events of Default</u>: | The DIP Facility includes customary and appropriate events of default (subject, in each case, to materiality thresholds, and customary notice and grace periods), including, among others, payment defaults, failure to comply with certain covenants, breach of warranty and representations, entry of a final judgment against any Loan Party in excess of $500,000, the occurrence of a change of control, a default in performance under the Ground Lease and Global Settlement Agreement (as each term is defined in the DIP Credit Agreement), and the occurrence of certain Chapter 11 related events, including, among others, the entry of an order staying, amending, vacating, supplementing, or otherwise modifying the DIP Credit Agreement or DIP Orders, the filing of a motion (or the support of any motion) by a Loan Party to obtain alternative financing not permitted by the DIP Credit Agreement or DIP Orders, and the filing of any plan of reorganization or disclosure statement by a Loan Party to which the DIP Agent or the DIP Lenders do not consent or otherwise agree to the treatment of their claims, _provided that_ the filing of any plan of reorganization that provides the DIP Lenders are paid in full shall not constitute an event of default. **See DIP Agmt., at § 11.** |

| Provision | Summary Description |
|---|---|
| Carve-Out: | The DIP Facility Superpriority Claims and the DIP Facility Liens shall be subject only to the payment of the following fees and expenses (the "Carve-Out"): (x) fees to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 and (y) subject in each case to the "Carve-Out Amount," the unpaid and outstanding fees and disbursements actually incurred on or after the Petition Date by the Debtors' Professionals (as defined in the DIP Credit Agreement) and professionals for the official committee of unsecured creditors (the "Committee,"), if any, appointed in the Chapter 11 Cases (collectively, the "Professionals") and allowed by order of this Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"). <br><br> The "Carve-Out Amount" incurred on or after the Petition Date through the earlier of (a) the effective date of the Prepackaged Plan or (b) the date the DIP Agent issues a notice of an Event of Default (as defined in the DIP Credit Agreement) to any of the Debtors or their counsel (the "Pre-Default Period") is a maximum, cumulative, aggregate amount of $2,000,000, and after the DIP Agent issues any such notice of an Event of Default, is a maximum cumulative, aggregate amount of $500,000, less the amount of any retainer or other deposit or security held by any Professional at the time the notice of an Event of Default is issued. If during the Pre-Default Period the Debtors make one or more requests in writing to the DIP Agent that the DIP Agent and the DIP Lenders increase the Carve-Out Amount applicable during the Pre-Default Period by not more than 10% in any single request, specifying the proposed new Carve-Out Amount for that period and the reasons for the requested increase, and the DIP Agent in its discretion does not object to the request within five business days after receipt of the request, the Carve-Out Amount for the Pre-Default Period will increase to the amount so requested by the Debtors. <br><br> The Carve-Out cannot be used to pay Allowed Professionals Fees for the prosecution of any claims or causes of action against BoA, in its capacity as issuer of the Existing Letters of Credit and lender under the Epayables Program the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders. <br><br> **See** **Int. DIP Ord., at ¶¶ 6, 7.** |

### Provisions to Be Highlighted Pursuant to Local Rule 4001-2

8. The Debtors believe the following provisions of the DIP Credit Agreement and/or Interim DIP Order must be highlighted (the "Highlighted Provisions") pursuant to Local Rule 4001-2:[6]

    a. *Waiver of Section 506(c) Rights*. Subject to the Carve-Out, and entry of the Final DIP Order, no expenses of administration will be charged against

---

[6] In accordance with Local Rule 4001-2(a)(i), the Debtors has provided a separate justification for each Highlighted Provision under the "Basis for Relief" heading below.

or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code. <u>See</u> Interim DIP Order, at ¶ 11.

b.     *<u>Roll-Up of Prepetition Obligations</u>*. The DIP Facility contemplates the immediate roll-up of the Prepetition Obligations, subject to the terms and conditions of the DIP Credit Agreement. <u>See</u> DIP Credit Agreement, at ¶ 5.2.

c.     *<u>Validity, Perfection and Amount of Prepetition Obligations</u>*. Subject to an investigation period, as applicable, the proposed Interim DIP Order contains certain findings of fact that would bind parties in interest with respect to the existence, validity or amount of the Prepetition Obligations. <u>See</u> Interim DIP Order, at ¶¶ D, E, F, G, H, 9.

9.     As illustrated below, these provisions are commonly found in debtor-in-possession financing agreements of this nature. The Debtors also note that the DIP Lenders would not have agreed to provide financing to the Debtors absent such provisions.

<u>Preliminary Statement</u>

10.     As set forth in greater detail in the First Day Declaration, the Debtors are the world's largest single site retailer of recreational vehicles ("<u>RVs</u>"). As has been widely reported, the U.S. economy is ensconced in the deepest recession in decades, compounded by continuing mortgage defaults, depressed real estate prices, falling equity value, illiquid credit markets, rising unemployment and depleted consumer wealth and confidence. There is no doubt that this recent economic turmoil has had an adverse impact on the RV industry, where sales volume is directly related to consumer confidence and discretionary spending. According to the Statistical Surveys, Inc., total industry-wide sales of new RVs decreased 26.8% from 308,447 units sold in 2007 to 225,541 units sold in 2008, with Class A motor home sales having decreased 44.5%, Class C motor home sales having decreased 36.9%, conventional travel trailer sales having decreased 24.1% and fifth-wheel towable sales having decreased 21.7%. In line with industry trends, in 2008, the Debtors sold 2,284 new vehicles (a decrease of 28% from 2007) and 2,642 used vehicles (a decrease of 24% from 2007).

8

11.     Against this backdrop, and as more fully-discussed in the First Day Declaration, once it became clear that the Debtors would not be able to complete an out-of-court alternative within the timeframe necessary to address pressing liquidity issues, the Debtors commenced these Chapter 11 Cases to effectuate the terms of their Prepackaged Plan (as defined below).

12.     In connection therewith, the Debtors bring this Motion to avert the immediate and irreparable harm the Debtors' estates would suffer without immediate access to additional funds to sustain going-concern operations and to fund the purchase of additional inventory.   In particular, the liquidity provided under the DIP Facility is urgently required to ensure the Debtors are able to continue ongoing business operations, preserve the value of estate assets, maintain favorable relationships with suppliers and customers, pay employees and satisfy other working capital and general corporate needs, among other things, all of which are necessary to maintain the value of the Debtors' business and, ultimately, effectuate a successful business reorganization.

13.     As discussed in greater detail below, except as otherwise set forth in the DIP Facility and the Interim DIP Order, the proposed DIP Facility will be provided by the Debtors' existing Prepetition Lenders on a superpriority administrative claim and first priority priming lien basis and the Prepetition Obligations will be rolled up into the DIP Facility.   The DIP Facility—the only reasonable financing alternative available to the Debtors at this time—is the culmination of extensive, arm's-length, good-faith negotiations and contains terms that are fair, reasonable and warranted under the circumstances.   Accordingly, for the reasons above-summarized and discussed more fully below, the Debtors respectfully submit that the DIP Facility should be approved on the terms proposed herein.

## Summary of The Debtors' Prepetition Debt Obligations

14. As discussed in detail in the First Day Declaration, as of September 2, 2009, the Debtors have total outstanding funded debt in the aggregate principal amount of $160.3 million, consisting of approximately $22 million in first lien bank debt, $137.8 million in unsecured bonds and approximately $493,600 of other debt obligations arising under or in connection with certain issued but undrawn standby letters of credit.

## A. Secured Bank Debt

15. Lazy Days is party to the Third Amended and Restated Credit Agreement, dated as of February 22, 2007 (as further amended, restated, supplemented or otherwise modified, the "Prepetition Credit Agreement"), by and among Lazy Days, as borrower, BoA, as administrative agent and collateral agent (in such capacity, the "Prepetition Agent"), and BoA and KeyBank National Association, each in their capacity as lenders (together, the "Prepetition Lenders"). The Prepetition Credit Agreement provides for financing consisting of (a) a $65 million floor plan credit facility (the "Floor Plan Facility") and (b) a $15 million revolving credit facility (the "Revolving Facility" and, together with the Floor Plan Facility, the "Prepetition Credit Facility"). As of the Petition Date, Lazy Days was not eligible to borrow under the Revolving Facility due to certain defaults thereunder.

16. The Floor Plan Facility allows Lazy Days to finance both new and pre-owned RV inventory.[7] Lazy Days' obligations under the Floor Plan Facility are collateralized by all vehicles purchased under the Prepetition Credit Agreement and all receivables generated from the sale of these vehicles. Principal is due upon the sale of the respective vehicle. Both the Floor Plan Facility and the Revolving Facility may be used by the Debtors for general working

---

[7] The entire Floor Plan Facility may be used to purchase new RVs, but only $26 million of the Floor Plan Facility may be used to purchase pre-owned inventory.

DB02:8906236.1

068731.1001

capital purposes. Lazy Days' obligations under Prepetition Credit Facility (collectively, the "Prepetition Obligations") are collateralized by a first priority perfected security interest in and lien on any and all of Lazy Days' assets, subject to certain exceptions, and are guaranteed by RV Acquisition and LD Holdings.

17.     As of the Petition Date, the outstanding principal amount due under the Floor Plan Facility was approximately $22 million. As of the Petition Date, the Revolving Facility was not drawn upon and approximately $493,600 is issued and outstanding under letters of credit (the "Existing Letters of Credit").[8]

**B.     Senior Unsecured Notes**

18.     Lazy Days is party to that certain Indenture, dated May 14, 2004 (the "11.75% Senior Notes Indenture"), by and between Lazy Days and The Bank of New York Mellon, as trustee (the "Indenture Trustee") for the Holders of the 11.75% Senior Notes (the "Noteholders"). Pursuant to the 11.75% Senior Notes Indenture, Lazy Days issued through a private placement $152 million in aggregate principal amount of its 11.75% Senior Notes due 2012 (the "11.75% Senior Notes"). On December 6, 2004, Lazy Days successfully completed an exchange of $137 million of its 11.75% Senior Notes. The remaining $15 million of 11.75% Senior Notes was not eligible for exchange. The 11.75% Senior Notes are unsecured obligations of Lazy Days. As of the Petition Date, approximately $137.8 million in aggregate principal amount of 11.75% Senior Notes remains outstanding. The 11.75% Senior Notes rank equally in right of payment with all existing unsecured debt of Lazy Days and junior to all existing secured debt of Lazy Days to the extent of the value of the liens securing such obligations.

---

[8]     The Existing Letters of Credit are used to support the Debtors' potential obligations under certain insurance policies and operating utilities.

**Proposed Postpetition Financing**

19.     As previously stated, the Debtors bring this Motion to forestall the immediate and irreparable harm that their estates likely would suffer if the Debtors do not have sufficient funds to run their business and continue operations during the pendency of the Chapter 11 Cases through the confirmation of the Prepackaged Plan (as defined below).  The highly-leveraged nature of the Debtors' balance sheet, compressed operating margins and unsuccessful refinancing efforts, all combined, have left the Debtors facing a liquidity crisis.   Moreover, the commencement of these Chapter 11 Cases has made the Debtors' need for additional working capital even greater, as the Debtors are unable to fund the purchase of additional inventory solely on cash from operations.

20.     It is not without significant effort taken to avoid a chapter 11 filing that the Debtors have commenced these Chapter 11 Cases.  Indeed, since the beginning of 2008, the Debtors' management, with the help of advisors and other professionals, has been working with the Debtors' lenders and other constituencies to cut costs, restructure their business operations and address operational cash shortfalls.

21.     During the several months leading up to the Petition Date, the Debtors, together with their financial advisor and legal counsel, engaged in intensive negotiations with the Prepetition Agent and an informal committee of unaffiliated Holders of the 11.75% Senior Notes (the "Ad Hoc Noteholders Committee") to reach a consensual agreement on restructuring the Debtors' balance sheet through a prepackaged chapter 11 plan.  On September 4, 2009, the Debtors and the Ad Hoc Noteholders Committee executed a restructuring term sheet (a copy of which is attached to the Disclosure Statement as Exhibit D, the "Restructuring Term Sheet"), which sets forth the terms of the contemplated restructuring and includes the commitment of the members of the Ad Hoc Noteholders Committee to support the *Joint Prepackaged Plan of*

12

*Reorganization of Lazy Days' R.V. Center, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* (as the same may be amended from time to time, the "Prepackaged Plan").

22.     Pursuant to and consistent with the Restructuring Support Agreement, the DIP Lenders have agreed to provide the Debtors with up to $65 million in debtor-in-possession financing, up to $45 million of which will be provided upon entry of the Interim DIP Order. Of that amount, the Debtors propose to use approximately $22 million to repay the approximately $22 million outstanding under the Prepetition Credit Facility, i.e. the "roll-up", on an interim basis. The Debtors believe that this arrangement will meet their financing needs during the brief duration of these prepackaged Chapter 11 Cases. Specifically, the DIP Facility is designed to provide immediate liquidity to further the Debtors' operational restructuring, meet working capital needs and implement the Prepackaged Plan.

### Urgent Need for DIP Financing

23.     If this Motion is not approved and the Debtors do not obtain authorization to borrow under the DIP Credit Agreement, the Debtors will suffer immediate and irreparable harm. Without the funds available under the DIP Facility, the Debtors will not have the liquidity to conduct their business as a going concern. Since the Petition Date, the Debtors do not have access to funds under the Prepetition Credit Facility. Further, the Debtors do not have unencumbered cash. The Debtors urgently need funds to make payroll, vendor payments and other expenditures that are critical to their continued viability and ability to reorganize. In short, other than through the DIP Facility, the Debtors cannot obtain financing (secured or otherwise) to effectuate their Prepackaged Plan.

24.     Absent the DIP Facility, the Debtors may have to curtail or even terminate their business operations to the material detriment of creditors, employees and other parties in interest and it is likely the Debtors' restructuring would fail. Thus, the Debtors need to ensure that

working capital is available on an interim basis and throughout the pendency of these Chapter 11 Cases. The Debtors anticipate accessing the DIP Facility immediately for, among other things, the purchase of additional inventory and to satisfy other obligations necessary to demonstrate to their customers, suppliers and vendors sufficient capital to ensure ongoing operations in the ordinary course.

25. With respect to the roll-up, the DIP Lenders are unwilling to provide postpetition financing absent the immediate roll-up of the Prepetition Obligations, a condition that has been the subject of extensive negotiations. Given the Debtors' immediate liquidity needs discussed herein, the DIP Lenders' participation in postpetition financing is critical to preserving and enhancing the value of the Debtors' estates and thus the Debtors believe the roll-up on an interim basis is justified in light of the circumstances of these Chapter 11 Cases.

<u>**Basis for Relief**</u>

**I.      The DIP Facility Should be Approved Under Section 364(c) and 364(d)(1) of the Bankruptcy Code.**

26. As set forth above, the Debtors' ability to maximize the value of their estates hinges upon their being able to access postpetition financing. Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c).

27.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.  *See Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders).  Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (authorizing secured credit under section 364(c)(2), after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding refusal of two national banks to grant unsecured loans was sufficient to support conclusion that requirements of section 364 requirement had been met); *Ames*, 115 B.R. at 37-39 (holding that debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

28.     In evaluating postpetition financing proposed under section 364(c) of the Bankruptcy Code, courts generally agree that a qualitative analysis of the credit transaction should be applied, advocating the consideration of several factors, including whether:

a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.     the credit transactions are necessary to preserve assets of the estate; and

c.     the terms of the credit agreement are fair, reasonable, and adequate.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987).

29.     As described above, the proposed DIP Lenders, who are comprised of the same lenders as the Prepetition Lenders, are the natural source of postpetition financing for the Debtors. Moreover, as described in the Phillips Declaration, the population of lenders that provide the specialized form of secured financing used by the Debtors and other dealers of recreational vehicles in their normal course of operations—known as floor plan financing—is very limited, particularly in light of current credit market conditions. *See* Phillips Declaration at ¶ 7. Accordingly, despite the Debtors' and their advisors' attempts to solicit all known floor plan lenders with the funding capacity to meet the Debtors' anticipated financing needs, it was clear that the Debtors would be unable to procure satisfactory alternative financing on terms as good as, or better than, those provided by the Prepetition Lenders. *See id.* Accordingly, the Debtors respectfully submit that their efforts to obtain postpetition financing satisfy the requirements under section 364(c) of the Bankruptcy Code.

30.     Under section 364(d), Courts may also authorize postpetition credit secured by a senior or equal lien on encumbered property without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).

31.     Specifically, section 364(d)(1) provides, in relevant part, that a court, after notice and a hearing, may:

authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A)     the trustee is unable to obtain credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

32.     The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364 should be whether the transaction would enhance the value of the debtor's assets. Courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements that focuses on the transaction as a whole, not just on the priming liens.  *See, e.g., In re Aqua Assoc.*, 123 B.R. at 196 ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.").

33.     In furtherance of this approach, courts consider a number of factors, including, without limitation: (a) whether alternative financing is available on any other basis (e.g. whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business; (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and the proposed lenders; (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best

interest of the debtor's estate and its creditors.  *See Blans v. Farmworker Creditors*, 308 B.R. 109, 113-114 (S.D. Ga. 2003).  Each of these conditions has been met here.

**A.**     **The DIP Facility Represents the Best Financing Available.**

34.     As explained above, the Debtors were unable to obtain satisfactory alternative financing on terms as good as, or better than, those provided by the DIP Lenders.

**B.**     **The DIP Facility Is Necessary To Preserve the Assets of the Debtors' Estates During the Pendency of the Chapter 11 Cases.**

35.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets.  *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003).  In recognition of that duty, the Debtors have determined in the exercise of their sound business judgment, that the Prepackaged Plan will maximize the value of their assets and provide greater value to creditors and all parties in interest than would converting these cases from chapter 11 to chapter 7 at this time.

36.     To effectuate the Prepackaged Plan, however, the Debtors will require access to working capital in the form of postpetition financing during these Chapter 11 Cases.  Given the cyclical nature of the business, the timing of the DIP Facility coincides with the Debtors' projected use of cash in their operations and the build of inventory levels during the RV selling season, which typically begins right before the holidays, ramps up.  Additionally, the DIP Facility provides needed liquidity to ensure the Debtors can manage any trade contraction and inventory price swings during this seasonal period of cash use inherent to the RV supply sector. Thus, it is imperative for the Debtors to have the additional liquidity provided by the DIP Facility available to them in the upcoming months.  This will allow the company's management

team and advisors to refine and achieve their business plan and focus on emerging from chapter 11 as a reorganized going-concern enterprise as quickly as possible.

37.     The Debtors' inability to access financing and thereby generate revenues to adequately support their business would severely jeopardize their ability to consummate their restructuring plans.  Approval and implementation of the DIP Facility, in contrast, will enable continued functioning of the Debtors' operations in the ordinary course of business and permit the Debtors to effectuate their restructuring strategy for the benefit of all stakeholders.

**C.**     **The Terms of the DIP Facility Are Fair, Reasonable and Appropriate Given the Circumstances and Were Negotiated In Good Faith.**

38.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  Moreover, given current economic conditions, there are significant barriers to procuring financing, including debtor-in-possession financing or otherwise, and provisions once considered "extraordinary" in debtor-in-possession financing arrangements are, for the time-being, becoming more commonplace.  *See Transcript of Record* at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. February 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

39.     The DIP Credit Agreement was negotiated in good faith and at arm's-length between the Debtors and the DIP Lender, culminating in a carefully crafted agreement designed

to maintain the Debtors' business as a going concern and preserve value for parties in interest. Viewed in light of the circumstances surrounding the RV industry and the financial markets in general, the DIP Credit Agreement, including the Highlighted Provisions discussed below, reflects an exercise of the Debtors' sound business judgment and is consistent with their fiduciary duties and supported by fair consideration.

> **D.**     **The Debtors Have Exercised Their Business Judgment in Entering Into the DIP Facility.**

40.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

41.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.* , 762 F.2d 1303, 1311 (5th Cir. 1985).

DB02:8906236.1 068731.1001

42.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines*, 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

43.     As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Credit Agreement,  The DIP Credit Agreement contains terms that are the best available under the circumstances.

## II.     Modification of the Automatic Stay is Warranted.

44.     The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Credit Agreement), all rights and remedies provided for in the DIP Credit Agreement, and to take various actions without further order of or application to the Court.  However, the DIP Lenders must provide the Debtors and various other parties, including the U.S. Trustee and counsel to the Ad Hoc Noteholders Committee, with three (3) business days written notice prior to exercising any enforcement rights or remedies in respect of the Collateral or upon a shorter period of time after notice and a hearing.  Moreover, the Debtors and various other parties, including the U.S. Trustee and counsel to the Ad Hoc Noteholders Committee, may seek within the three (3) business days notice period an expedited

DB02:8906236.1                                                                                                    068731.1001

hearing before this Court solely for the purpose of considering whether, in fact, an Event of Default has occurred and is continuing. Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

## III. The DIP Facility Meets the Requirements of Local Rule 4001-2

45.     The following provisions of the DIP Credit Agreement are required to be identified in accordance with Local Rule 4001-2 and such provisions are justified and necessary in the context and circumstances of these Chapter 11 Cases.

### A. Section 506(c) Waiver

46.     Subject to entry of the Final DIP Order, the DIP Lenders have required that no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, be charged against or recovered from the DIP Lenders or any of their interests in the Collateral, pursuant to section 506(c) of the Bankruptcy Code (the "506(c) Waiver"). <u>See</u> Interim DIP Order, at ¶ 11.

47.     Section 506(c) of the Bankruptcy Code allows the estate to surcharge the collateral of a secured creditor to pay the reasonable and necessary costs and expenses of preserving or disposing of such creditor's collateral to the extent of any benefit received. *See* 11 U.S.C. § 506(c). In connection with the provision of debtor-in-possession financing, lenders commonly request a waiver of a debtor's ability to surcharge such lender's collateral.

48.     Here, the Debtors are not seeking the approval of the 506(c) Waiver on an interim basis but, rather, are seeking approval of this Highlighted Provision under the Final DIP Order pursuant to Local Bankruptcy Rule 4001-2(c). To that end, notice of this Motion and the Interim DIP Order entered hereon will be served on all parties in accordance with Local Rule 9013-1(m).

49.     This Court has authorized similar section 506(c) waivers in other instances.  *See, e.g., In re Source Interlink Cos.*, Case No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009); *In re Ez Lube LLC*, Case No. 08-13256 (CSS) (Bankr. D. Del. Jan 14, 2009); *In re CMC (f/k/a Cone Mills Corp.)*, Case No. 03-12944 (MFW) (Bankr. D. Del. Oct. 27, 2003); *In re Pillowtex Corp.*, Case No. 03-12339 (PJW) (Bankr. D. Del. Sept. 25, 2003). [9]

## B.     Roll-Up of Prepetition Obligations

50.     The DIP Facility contemplates a roll-up of approximately $22 million of indebtedness under the Prepetition Credit Facility on an interim basis.  <u>See</u> DIP Credit Agreement, at ¶ 5.2.  Understanding the extraordinary nature of roll-ups, the Debtors carefully considered the terms of the postpetition financing.  The Debtors believe the roll-up is justified on an interim and final basis because the Debtors would not have been able to secure the postpetition financing it needs to maintain and stabilize its business absent the roll-up.  Indeed, the DIP Lenders were unwilling to provide postpetition financing without the roll-up, a condition that has been the subject of extensive negotiations.

51.     As the obligations under the Prepetition Credit Agreement are fully-secured, the Debtors came to the conclusion that the roll-up of the Prepetition Obligations into the DIP Facility would only affect the timing of the repayment of the Prepetition Obligations, not their ultimate disposition.  Additionally, the refinancing of the Prepetition Obligations in connection with the Interim DIP Order will decrease the amount of interest expense payable by the Debtors in respect of the Prepetition Obligations that would otherwise be incurred absent interim relief.  Finally, the Interim DIP Order provides that the approval of the DIP Facility is without prejudice

---

[9]     Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders are available on request of the Debtors' counsel.

to the right of any official committee appointed in these Chapter 11 Cases, or other parties in interest, to contest or challenge the validity of the Prepetition Lenders' claims and liens.

52.     Courts in this district have previously approved debtor-in-possession financing agreements that provide for a roll-up of prepetition obligations. *See, e.g., In re Indalex Holdings Finance, Inc.*, Case No. 09-10982 (PJW) (Bankr. D. Del. May 1, 2009) (approving approximately $85.9 million debtor-in-possession credit facility that provided for the roll-up of approximately $72.4 million of obligations outstanding under the debtors' prepetition credit facility); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008) (approving debtor-in-possession credit facility providing for the roll-up of certain prepetition obligations); *In re Hoop Holdings Inc.*, Case No. 08-10544 (BLS) (Bankr. D. Del. Apr. 16, 2008) (same); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008) (same); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 21, 2006) (same).[10]

53.     Accordingly, the Debtors believe the proposed roll-up is appropriate under the circumstances and is justified on both an interim and final basis.

### C.     Validity, Perfection and Amount of Prepetition Obligations

54.     The proposed Interim DIP Order contains certain findings of fact that would bind parties in interest with respect to the existence, validity or amount of the Prepetition Obligations. Specifically, the Committee, if any, or other party in interest has until the earlier of (i) seventy five (75) days from the Petition Date, (ii) the confirmation objection deadline on the Prepackaged Plan and (iii) for any Committee, if formed, sixty (60) days from the date of such Committee's formation to investigate the validity, perfection, enforceability, extent of the

---

[10] Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders are available on request of the Debtors' counsel.

Prepetition Obligations, lender liability claims and causes of action, any actions, claims or defenses under chapter 5 of the Bankruptcy Code or any other claims or causes of action. If no objection or other action is timely-filed, all holders of claims and interests as well as other parties in interest shall be forever barred from bringing or taking any action and the Debtors' stipulations and acknowledgements will be binding on all parties in interest. <u>See</u> Interim DIP Order, at ¶ 9.

55. Local Rule 4001-2(a)(i)(B) requires explicit disclosure of provisions that seek to bind the estate or other parties in interest with respect to the validity, perfection or amount of a secured creditor's prepetition lien or the waiver of claims against such secured creditors without first giving parties in interest at least 75 days from the date of entry of the interim financing order (or the Committee 60 days from the date of formation). <u>See</u> Del. Bankr. L.R. 4001-2(a)(i)(B). Here, the Debtors submit they have complied with the Local Rule, including the time requirements set forth therein.

**IV. Interim Approval of Access to the DIP Facility Proceeds Should be Approved.**

56. The Court may grant interim relief in respect of a motion filed pursuant to section 363 and 364 of the Bankruptcy Code, such as this Motion, where such interim relief is "is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." <u>See</u> Fed. R. Bankr. P. 4001; Del. Bank. L.R. 4001-2(b). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449. Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate.

57. In this instance, it is essential that the Debtors immediately stabilize its operations and cash flow, which will maximize the potential for implementation of a successful plan of

reorganization and preserve the going concern value for all stakeholders. Given the Debtors' current cash constraints, however, the foregoing will not be possible unless the Debtors have immediate access to additional funds. Accordingly, the Debtors are requesting authority to have immediate access to the proceeds provided under the DIP Credit Agreement and subject to the terms and conditions of the Interim DIP Order.

58. Moreover, courts in this jurisdiction have granted similar relief in other chapter 11 cases. *See e.g., In re Smurfit-Stone Container Corporation*, No. 09-10235 (BLS) (Bankr. D. Del. Jan. 27, 2009) (allowing the debtors to borrow $550 million of a proposed $750 million DIP facility on an interim basis); *In re Broadstripe, LLC*, No. 09-10006 (CSS) (Bankr. D. Del. Jan. 6, 2009) (allowing the debtors to borrow $6 million of a proposed $15 million DIP facility on an interim basis); *In re SemCrude, L.P.*, No. 08-11525 (BLS) (Bankr. D. Del. Aug. 8, 2008) (allowing the debtors to borrow $150 million of a proposed $250 million DIP facility on an interim basis); *In re Pierre Foods, Inc.*, No. 08-11480 (KG) (Bankr. D. Del. July 16, 2008) (allowing the debtors to borrow $29 million of a proposed $35 million DIP facility on an interim basis); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 7, 2008) (allowing the debtors to borrow $20 million of a proposed $67 million DIP facility on an interim basis); *In re Leiner Health Prods. Inc.*, No. 08-10446 (KJC) (Bankr. D. Del. March 12, 2008) (allowing the debtors to borrow $20 million of a proposed $74 million DIP facility on an interim basis); *In re Wickes Holdings, LLC*, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008) (allowing the debtors interim access to $30 million DIP facility); *In re Tweeter Home Entm't Group, Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. June 12, 2007) (allowing the debtors to borrow $33 million of a proposed $60 million DIP facility on an interim basis); *In re Hancock Fabrics, Inc.*, No. 07-10353 (BLS) (Bankr. D. Del. March 21, 2007) (allowing the debtors to borrow $10 million of a

26

proposed $105 million DIP facility on an interim basis); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) (allowing the debtors to borrow $50 million of a proposed $300 million DIP facility on an interim basis); *In re J.L. French Auto. Castings, Inc.*, No. 06-10119 (MFW) (Bankr. D. Del. Feb. 13, 2006) (allowing the debtors to borrow $25 million of a proposed $50 million DIP facility on an interim basis).[11]

### **Request for Final Hearing**

59.     Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) and Local Rule 4001-2(c), the Debtors requests that the Court set a date for the final hearing that is as soon as practicable, but in no event later than thirty (30) days following the entry of the Interim DIP Order, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

### **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

60.     To implement the relief requested herein successfully, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h), as applicable.

### **Notice**

61.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the DIP Agent and the Prepetition Agent; (d) the indenture trustee for the Debtors' 11.75% Senior Notes; (e) counsel to the Ad Hoc Noteholders Committee; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission.  Notice of the Motion and

---

[11]     Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders are available on request of the Debtors' counsel.

any order entered in connection with the Motion will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **No Prior Request**

62.     No prior motion for the relief requested herein has been made to this or any other court.

DB02:8906236.1

068731.1001

WHEREFORE, for the reasons set forth herein, the Debtors respectfully requests that the Court enter the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other and further relief as the Court deems appropriate.

Dated:  November 5, 2009
       Wilmington, Delaware

*Edmon L. Morton*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Robert S. Brady (Bar No. 2847)
Edmon L. Morton (Bar No. 3856)
1000 West Street, 17th Floor
PO Box 391
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253

- and -

**KIRKLAND & ELLIS LLP**
David L. Eaton (*pro hac vice* admission pending)
300 North LaSalle Drive
Chicago, Illinois  60654
Telephone:    (312) 862–2000
Facsimile:    (312) 862–2200

- and -

**KIRKLAND & ELLIS LLP**
Jennifer L. Marines (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022–4611
Telephone:    (212) 446–4800
Facsimile:    (212) 446–4900

Proposed Attorneys for the Debtors and Debtors in Possession