# EXHIBIT B

LD HOLDINGS, INC.
RV ACQUISITION, INC.
LDRV HOLDINGS CORP.
LAZY DAYS' R.V. CENTER, INC.


$65,000,000 FLOOR PLAN CREDIT FACILITY


_____


POST-PETITION CREDIT AGREEMENT


_____


DATED AS OF _____, 2009

# TABLE OF CONTENTS

SECTION 1.    THE FLOOR PLAN CREDIT; COLLATERAL ........................................................ 2

*Section 1.1. Floor Plan Credit* ................................................................................. 2
*Section 1.2. Letters of Credit* ................................................................................. 5
*Section 1.3.  Collateral* .......................................................................................... 7
*Section 1.4.  Super Priority; Nature of Secured Obligations and the Agent's Liens* ....... 7
*Section 1.5. Waiver* ............................................................................................... 9
*Section 1.6. Epayables Program* ............................................................................. 9

SECTION 2.  INTEREST AND CHANGE IN CIRCUMSTANCES .................................................. 11

*Section 2.1. Floor Plan Interest Rate* ...................................................................... 11
*Section 2.2. Intentionally Omitted* .......................................................................... 11
*Section 2.3. Default Rate* ...................................................................................... 11
*Section 2.4. Due Dates* ......................................................................................... 11
*Section 2.5. Computation of Interest* ...................................................................... 11
*Section 2.6. Interest on Borrowings to Fund Unfunded Approvals* ............................... 11
*Section 2.7. Change in Capital Adequacy Requirements* ............................................ 12
*Section 2.8 Limitation on Interest Charges* .............................................................. 12

SECTION 3.  FEES ..................................................................................................... 12

*Section 3.1. Fees* ................................................................................................. 12
*Section 3.2. Covenant Violation Fees* ...................................................................... 13
*Section 3.3. Origination Fee* .................................................................................. 13
*Section 3.4. Agent Fees* ........................................................................................ 13
*Section 3.5. Letter of Credit Fee* ........................................................................... 13

SECTION 4.    CONDITIONS TO LOANS ........................................................................ 13

*Section 4.1. Conditions Precedent to Initial Loans under Floor Plan Credit* ................. 13
*Section 4.2. Conditions to Subsequent Borrowing of Loans* ........................................ 18

SECTION 5. REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES ......................... 19

*Section 5.1. Organization; Power and Authority* ....................................................... 19
*Section 5.2. Authorization. Etc* ............................................................................... 20
*Section 5.3. Disclosure* ......................................................................................... 20
*Section 5.4. Affiliates* ........................................................................................... 21
*Section 5.5. Financial Statements* .......................................................................... 21
*Section 5.6. Compliance with Laws, Other Instruments, Etc* ...................................... 21
*Section 5.7. Governmental Authorizations, Etc* ........................................................ 22
*Section 5.8. Litigation; Observance of Agreements, Statutes and Orders* .................... 22
*Section 5.9. Taxes* ............................................................................................... 22
*Section 5.10. Title to Property; Leases* ................................................................... 23
*Section 5.11. Licenses, Permits, Etc* ...................................................................... 23
*Section 5.12. Compliance with ERISA* ..................................................................... 23

*Section 5.13. Intentionally Omitted* .................................................................25
*Section 5.14. Use of Proceeds; Margin Regulations* ...................................25
*Section 5.15. Existing Debt; Future Liens* ....................................................25
*Section 5.16. Foreign Assets Control Regulations, Etc* ..............................26
*Section 5.17. Status under Certain Statutes* .................................................26
*Section 5.18. Environmental Matters* ............................................................26
*Section 5.19. Collateral* ..................................................................................27
*Section 5.20. Insurance* ...................................................................................27
*Section 5.21. Patents, Trademarks, and Copyrights* ...................................27
*Section 5.22. Intentionally Omitted* ...............................................................28
*Section 5.23. Material Contracts* ...................................................................28
*Section 5.24. LDRV ESOP* ..............................................................................28
*Section 5.25. Intentionally Omitted* ...............................................................28
*Section 5.26. Employee and Labor Matters* .................................................28
*Section 5.27. Suppliers* ....................................................................................28
*Section 5.28. LDH Acquisition* ......................................................................29
*Section 5.29. LDH Purchase Documents* ......................................................29
*Section 5.30. Real Property Collateral* .........................................................29
*Section 5.31 Reorganization Matters* ............................................................30
SECTION 6.    REPRESENTATION AND ACKNOWLEDGMENTS OF EACH LENDER ...............30

SECTION 7.    INFORMATION AS TO COMPANY ..................................................30

*Section 7.1. Financial and Business Information* ........................................30
*Section 7.2. Officer's Certificate* ..................................................................35
*Section 7.3. Inspection* ....................................................................................35
SECTION 8.    PREPAYMENT OF NOTES; TERMINATION, ETC ............................36

*Section 8.1. Floor Plan Loan Voluntary Prepayments* ...............................36
*Section 8.2. Floor Plan Loan Mandatory Payments* ...................................36
*Section 8.3. Terminations* ...............................................................................37
*Section 8.4. Overadvances* ..............................................................................37
*Section 8.5. Place and Application of Payments* .........................................38
*Section 8.6. Weekly Settlement* ......................................................................39
*Section 8.7. Notations* ......................................................................................41
*Section 8.8. Redemption of Notes* ..................................................................41
SECTION 9.    AFFIRMATIVE COVENANTS ..........................................................41

*Section 9.1. Compliance with Law* ................................................................41
*Section 9.2. Insurance* ......................................................................................41
*Section 9.3. Maintenance of Properties, Environmental Matters, Etc* ......44
*Section 9.4. Payment of Taxes and Claims* ..................................................45
*Section 9.5. Corporate Existence, Etc* ..........................................................45
*Section 9.6. Inventory Location, Etc* .............................................................46
*Section 9.7. Taxes* .............................................................................................46
*Section 9.8. Landlord Consents; Mortgagee Acknowledgements* ...............47

*Section 9.9. Real Property Collateral* ..................................................................48
*Section 9.10. Use of Proceeds* ........................................................................48
*Section 9.11. Consignment Units* .....................................................................48
*Section 9.12. Repurchase Agreements* ..............................................................49
*Section 9.13. Purchase Option* .......................................................................49
SECTION 10.    NEGATIVE COVENANTS ..................................................................49

*Section 10.1. Name Change* ...........................................................................49
*Section 10.2. Intentionally Omitted* .................................................................49
*Section 10.3. Intentionally Omitted* .................................................................49
*Section 10.4. Current Ratio* ..........................................................................49
*Section 10.5. Limitation on Capital Expenditures* ...............................................49
*Section 10.6. Compensation; Management Fees* ..................................................49
*Section 10.7. Accounts Payable* ......................................................................50
*Section 10.8. Limitations on Debt* ...................................................................50
*Section 10.9. Limitation on Liens* ....................................................................50
*Section 10.10. Distributions* ..........................................................................52
*Section 10.11. Restricted Investment* ...............................................................52
*Section 10.12. Merger, Consolidation, Etc* .........................................................52
*Section 10.13. Sale of Assets* .........................................................................52
*Section 10.14. Issuance of Common Stock* .........................................................52
*Section 10.15. Sale-and-Leasebacks* .................................................................53
*Section 10.16. Prohibition of Change in Fiscal Year and Accounting Methods* ...........53
*Section 10.17. Sale or Discount of Receivable* ....................................................53
*Section 10.18. Subsidiaries* ...........................................................................53
*Section 10.19. Partnerships, Joint Ventures and LLCs* ..........................................53
*Section 10.20. Margin Securities* .....................................................................53
*Section 10.21. Payments of Debt* .....................................................................53
*Section 10.22. No Amendment of Articles of Incorporation or By-Laws* ....................54
*Section 10.23. Guaranties* .............................................................................54
*Section 10.24. Amendments to Other Documents* ................................................54
*Section 10.25. Transactions with Affiliates* ........................................................54
*Section 10.26. Line of Business* ......................................................................54
*Section 10.27. Termination of Pension Plans* ......................................................54
*Section 10.28. Collateral Base* ........................................................................55
*Section 10.29  Minimum EBITDA* ....................................................................55
*Section 10.31 Pre-Petition Indebtedness* ...........................................................55
*Section 10.32. Repayment of Indebtedness* ........................................................56
*Section 10.33. Chapter 11 Claims* ....................................................................56
SECTION 11.    EVENTS OF DEFAULT ...................................................................56

SECTION 12.    REMEDIES ON DEFAULT, ETC..........................................................61

*Section 12.1. Intentionally Omitted* .................................................................61
*Section 12.2. Default*....................................................................................61
*Section 12.3. No Waivers or Election of Remedies, Expenses, Etc* ...........................62

iii

*Section 12.4. Interest Upon Acceleration* ...................................................................62

*Section 12.5.  Effect of Termination*.........................................................................62

SECTION 13.     [INTENTIONALLY OMITTED] ...........................................................63

SECTION 14.     ACKNOWLEDGMENT AND CONSENT............................................63

SECTION 15.     EXPENSES, INDEMNITY, ETC .........................................................64

*Section 15.1. Transaction Expenses*...........................................................................64

*Section 15.2. General Indemnity*................................................................................64

*Section 15.3.    Pre-Petition Credit Agreement* ...........................................................65

*Section 15.4. Survival* ................................................................................................66

SECTION 16.     SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT66

SECTION 17.     AMENDMENT AND WAIVER ..........................................................66

*Section 17.1. Requirements*........................................................................................66

*Section 17.2. Solicitation of Lenders* .........................................................................67

*Section 17.3. Binding Effect, Etc* ...............................................................................67

SECTION 18.     NOTICES................................................................................................67

SECTION 19.     THE AGENT ..........................................................................................68

*Section 19.1. Appointment and Authorization* ...........................................................68

*Section 19.2. Rights as a Lender*................................................................................69

*Section 19.3. Standard of Care* ..................................................................................69

*Section 19.4. Costs and Expenses* ..............................................................................70

*Section 19.5. Indemnity*..............................................................................................70

*Section 19.6 Consultation with Experts* .....................................................................70

SECTION 20.     PARTICIPATIONS ...............................................................................70

SECTION 21.     MISCELLANEOUS ..............................................................................70

*Section 21.1. Successors and Assigns* .........................................................................70

*Section 21.2. Actions and Proceedings*.......................................................................71

*Section 21.3. Severability*...........................................................................................71

*Section 21.4. Construction*..........................................................................................71

*Section 21.5. Counterparts* .........................................................................................72

*Section 21.6. Payments Due on Non-Business Days* ...................................................72

*Section 21.7. Governing Law*......................................................................................72

*Section 21.8. Agreement of Lenders* ...........................................................................72

*Section 21.9. Waiver of Trial by Jury* .........................................................................72

*Section 21.10. Reproduction of Documents* ................................................................73

LD HOLDINGS, INC.
RV ACQUISITION, INC.
LDRV HOLDINGS CORP.
LAZY DAYS' R.V. CENTER, INC.
6130 LAZY DAYS BOULEVARD
SEFFNER, FLORIDA 33584

$65,000,000 Floor Plan Credit Debtor-In-Possession Facility

This POST-PETITION CREDIT AGREEMENT, dated as of _____, 2009 (this "*Agreement*"), is executed by and among LAZY DAYS' R.V. CENTER, INC., a Florida corporation, debtor, and debtor-in-possession (the "*Company*"), RV ACQUISITION, INC., a Delaware corporation, debtor, and debtor-in-possession, LD HOLDINGS, INC., a Delaware corporation, debtor, and debtor-in-possession, LDRV HOLDINGS CORP., a Florida corporation, debtor, and debtor-in-possession, BANK OF AMERICA, N.A., as Administrative Agent and as Collateral Agent, and BANK OF AMERICA, N.A., and KEYBANK NATIONAL ASSOCIATION (a national banking association), as Lenders.

The Agent, the Company, and the Lenders are parties to a Third Amended and Restated Credit Agreement, originally dated as of July 15, 1999, as amended and restated as of July 31, 2002, May 14, 2004, and February 22, 2007, and as subsequently amended January 14, 2008, April 14, 2008, August 30, 2008, September 1, 2008, and December 31, 2008 (the "*Pre-Petition Credit Agreement*"), pursuant to which the Lenders have made available to the Company a revolving floor plan credit facility in an aggregate amount of up to $80,000,000. On _____, 2009 (the "*Petition Date*"), the Company, its wholly owned subsidiary, LDRV Holdings Corp., and its parent companies, RV Acquisition, Inc., and LD Holdings, Inc., commenced Chapter 11 Case No. _____ (the "*Chapter 11 Cases*") by filing voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"). The Company, LD Holdings, LDRV Holdings, and RV Acquisition continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Company has requested that the Agent and the Lenders provide a debtor-in-possession revolving floor plan credit facility in an aggregate amount of $45,000,000, with a seasonal limit increase to $65,000,000 from October 1, 2009, through the earlier of the Termination Date or March 31, 2010, to replace the pre-petition revolving floor plan credit provided pursuant to the Pre-Petition Credit Agreement. The Company intends to utilize this credit facility to repay the outstanding Pre-Petition Indebtedness, to fund its purchases of Eligible Floor Plan Units during the pendency of the Chapter 11 Cases, and otherwise as provided in this Agreement.

References herein to the "*Agent*" shall be deemed to refer to the Administrative Agent, unless the context requires otherwise. Certain capitalized terms used in this Agreement are defined in <u>Schedule B</u>; references to a "*Schedule*" or an "*Exhibit*" are, unless otherwise specified, to a Schedule or an Exhibit attached to this Agreement. The Agent, the Lenders, and the Loan Parties agree as follows:

SECTION 1.        THE FLOOR PLAN CREDIT; COLLATERAL.

*Section 1.1. Floor Plan Credit.*    (a) *General Terms.* Subject to the terms and conditions hereof, each Lender severally agrees to extend a revolving line of credit (the "*Floor Plan Credit*") to the Company that may be utilized by the Company from time to time during the period from and including the Effective Date to but not including the Termination Date, at which time the commitments of the Lenders to extend credit under the Floor Plan Credit shall expire. The maximum aggregate amount of the Floor Plan Credit that each Lender agrees to extend to the Company shall be as set forth opposite such Lender's name on <u>Schedule A</u> hereto under the heading "*Floor Plan Commitment*", for the time periods specified on <u>Schedule A</u>, as such amount may be reduced pursuant hereto (collectively for all Lenders, the "*Floor Plan Commitments*"). The Floor Plan Credit shall be utilized by the Company solely for the purchase of new or used Floor Plan Units, to repay the Pre-Petition Indebtedness, and otherwise as expressly provided in this Agreement, and shall be in the form of loans (individually, a "*Floor Plan Loan*" and collectively, the "*Floor Plan Loans*"); *provided* that (a) the aggregate principal amount of Floor Plan Loans outstanding at any one time shall not exceed the Floor Plan Commitments (as the same may be increased or decreased pursuant to Section 1.1(g) and reduced pursuant to Section 8.3) minus the aggregate Unfunded Approved Amounts then outstanding, and (b) the aggregate principal amount of Floor Plan Loans then outstanding and representing Borrowings advanced against Eligible Used Floor Plan Units referred to in clauses (ii) and (iii) below shall not at any time exceed $20,000,000.

Each Borrowing of Floor Plan Loans shall be advanced against individual Floor Plan Units on a specific identification basis, with each Borrowing against an:

        (i)        Eligible New Floor Plan Unit to be equal to 100% of the face amount manufacturer invoice (including freight charges), as specified by the applicable manufacturer to the Agent of such Eligible New Floor Plan Unit;

        (ii)        Eligible Used Floor Plan Unit that is of the then current model year or the previous seven model years to be equal to the lesser of (x) the actual purchase price of such Floor Plan Unit and (y) 85% of the low wholesale value (as determined by reference to the most recently published National Automotive Dealers Association R.V. Industry Appraisal Guide or, if such guide is no longer published, such comparable report or source of information reasonably designated by the Agent) of such Eligible Used Floor Plan Unit; and

        (iii)        Eligible Used Floor Plan Unit that is of the previous eighth, ninth, or tenth model year to be equal to the lesser of (x) the actual purchase price of such Floor Plan Unit, and (y) 65% of the low wholesale value (as determined by reference to the most recently published National Automotive Dealers Association R.V. Industry Appraisal Guide or, if such guide is no longer published, such comparable report or source of information reasonably designated by the Agent) of such Eligible Used Floor Plan Unit.

The Agent and the Lenders reserve the right to determine whether to finance a particular Floor Plan Unit and whether to finance Floor Plan Units of a particular manufacturer in their sole and absolute discretion.

(b) *Initial Loans.* On the date of the entry of the Interim Order (or any earlier date as may be permitted by the Bankruptcy Court), the Company shall be deemed to have requested, and each Lender agrees to make available, subject to the provisions of Section 4.1, Floor Plan Loans in an amount equal to the outstanding Pre-Petition Indebtedness on that date to pay those obligations in full, and those Floor Plan Loans shall be deemed to have been advanced against the same Floor Plan Units against which the Pre-Petition Indebtedness was advanced. After the foregoing payment in full of the Pre-Petition Indebtedness, the Pre-Petition Credit Agreement and all Obligations (as defined in the Pre-Petition Credit Agreement, but excluding any indemnity and reimbursement obligations) will be deemed satisfied and terminated in full.

(c) *Floor Plan Notes.* Each Borrowing of Floor Plan Loans shall be made ratably by the Lenders in accordance with their Percentages of the Floor Plan Commitments. The obligations of the Lenders hereunder to make Floor Plan Loans are several and not joint, and no Lender shall under any circumstances be obligated to extend credit under the Floor Plan Credit in excess of its applicable Floor Plan Commitment. All Floor Plan Loans made by a Lender shall be made against and evidenced by a single promissory note of the Company in the form (with appropriate insertions) attached hereto as <u>Exhibit 1.1A</u> (individually, *a "Floor Plan Note"* and, collectively, the *"Floor Plan Notes"*), payable to the order of such Lender in the maximum principal amount of its Floor Plan Commitment. Each Floor Plan Note shall be dated the date of issuance thereof, be expressed to bear interest as set forth in Section 2, and be expressed to mature on the Termination Date. Without regard to the principal amount of each Floor Plan Note stated on its face, the actual principal amount at any time outstanding and owing by the Company on account of such Floor Plan Note shall be the sum of all advances then or theretofore made thereon less all payments of principal actually received. During the period from and including the Effective Date to but not including the Termination Date, the Company may use the Floor Plan Commitments by borrowing, repaying, and reborrowing Floor Plan Loans in whole or in part, all in accordance with the terms and conditions of this Agreement. No Loan Party other than the Company may request or receive any Floor Plan Loans.

(d) *Manner and Disbursement of Floor Plan Loans.* The Company shall give written or telephonic notice to the Agent (which notice shall be irrevocable once given and, if given by telephone, shall be promptly confirmed in writing) by no later than 11:00 a.m. (New York, New York time) on the Business Day before the date the Company requests that any Borrowing of Floor Plan Loans be made to it under the Floor Plan Commitments. The Agent shall administer all such requests in accordance with the terms of Section 8.6 and shall promptly notify each Lender of the Agent's receipt of each such notice with respect to which the Agent is requesting each Lender to fund its Percentage. Each such notice shall specify the date of the Borrowing of Floor Plan Loans requested (which must be a Business Day), the amount of such Borrowing, and the amount of such Borrowing to be loaned by such Lender; *provided* that the date of each Borrowing must be a Business Day. An Approved Vendor may contact the Agent directly for approval to fund the Company's obligation under a purchase order submitted by the Company to the Agent under its direct floor plan funding program, and the Agent is hereby authorized to

3

arrange on the Company's behalf for a Borrowing of Floor Plan Loans from the Lenders to pay the relevant invoice in full, which Borrowing will be made as directed by the Approved Vendor upon the Company's written confirmation to the Agent of receipt and satisfactory inspection of the relevant Eligible New Floor Plan Units. The Loan Parties agree that the Agent may rely upon any written or telephonic notice given by any person the Agent in good faith believes is an Authorized Representative or an Approved Vendor without the necessity of independent investigation and, in the event any telephonic notice conflicts with the written confirmation, such telephonic notice shall govern if the Agent and the Lenders have acted in reliance thereon. Subject to the provisions of Section 4, the proceeds of each Borrowing of Floor Plan Loans shall be made available as follows: (i) if such Borrowing is being applied to the purchase price for Eligible New Floor Plan Units, such proceeds shall be advanced directly by the Agent to the manufacturer or vendor of such inventory; and (ii) if such Borrowing is being applied to the purchase of Eligible Used Floor Plan Units, such proceeds shall be made available to the Company by wire transfer or ACH deposit to the Operating Account (or such other location as the Company and the Agent may mutually agree), upon receipt by the Agent from each Lender of its Percentage of such Borrowing (if applicable to such Borrowing).

(e)     *Agent Advances.*  In accordance with Section 1.1(d) and with the terms and conditions of this Agreement, including, without limitation, Section 4 and Section 8.6, the Agent may, in its sole discretion without conferring with the Lenders but on their behalf, make Floor Plan Loans to the Company in amounts requested by the Company. Any such Floor Plan Loan so funded by the Agent shall be deemed a Floor Plan Loan made by the Agent under its Floor Plan Commitment. Each Lender's obligation to fund its portion of any such Floor Plan Loan made by the Agent will commence on the date such Floor Plan Loan is actually so made by the Agent. However, until the date on which the Settlement of such Floor Plan Loan is required in accordance with Section 8.6 hereof, such obligation of the Lender shall be satisfied by the Agent's making of such Floor Plan Loan. The Company and the other Loan Parties acknowledge and agree that the making of such Floor Plan Loans by the Agent under this Section 1.1(e) shall, in each case, be subject in all respects to the provisions of this Agreement as if each such Floor Plan Loan were made in response to a notice requesting such Borrowing made in accordance with Section 1.1(d), including, without limitation, the limitations set forth in Section 1.1 and the requirements of Section 4.2. All actions taken by the Agent pursuant to the provisions of this Section 1.1(e) shall be conclusive and binding on each Loan Party. Notwithstanding anything herein to the contrary, before the Settlement with any Lender of any Floor Plan Loan funded by the Agent under this Section 1.1(e), interest payable on such Floor Plan Loan otherwise allocable to such Lender shall be for the sole account of the Agent and payment of principal on such Floor Plan Loan otherwise allocable to such Lender shall be for the sole account of the Agent.

(f)     *Payment of Agent Advances.*  If any amount due the Agent from a Lender to fund such Lender's Floor Plan Loan comprising part of any Borrowing as required by Section 1.1(d), or to effect the Settlement of any Floor Plan Loan as required by Section 8.6 hereof, is not in fact made available to the Agent by such Lender when due and the Agent has made such amount available to the Company, the Agent shall be entitled to receive such amount from such Lender forthwith upon the Agent's written demand, together with interest thereon in respect of each day during the period commencing on the date the amount was made available to the Company and ending on but excluding the date the Agent recovers such amount at a rate per annum equal to

the Federal Funds Rate plus .50% for each day as determined by the Agent (or in the case of a day that is not a Business Day, then for the preceding day); if such amount is not received from such Lender by the Agent immediately upon written demand, the Loan Parties will, on written demand, repay to the Agent the proceeds of such Floor Plan Loan attributable to such Lender with interest thereon at a rate per annum equal to the interest rate applicable to the relevant Floor Plan Loan.

(g)     *Seasonal Increase in Commitments.*     Each Lender's Floor Plan Commitment will temporarily increase as set forth on <u>Schedule A</u> on October 1, 2009, and remain in effect through March 31, 2010, and will temporarily increase again as set forth on <u>Schedule A</u> on October 1, 2010, and remain in effect through the Termination Date.

*Section 1.2. Letters of Credit.*     (a)     The Agent, Lenders, and the Loan Parties acknowledge that BOA has previously issued the Existing Letters of Credit on behalf of the Company.  The Agent and the Lenders have no obligation to issue any additional letters of credit during the term of this Agreement.  If BOA makes an L/C Disbursement under an Existing Letter of Credit, BOA immediately may draw from the L/C Security Account an amount equal to the L/C Disbursement plus any costs incurred by BOA in connection with the L/C Disbursement, without notice to or the consent of any Loan Party or any other Lender.  BOA acknowledges and agrees that any Existing Letter of Credit may be extended, at any time before the Termination Date, by BOA to a date no later than 12 months after the maturity date.  Each request for an amendment of an Existing Letter of Credit must (i) be made in writing by a Senior Financial Officer, (ii) be delivered to BOA via hand delivery, telefacsimile, or other electronic method of transmission at least fifteen (15) Business Days in advance of the requested amendment, (iii) be in form and substance satisfactory to BOA in its sole discretion, (iv) specifically identify the Existing Letter of Credit by number and beneficiary, (v) specify the date of the requested amendment, renewal, or extension of the Existing Letter of Credit, and (vi) include any other information necessary to amend the Existing Letter of Credit.

(b)     *Letter of Credit Security.*     As security for any obligations of BOA under the Existing Letters of Credit, the Company grants to BOA, solely for the benefit of BOA in its individual capacity, a first priority perfected security interest in and lien on the L/C Security Account.  On the Agreement Date, the Company shall deposit into the L/C Security Account cash in the amount of $518,280.00 (105% of the aggregate face amount of the Existing Letters of Credit).  The Company shall maintain the L/C Security Account with BOA, which will constitute a separate bank account to which the other Lenders and the Loan Parties will not have any access pursuant to the terms and conditions of the L/C Security Agreement.

Upon the expiration or termination of an Existing Letter of Credit and termination of all obligations of BOA under an Existing Letter of Credit, BOA shall transfer from the L/C Security Account to the Operating Account, to the extent available in the L/C Security Account, an amount equal to the face amount of the expired or terminated Existing Letter of Credit. Additionally, if an Existing Letter of Credit is returned to BOA or if the Loan Parties collateralize an Existing Letter of Credit with one or more back-to-back letters of credit, in an amount equal to 105% of the face amount of the Existing Letter of Credit, in form and substance and issued by a commercial bank reasonably satisfactory to BOA, BOA shall transfer from the

L/C Security Account to the Operating Account, to the extent available in the L/C Security Account, an amount equal to the face amount of the returned or collateralized Existing Letter of Credit. Once all the Existing Letters of Credit have expired or terminated (and all obligations of BOA with respect to those letters of credit have terminated), been returned to BOA, or have been collateralized as provided in this Section 1.2(b), BOA shall transfer all remaining funds in the L/C Security Account (less any costs incurred by BOA with respect to the Existing Letters of Credit that have not been paid to BOA) to the Operating Account and will close the L/C Security Account.

(c)    *Indemnification.*  Each Loan Party, jointly and severally, shall indemnify, save, defend, and hold BOA harmless from any loss, cost, expense, or liability, and attorneys fees incurred by BOA arising out of or in connection with any Existing Letter of Credit; provided, however, that the Loan Parties are not obligated to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of BOA. The Loan Parties shall be bound by BOA's interpretations of any Existing Letter of Credit, even though this interpretation might be different from the Loan Party's own interpretation, and the Loan Parties understand and agree that neither BOA nor any other Lender is liable for any error, negligence, or mistake, whether of omission or commission, in following any Loan Party's instructions or those contained in the Existing Letter of Credit or any modifications, amendments, or supplements thereto. The Loan Parties hereby acknowledge and agree that neither BOA nor any other Lender is responsible for delays, errors, or omissions resulting from the malfunction of equipment in connection with any Existing Letter of Credit.

(d)    *Changes.*  If by reason of (i) any change after the Agreement Date in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by BOA or any other Lender with any direction, request, or requirement (whether or not having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(A)    any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Existing Letter of Credit, or

(B)    there shall be imposed on BOA or any other Lender any other condition regarding any Existing Letter of Credit;

and the result of the foregoing is to increase, directly or indirectly, the cost to BOA or any other Lender of issuing, making, guaranteeing, or maintaining any Existing Letter of Credit or to reduce the amount receivable in respect thereof by BOA or any other Lender, then, and in any such case, BOA may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify the Company, and the Loan Parties, jointly and severally, shall pay on demand such amounts as BOA may specify to be necessary to compensate BOA or any other Lender for the additional cost or reduced receipt, together with interest on that amount from the date of its demand until payment in full thereof at the rate then applicable to Loans. The determination by BOA or any other Lender of any amount due pursuant to this Section, as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall,

in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

Section 1.3.  Collateral.

(a)    The Floor Plan Notes and the Loan Parties' other Obligations hereunder and under the Financing Documents will be secured respectively by the Security Documents and the Orders.  The Loan Parties' obligations with respect to the Existing Letters of Credit will be secured by the L/C Security Agreement.  The Loan Parties' obligations with respect to the Epayables Program will be secured by the Epayables Security Agreement.

(b)    The Loan Parties shall make such arrangements as shall be necessary or appropriate to assure that all proceeds of the Collateral are deposited (in the same form as received) in the Operating Account. Any proceeds of Collateral received by the Company or any other Loan Party shall be held by the Company or other Loan Party in trust for the Agent and the Lenders in the same form in which received, and shall be delivered immediately to the Collateral Agent, in the same form as received by the Loan Party (together with any necessary endorsement thereto), for deposit into that account.

(c)    The Liens and security interests granted to the Agent for the benefit of the Lenders pursuant to the Security Documents are in addition to all Liens conferred on the Agent for the benefit of the Lenders pursuant to the terms of the Orders.  The Liens and security interests granted to BOA pursuant to the L/C Security Agreement and Epayables Security Agreement are in addition to all Liens conferred on BOA pursuant to the terms of the Orders.

(d)    To the extent the Agent or any Lender is in possession of Collateral that was originally pledged as collateral security for the Pre-Petition Indebtedness, the Agent or the Lender shall continue to hold that Collateral as collateral security for both the Pre-Petition Indebtedness and the Secured Obligations, as approved by the terms of the Orders.

Section 1.4.  Super Priority; Nature of Secured Obligations and the Agent's Liens.

(a)    The priority of the Agent's Liens on the Collateral for the benefit of the Lenders shall be set forth in the Interim Order and the Final Order.

(b)    All Secured Obligations shall constitute administrative expenses of the Loan Parties in the Chapter 11 Cases, with administrative priority and senior secured status under Sections 364(a) and 364(d) of the Bankruptcy Code.  Subject to the applicable Carve-Out Amount, those administrative claims shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c) (to the extent and as provided in the Orders), 507(a), 507(b), 726, or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Loan Parties, the Loan Parties' respective estates, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code.  The Liens and security interests granted to the Agent on the Collateral for the benefit of the Lenders, and the priorities accorded to the Secured Obligations, shall have the priority and senior secured status afforded by

7

Sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Orders), senior to all claims and interests other than the Carve-Out up to the applicable Carve-Out Amount.

(c)     The Agent's Liens on the Collateral for the benefit of the Lenders and its administrative claims under Sections 364(c)(1) and 364(d) of the Bankruptcy Code granted in respect of the Secured Obligations also shall have priority over any claims arising under Section 506(c) of the Bankruptcy Code (to the extent and as provided in the Orders), subject only to the following fees and expenses (the *"Carve-Out"*):  (i) fees to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) subject in each case to a cumulative, maximum, aggregate amount equal the applicable Carve-Out Amount (defined below), unpaid and outstanding fees and disbursements actually incurred on or after the Petition Date by the Loan Parties' Professionals and professionals for any Committee (if any) appointed in the Chapter 11 Cases (collectively, the *"Case Professionals"*) and allowed by order of the Bankruptcy Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the *"Allowed Professional Fees"*).

For purposes of this Agreement, the *"Carve-Out Amount"* for Allowed Professional Fees incurred on and after the Petition Date through the earlier of (A) the effective date of the Reorganization  Plan or (B) the date the Agent issues a notice of an Event of Default to any of the Loan Parties (the *"Pre-Default Period"*) is a maximum, cumulative, aggregate amount of $2,000,000 and, after the Agent issues a notice of an Event of Default to any of the Loan Parties, is a maximum, cumulative, aggregate amount of $500,000, less the amount of any retainers, deposits, or other security held by any Case Professionals at the time the notice of an Event of Default is issued.  If, during the Pre-Default Period, the Loan Parties make one or more requests in writing to the Agent that the Agent and the Lenders increase the Carve-Out Amount applicable during the Pre-Default Period by not more than 10% in any single request, specifying the proposed new Carve-Out Amount for that period and the reasons for the requested increase, and the Agent in its discretion does not object to the requested increase within five Business Days after the Agent's receipt of the Loan Parties' request, the Carve-Out Amount for the Pre-Default Period will increase to the amount so requested by the Loan Parties.

Notwithstanding the foregoing, the Carve-Out Amount and Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Loan Parties or any Committee, in connection with any of the following: (A) an assertion, a joinder in, or the support of (but excluding any investigation conducted prior to the assertion or joinder in) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against BOA, the Agent, the Lenders, the Pre-Petition Agent, or the Pre-Petition Lenders, including without limitation, challenging the extent, amount, legality, validity, priority, perfection, or enforceability of, or asserting any offset, defense, or counterclaim to (1) the Secured Obligations or the security interests and Liens of BOA in respect of the Epayables Program and Existing Letters of Credit and the Agent in respect of the Secured Obligations, or (2) the Pre-Petition Floor Plan Loans, the Pre-Petition Credit Agreement, or the security interests and Liens of the Pre-Petition Agent and Pre-Petition Lenders in respect thereof, or asserting any claims or causes of action, including without limitation, any actions under Chapter 5 of the Bankruptcy Code against BOA, the Agent, the Lenders, the Pre-Petition Agent, or the Pre-

8

Petition Lenders; (B) a request to use Cash Collateral (as defined in Section 363 of the Bankruptcy Code) without the advance written consent of the Agent and the Lenders; (C) a request for authorization to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code other than from BOA and the Lenders, as the case may be, without the prior written consent of BOA or the Lenders; or (D) any act or omission to act adverse to BOA, the Agent, the Lenders, or their respective rights and remedies under this Agreement and the other Financing Documents or their interests in the Collateral that would, individually or in the aggregate, have a Material Adverse Effect.

Nothing in this Section 1.4(c) or otherwise constitutes or should be construed to constitute a consent by the Agent or any Lender to the allowance of any fees and expenses of the Case Professionals or any other person, and shall not affect the right of BOA, the Agent, and each Lender to object to the allowance and payment of those amounts.

Except as expressly set forth in this Agreement or the Final Order, (1) no other claims having a priority superior or *pari passu* to that granted to BOA by the Final Order with respect to the Existing Letters of Credit and the L/C Security Account shall be granted or approved while any of the Existing Letters of Credit are issued and outstanding, (2) no other claims having a priority superior or *pari passu* to that granted to BOA by the Final Order with respect to the Epayables Program and the Epayables Security Account shall be granted or approved while the Epayables Program is effective and the Company has any indebtedness or obligations outstanding with respect to the Epayables Program, and (3) no other claims having a priority superior or *pari passu* to that granted to the Agent and the Lenders by the Final Order shall be granted or approved while any of the Secured Obligations under this Agreement remain outstanding.

*Section 1.5. Waiver.* Upon the Effective Date, and on behalf of themselves and their estates, and for so long as any Secured Obligations are outstanding, the Loan Parties irrevocably waive any right, pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Secured Obligations and the Lien securing BOA's obligations under the Existing Letters or Credit, or to approve a claim of equal or greater priority than the Secured Obligations and BOA's obligations under the Existing Letters of Credit.

*Section 1.6. Epayables Program.* (a) The Agent, Lenders, and the Loan Parties acknowledge that BOA will permit the Company to participate in the Epayables Program during the term of this Agreement. Upon any default by the Company in connection with the Epayables Program, BOA immediately may terminate the Epayables Program in accordance with its terms, draw from the Epayables Security Account an amount sufficient to cure the default, without the consent of any Loan Party or any other Lender and without prior notice to any Loan Party or any other Lender, and otherwise exercise all remedies available to it under the Epayables Program and applicable law with respect to the breach or default. BOA will provide notice of any withdrawal from the Epayables Security Account to the Loan Parties and the other Lender on the day it makes a withdrawal from that account, but its failure to do so will not affect its right to withdraw the amount from the account or to otherwise exercise any of its rights or remedies under this Agreement, the Epayables Program, or otherwise.

9

(b)     *Epayables Security*.  As security for any obligations of BOA under the Epayables Program, the Company grants to BOA, solely for the benefit of BOA in its individual capacity, a first priority perfected security interest in and lien on the Epayables Security Account.  On the Agreement Date, the Company shall deposit into the Epayables Security Account cash in the amount of $700,000.00.  The Company shall maintain the Epayables Security Account with BOA, which will constitute a separate bank account to which the other Lenders and the Loan Parties will not have any access pursuant to the terms and conditions of the Epayables Security Agreement.

Upon the expiration or termination of the Epayables Program and termination of all obligations of BOA under the Epayables Program, BOA shall transfer from the Epayables Security Account to the Operating Account, to the extent available in the Epayables Security Account, all remaining funds in the Epayables Security Account (less any costs incurred by BOA with respect to the Epayables Program that have not been paid to BOA) to the Operating Account and will close the Epayables Security Account.

(c)     *Indemnification.*  Each Loan Party, jointly and severally, shall indemnify, save, defend, and hold BOA harmless from any loss, cost, expense, or liability, and attorneys fees incurred by BOA arising out of or in connection with the Epayables Program; provided, however, that the Loan Parties are not obligated to indemnify for any loss, cost, expense, or liability to the extent that it is caused by the gross negligence or willful misconduct of BOA.

(d)     *Changes.*  If by reason of (i) any change after the Agreement Date in any applicable law, treaty, rule, or regulation or any change in the interpretation or application thereof by any Governmental Authority, or (ii) compliance by BOA or any other Lender with any direction, request, or requirement (whether or not having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Federal Reserve Board as from time to time in effect (and any successor thereto):

(A)     any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of the Epayables Program, or

(B)     there shall be imposed on BOA or any other Lender any other condition regarding the Epayables Program;

and the result of the foregoing is to increase, directly or indirectly, the cost to BOA of maintaining the Epayables Program or to reduce the amount receivable in respect thereof by BOA or any other Lender, then, and in any such case, BOA may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify the Company, and the Loan Parties, jointly and severally, shall pay on demand such amounts as BOA may specify to be necessary to compensate BOA or any other Lender for the additional cost or reduced receipt, together with interest on that amount from the date of its demand until payment in full thereof at the rate then applicable to Loans.  The determination by BOA or any other Lender of any amount due pursuant to this Section, as set forth in a certificate setting forth

10

the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

SECTION 2.  INTEREST AND CHANGE IN CIRCUMSTANCES.

*Section 2.1. Floor Plan Interest Rate.*  Subject to all of the terms and conditions of this Section 2, the Company hereby promises to pay interest on the principal balance of the Floor Plan Loans from time to time outstanding hereunder at a per annum rate equal to the Adjusted LIBOR Rate or, if the Lenders determine that the LIBOR Rate at any time is unavailable, at a per annum rate equal to the Adjusted Prime Rate.  For purposes of this Agreement, (a) *"Adjusted LIBOR Rate"* means the total of the LIBOR Rate plus 5.00%, and (b) *"Adjusted Prime Rate"* means the total of the Prime Rate plus a margin to be determined by the Lenders from time to time in their sole discretion.

During each period in which the Adjusted LIBOR Rate applies to the Floor Plan Loans, that rate will be adjusted on the first day of each calendar month (the *"Adjustment Date"*) and remain fixed until the next Adjustment Date.  If the Adjustment Date in any particular month would otherwise fall on a day that is not a Business Day then, at the Agent's option, the Adjustment Date for that particular month will be the first Business Day immediately following thereafter.  Likewise, during each period in which the Adjusted Prime Rate applies to the Floor Plan Loans, that rate will be adjusted and take effect on the first day of the next billing cycle after the public announcement of a change in the Prime Rate.

*Section 2.2. Intentionally Omitted.*

*Section 2.3.  Default Rate.* During the existence of any Event of Default or after acceleration of the Loans pursuant to the terms of Section 12.2, the Company shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of all Loans outstanding hereunder at a rate per annum equal to the Overdue Rate.  Any increase of the applicable interest rate resulting from the operation of this Section 2.3 in connection with an Event of Default shall terminate as of the close of business on the date on which no Event of Default exists, unless payment of the Loans has been accelerated (in which case the Overdue Rate will continue to apply).

*Section 2.4. Due Dates.*   Interest on each Borrowing of Loans shall be payable not later than five Business Days after the date of each invoice therefor from the Agent to the Company and at maturity of the relevant Borrowing of Loans. While any Event of Default exists or after acceleration of the Loans, interest shall be paid on written demand of the Agent.

*Section 2.5. Computation of Interest.* All interest on the Floor Plan Notes shall be computed on the basis of a year of 360 days for the actual number of days elapsed.

*Section 2.6. Interest on Borrowings to Fund Unfunded Approvals.*   For purposes of computing interest on any Borrowing of Floor Plan Loans made at the request of the Company to an Approved Vendor in payment of an invoice subject to an Unfunded Approved Amount, interest on such Borrowing of Floor Plan Loans shall begin to accrue upon delivery of the Floor

11

Plan Unit to the Company and acceptance of that Unit by the Company, as evidenced by the "*Receipts Log*" sent to the Agent and the Lenders by the Company.

*Section 2.7. Change in Capital Adequacy Requirements.* If any Lender shall determine that the adoption after the Agreement Date of any applicable law, rule, or regulation regarding capital adequacy, or any change after the Agreement Date in any existing law, rule, or regulation, or any change after the Agreement Date in the interpretation or administration thereof by any Governmental Authority, central bank, or comparable agency charged with the interpretation or administration thereof, or compliance by such Lender (or any of its branches) or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on such Lender's or such corporation's capital, as the case may be, as a consequence of such Lender's obligations hereunder or for the credit that is the subject matter hereof to a level below that which such Lender or such corporation could have achieved but for such adoption, change, or compliance (taking into consideration such Lender's or such corporation's then existing policies with respect to liquidity and capital adequacy) by an amount deemed by such Lender to be material, then from time to time, within fifteen (15) days after written demand by such Lender, the Loan Parties, jointly and severally, shall pay to such Lender such additional amount or amounts reasonably determined by such Lender as will compensate such Lender for such reduction. The Lender's written demand must set forth in reasonable detail the Lender's calculation of the amount due and the assumptions upon which the calculation is based (which statement shall be deemed true and correct absent manifest error). In determining the amount due, a Lender may use any reasonable averaging and attribution methods.

*Section 2.8 Limitation on Interest Charges.* The Company, the Agent, and the Lenders intend to comply strictly with applicable law regulating the maximum allowable rate or amount of interest that the Lenders may charge and collect on the Loans. Accordingly, and notwithstanding anything in this Agreement to the contrary, the maximum aggregate amount of interest and other charges constituting interest under applicable law that is payable, chargeable, or receivable on the Loans under this Agreement is limited to the maximum amount of interest now allowed by applicable law or any greater amount of interest allowed because of a future amendment to existing law. The Company is not liable for any interest in excess of this maximum amount, and any excess interest charged or collected by a Lender will constitute an inadvertent mistake and, if charged but not paid, will be cancelled automatically, or, if paid, will be credited against the outstanding principal amount of the applicable Loan.

SECTION 3. FEES.

*Section 3.1. Fees.* So long as any Obligations or any Commitment to extend credit hereunder remains outstanding, the Company shall pay to the Administrative Agent such fees (including, without limitation, closing fees, administrative agent fees, and collateral inspection fees) payable in accordance with this Agreement and the other Financing Documents and such other fees as may from time to time be mutually agreed upon by the Company and the Agent or any such Lender; provided however, if no further Commitment to extend credit hereunder

remains outstanding and the only Obligations outstanding are unknown indemnification Obligations, the Company need not pay any of the fees required by Sections 3.2, 3.4 or 3.5.

*Section 3.2. Covenant Violation Fees.* The Company shall pay to the Agent, for the benefit of the Lenders, on written demand, from time to time, a fee equal to $25,000 per calendar month or portion thereof during which any Loan Party is in violation of any of its covenants in Section 10 of this Agreement. Payment and acceptance of the foregoing fees in no way waives any default or Event of Default triggered by any of the foregoing violations or affects or waives Lenders' or any of the Agents' respective rights to exercise all remedies under this Agreement and otherwise to which they are entitled.

*Section 3.3. Origination Fee.* On the Agreement Date, the Company shall pay to the Agent for the benefit of the Lenders a fee equal to $412,500 as consideration for the extension of the Floor Plan Loans under the terms and conditions of this Post-Petition Credit Agreement.

*Section 3.4. Agent Fees.* The Company shall pay to the Agent all administrative fees required in the Fee Letter and any other agreement executed by the Company and the Agent in connection with this Post-Petition Credit Agreement.

*Section 3.5. Letter of Credit Fee.* With respect to each Existing Letter of Credit, the Company shall pay to BOA, for its own account, an annual renewal fee equal to 2.0% per annum of the amount of the Existing Letter of Credit for the continuance of each Existing Letter of Credit. Upon the occurrence and during the continuation of an Event of Default, the foregoing Existing Letter of Credit fee will be increased to 4%. Nothing in this Section 3.5 or otherwise requires BOA to renew any Existing Letter of Credit, however, after and during the continuance of an Event of Default.

SECTION 4.    CONDITIONS TO LOANS.

*Section 4.1. Conditions Precedent to Initial Loans under Floor Plan Credit.* This Agreement and the obligation of each Lender to make the initial Loan to be made by it hereunder shall commence being effective and in force only on the date on which each of the following conditions precedent are fulfilled (or waived in writing by the Lenders) in all respects to such Lender's satisfaction before or on the Effective Date:

(a)      *Representations and Warranties.* The representations and warranties of each Loan Party in the Financing Documents, except in each case for those that relate specifically to an earlier date, shall be true and correct when made and on the Effective Date. The representations and warranties of the Company in the L/C Security Agreement and the Epayables Security Agreement shall be true and correct when made and on the Effective Date.

(b)      *Performance; No Default.* (i) Each Loan Party shall have performed and complied with all agreements and conditions contained in the Financing Documents required to be performed or complied with by it on or before the Effective Date, and (ii) after giving effect to this Agreement, no Default or Event of Default, violations, or other default shall have occurred under this Agreement or the Financing Documents as of the Effective Date.

13

(c)     *Compliance Certificates.*

(i)     *Officer's Certificate.* The Loan Parties shall have delivered to such Lender an Officer's Certificate from the Chief Financial Officer or Chief Executive Officer of each Loan Party, dated as of the Effective Date, certifying that the conditions specified in Sections 4.1(a) and 4.1(b) have been fulfilled or waived;

(ii)     *Secretary's Certificate.* The Loan Parties shall have delivered to such Lender a certificate from the Secretary of each Loan Party (A) certifying as to the resolutions of the Loan Party's board of  directors attached thereto and other corporate proceedings relating to the authorization, execution, and delivery of this Agreement, the other Financing Documents, and the documents specified in Section 4.1(p), with a certificate, certified by the respective corporation's Secretary, stating that all Governing Documents delivered in connection with the Pre-Petition Credit Agreement are still true and complete, (B) authorizing specific officers of the Loan Party to execute those documents, (C) attesting to the incumbency and signatures of the specific officers of the Loan Party, and (D) with respect to each Loan Party, an incumbency certificate that contains the name, title, and genuine signature of each Loan Party's Authorized Representatives.

(d)     *Opinion of Counsel.* The Agent and the Lenders shall have received opinions in form and substance satisfactory to them, dated as of the Agreement Date, from Kirkland & Ellis LLP, counsel for the Loan Parties, covering the matters set forth in Exhibit 4.1(d), and covering such other matters incident to the transactions contemplated hereby as such Lender or Lenders' legal counsel may request (and each Loan Party hereby instructs its counsel to deliver such opinion to the Agent and the Lenders).

(e)     *Loans Permitted By Applicable Law, Etc.*   On the Agreement Date and the Effective Date, the Loans made or to be made hereunder shall (i) be permitted by the laws and regulations of each jurisdiction to which such Lender is subject, (ii) not violate any applicable law or regulation (including, without limitation, Regulation T, U, or X of the Board of Governors of the Federal Reserve System), and (iii) not subject such Lender to any tax, penalty, or liability under or pursuant to any applicable law or regulation of any U.S. Governmental Authority, which law or regulation was not in effect on the Agreement Date. If requested by any Lender at least three (3) Business Days before the Agreement Date, such Lender shall have received an Officer's Certificate certifying as to such matters of fact as it may reasonably specify to enable such Lender to determine whether such Loan is so permitted.

(f)     *Financing Document.* Each of the Financing Documents, the Epayables Security Agreement, and the L/C Security Agreement shall be in full force and effect.

(g)     *Payment of Expenses.* Without limiting the provisions of Section 15.1, the Loan Parties shall have paid, or reimbursed the Lenders and the Agent for payment of, on or before the Effective Date, the reasonable fees, charges, and disbursements of Lenders' legal counsels, to the

14

extent reflected in a statement of such Person (or in connection with amounts to be reimbursed to the Lenders and the Agent, rendered by such Person or the Lenders and the Agent) or the Lenders and the Agent are satisfied, in their sole discretion, that those fees, charges, and disbursements will be paid on the Effective Date from the proceeds of the Loans made on the Effective Date.

(h)     *Lien Searches.* The Agent shall have received customary searches evidencing the absence of any other Liens on the Collateral or the collateral provided under the Guarantor Security Agreement, other than Permitted Liens.

(i)     *Changes in Corporate Structure.* The Loan Parties shall not have changed their respective jurisdictions of formation since February 22, 2007.  Additionally, since February 22, 2007, none of the Loan Parties shall have been a party to any merger, recapitalization, share exchange, or consolidation and shall not have succeeded to all or any substantial part of the liabilities of any other Person.

(j)     *Financial Statements, Etc.* The Company shall have delivered to the Lenders and the Agents all financial statements of the Loan Parties required by Section 7.1 of the Pre-Petition Credit Agreement.

(k)     *Closing Fees.* All of the Agents and the Lenders shall have received the payment of any fees required under this Agreement and the other Financing Documents.

(l)     *Proceedings and Documents.* All corporate and other proceedings in connection with the transactions contemplated by this Agreement and all documents and instruments incident to such transactions shall be satisfactory to the Agents, the Collateral Agent, and such Lender and Lenders' legal counsel shall have received all such counterpart originals or certified or other copies of such documents as it or they may reasonably request.

(m)     *Consents.*  The Agent and the Lenders shall have received any and all consents and approvals that may be necessary from any Person, including, without limitation, from the Bankruptcy Court, any Governmental Authority, or any other Person pursuant to a manufacturing supply or vendor agreement (including consents relative to changes in control) necessary or appropriate to consummate the transactions contemplated hereunder and under the other Financing Documents, the Epayables Security Agreement, and L/C Security Agreement and any and all applicable waiting periods have expired without any action being taken by any administrative, regulatory, or other Governmental Authority which restrains, prevents, limits, or imposes any materially adverse condition upon such transactions or any portion thereof.

(n)     *Insurance Broker's Opinion.*  The Agent and the Lender shall have received the broker's opinion required by Section 9.2(f), effective as of the Effective Date.

(o)     *Corporate Status.*  The Agent shall have received a certificate of status with respect to each Loan Party, dated within 10 days (which date may be reduced or extended at the discretion of the Lenders) of the Effective Date and issued by the appropriate officer of the

15

jurisdiction of organization of the Loan Party, indicating that the Loan Party is in good standing in that jurisdiction.

(p)    *Documents.*  The Agent shall have received each of the following documents, in form and substance reasonably satisfactory to the Agent and the Lenders, duly executed, and each such document shall be in full force and effect:

(i)    this Agreement;

(ii)    the Floor Plan Notes in the form of <u>Exhibit 1.1A</u> evidencing the amount of debt owed under each Floor Plan Note and representing and evidencing the additional advances made by each Lender under this Agreement and, in the aggregate evidencing the total maximum amount of the Floor Plan Credit Commitments;

(iii)    the Security Agreement;

(iv)    the Collateral Agency Agreement;

(v)    the Copyright Security Agreement;

(vi)    the Trademark Security Agreement;

(vii)    the Related Party Guaranty;

(viii)    the Guarantor Security Agreement;

(ix)    the Pledge Agreement, together with all promissory notes (including, without limitation, any intercompany promissory notes issued by any Subsidiary of a Loan Party) pledged thereunder, as well as allonges thereto or other appropriate instruments of transfer endorsed in blank;

(x)    the Collateral Assignment;

(xi)    the Mortgage;

(xii)    the Fee Letter;

(xiii)    the Intercompany Subordination Agreement;

(xiv)    the Epayables Security Agreement;

(xv)    the L/C Security Agreement;

16

(xvi)    the Global Settlement and Lease Assumption Agreement among the Company, the Landlord, and Wallace (and the Agent confirms its receipt of a copy of that fully executed agreement);

(xvii)    the Noteholder Estoppel Agreement; and

(xviii)    a commitment by a title company acceptable to the Agent, in its sole discretion, to issue a Mortgage Policy to the Agent in accordance with Section 9.9, together with all documents listed in the commitment that must be executed and delivered by the Company or the Landlord to the title company for the title company to issue the Mortgage Policy.

(q)    *Landlord's Agreement.*  The Agent shall have received the Landlord Agreement, duly executed by the Company and the Landlord in the presence of a notary, and a Memorandum of Estoppel Certificate, duly executed by the Company and the Landlord in the presence of a notary with respect to this Agreement and a Landlord Agreement, duly executed by the Company, LDRV Holdings Corp., and the Landlord in the presence of a notary, and a Memorandum of Estoppel Certificate, duly executed by the Company and the Landlord in the presence of a notary with respect to the proposed financing by the Agent and the Lenders upon the Loan Parties' exit from the Chapter 11 Cases.

(r)    *Inventory Reports.* Not less than one day before the Agreement Date, the Agent shall have received an inventory report of the Company, which inventory report shall be satisfactory in form and substance to the Agent, the facts assumed by the Agent with respect to the inventory report shall continue to be accurate, and the information given to the Agent in connection with the Company's assets and properties before the Effective Date shall not contain any untrue statements of a material fact or omit to state a material fact necessary to make such information not misleading;

(s)    *Bankruptcy Conditions.*

(i)    The Bankruptcy Court shall have entered the Interim Order, in form and substance satisfactory to the Agent and the Lenders, approving the transactions contemplated by this Agreement, the other Financing Documents, the Epayables Program and Epayables Security Agreement, and the L/C Security Agreement, and granting to the Agent, for the benefit of the Lenders, a first priority perfected Lien and security interest in the Collateral, subject only to the Carve-Out up to the Carve-Out Amounts, and granting to BOA a first priority perfected Lien and security interest in the L/C Security Account and in the Epayables Security Account;

(ii)    The Loan Parties shall have obtained appropriate orders from the Bankruptcy Court approving and ratifying the continued use of the cash management system used by the Loan Parties (including account no. 004890202640 maintained by Bank of America, N.A.); and

(iii)     The "first day" orders described in Exhibit 4.1(s) in form and substance satisfactory to the Agent and the Lenders shall have been entered in the Chapter 11 Cases, and the Agent shall have received copies of those orders (including a certified copy of the Interim Order).

(t)     *Collateral Base Certificate.*   The Agent must have received a Collateral Base Certificate prepared as of September 30, 2009, duly executed and delivered by a Senior Financial Officer.

(u)     *Miscellaneous.*   All other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to the Agent and the Lenders.

*Section 4.2. Conditions to Subsequent Borrowing of Loans.*   The obligation of each Lender to make each Loan under its Floor Plan Commitment is subject to the fulfillment or waiver in writing by the Lenders of the following conditions precedent:

(a)     the Agent shall have received the notice of Borrowing of such Loan required by Section 1.1(d);

(b)     after giving effect to such Loan, the aggregate principal amount of all Floor Plan Loans outstanding under this Agreement shall not exceed the amount of the Floor Plan Commitments;

(c)     after giving effect to such Loan, the aggregate principal amount of all Floor Plan Loans outstanding under this Agreement shall not exceed the Collateral Base as of the date of the proposed Loan;

(d)     the representations and warranties of each of the Loan Parties in the Financing Documents, except in each case for those that relate specifically to an earlier date, shall in each case be correct in all Material respects at the time such subsequent Loan is made;

(e)     each of the Loan Parties shall have performed and complied in all Material respects with all agreements and conditions contained in the Financing Documents required to be performed or complied with by it before or on the date of such subsequent Loan;

(f)     on the date of such Loan, such Lender's Loan shall (i) be permitted by the laws and regulations of each jurisdiction to which such Lender is subject, (ii) not violate any applicable law or regulation (including, without limitation, Regulation T, U, or X of the Board of Governors of the Federal Reserve System), and (iii) not subject such Lender to any tax, penalty, or liability under or pursuant to any applicable law or regulation of any U.S. Governmental Authority, which law or regulation was not in effect on the Agreement Date;

(g)     no Default or Event of Default shall have occurred and be continuing;

(h)     all corporate and other proceedings in connection with the transactions contemplated by this Agreement in connection with such Loans and all documents and instruments incident to such transactions shall be satisfactory to the Lenders (provided that (i) the Reorganization Plan shall be deemed satisfactory to the Lenders so long as it is not amended or modified in a manner that causes an Event of Default under Section 11(q)(ii) and (ii) any reorganization plan that is proposed by the Loan Parties or is confirmed by the Bankruptcy Court that provides for payment in full of the Secured Obligations and the termination of the Commitments, provides for the payment in full of all obligations owed by the Loan Parties with respect to the Epayables Program and the termination of all commitments of BOA to fund under the Epayables Program, provides for the termination, cancellation, and return to BOA of the Existing Letters of Credit, and provides that no further financing of the Loan Parties during or after the Chapter 11 Cases is to be provided by BOA, the Agent, or any of the Lenders in any manner, shall be deemed satisfactory to the Lenders), and the Lenders' legal counsel shall have received all such counterpart originals or certified or other copies of such documents as it or they may reasonably request; and

(i)     (i) the Bankruptcy Court shall have entered the Final Order on or before the date that is 30 days (which date may be extended for up to an additional 15 days at the discretion of the Lenders) after the Petition Date, (ii) the Bankruptcy Court shall have entered the Final Order following the expiration of the Interim Order, (iii) no Order shall have been vacated, reversed, modified, or amended in any respect in a manner determined by the Lenders, in their sole discretion, to be adverse to the interests of the Agent or the Lenders without the Lenders' written consent, (iv) no motion for reconsideration of any Order shall have been timely filed (unless waived in writing by the Lenders), and (v) no appeal of any Order shall have been timely filed, or if timely filed, such appeal has been dismissed, overruled, withdrawn, or resolved to the sole satisfaction of the Agent and the Lenders (unless the Agent and the Lenders waive the requirement).

The Company's request for any Loan shall constitute its warranty as to the matters specified in subsections (a) through (i), both inclusive, above.

SECTION 5. REPRESENTATIONS AND WARRANTIES OF THE LOAN PARTIES.

As of the Agreement Date, as of the Effective Date, and as of the date each subsequent Loan is made, each Loan Party, jointly and severally, makes the following representations and warranties to the Agent and each Lender:

*Section 5.1. Organization; Power and Authority.* (a) Each Loan Party is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, and is duly qualified as a foreign corporation and is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) and after giving effect thereto, each Loan Party has the corporate power and authority to own or hold under lease the properties it purports to own or hold under lease and to transact the business it transacts and

19

proposes to transact. Upon the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) and after giving effect thereto, to the extent provided in the Order, each Loan Party has the requisite corporate power and authority to execute and deliver the Financing Documents to which it is a party and to perform the provisions hereof and thereof.

(b) Upon the Effective Date, the only Debt of any Loan Party (including without limitation, off-balance sheet indebtedness) will be the liabilities of the Company under this Agreement, the Pre-Petition Credit Agreement, the Indenture, the New Notes, and the Debt listed on Schedule 5.15 of this Agreement.

*Section 5.2. Authorization. Etc.* Subject to the entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable) and after giving effect thereto, the Financing Documents (including this Post-Petition Credit Agreement), the Epayables Security Agreement, and the L/C Security Agreement have been duly authorized by all necessary corporate action on the part of the Loan Parties. Subject to entry by the Bankruptcy Court of the Interim Order and the Final Order, as applicable, and after giving effect thereto, the filing of the Chapter 11 Cases and the entry into this Agreement, the other Financing Documents, the Epayables Security Agreement, and the L/C Security Agreement executed by the Loan Parties constitute the legal, valid, and binding obligations of the Loan Parties enforceable against the Loan Parties in accordance with their respective terms.

*Section 5.3. Disclosure.* The representations in this Agreement, the Financing Documents, and the other documents, certificates, and other writings delivered to the Lenders by or on behalf of the Loan Parties in connection with the transactions contemplated hereby and the financial statements listed in Schedule 5.5, taken as a whole, are complete and do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made. The budget and other *pro forma* financial information contained in such materials are based upon good faith estimates and assumptions believed by the Loan Parties to be reasonable at the time made and the Loan Parties believe such estimates and assumptions continue to be reasonable, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results. Except as disclosed in Schedule 5.3 or 5.5, since July 31, 2009, there has been no change in the financial condition, operations, business, properties, or prospects of the Company except changes that individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, other than the filing of the Chapter 11 Cases. There is no fact known to any Loan Party (other than matters of a general economic nature and the filing of the Chapter 11 Cases) that could reasonably be expected to have a Material Adverse Effect that has not been set forth herein or in the other documents, certificates, and other writings delivered to the Lenders by or on behalf of the Loan Parties specifically for use in connection with the transactions contemplated hereby (including, without limitation, any Material reimbursement or indemnification of liabilities to any party under the Master Agreement). All lists of assets provided to the Agent or the Lenders by or on behalf of the Company will exclude all Consignment Units.

*Section 5.4. Affiliates.* Schedule 5.4 contains complete and correct lists and descriptions (a) of the Company's Affiliates (including without limitation, the authorized Stock of each Loan Party and its respective Subsidiaries, by class, all shareholders of each Loan Party and each Subsidiary, their respective ownership of equity securities of each Loan Party and each Subsidiary, and their respective jurisdiction of organization), and (b) of the directors and senior officers of each Loan Party. The Company has no Subsidiaries except LDRV Holdings, which (i) has no material assets and will not have any material assets during the term of this Agreement and (ii) will not conduct any business (except to further the implementation of the Reorganization Plan) or engage in any operations during the term of this Agreement. Except as set forth on Schedule 5.4, there are no Liens on the assets or property of LDRV Holdings. The sole assets of LDRV Holdings on the Agreement Date and the Effective Date are certain contract rights and the contracts listed on Schedule 5.4.

Other than as described on Schedule 5.4, there are no subscriptions, options, warrants, or calls relating to any shares of any Loan Party's capital Stock or any Loan Party's Subsidiaries' capital Stock, including any right of conversion or exchange under any outstanding security or other instrument. No Loan Party or any of its respective Subsidiaries is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital Stock or the capital stock of any Loan Party's Subsidiary or any security convertible into or exchangeable for any of its or its Subsidiary's capital Stock. All of the outstanding capital Stock of each such Loan Party and their respective Subsidiaries has been validly issued and is fully paid and non-assessable.

*Section 5.5. Financial Statements.* All of the financial statements listed on Schedule 5.5 and otherwise provided to the Agent or the Lenders by the Company (including in each case the related schedules and notes) fairly present in all material respects the financial position of the Loan Parties as of the respective dates specified in such financial statements and the results of its operations and cash flows for the respective periods so specified and have been prepared in accordance with GAAP consistently applied throughout the periods involved except as set forth in the notes thereto (subject, in the case of any interim financial statements, to normal year-end adjustments and the absence of footnotes) and except as set forth in Schedule 5.5.

*Section 5.6. Compliance with Laws, Other Instruments, Etc.* The execution, delivery, and performance by the Loan Parties of the Financing Documents will not, subject to the entry by the Bankruptcy Court of the Interim Order or the Final Order, as applicable, and after giving effect thereto, (a) contravene, result in any breach of, or constitute a default under, or result in the creation of any Lien (other than under the Security Documents, the L/C Security Agreement, and the Epayables Security Agreement) in respect of any Property of any Loan Party under, any indenture, mortgage, deed of trust, loan, purchase, or credit agreement, lease, corporate charter or bylaws, or any other agreement or instrument to which any Loan Party is a party or by which a Loan Party or any of its Properties may be bound or affected, other than the breach of one or more contracts which breaches individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, (b) conflict with or result in a breach of any of the terms, conditions, or provisions of any order, judgment, decree, or ruling of any court, arbitrator, or Governmental Authority applicable to a Loan Party, or (c) violate any provision of any statute or other rule or regulation of any Governmental Authority known to be applicable to any Loan

21

Party. Each Loan Party represents and warrants that Schedule 5.6 contains a true and correct description of all indentures, mortgages, deeds of trust, loan, purchase, or credit agreements, leases, corporate charters or bylaws, or any other agreement or instrument to which each Loan Party is a party or by which any of its Properties may be bound or affected post-petition which, in each case, is Material (excluding (i) Material contracts described in or referred to in Section 5.23 and (ii) retail sales contracts for the sale of recreational vehicles in the ordinary course of business and related insurance, warranty, and financing contracts between the Company and the purchaser of a recreational vehicle purchased in the ordinary course of business).

The issuance of the New Notes did not (A) contravene, result in any breach of, or constitute a default under, the Company's Amended and Restated Articles of Incorporation or Bylaws, or any other agreement or instrument to which it is a party, (B) conflict with or result in a breach of any of the terms, conditions, or provisions of any order, judgment, decree, or ruling of any court, arbitrator, or Governmental Authority applicable to the Company, or (C) violate any provision of any statute or other rule or regulation of any Governmental Authority applicable to the Company (including without limitation any applicable securities law).

*Section 5.7. Governmental Authorizations, Etc.* Except for the Interim Order or the Final Order, as applicable, and after giving effect thereto, no consent, approval, or authorization of, or registration, filing, or declaration with, any Governmental Authority is required in connection with the execution, delivery, or performance by the Loan Parties of the Financing Documents that has not been received before the Agreement Date, except for filings and recordings in respect of the Liens created pursuant to the Security Documents.

*Section 5.8. Litigation; Observance of Agreements, Statutes and Orders.*

(a)  There are no actions, suits, or proceedings pending or, to the knowledge of any Loan Party, threatened against or affecting any Loan Party or any of their respective Property in any court or before any arbitrator of any kind or before or by any Governmental Authority that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, other than the Chapter 11 Cases.

(b)      No Loan Party is in default under any term of any agreement or instrument to which it is a party or by which it is bound (except for its defaults under the New Notes, the Indenture, the Pre-Petition Credit Agreement, and defaults occasioned by the Chapter 11 Cases) or any order, judgment, decree, or ruling of any court, arbitrator, or Governmental Authority or in violation of any applicable law, ordinance, rule, or regulation (including without limitation Environmental Laws) of any Governmental Authority, which default or violation, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

*Section 5.9. Taxes.* Except as set forth on Schedule 5.9, each Loan Party has filed all federal tax returns and all other Material tax returns that are required to have been filed in any jurisdiction, and has paid all taxes shown to be due and payable on such returns and all other taxes and assessments levied upon it or its Properties, assets, income, or franchises, to the extent such taxes and assessments have become due and payable and before they have become delinquent, except for any taxes and assessments (a) the amount of which is not individually or

in the aggregate Material or (b) the amount, applicability, or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which the applicable Loan Party has established adequate reserves in accordance with GAAP. The Loan Parties know of no basis for any other tax or assessment that could reasonably be expected to have a Material Adverse Effect. The charges, accruals, and reserves on the books of each Loan Party in respect of Federal, state, or other taxes for all fiscal periods are adequate in all material respects.

Section 5.10. *Title to Property; Leases.* (a) All leases under which a Loan Party is lessee and that individually or in the aggregate are Material are valid and subsisting and are in full force and effect in all material respects. Each Loan Party enjoys peaceful and undisturbed possession under all leases Material to its business and to which it is party or under which it is operating.

(b)        Schedule 5.10 sets forth a complete and accurate list of the location, by state and street address, of all Real Property (whether owned or leased) of each Loan Party and, except as set forth on Schedule 5.10(b), each Loan Party has marketable title to, or a valid leasehold interest in, its personal property assets and marketable title to, or a valid leasehold interest in, its Real Property, in each case free and clear of all Liens other than Permitted Liens.

Section 5.11. *Licenses, Permits, Etc.* Except as a result of a deemed breach or default under any license agreement caused by the filing of the Chapter 11 Cases:

(a) each Loan Party owns or possesses all licenses, permits, franchises, authorizations, patents, copyrights, service marks, trademarks, and trade names, or rights thereto, without conflict with the rights of others, except such licenses, permits, franchises, authorizations, patents, copyrights, service marks, trademarks, and trade names, or rights thereto, as the failure to own or possess could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(b)        no item sold or produced by a Loan Party infringes in any respect any license, permit, franchise, authorization, patent, copyright, service mark, trademark, trade name, or other right owned by any other Person, except such infringements as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(c)        there is no violation by any Person of any right of any Loan Party with respect to any patent, copyright, service mark, trademark, trade name, or other right owned or used by any of them, except such violations as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.12. *Compliance with ERISA.* (a) Except for Plans listed on Schedule 5.12(a), none of the Loan Parties maintains or has any obligation to contribute to any Plan. Each Plan has been operated and administered in all material respects in accordance with its terms and in compliance with ERISA, the Code, and all other applicable laws. Except as could not reasonably be expected to have a Material Adverse Effect, with respect to any Plan intended to satisfy the requirements of Section 401(a) and related Sections of the Code, except as indicated on Schedule 5.12(a), the Internal Revenue Service ("*IRS*") has issued favorable determination letters to the effect that the forms of Plans satisfy the requirements of Section 401(a) and related Sections of

the Code and the trusts related to such Plans satisfy Section 501(a) and the related Sections of the Code or an application for such a determination has been filed with the IRS, and, there are no facts or circumstances that would jeopardize or adversely affect in any material respect the qualification under Code Section 401(a) of any such Plan. Neither the Loan Parties, nor any ERISA Affiliate, nor any trustee or plan administrator or other fiduciary of any Plan has incurred any liability pursuant to Title I (other than normal operating liabilities under a Plan) or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans (as defined in Section 3 of ERISA), and no event, transaction, or condition has occurred or exists that could reasonably be expected to result in the incurrence of any such liability by a Loan Party, any ERISA Affiliate, or any trustee or plan administrator or other fiduciary of any Plan, or in the imposition of any Lien on any of the rights, properties, or assets of any of the Loan Parties or any ERISA Affiliate, in either case pursuant to Title I or IV of ERISA or to such penalty or excise tax provisions of the Code or to Section 401(a)(29) or 412 or 4975 of the Code which liability or Lien, either individually or together with any other liability or Lien, could reasonably be expected to have a Material Adverse Effect. No lawsuits, claims, or complaints to or by any Person or Governmental Authority have been filed or, to the knowledge of any Loan Party, are contemplated or threatened, with respect to any Plan which either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

(b)  With respect to each Plan: (i) full payment has been made to each such Plan of all contributions that are required by each Loan Party or any ERISA Affiliate under the terms thereof and under ERISA or the Code to be made on or before the date hereof, (ii) no "*accumulated funding deficiency*" (as defined in ERISA Section 302 or Code Section 412), whether or not waived, exists with respect to any Plan, (iii) the present value of the aggregate benefit liabilities under each of the Plans, determined as of the end of such Plan's most recently ended plan year on the basis of the actuarial assumptions specified for funding purposes in such Plan's most recent actuarial valuation report, did not exceed the aggregate current value of the assets of such Plan allocable to such benefit liabilities and (iv) such actuarial assumptions have not been materially altered since the date of the most recent actuarial valuation report; except to the extent that any non-compliance with any provision of clauses (i) through (iii) above, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. The term "*benefit liabilities*" has the meaning specified in Section 4001 of ERISA and the terms "*current value*" and "*present value*" have the meaning specified in Section 3 of ERISA. Except as could not reasonably be expected to have a Material Adverse Effect, with respect to each Plan, (A) there has been no non-exempt prohibited transaction (as defined in Section 406 of ERISA or Section 4975 of the Code), (B) no fiduciary or trustee has any liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investments of the assets of the Plan, and (C) no action, investigation, suit, proceeding, hearing, or claim with respect to the assets of any Plan (other than routine claims for benefits) is pending or threatened, and the Loan Parties do not have any knowledge of any facts that would give rise to or could reasonably be expected to give rise to any claim, action, or suit.

(c)  No Loan Party nor any ERISA Affiliate currently sponsors, maintains, or has any obligations to contribute to or has ever sponsored, maintained, or had any obligations to contribute to any Multiemployer Plan.

(d)     Except for continuation coverage mandated by Section 4980B of the Code, and except as listed on Schedule 5.12(d), the Loan Parties do not have any post-retirement benefit obligations that are subject to Financial Accounting Standards Board Statement No. 106, that individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

(e)     *[Intentionally Omitted.]*

(f)     The making of the Loans contemplated by this Agreement will not involve any non-exempt transaction that is subject to the prohibitions of Section 406(a) of ERISA or in connection with which a tax could be imposed pursuant to Section 4975(c)(1)(A)-(D) of the Code. The representation by the Loan Parties in the first sentence of this Section 5.12(f) is made in reliance upon and subject to the accuracy of each Lender's representation in Section 6 as to the sources of the funds used by such Lender to make the Loans hereunder. For purposes of determining whether the representation in the first sentence in this Section 5.12(f) is correct on any date after the Effective Date, such representation in Section 6 shall be considered made by each Lender on such date and shall be considered accurate on such date.

(g)     None of the Loan Parties has withdrawn from any Plan (including any Multiemployer Plan) or permitted any employee benefit plan maintained by them or any of their predecessors in interest to be terminated if such withdrawal or termination would result in (i) withdrawal liability (as described in Part 1 of Subtitle E of Title IV of ERISA) in an amount that could reasonably be expected to have a Material Adverse Effect or (ii) the imposition of a Lien on any Property of a Loan Party pursuant to Section 4068 of ERISA.

Section 5.13. *Intentionally Omitted.*

Section 5.14. *Use of Proceeds; Margin Regulations.* The Company will apply the proceeds of the Floor Plan Loans for the payment of the outstanding Pre-Petition Indebtedness and, thereafter, (a) the purchase of Eligible New Floor Plan Units and Eligible Used Floor Plan Units, (b) making payments in respect of Adequate Protection, and (c) making other payments or funding other amounts expressly permitted by this Agreement, and may use the proceeds of Floor Plan Loans on Eligible Used Floor Plan Units for general working capital needs.  Margin stock will not on the Effective Date constitute more than 1% of the value of the assets of the Company and the Company does not have any present intention that margin stock will constitute more than 1% of the value of such assets. As used in this Section 5.14, the term "*margin stock*" shall have the meaning assigned to it in said Regulation U.  The Company shall not use any proceeds of any Floor Plan Loans to (i) make any distribution under a plan of reorganization in the Chapter 11 Cases or (ii) finance in any way any suit, action, motion, arbitration, proceeding, application, or other litigation of any kind adverse to the interest of the Agent, the Lenders, the Pre-Petition Agent, or the Pre-Petition Lenders or their rights and remedies under this Agreement, the other Financing Documents, the L/C Security Agreement, the Epayables Security Agreement, the Pre-Petition Credit Agreement and related documents, or the Interim Order or Final Order.

Section 5.15. *Existing Debt; Future Liens.* (a)  Schedule 5.15 sets forth a complete and correct list of all outstanding Debt of each Loan Party (other than the New Notes, the Indenture,

and the Pre-Petition Credit Agreement) as of the Agreement Date, since which date there has been no Material change in the amounts, interest rates, sinking funds, installment payments, or maturities of the Debt of the Loan Party, except as set forth on Schedule 5.15. As of the Agreement Date and as of the Effective Date, no Loan Party will be in default in the payment of any principal or interest on any Debt, except for defaults under the New Notes, the Indenture, the Pre-Petition Credit Agreement, and defaults occasioned by the filing of the Chapter 11 Cases, and no event or condition exists with respect to any Debt of any Loan Party, except for defaults under the New Notes, the Indenture, the Pre-Petition Credit Agreement, and defaults occasioned by the filing of the Chapter 11 Cases, that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Debt to become due and payable before its stated maturity or before its regularly scheduled dates of payment, except as set forth on Schedule 5.15.

(b)     No Loan Party has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its respective Property, whether now owned or hereafter acquired, to be subject to a Lien not permitted by Section 10.9.

*Section 5.16. Foreign Assets Control Regulations, Etc.*   Neither the making of the Loans contemplated by this Agreement nor the use of the proceeds of any of those Loans, will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

*Section 5.17. Status under Certain Statutes.* No Loan Party is an *"investment company"* registered or required to be registered under the Investment Company Act of 1940, as amended, or subject to regulation under the Interstate Commerce Act, as amended, or the Federal Power Act, as amended.

*Section 5.18. Environmental Matters.*   (a)     Except as specifically set forth in environmental audits prepared by EnviroAssessments, Inc. dated November 1993, by UST Environmental Services, Inc. dated March 18, 1994, and by ENVIRON International Corporation dated February 2004 and August 2006, copies of which have previously been delivered to the Collateral Agent, no claim or proceeding instituted or, to the knowledge of any Loan Party, threatened has been raising any claim against any Loan Party or any of its Real Properties now or formerly owned, leased, or operated by it or other assets, alleging any damage to the environment or violation of any Environmental Laws, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect;

(b)     There are no facts that would give rise to any claim, public or private, of violation of Environmental Laws or damage to the environment emanating from, occurring on, or in any way related to real properties now or formerly owned, leased, or operated by any Loan Party or to other assets or their use, except, in each case, such as could not reasonably be expected to result in a Material Adverse Effect;

(c)     No Loan Party has stored any Hazardous Materials on Real Properties now or formerly owned, leased, or operated by any of them or has disposed of any Hazardous Materials

26

in a manner contrary to any Environmental Laws, in each case in any manner that could reasonably be expected to result in a Material Adverse Effect;

(d)    All buildings on all real properties now owned, leased, or operated by each Loan Party are in compliance with applicable Environmental Laws, except where failure to comply could not reasonably be expected to result in a Material Adverse Effect; and

(e)    There are no Liens, nor has any Loan Party received notice of any potential Liens, arising under any Environmental Laws against any of the Real Properties owned, leased, or operated by it.

Section 5.19. *Collateral.* The Collateral (and the collateral described in the Guarantor Security Agreement, L/C Security Agreement, and the Epayables Security Agreement) is adequately described in and is subject to the respective Liens of the Security Documents, the L/C Security Agreement, and the Epayables Security Agreement, as the case may be. The L/C Security Agreement, Epayables Security Agreement, and each of the Security Documents, upon entry by the Bankruptcy Court of the Interim Order, creates a valid and enforceable Lien on and security interest in the collateral described in such Security Document, subject only to Permitted Encumbrances (as defined therein). All documents and instruments have been (or will on the Effective Date, or upon entry by the Bankruptcy Court of the Interim Order, be) recorded, filed for record, or delivered in such manner and in such places as required to establish such Liens and to perfect and preserve perfected Liens intended to be created thereby with the priority intended therefor and no further action (other than the filing of continuation statements as required by law) is (or will on the Effective Date be) required to maintain and preserve, or effectively to put third parties on notice of, such Liens. All taxes and filing fees that are required to be paid or are payable in connection with the execution, delivery, or recordation of such Liens have (or at or before the Effective Date or upon entry by the Bankruptcy Court of the Interim Order will have) been paid.  Other than the L/C Security Account and the Epayables Security Account, the only Deposit Account (as defined in the Security Agreement) maintained by any Loan Party is the Operating Account.  The Agent's Liens on the Collateral pursuant to the Financing Documents and BOA's Lien on the L/C Security Account and the Epayables Security Account pursuant to the L/C Security Agreement and the Epayables Security Agreement, upon entry by the Bankruptcy Court of the Interim Order and after giving effect thereto, are validly created, perfected first priority Liens, subject only to Permitted Liens.

Section 5.20. *Insurance.* The insurance required by the provisions of Section 9.2 and by the Security Documents is, or on the Effective Date will be, in force and all premiums due and payable in respect thereof have or will have been paid.

Section 5.21. *Patents, Trademarks, and Copyrights.* Schedule 5.21 hereto lists, as of the Agreement Date and as of the Effective Date, all patents, patent applications, trademark and service mark registrations and applications therefor, and copyright registrations and applications therefor owned or licensed by each Loan Party, and all license agreements for the same entered into by each Loan Party. Except as otherwise specifically provided in Schedule 5.21, the Loan Parties as of the Effective Date, will own, possess or, with respect to any license agreement, will have the valid right to use all such patents, patent applications, trademark, and service

registrations and applications therefor and copyright registrations and applications therefor necessary for the present and, as now contemplated, future conduct of its business, without any Material conflict with the rights of others.

Section 5.22. *Intentionally Omitted.*

Section 5.23. *Material Contracts.* Except as set forth in Schedule 5.23 and Schedule 5.6, there are no contracts individually Material to the business of the Loan Parties, other than retail sales, insurance, warranty, and finance contracts entered into between the Company and non-fleet purchasers of recreational vehicles in the ordinary course of business. Except as a result of the Chapter 11 Cases, each such Material contract (a) is in full force and effect and is binding and enforceable against the Loan Party that is a party to it, and, to the knowledge of the Loan Parties, all other parties to them in accordance with its terms, (b) has not been otherwise amended or modified, and (c) is not in default due to the actions of any Loan Party, or, to the knowledge of any Loan Party, any other party to the contract, except in the case of clauses (a), (b), and (c), as would not reasonably likely to result in a Material Adverse Effect.

Section 5.24. *LDRV ESOP.* The LDRV ESOP was terminated as of May 14, 2004, and all the assets of the LDRV ESOP have been distributed to its participants in accordance with applicable law. To the Company's knowledge, at all times, the LDRV ESOP and the LDRV ESOT, and to the Company's knowledge, each predecessor plan and trust, have complied with the applicable requirements of Sections 401(a)(22) and 409(e) of the Code, with respect to the rights of employee stock ownership plan participants to exercise participant voting rights with respect to employer securities.

Section 5.25. *Intentionally Omitted.*

Section 5.26. *Employee and Labor Matters.* Except as set forth on Schedule 5.26, there is (a) no unfair labor practice complaint pending or, to the knowledge of the Loan Parties, threatened against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending against any Loan Party that arises out of or under any collective bargaining agreement, (b) no strike, labor dispute, slowdown, stoppage, or similar action or grievance pending or, to the knowledge of the Loan Parties, threatened against any Loan Party, and (c) no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any of them. No Loan Party has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act or similar law that remains unpaid or unsatisfied. The hours worked and payments made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements. All material payments due from any Loan Party on account of workers compensation, wages, and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party.

Section 5.27. *Suppliers.* There exists no actual or, to the knowledge of the Loan Parties, threatened termination, cancellation, or limitation of, or modification to or change in, the business relationship between any Loan Party, on the one hand, and any supplier thereof or

distributor therefor, on the other hand, which termination, cancellation, limitation, modification, or change in any such case would, individually or in the aggregate, reasonably be likely to result in a Material Adverse Effect.

     *Section 5.28. LDH Acquisition.*  The LDH Acquisition was effected in accordance with the terms of the LDH Purchase Documents and all applicable law.  At the time of consummation of the LDH Acquisition, (a) all consents and approvals of, and filings and registrations with, and all other actions in respect of, all Governmental Authorities required in order to consummate the LDH Acquisition (including Hart Scott Rodino) were obtained, given, filed, or taken and were in full force and effect, and (b) no judgment, order, or injunction prohibiting or imposing any material adverse condition upon the consummation thereof existed.

     *Section 5.29.  LDH Purchase Documents.*  (a) The Company has delivered to the Lenders a true, complete, and correct copy, as of the Agreement Date, of each LDH Purchase Document, including all schedules and exhibits thereto and all agreements, instruments, or other documents evidencing or governing any Stock issued in connection with any LDH Purchase Document; (b) each LDH Purchase Document is the legal, valid, and binding obligation of each Loan Party that is a party thereto and, to the knowledge of the Loan Parties, each other Person that is a party thereto, enforceable against each Loan Party that is a party thereto and, to the knowledge of the Loan Parties, each other Person that is a party thereto, in accordance with its terms; and (c) none of the Loan Parties is in default of any of its obligations under any LDH Purchase Document to which it is a party, and, to the knowledge of the Loan Parties, no other party to any LDH Purchase Document is in default thereunder.

     *Section 5.30. Real Property Collateral.*  (a)  The use of the Real Property complies in all material respects with, and shall remain in compliance in all material respects with, all applicable statutes, rules, regulations, and private covenants now or hereafter relating to the ownership, construction, use, or operation of the Real Property, including all applicable statutes, rules, and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, zoning, and land use.  The improvements on the Real Property comply in all material respects with, and shall remain in compliance in all material respects with, all applicable health, fire, and building codes.  All material certifications, permits, licenses, and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy, and operation of the Real Property have been obtained and are in full force and effect.  All of the improvements on the Real Property comply in all material respects with all requirements of any applicable zoning and subdivision laws and ordinances, including, without limitation, parking requirements.

     (b)     The Real Property is not located in a "flood hazard area," as such term is defined by the U.S. Federal Insurance Administration.

     (c)     No part of the Real Property Collateral has been taken in condemnation or other like proceeding nor is any proceeding pending or known to be threatened for the partial or total condemnation or taking of the Real Property Collateral.

*Section 5.31 Reorganization Matters.*   The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law, and proper notice of the Chapter 11 Cases and proper notice for the hearing to consider entry of the Interim Order has been given and proper notice for the hearing to consider entry of the Final Order will be given.

SECTION 6.        REPRESENTATION AND ACKNOWLEDGMENTS OF EACH LENDER.

Each Lender represents, for itself, that the source of funds to be used by it to make Loans hereunder does not include assets of any employee benefit plan. As used in this Section 6, the terms "employee benefit plan" shall have the meaning assigned to such term in Section 3(3) of ERISA.

SECTION 7.        INFORMATION AS TO COMPANY.

*Section 7.1. Financial and Business Information.* The Company shall deliver to the Agent and each Lender all of the information required by this Section 7.1.

(a)        *Monthly Statements.*   Promptly*,* and in any event, within 30 calendar days after the end of each monthly period (commencing with the first full month after the Agreement Date) in each fiscal year of the Company (including the last monthly period of each such fiscal year), the Company shall provide to the Agent and each Lender a copy of:

(i)        an unaudited balance sheet of the Company as at the end of such month,

(ii)        unaudited statements of income, changes in shareholders' equity and cash flows of the Company for such month and for the portion of the fiscal year ending with such month,

setting forth in each case for each month, in comparative form the figures for the corresponding monthly and year-to-date periods in the previous fiscal year and the monthly and the year-to-date variances to the budget for such monthly fiscal period, all in reasonable detail, prepared by the Company in accordance with GAAP, and certified by a Senior Financial Officer of the Company as fairly presenting, in all material respects, the financial position of the Company and its results of operations and cash flows, subject to the absence of footnotes and changes resulting from year-end adjustments.

Additionally, the Company shall deliver to the Agent and each Lender via electronic transmission by the last calendar day of each month beginning on the Effective Date, (A) a reasonably detailed covenant compliance calculation with respect to compliance with the covenants contained in Sections 10.4 and 10.28, determined as of the end of the immediately preceding calendar month, (B) a Unit Sales by Category report as of the end of the immediately preceding calendar month, substantially in the report format provided to the Agent in fiscal year 2008, (C) internally generated "Lot-up" and "Phone-up" statistics for the immediately preceding calendar month as of the end of the month, substantially in the report format provided to the Agent in fiscal year 2008, (D) a summary of all Accounts of the Company, by category, as of the end of the immediately preceding calendar month, (E) a complete list of all Consignment Units

held by or on behalf of the Company at the end of the immediately preceding calendar month, and (F) a detailed inventory report, listing all additions to Inventory, all sales or dispositions of Inventory, and all sales Contracts in Transit for any Inventory outstanding as of the end of the prior calendar month, in each case, regardless of whether the Inventory constitutes Floor Plan Units, and clearly separating Inventory into Floor Plan Units and other categories of Inventory (such as boats, ATVs, automobiles, and personal watercraft), in each case identifying each item of Inventory in detail specified by the Agent (including where applicable the manufacturer, model, model year, vehicle identification number, date of acquisition by the Company, and purchase price of each unit of Inventory), and specifying which units constitute Eligible New Floor Plan Units or Eligible Used Floor Plan Units, together with all other information as the Agent or any Lender requests, prepared by the Company and certified by a Senior Financial Officer.

Further, the Company shall deliver to the Agent and each Lender via electronic transmission by the last calendar day of each January, April, July, and October a reasonably detailed covenant compliance calculation with respect to compliance with the covenant contained in Section 10.29, determined (on a quarterly basis) as of the end of the immediately preceding calendar month.

Additionally, on or before the fifth (5th) day of each calendar month, the Company shall provide to the Agent and each Lender a Collateral Base Certificate, together with all required schedules, as of the close of business on the last day of the preceding calendar month and accompanied by detailed Floor Plan Unit and Contracts in Transit receivable aging reports, in form and substance satisfactory to the Required Lenders and certified as true and complete by a Senior Financial Officer.

At any time requested by the Agent or any Lender, the Company shall deliver to the Agent and each Lender a report by the chief financial or executive officer of the Company discussing and analyzing the Company's operating performance as at the end of each such month, substantially in the report format provided to the Agent in fiscal year 2008.

(b)      *Weekly Reports.*     Each Wednesday during the term of this Agreement, the Company shall deliver to the Agent and each Lender via electronic transmission:

(i)      an updated 26-week cash forecast used by the Company management for the ensuing 26-week period, that includes, for the period covered by the applicable forecast, projected financial and operating performance on a line item and week-by-week basis (the *"Forecast"*);

(ii)      a list of all Contracts in Transit as of the close of business on the immediately preceding Saturday (the *"Prior Week"*);

(iii)      a detailed inventory report as of the end of the Prior Week, listing all additions to Inventory, all sales or dispositions of Inventory, and all Contracts in Transit outstanding as of the end of the Prior Week, in each case, regardless of whether the Inventory constitutes Floor Plan Units, and clearly separating

Inventory into Floor Plan Units and other categories of Inventory (such as boats, ATVs, automobiles, and personal watercraft), in each case identifying each item of Inventory in detail specified by the Agent (including where applicable the manufacturer, model, model year, vehicle identification number, date of acquisition by the Company, and purchase price of each unit of Inventory), and specifying which units constitute Eligible New Floor Plan Units or Eligible Used Floor Plan Units, together with all other information as the Agent requests, prepared by the Company and certified by a Senior Financial Officer; and

(iv)     a Collateral Base Certificate, complete with all required schedules, for the Prior Week, accompanied by detailed Floor Plan Unit and Contracts in Transit receivable aging reports, in form and substance satisfactory to the Required Lenders and certified as true and complete by a Senior Financial Officer of the Company.

(c)     *Annual Statements.* Promptly, and in any event, within 90 calendar days after the end of each fiscal year of the Company, the Company shall deliver to the Agent and each Lender a copy of,

(i)     a balance sheet of each Loan Party, as at the end of such year, and

(ii)     statements of income, changes in shareholders' equity and cash flows of each Loan Party, for such year,

setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail, prepared in accordance with GAAP, and accompanied by

(A)     an opinion thereon of independent certified public accountants of recognized national standing and approved in advance by the Required Lenders in writing (which includes, but is not limited to, Crowe Horwath, LLP), which opinion shall state that such financial statements present fairly, in all material respects, the financial position of each Loan Party and its results of operations and cash flows and have been prepared in conformity with GAAP, and that the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards, and that such audit provides a reasonable basis for such opinion in the circumstances, and

(B)     a certificate of such accountants stating that they have reviewed the covenants contained in Sections 10.4 through 10.7, inclusive, and Sections 10.28 and 10.29, and stating further whether, in making their audit, they have become aware of any condition or event that then constitutes a Default or an Event of Default under such Sections, and, if they are aware that any such condition or event then exists, specifying the nature and period of the existence thereof (it being understood that such accountants shall not be liable, directly or indirectly, for any failure to obtain knowledge of any Default or Event of Default);

32

(d)     *SEC and Other Reports.*  Promptly upon their becoming available, the Company shall deliver to the Agent and each Lender one copy of (i) each financial statement, report, notice, or proxy statement sent by any Loan Party to its stockholders (in their capacity as stockholders) generally, and (ii) each report, each registration statement (without exhibits except as expressly requested by such Lender), and each prospectus and all amendments thereto filed by any Loan Party with the Securities and Exchange Commission and of all press releases and other statements made available generally by any Loan Party to the public concerning developments that are Material.

(e)     *Notice of Default or Event of Default.*  Promptly, and in any event within two (2) Business Days after a Responsible Officer becomes aware of the existence of any Default or Event of Default or that any Person has given any notice or taken any action with respect to a claimed default hereunder or that any Person has given any notice or taken any action with respect to a claimed default of the type referred to in Section 11(f), the Company shall deliver to the Agent and each Lender a written notice specifying the nature and period of existence thereof and what action the Loan Parties are taking or propose to take with respect thereto.

(f)     *ERISA Matters.*  Promptly, and in any event within five (5) Business Days after a Responsible Officer becoming aware of any of the following, the Company shall deliver to the Agent and each Lender a written notice setting forth the nature thereof and the action, if any, that the Loan Party or an ERISA Affiliate proposes to take with respect thereto:

(i)     with respect to any Plan, any reportable event, as defined in Section 4043(c) of ERISA and the regulations thereunder, for which notice thereof has not been waived pursuant to such regulations as in effect on the date hereof; or

(ii)     the taking by the PBGC of steps to institute, or the threatening by the PBGC of the institution of, proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by a Loan Party or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan; or

(iii)     any event, transaction, or condition that occurs or exists after the Agreement Date or any change in any event, transaction, or condition that occurred or existed before the Agreement Date that, in either case, could reasonably be expected to result in the incurrence of any material liability by a Loan Party or any ERISA Affiliate pursuant to Title I (other than normal operating liabilities under a Plan) or IV of ERISA or the penalty or excise tax provisions of the Code relating to employee benefit plans, or in the imposition of any Lien on any of the rights, properties, or assets of a Loan Party or any ERISA Affiliate pursuant to Title I or IV of ERISA or such penalty or excise tax provisions; or

(iv)     the commencement of any investigation of the LDRV ESOP, the Lazy Days ESOP, the Alliance ESOP (as it pertains to the spin-off of the LDRV ESOP), or their respective fiduciaries by the IRS or the Department of Labor; or

(v)     the commencement of any litigation against the LDRV ESOP, the LDRV ESOT, or the fiduciaries of either by, or on behalf of,  any participant or beneficiary in the LDRV ESOP.

(g)     *Notices from Governmental Authority.*  Promptly, and in any event within 20 days of receipt thereof, the Company shall deliver to the Agent and each Lender copies of any notice to any Loan Party from any Governmental Authority relating to any order, ruling, statute, or other law or regulation that could reasonably be expected to have a Material Adverse Effect.

(h)     *Audit Reports.*  Promptly upon receipt thereof, the Company shall deliver to the Agent and each Lender one copy of each interim or special audit made by independent accountants of the books of any Loan Party and any management letter received from such accountants.

(i)     *Material Litigation.*  Promptly (and in any event within five (5) Business Days) after any Loan Party becomes aware of (i) the institution of, or non-frivolous, written (or otherwise overt) threat of, any action, suit, proceeding, governmental investigation, or arbitration against or affecting any Loan Party or any of its Property, or (ii) any Material development in any such action, suit, proceeding, governmental investigation, or arbitration, which, in either case, if adversely determined, could have a Material Adverse Effect, the Company shall deliver to the Agent and each Lender a certificate of a Responsible Officer of the Company describing the nature and status of such matter in reasonable detail (unless such disclosure would, in the reasonable opinion of counsel to the Company, cause a waiver of attorney-client privilege).

(j)     *Chapter 11 Cases.*  As soon as available, the Company shall deliver to the Agent and each Lender copies of all motions, pleadings, applications, judicial information, financial information, and other documents filed on or behalf of any Loan Party with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases.

(k)     *New Note Notice.*  As soon as possible, the Company shall deliver to the Agent and each Lender copies of any notices given by or delivered to the Company or any other Loan Party under or pursuant to the Indenture or under the New Notes, including without limitation, any notices of default thereunder.

(l)     *Budget.*  As soon as available, but in any event not later than 30 days after the first day of each fiscal year commencing with the Company's 2010 fiscal year, the Company shall deliver to the Agent and each Lender a copy of the initial budget of the Company for the fiscal year, prepared on a monthly basis and including appropriate balance sheet, income statement, cash flow, and working capital projections for that period.  The Company promptly shall deliver to the Agent and each Lender copies of any material adjustments to the foregoing budget of the Company.  The Company also shall deliver to the Agent and each Lender a copy of any long-range business plans of the Company that are prepared from time to time for or at the direction of the Board of Directors of the Company, and all material amendments thereto that are in effect from time to time, promptly after each of those items is presented to the Board of Directors of the Company.  As soon as available, but in any event no later than January 31 of each year,

34

commencing January 31, 2010, a the Company shall deliver to the Agent and each Lender a projected income statement, balance sheet, and cash flow statement for the subject calendar year.

(m)    *Requested Information.* With reasonable promptness, the Company shall deliver to the Agent and each Lender all other data and information relating to the business, operations, affairs, financial condition, assets, or properties of each Loan Party or relating to the ability of any Loan Party to perform its obligations under the Notes, this Agreement, or any other Financing Document (including, without limitation, any data or information furnished to any other holder of Debt of the Loan Party) as from time to time may be reasonably requested by the Agent or any Lender.

(n)    *Other Notices.* Promptly after receipt or delivery, the Company shall deliver to the Agent and each Lender a copy of each Material notice, demand, statement, certificate, report, or other communication or document delivered in connection with (i) the LDH Purchase Documents or the LDH Acquisition, and (ii) the Ground Lease, including without limitation with respect to the purchase option under that Ground Lease.

*Section 7.2. Officer's Certificate.* Each set of financial statements delivered to the Agent or a Lender pursuant to Section 7.1(a) or 7.1(c) hereof shall be accompanied by a certificate of a Senior Financial Officer setting forth:

(a)    *Covenant Compliance* - the information (including detailed calculations) required to establish whether the Company was in compliance with the requirements of Section 10.4 through Section 10.7, inclusive, and Sections 10.28 and 10.29 during the period covered by the statements then being furnished (including with respect to each such Section, where applicable, the calculations of the maximum or minimum amount, ratio, or percentage, as the case may be, permissible under the terms of such Sections, and the calculation of the amount, ratio, or percentage then in existence); and

(b)    *Event of Default* - a statement that such officer has reviewed the relevant terms hereof and has made, or caused to be made, under his or her supervision, a review of the transactions and conditions of the Loan Party from the beginning of the period covered by the statements then being furnished to the date of the certificate and that such review shall not have disclosed the existence during such period of any condition or event that constitutes a Default or an Event of Default or, if any such condition or event existed or exists (including, without limitation, any such event or condition resulting from the failure of a Loan Party to comply with any Environmental Law), specifying the nature and period of existence thereof and what action the Company shall have taken or proposes to take with respect thereto.

*Section 7.3. Inspection.* (a)  The Agent shall have the right to conduct at any time and from time to time as often as the Agent deems advisable or necessary (and, whenever the Agent so desires, on a continuous basis) an inventory audit of the Inventory (including without limitation each Floor Plan Unit) of the Company on a random basis regardless of whether an Event of Default exists.  The Agent may inspect individually each Floor Plan Unit and other item of Inventory during each such inventory audit.

(b)     In addition to and not in limitation of the rights granted to the Agent in Section 7.3(a), the Company shall permit and shall cause each Loan Party to permit the representatives of each Lender, upon reasonable prior notice to the Company, to visit and inspect any of the offices or properties of each Loan Party, to examine all its books of account, records, reports, and other papers, to make copies and extracts therefrom and to discuss the affairs, finances, and accounts of the Loan Party with the Loan Party's officers and accountants (and by this provision each Loan Party authorizes said accountants to discuss the affairs, finances, and accounts of the Loan Party), all at such reasonable times during normal business hours and as often as may be reasonably requested. Any such visit or inspection shall, during the continuance of a Default or an Event of Default, be at the Loan Parties' expense.

(c)     In addition to and not in limitation of the rights granted to the Agent in Section 7.3(a), the Agent, upon reasonable notice to the Company, shall have the right to verify at any time and from time to time all or any part of the Collateral in any manner, and through any medium, that the Agent reasonably considers appropriate, and the Company agrees to furnish all assistance and information, and perform any acts, that the Agent may reasonably require in connection therewith. The Company hereby appoints the Agent, its nominee, and any other Person whom the Agent may designate, as the Company's attorney-in-fact, which appointment shall be coupled with an interest and irrevocable until all Obligations have been paid in full and all Commitments hereunder have been terminated, with full power to sign the Company's name on verifications of Accounts and to send requests for verification of Accounts to the Company's customers, Account Debtors, and other obligors. The Company hereby ratifies and approves all acts of any such attorney and agrees that neither the Agent nor any such attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law other than such Person's gross negligence or willful misconduct.

SECTION 8.     PREPAYMENT OF NOTES; TERMINATION, ETC.

*Section 8.1. Floor Plan Loan Voluntary Prepayments.* Without limiting the obligation of the Company to prepay the Floor Plan Notes as otherwise required in this Agreement, the Company may make prepayments without premium or penalty of the Floor Plan Notes in whole or in part (but if in part, in an amount not less than $100,000) at any time upon one day's prior notice to the Agent (such notice if received subsequent to 1:00 p.m. (New York, New York time) on a given day to be treated as though received at the opening of business on the next Business Day), by paying to such Lenders on a *pro rata* basis, based on the outstanding principal amount of the Floor Plan Notes immediately before such prepayment, the principal amount to be prepaid and if such a prepayment prepays the Floor Plan Notes in full and is accompanied by the termination in whole of the Floor Plan Commitments, accrued interest thereon to the date of prepayment. Each such prepayment (a) must be accompanied by a certificate of the Company specifying the Eligible New Floor Plan Units or Eligible Used Floor Plan Units against which such prepayment is to be applied or, (b) if made electronically by the Company pursuant to the online payment program established by the Agent, must be applied by the Company to specific Floor Plan Units financed by Borrowings.

*Section 8.2. Floor Plan Loan Mandatory Payments.* (a) *New Floor Plan Units.* Principal curtailments (repayments) relating to Borrowings for Eligible New Floor Plan Units shall be due

as follows: (i) the entire balance owed on a Floor Plan Unit shall be due upon the earliest of (A) one Business Day from the receipt of proceeds from the sale of a Floor Plan Unit, (B) four Business Days from the sale of a Floor Plan Unit, (C) one Business Day after a Floor Plan Unit ceases, for any reason, to qualify as an Eligible New Floor Plan Unit, or (D) 18 months from the date of the original Borrowing made as to any specific Floor Plan Unit; and (ii) if not previously sold or otherwise disposed of, 10% of the original principal amount of the Borrowing made as to any specific Eligible New Floor Plan Unit will be due and payable 12 months from the date of the original funding of such Borrowing, and an additional 10% of the original principal amount of the Borrowing made as to such Floor Plan Unit will be due and payable 15 months from the date of the original funding of such Borrowing. For purposes of this Section 8.2(a), the date of sale shall be the earlier of the date on which the purchaser takes possession of a Floor Plan Unit, the date on which the purchaser otherwise acquires a legal right to a Floor Plan Unit, or the date the Company receives payment for the purchase of the Floor Plan Unit.

(b)      *Used Floor Plan Units.* Principal curtailments (repayments) relating to Borrowings for Eligible Used Floor Plan Units shall be due as follows: (i) the entire balance owed on a Floor Plan Unit shall be due upon the earliest of (A) one Business Day from the receipt of proceeds from the sale of a Floor Plan Unit, (B) four Business Days from the sale of a Floor Plan Unit, (C) one Business Day after a Floor Plan Unit ceases, for any reason, to qualify as an Eligible Used Floor Plan Unit, or (D) 12 months from the date of the original Borrowing made as to any specific Floor Plan Unit; and (ii) if not previously sold or otherwise disposed of, 10% of the original principal amount of the Borrowing made as to any specific Eligible Used Floor Plan Unit will be due and payable six months from the date of the original funding of such Borrowing, and an additional 10% of the original principal amount of the Borrowing made as to such Floor Plan Unit will be due and payable nine months from the date of the original funding of such Borrowing. For purposes of this Section 8.2(b), the date of sale shall be the earlier of the date on which the purchaser takes possession of a Floor Plan Unit, the date on which the purchaser otherwise acquires a legal right to a Floor Plan Unit, or the date the Company receives payment for the purchase of the Floor Plan Unit.

(c)      *All Loans.* All Loans shall be due and payable in full on the Termination Date.

*Section 8.3. Terminations.* The Company shall have the right at any time and from time to time after the Effective Date, upon seven (7) Business Days prior notice to the Agent (which shall promptly so notify the Lenders), to ratably terminate in whole or in part (but if in part, then in an aggregate amount not less than $1,000,000 or such greater amount which is an integral multiple of $100,000) the Floor Plan Commitments; *provided* that none of the Commitments may be reduced to an amount less than the aggregate principal amount of the Loans then outstanding with respect to the applicable Commitments. Any termination of the Commitments pursuant to this Section may not be reinstated.

*Section 8.4. Overadvances.* If, at any time or for any reason, the amount of Obligations owed by the Company to the Lenders pursuant to Section 1.1 is greater than any of the limitations set forth in Section 1.1, the Company immediately shall pay to the appropriate Lender, in each case, the amount of the excess, which amount shall be used by the Lender to reduce the Obligations in accordance with the priorities set forth in Section 8.5.

*Section 8.5. Place and Application of Payments.* All payments of principal, interest, fees, and all other Obligations payable to the Agent or the Lenders hereunder shall be made to the Agent at Bank of America, N.A., ABA No. 1110000012, Bank of America Account, Account No. 375 320 7600, Reference Lazy Days R.V. (or at such other place as the Agent may specify) on the date any such payment is due and payable. Payments received by the Agent after 11:00 a.m. (New York, New York time) shall be deemed received as of the opening of business on the next Business Day. All such payments shall be made in lawful money of the United States of America, in immediately available funds at the place of payment, without set-off or counterclaim. Except as herein provided, all payments shall be received by the Agent for the ratable account of the Lenders and shall be promptly distributed by the Agent ratably to the Lenders.

So long as no Event of Default then exists, (a) all payments received by the Agent in respect of the Obligations that are designated by the Company at the time of payment as principal payments for specified Floor Plan Units shall be applied to the principal amounts outstanding in respect of those Floor Plan Units, (b) all payments received by the Agent in respect of the Obligations that are designated by the Company at the time of payment as interest payments shall be applied to the applicable interest invoice specified by the Company when it remits those payments to the Agent, and (c) all payments of fees, costs, and other amounts received by the Agent in respect of the Obligations shall be applied in the manner specified by the Company when it remits those payments to the Agent. If the Company fails to indicate the manner in which a particular payment should be applied at the time of payment, the Agent may apply those amounts as it determines in its reasonable discretion.

Anything contained herein to the contrary notwithstanding, all payments and collections received in respect of the Obligations and all proceeds of Collateral received, in each instance, by the Agent or any of the Lenders from the Collateral Agent after the occurrence of an Event of Default shall be remitted to the Agent and distributed as follows:

(i)      *first,* to the payment of any outstanding costs and expenses incurred by the Agent in monitoring, verifying, protecting, preserving, or enforcing the Liens on the Collateral, and in protecting, preserving, or enforcing rights under this Agreement or any of the other Financing Documents, and in any event including all costs and expenses of a character that the Loan Parties have agreed to pay under Section 15.1 (such funds to be retained by the Agent for its own account unless it has previously been reimbursed for those costs and expenses by the Lenders, in which event those amounts shall be remitted to the Lenders to reimburse them for payments theretofore made to the Agent);

(ii)      *second,* to the payment of any outstanding fees due under this Agreement, pro rata as among the Agent and the Lenders in accordance with the amount of such fees owing each;

(iii)      *third,* to the payment of any outstanding interest due under this Agreement on the Floor Plan Notes, pro rata as among the Agent and the Lenders in accordance with the amount of such interest owing each;

38

(iv)    *fourth,* to the payment of the outstanding principal of the Floor Plan Notes then due under Section 8.2, pro rata as among the Lenders in accordance with the then respective unpaid principal balances of such Notes;

(v)    *fifth,* to the payment of the principal amount of any Floor Plan Loans made by the Agent and the Lenders pursuant to Section 1.1(b) and for which Settlement has not been made pursuant to Section 8.6 pro rata as among the Agent and the Lenders in accordance with the amount of such principal owing to each;

(vi)    *sixth,* to the payment of the outstanding principal of the Floor Plan Notes pro rata as among the Lenders in accordance with the respective unpaid principal balances of such Notes; and

(vii)    *seventh,* to the Agent and the Lenders pro rata in accordance with the amounts of any other indebtedness, obligations, or liabilities of the Company owing to them hereunder and under the Notes unless and until all such indebtedness, obligations, and liabilities have been fully paid and satisfied.

If an Event of Default has occurred and is continuing, all payments received by the Lenders or the Agent shall be remitted to the Collateral Agent for application pursuant to the Collateral Agency Agreement.  Notwithstanding the foregoing, (A) a Lender that has failed to make any required Settlement payment to any other Lender pursuant to Section 8.6 shall not be entitled to receive any distributions under this Section 8.5 until such Settlement payment obligation has been satisfied in full, and (B) all payments received by the Agent pursuant to any Eligible Repurchase Agreement shall be applied <u>first</u> to repay in full the outstanding principal of the relevant Borrowing owed to Bank of America, N.A. and <u>second</u> pro rata to repay in full the outstanding principal amount of such Borrowing owed to the other Lenders.

Each Loan Party acknowledges and agrees that the Agent, for the benefit of the Lenders, has and is hereby granted a Lien on the Operating Account as collateral for the Obligations.  The foregoing Lien granted to the Agent for the benefit of the Lenders is in addition to all Liens conferred on the Agent for the benefit of the Lenders pursuant to the terms of the Orders.

*Section 8.6. Weekly Settlement.* (a) To minimize the frequency of transfers of funds between the Agent and each Lender, advances and repayments of Loans will be settled according to the procedures described in this Section 8.6. The Agent shall, once every seven days, or, so long as a Default or Event of Default exists, sooner, if so elected by the Agent in its discretion but in each case on a Business Day (each such day being a "*Settlement Date*"), distribute to each Lender a statement (the "*Agent's Report*") disclosing as of the immediately preceding Business Day, the aggregate unpaid principal balance of Floor Plan Loans outstanding as of such date, repayments and prepayments of principal received from the Company with respect to the Loans since the immediately preceding Agent's Report, and additional Loans made to the Company since the date of the immediately preceding Agent's Report. Each Agent's Report shall disclose the net amount (the "*Settlement Amount*") due to or due from the Lenders to effect a Settlement of any Loan. The Agent's Report submitted to a Lender shall be, absent manifest error, prima facie evidence of the amount due to or from such Lender to effect a Settlement of any Loan. If

the Agent's Report discloses a net amount due from the Agent to any Lender to effect the Settlement of a Loan, the Agent, concurrently with the delivery of the Agent's Report to the Lenders, shall transfer, by wire transfer or otherwise, such amount to such Lender in funds immediately available to such Lender, in accordance with such Lender's instructions. If the Agent's Report discloses a net amount due to the Agent from any Lender to effect the Settlement of any Loan, then such Lender shall wire transfer such amount, in funds immediately available to the Agent, as instructed by the Agent. Such net amount due from a Lender to the Agent shall be due by 2:00 p.m. (New York, New York time) on the Settlement Date if such Agent's Report is received before 11:00 a.m. (New York, New York time) and such net amount shall be due by 2:00 p.m. (New York, New York time) on the first Business Day following the Settlement Date if such Agent's Report is received after 11:00 a.m. (New York, New York time). Notwithstanding the foregoing, payments actually received by the Agent (which shall be credited on the day received if received before 11:00 a.m. (New York, New York time)) with respect to the following items shall be distributed by the Agent to each Lender as follows:

(i)      as soon as possible, but in any event within one Business Day after receipt thereof by the Agent, payments applicable to interest on the Loans shall be paid to each Lender in proportion to its pro rata share of the Loans (based on the outstanding principal amount of funds actually advanced by such Lender with respect to such Loans). Each Lender's share of interest accruing each day on the Loans shall be based on such Lender's Daily Loan Balance. For purposes hereof, the term "*Daily Loan Balance*" shall mean as of any day for any Lender, an amount calculated as of the end of that day by subtracting (a) the cumulative principal amount paid by the Agent to such Lender on account of Loans from the Effective Date through and including the date as of which the Daily Loan Balance is being determined from (b) the cumulative principal amount advanced by such Lender to the Agent for the benefit of the Loan Parties to fund Loans made on and after the Effective Date through and including such date of determination; and

(ii)      as soon as possible, but in any event within one Business Day after receipt thereof by the Agent, payments applicable to the fees set forth in Section 3 and expenses payable under this Agreement, shall in each case be paid to each Lender as set forth therein.

(b)      In the event that any bankruptcy, reorganization, liquidation, receivership, or similar cases or proceedings in which a Loan Party is a debtor prevent the Agent or any Lender from making any Loan to effect a Settlement contemplated hereby, the Agent or such Lender, as the case may be, will make such dispositions and arrangements with the other Lenders with respect to such Loans, either by way of purchase of participations, distribution, pro tanto assignment of claims, subrogation, or otherwise, as shall result in each Lender's share of the outstanding Floor Plan Loans being equal, as nearly as may be, to the percentage which such Lender's Floor Plan Commitment bears to the Floor Plan Commitments of all the Lenders.

(c)      Payments to effect a Settlement shall be made without set-off, counterclaim, or reduction of any kind. The failure or refusal of any Lender to make available to the Agent at the aforesaid time and place the amount of the Settlement Amount due from such Lender (i) shall not

relieve any other Lender from its several obligation hereunder to make available to the Agent the amount of such other Lender's Settlement Amount, and (ii) shall not impose upon such other Lender any liability with respect to such failure or refusal or otherwise increase the Commitment of such other Lender.

*Section 8.7. Notations.* Each Loan made against a Note and the outstanding principal balance thereof and interest rate thereon shall be recorded by the relevant Lender on its books and records or, at its option in any instance, endorsed on a schedule to its Note and the unpaid principal balance and interest rate so recorded or endorsed by such Lender shall absent manifest error be prima facie evidence in any court or other proceeding brought to enforce such Note of the principal amount remaining unpaid thereon and the interest rate applicable thereto; *provided* that the failure of a Lender to record any of the foregoing shall not limit or otherwise affect the obligation of the Company to repay the principal amount of such Note together with accrued interest thereon. Before any negotiation of a Note, a Lender shall record on a schedule thereto the status of all amounts evidenced thereby and the rate of interest applicable thereto.

*Section 8.8. Redemption of Notes.* The Loan Parties will not and will not permit any Affiliate*,* to purchase, redeem, prepay, or otherwise acquire, directly or indirectly, any of the Notes except upon payment or prepayment of such Notes in accordance with the terms of this Agreement.

SECTION 9.        AFFIRMATIVE COVENANTS.

The Loan Parties covenant that so long as credit is available to or in use by the Company hereunder:

*Section 9.1. Compliance with Law.* Each Loan Party will comply with all laws, ordinances or governmental rules or regulations to which it is subject, including, without limitation, ERISA, the Code, and Environmental Laws, and will obtain and maintain in effect all licenses, certificates, permits, franchises, and other governmental authorizations necessary to the ownership of its Properties or to the conduct of its business, in each case, except as otherwise excused by the Bankruptcy Code, to the extent necessary to ensure that non-compliance with such laws, ordinances, or governmental rules or regulations or failures to obtain or maintain in effect such licenses, certificates, permits, franchises, and other governmental authorizations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

*Section 9.2. Insurance.* (a) All risk of loss of Collateral (other than the pledged stock) shall be borne solely by the Company (and all risk of loss of all collateral pledged under the Guarantor Security Agreement will be borne by the party pledging that collateral).

(b)        The Company shall maintain at its own expense, with commercial insurers that are licensed to do business in the State of Florida and have an A.M. Best's rating of A- (or better) and Class VI (or higher), provided that at least one of the insurers providing coverage for the Company's Inventory must have a rating of A (or better) and Class IX (or higher) (for

purposes of this Section 9.2, Lloyds of London is an acceptable insurer) and shall comply with all terms and conditions of the following insurance coverages:

(i)     the Company shall maintain all risk property insurance against direct physical loss or damage on an all risks basis, including windstorm and hurricane and comprehensive boiler and machinery coverage, subject to a maximum deductible of two percent (2%) per building and $100,000 per occurrence (and 5% maximum deductible for windstorm coverage). The property shall be insured for the full replacement cost and such policy shall contain an agreed amount endorsement waiving any coinsurance penalty;

(ii)    as an extension of the coverage required under Section 9.2(b)(i), the Company shall maintain business interruption insurance on a profits form including extra expense in an agreed amount not less than $5,000,000, subject to a maximum seven-day waiting period or $100,000 deductible and shall contain an agreed amount endorsement waiving any coinsurance penalty;

(iii)   the Company shall maintain commercial general liability insurance written on an occurrence basis with a limit of not less than $1,000,000 each occurrence and $3,000,000 in the aggregate. Such coverage shall include, but not be limited to, premises/operations, blanket contractual liability, independent contractors, broad form products and completed operations, personal injury, fire legal liability, and employee benefits liability. Such insurance shall not exclude coverage for punitive or exemplary damages where insurable by law;

(iv)    the Company shall maintain workers' compensation insurance in accordance with statutory provisions covering accidental injury, illness, or death of an employee of the Company while at work or in the scope of his or her employment with the Company and employer's liability insurance in an amount not less than $500,000. Such coverage shall not contain any occupational disease exclusions;

(v)     the Company shall maintain automobile liability insurance covering owned, non-owned, leased, hired, or borrowed vehicles against bodily injury or property damage. Such coverage shall have a limit of not less than $1,000,000;

(vi)    the Company shall maintain excess or umbrella liability insurance in an amount not less than $25,000,000, written on an occurrence basis providing limits in excess of the insurance limits required under Section 9.2(b)(iii), (b)(iv) (employers liability only), (b)(v), and (b)(xi). Such insurance shall follow from the primary insurances and drop down in case of exhaustion of underlying limits and/or aggregates. Such insurance shall not exclude coverage for punitive or exemplary damages where insurable by law;

(vii)   the Company shall maintain employee dishonesty insurance in an amount not less than $100,000 including Inside/Outside coverage in an amount not less than $15,000 and Depositors Forgery in an amount not less than $50,000;

(viii)   the Company shall maintain employment practices liability insurance written on a claims-made basis with a limit of not less than $1,000,000 each loss and in the aggregate with a deductible not to exceed $50,000;

(ix)   the Company shall maintain employed lawyers professional liability insurance written on a claims-made basis with a limit of not less than $1,000,000 each claim and in the aggregate with a deductible not to exceed $25,000;

(x)   the Company shall maintain miscellaneous professional liability insurance written on a claims-made basis with a limit of not less than $1,000,000 each claim and in the aggregate with a deductible not to exceed $25,000;

(xi)   the Company shall maintain garage liability insurance in an amount not less than $1,000,000 for bodily injury and property damage to third parties arising out of the operations of selling, maintaining, and servicing licensed vehicles; garagekeepers insurance in an amount not less than $3,000,000 for physical damage to customers' vehicles in the care, custody, and control of the Company with a deductible not more than $25,000 for any one event; and garage physical damage insurance covering physical damage to owned vehicles in an amount not less than the value of the Inventory for any one event; and garage physical damage insurance covering physical damage to owned vehicles in an amount not less than the value of the Inventory; and

(xii)   the Company shall maintain directors and officers liability insurance in an amount not less than $5,000,000. Policy to cover prior acts of the former directors and officers of the Company, without limitation.

(c)   The Company shall maintain such other insurance to such extent and against such risks, as are reasonably satisfactory to the Collateral Agent.

(d)   All such insurance policies (other than the policies specified in clauses (b)(iv), (b)(vii), (b)(ix), (b)(x), and (b)(xii) of this Section 9.2) shall name the Collateral Agent, for itself and for the benefit of all the Agents and the Lenders as additional insureds (the "*Additional Insureds*") and, with respect to property insurance covering the Collateral, naming the Collateral Agent and its successors and assigns as first loss payee under a standard lender's loss payee rider. Such insurance policies shall provide: (1) waiver of subrogation, set-off, or counterclaim by the insurer against Additional Insureds, (2) an undertaking that the applicable insurer will endeavor to provide 10 days' prior written notice of cancellation, termination, or material modification to the Additional Insureds, (3) confirmation that coverage is primary and non-contributory with respect to any other insurance available for the protection of the Additional Insureds, (4) severability of interest clause in each liability policy providing each Additional Insured the same protection as would have been available had these policies been issued individually to each of them, except that this fact shall not in any event increase the total liability of the insurer beyond the limits set forth in the policies, and (5) that the Collateral Agent and other Additional Insureds and their respective subsidiaries and affiliates have no responsibility for premiums.

(e)    *Intentionally Omitted.*

(f)    On the Agreement Date and at least thirty (and not more than 60) days before each anniversary of the Agreement Date, the Company shall deliver or cause to be delivered to the Collateral Agent (i) an insurance broker's letter from the Company's independent insurance agent confirming that the insurance premiums with respect to the policies of insurance required to be maintained pursuant to this Section 9.2 have been paid and that such policies are in force, (ii) certificates of insurance evidencing that (x) all the coverages listed in Section 9.2 have been renewed and continue to be in full force and effect for such period as shall be then stipulated, (y) specify the insurers with whom the insurances are carried, and (z) contain such other certifications and undertakings as are customarily provided to the Lenders, as reasonably requested by the Collateral Agent, and (iii) at the Agent's request, complete copies of all current insurance policies required by this Section 9.2.

(g)    Upon the request of the Collateral Agent, the Agent, or any Lender, the Company will provide copies of the insurance policies maintained by the Company. In the event the Company, at any time or times hereafter, shall fail to obtain or maintain any of the policies or insurance required herein or to pay any premium in whole or part relating thereto, then the Collateral Agent, without waiving or releasing any obligations or resulting Event of Default, may at any time or times thereafter (but shall be under no obligation to do so) obtain and maintain such policies of insurance and pay such premiums and take any other action with respect thereto that the Collateral Agent deems advisable. The Collateral Agent shall provide the Company with contemporaneous notice of any action taken by the Collateral Agent and any such payments shall be part of the indebtedness secured by the Security Documents, secured by the Collateral, and payable on written demand.

(h)    The Company will not and will not suffer or permit its Subsidiaries or any other Loan Party to take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained under this Section 9.2, unless the Agent is included thereon as an additional insured or loss payee under a lender's loss payable endorsement.  The Company promptly shall notify the Agent whenever such separate insurance is taken out, specifying the insurer thereunder and full particulars as to the policies evidencing the same, and copies of such policies promptly shall be provided to the Agent.

*Section 9.3. Maintenance of Properties, Environmental Matters, Etc.*  Each Loan Party will maintain and keep, or cause to be maintained and kept, its properties in good repair, working order and condition (other than ordinary wear and tear), so that the business carried on in connection therewith may be properly conducted at all times, *provided* that this Section 9.3 shall not prevent the Company from discontinuing the operation and the maintenance of any of its properties if such discontinuance is desirable in the conduct of its business and the Company has concluded that such discontinuance could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Without limiting the generality of this Section 9.3, each Loan Party: (i) shall maintain its Properties in compliance in all Material respects with any applicable Environmental Laws; (ii) shall obtain and maintain in full force and effect all governmental approvals required for its operations at or on its properties by any applicable Environmental Laws; (iii) shall cure as soon as practicable any material violation of applicable

Environmental Laws with respect to any of its Properties; (iv) shall not, and shall not permit any other Person to, own or operate on any of its Properties any landfill or dump or hazardous waste treatment, storage, or disposal facility as defined pursuant to the Resource Conservation and Recovery Act of 1980, as amended, or any comparable state law; (v) shall not use, generate, treat, store, release, or dispose of Hazardous Materials at or on any of its Properties (including without limitation, any underground storage tanks) except in the ordinary course of its business and in Material compliance with all Environmental Laws; and (vi) shall notify each Lender in writing, and within a reasonable period of time, and provide any reasonably requested documents, upon learning of any Material environmental claim or Material violation of any Environmental Laws, or any release of a reportable quantity (as determined under any Environmental Law) of a Hazardous Material, or any claim arising out of or in connection with a release of a Hazardous Material, that arises in connection with any of its Properties, and any other environmental or health and safety condition that would reasonably be expected to result in any material interference with the use or operation of any of its Properties or could reasonably be expected to have a Material Adverse Effect. With respect to any release of Hazardous Materials, the Company shall conduct any necessary or required investigation, study, sampling, and testing, and undertake any cleanup, removal, remedial, or other response action necessary to remove, clean up, or abate any material quantity of Hazardous Materials released or disposed at or on any of its respective properties as required by any applicable Environmental Law.

*Section 9.4. Payment of Taxes and Claims.*  Except in accordance with the Bankruptcy Code or any applicable Order issued by the Bankruptcy Court, each Loan Party will file all tax returns required to be filed in any jurisdiction and will pay and discharge all taxes, including material post-petition taxes, if any, shown to be due and payable on such returns and all other taxes, assessments, governmental charges, or levies imposed on it or any of its Properties, assets, income, or franchises, to the extent such taxes and assessments have become due and payable and before they have become delinquent and all claims for which sums have become due and payable that have or might become a Lien on properties or assets of a Loan Party, *provided* that a Loan Party need not pay any such tax or assessment or claims if (i) the amount, applicability, or validity thereof is contested by the Loan Party on a timely basis in good faith and in appropriate proceedings, and the Loan Party has established reserves reasonably deemed by it to be adequate on its books with respect thereto, and (ii) the nonpayment of all such taxes and assessments in the aggregate could not reasonably be expected to have a Material Adverse Effect and any Lien resulting from such nonpayment of any such tax or assessment or claim is and remains a Permitted Lien.

*Section 9.5. Corporate Existence, Etc.*  Each Loan Party will at all times preserve and keep in full force and effect its corporate existence (provided that RV Acquisition and LD Holdings may be dissolved in accordance with the terms of the Reorganization Plan at or immediately before the confirmation of the Reorganization Plan by the Bankruptcy Court, so long as no Loan Party makes any Distributions or Asset Transfers in connection with those dissolutions). Each Loan Party will at all times preserve and keep in full force and effect all rights and franchises of the Loan Party unless, in the good faith judgment of the Loan Party, the termination of or failure to preserve and keep in full force and effect such right or franchise could not, individually or in the aggregate, reasonably be expected to have a Material Adverse

Effect. Immediately, but in any event within five (5) days after it obtains a new organizational identification number, a Loan Party shall notify the Agent in writing of the new number.

Section 9.6. *Inventory Location, Etc.* Each Loan Party shall maintain its chief executive offices at, and, other than as in transit, out for repair, or offsite at a sales event in the ordinary course of business, the Loan Parties shall keep all Collateral only at, 6130 Lazy Days Boulevard, Seffner, Florida 33584.

Section 9.7. *Taxes.*

(a)       *Payments Free and Clear of Taxes.* Any and all payments by the Loan Parties hereunder, under the Notes, or under any other Financing Document or with respect to the Existing Letters of Credit, Epayables Program, the L/C Security Agreement, and the Epayables Security Agreement shall be made free and clear of and without deduction for any and all present or future taxes (including any excise taxes), levies, imposts, deductions, charges, penalties, assessments, or withholdings, and all liabilities with respect thereto, *excluding,* in the case of each Lender, taxes imposed on its income, capital, profits, or gains and franchise taxes imposed on it, in each case by (i) the United States (including, without limitation, withholding taxes imposed by the United States) including any authority, agency, or instrumentality thereof, (ii) the jurisdiction in which such Lender's office is located, or (iii) the jurisdiction in which such Person is organized, managed, controlled, or doing business, in each case including all political subdivisions thereof (all such taxes, levies, imposts, deductions, charges, withholdings, and liabilities not excluded by the foregoing clauses (i), (ii), or (iii) being hereinafter referred to as "*Taxes*"). If the Company is required by law to withhold or deduct any Taxes from or in respect of any sum payable hereunder, under the Notes or under any other Financing Document or the Existing Letters of Credit, the Epayables Security Agreement, or the L/C Security Agreement to such Lender or the Collateral Agent, (x) such gain payable shall be increased as may be necessary so that after making all required withholdings or deductions (including withholdings or deductions applicable to additional sums payable under this Section 9.7) such Lender or the Collateral Agent (as the case may be) receives an amount equal to the sum it would have received had no such withholdings or deductions been made, (y) the Company shall make such withholdings or deductions, and (z) the Company shall pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)       *Other Taxes.* In addition, the Company shall pay any present or future stamp, value-added, or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from and that relate directly to (i) any payment made under any Financing Document or with respect to the Epayables Program or an Existing Letter of Credit or (ii) the execution, delivery, or registration of or otherwise with respect to, the Notes, this Agreement, any other Financing Document, the Epayables Security Agreement, the L/C Security Agreement, or the Pre-Petition Credit Agreement and related financing documents (hereinafter referred to as "*Other Taxes*").

(c)       *Indemnification.* The Loan Parties, jointly and severally, shall indemnify the Agents and each Lender against, and reimburse each on written demand for, the full amount of all Taxes and Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by

any Governmental Authority on amounts payable under this Section 9.7 and any additional income or franchise taxes resulting therefrom) incurred or paid by such Lender or the Collateral Agent (as the case may be) or any affiliate of such Lender and any liability (including penalties, interest, and out-of-pocket expenses paid to third parties) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or lawfully payable; *provided* that the Loan Parties shall not be obligated to indemnify any Lender, the Collateral Agent, or any affiliate of such Lender for liability resulting from such Person's gross negligence or willful misconduct or its failure to give notice thereof to the Company within a reasonable period after it becomes aware of such Taxes or Other Taxes. A certificate as to any amount payable to any Person under this Section 9.7 submitted by such Person to the Company shall, absent manifest error, be final, conclusive, and binding upon all parties hereto. This indemnification shall be made within thirty (30) days from the date such Person makes written demand therefor and within thirty (30) days after the receipt of any refund of the Taxes or Other Taxes following final determination that the Taxes or Other Taxes that gave rise to the indemnification were not required to be paid, such Person shall repay the amount of such paid indemnity to the Company. Such Person agrees to take reasonable efforts to pursue any right such Person has to any rebate, refund, or credit of such paid indemnity.

(d)     *Receipts.* Within thirty (30) days after the date of any payment of Taxes or Other Taxes by a Loan Party, the Loan Party will furnish to the Lender or Lenders affected thereby, the original or a certified copy of a receipt or other documentation reasonably satisfactory to such Lender evidencing payment thereof. Each Loan Party will furnish to any Lender upon such Lender's request from time to time an Officer's Certificate stating that all Taxes and Other Taxes of which it is aware that are due have been paid and that no additional Taxes or Other Taxes of which it is aware are due.

(e)     *Withholding Forms.* (i) Each Lender that is not created or organized under the laws of the United States or a political subdivision thereof shall deliver to the Company on or before the Agreement Date or upon becoming, and from time to time thereafter upon the Company's request, a Lender a true and accurate certificate executed in duplicate by a duly authorized officer of such Lender to the effect that such Lender is eligible to receive payments hereunder and under the Notes without deduction or withholding of United States federal income tax (i) under the provisions of an applicable tax treaty concluded by the United States (in which case the certificate shall be accompanied by two duly completed copies of IRS Form W--8BEN (or any successor or substitute form or forms)) or (ii) under Sections 1441(c) (1) and l442(a) of the Code (in which case the certificate shall be accompanied by two duly completed copies of IRS Form W-8ECI (or any successor or substitute form or forms)), or (iii) in the case of any Lender claiming exemption from United States withholding tax with respect to "*portfolio interest*," a properly completed and executed IRS Form W-8BEN (or any successor or substitute form or forms) and a certificate representing that such holder is not a "*bank*" for purposes of Section 881(c) of the Code, is not a "*10% shareholder*" of a Loan Party within the meaning of Section 871(h)(3)(B) of the Code, and is not a "*controlled foreign corporation*" with respect to a Loan Party within the meaning of Section 864(d)(4) of the Code.

*Section 9.8. Landlord Consents; Mortgagee Acknowledgements.* In addition to (but without duplication of) the requirements of Section 4, concurrently with the Effective Date (to

the extent not already done before the Effective Date), the Loan Parties shall deliver to the Agent (which shall provide copies to each of the Lenders), with respect to each parcel of real estate leased by a Loan Party and on which any Collateral is stored or kept, a consent and waiver of the lessor and any other Person by the Lenders, and which consent and waiver shall otherwise be in form and substance satisfactory to the Required Lenders. Upon obtaining a consent, the Loan Parties shall promptly record such consent in the real estate records for such Property.

*Section 9.9. Real Property Collateral.*  Upon request from the Agent and at the Loan Parties' sole cost and expense in accordance with the terms of this Agreement, the Loan Parties shall provide the Agent with:

(a)      mortgagee title insurance policies for the Real Property Collateral issued by a title insurance company reasonably satisfactory to the Agent (each a *"Mortgage Policy"* and, collectively, the *"Mortgage Policies"*) in amounts satisfactory to the Agent assuring the Agent that the Mortgage on such Real Property Collateral is a valid and enforceable first priority mortgage Lien on such Real Property Collateral free and clear of all defects and encumbrances except Permitted Liens, the legal description and endorsements with respect thereto shall be reasonably satisfactory to the Agent, and the Mortgage Policies otherwise shall be in form and substance reasonably satisfactory to the Agent;

(b)      an opinion of counsel to the Loan Parties, in form and substance satisfactory to Lenders indicating, among other things, that the mortgage Lien on such Real Property Collateral constitutes a valid and enforceable mortgage Lien on such Real Property Collateral;

(c)      an updated survey, in form and substance satisfactory to Lenders and certified to the Agent and the Lenders and its insurers by such surveyor to be correct and accurate and containing legal and metes and bounds descriptions of the Real Property Collateral, certified by such surveyor, containing only such encroachments, exceptions, and state of facts as are set forth in the Mortgage Policy acceptable to the Lenders; and

(d)      such other agreements, instruments or other documents and information as the Agent may request in order to perfect and protect its Lien on the Real Property Collateral.  The Company expressly authorizes the Agent and the Lenders to (i) charge any and all amounts payable, and all expenses incurred, in connection with recording the Mortgage, obtaining the Mortgage Policy, and all related matters (including, without limitation, any and all mortgage recording tax, intangible tax and documentary stamp tax and all title insurance premiums) to the Floor Plan Credit, and (ii) designate such amounts as an advance under the Floor Plan Credit.

*Section 9.10. Use of Proceeds.* All proceeds of Loans shall be used as provided in Section 5.14.

*Section 9.11. Consignment Units*.  The Company shall maintain and make available to the Agent and the Lenders at all times a complete, accurate, and detailed list of all Consignment Units held for sale or lease.  Before accepting a Consignment Unit from any supplier or manufacturer, the Company shall deliver to the Agent and the Lenders a letter from the supplier or manufacturer, in form and substance satisfactory to the Agent, confirming that the supplier or

48

manufacturer has an interest only in the particular Consignment Unit and any identifiable cash proceeds from that Consignment Unit and that the supplier or manufacturer does not have any interest in any other property of the Company, including without limitation any trade-in units associated with the sale or lease of the Consignment Unit.

Section 9.12. *Repurchase Agreements.*  The Company shall use its reasonable best efforts to cause the manufacturers of Eligible New Floor Plan Units to enter into inventory repurchase agreements in form and substance acceptable to the Collateral Agent.

Section 9.13.  *Purchase Option.*  If the Company intends to exercise its purchase option with respect to the Real Property subject to the Ground Lease, the Company shall deliver to the Agent (for the benefit of the Lenders) fee mortgage title insurance and all other agreements, documents, and instruments that the Lenders request to perfect and protect the Agent's Lien on that Real Property before the Company closes on the purchase option.

SECTION 10.    NEGATIVE COVENANTS.

Each Loan Party covenants that so long as any credit is available to or in use by the Company hereunder:

Section 10.1. *Name Change.*  The Loan Party shall not change its name, organizational identification number, or state of organization; provided however, that a Loan Party may change its name upon at least 30 days prior written notice to the Agent and the Lenders of the change and so long as, at the time of the written notification, the Loan Party provides any financing statements necessary to perfect the Liens of the Agent and the Lenders.

Section 10.2.  *Intentionally Omitted.*

Section 10.3. *Intentionally Omitted.*

Section 10.4. *Current Ratio.*  As of the end of the immediately preceding calendar month, the Company will not permit the Current Ratio to be less than 1.10.

Section 10.5.  *Limitation on Capital Expenditures*.  The Loan Parties shall not make any Maintenance Capital Expenditures or Expansion Capital Expenditures that, in the aggregate, exceed $1,000,000 per calendar year.

Section 10.6.  *Compensation; Management Fees.*  (a) The Company will not, at any time, permit total direct and indirect compensation to Horton to exceed the amounts permitted by Sections 1(c), 1(d), 2, and 9(h) of the Horton Employment Agreement.  The Company may pay incentive, bonus, and other cash compensation to Persons who are not Affiliates or directors, shareholders, or partners of the Company, LD Holdings, RV Acquisition, LDRV Holdings, or BRS LP or any of their respective Affiliates if the payment is consistent with the Company's past practices, is incurred in the ordinary course of business for services rendered to or on behalf of the Company, and is a deductible expense of the Company for federal income tax purposes or if the payment is otherwise permitted by Section 10.25.

49

(b)     The Company shall defer and not make (but may accrue) any payments under the Management Agreement or pay any other management fees and expenses.

(c)     During the term of this Agreement, the Company shall not (i) increase the salaries or other compensation of its C-Level Management employees, or (ii) pay any cash bonuses to C-Level Management of the Company.

*Section 10.7. Accounts Payable.*  Subject to the terms and conditions of the Orders, the Company will not extend any accounts payable beyond 60 calendar days past due, unless such accounts payable are disputed by the Company in good faith, are subject to a right of offset by the Company or otherwise similarly should not be paid in the business judgment of the Company, and could not materially adversely affect the assets (including, without limitation, any collateral under any of the Financing Documents) or operations of the Company or the rights or remedies of any Lender, the Agent, or the Collateral Agent.

*Section 10.8. Limitations on Debt.* The Loan Parties will not create, assume, guarantee, or otherwise incur or in any manner be or become liable in respect of any Debt, except:

(1)     Debt evidenced by the Notes (as amended from time to time);

(2)     Debt described on Schedule 10.8;

(3)     secured Debt of the Company permitted pursuant to Section 10.9(h) in an aggregate principal amount not to exceed $2,500,000;

(4)     debt under the New Notes; and

(5)     Debt in respect of Capital Lease Obligations to finance Capital Expenditures permitted by Section 10.5.

*Section 10.9. Limitation on Liens.* The Loan Parties will not create or incur, or suffer to be incurred or to exist, any Lien on any of their respective property or assets, whether now owned or hereafter acquired, or upon any income or profits therefrom, or transfer any property for the purpose of subjecting the same to the payment of obligations in priority to the payment of their respective general creditors, or acquire or agree to acquire any property or assets upon conditional sales agreements or other title retention devices, except:

(a)     Liens for property taxes and assessments or governmental charges or levies and Liens securing claims or demands of mechanics and materialmen, *provided* payment thereof is not at the time required by Section 9.4; *provided further* in each case, the obligation secured is not overdue or, if overdue, is bonded or the execution of which is stayed by appropriate judicial action; and *provided finally* that any such Lien is subject and subordinate to the Liens of the Security Documents, the Epayables Security Agreement, and the L/C Security Agreement, as the case may be, unless otherwise provided by operation of law;

50

(b)    Liens of or resulting from any judgment or award, the time for the appeal or petition for rehearing of which shall not have expired, or in respect of which the Company shall at any time in good faith be prosecuting an appeal or proceeding for a review and in respect of which the obligation secured by such Lien is bonded or a stay of execution pending such appeal or proceeding for review shall have been secured; *provided* that any such Lien is subject and subordinate to the Liens of the Security Documents and the Liens of the L/C Security Agreement and Epayables Security Agreement;

(c)    Liens incidental to the conduct of business or the ownership of properties and assets (including Liens in connection with worker's compensation, unemployment insurance and other like laws, warehousemen's and attorneys' liens and statutory landlords' liens) and Liens to secure the performance of bids, tenders or trade contracts, or to secure statutory obligations, surety or appeal bonds or other Liens of like general nature incurred in the ordinary course of business and not in connection with the borrowing of money; *provided* in each case, the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate actions or proceedings and is bonded or the execution of which is stayed by appropriate judicial action; and *provided further* that any such Lien is subject and subordinate to the Lien of the Security Documents and the Liens of the L/C Security Agreement and Epayables Security Agreement, unless otherwise provided by operation of law;

(d)    minor survey exceptions or minor encumbrances, easements or reservations, or rights of others for rights-of-way, utilities, and other similar purposes, or zoning or other restrictions as to the use of Real Properties, that do not in any event materially impair the value of the Real Property or the use thereof in the operation of the business of the Company;

(e)    Liens existing as of the Agreement Date and reflected in Schedule 5.15;

(f)    Liens of the Security Documents and Liens expressly permitted pursuant thereto;

(g)    Liens incurred after the Agreement Date given to secure the payment of the purchase price incurred in connection with the acquisition of fixed assets useful and intended to be used in carrying on the business of the Company, including Liens existing on such fixed assets at the time of acquisition thereof, whether or not such existing Liens were given to secure the payment of the purchase price of the fixed assets to which they attach so long as they were not incurred, extended, or renewed in contemplation of such acquisition, provided that (i) the Lien shall attach solely to the fixed assets acquired or purchased, (ii) at the time of acquisition of such fixed assets, the aggregate amount remaining unpaid on all Debt secured by Liens on such fixed assets whether or not assumed by the Company shall not exceed 100% of the lesser of the total purchase price or Fair Market Value at the time of acquisition of such fixed assets (as determined in good faith by the Board of Directors of the Company), and (iii) all such Debt shall have been incurred within the limitations provided in Section 10.8(3);

(g)    Liens resulting from deposits made with insurance companies to secure the obligation of the Company to make installment payments of premiums, so long as such deposits do not exceed $75,000 in the aggregate at any time;

51

(h)     Interests of lessors under operating leases in effect on the Petition Date and listed on Schedule 10.9(h);

(i)     Claims of licensees to intellectual property licensed by the Company to the licensees in the ordinary course of business;

(j)     Liens securing the Pre-Petition Indebtedness;

(k)     Liens arising under the Epayables Security Agreement; and

(l)     Liens arising under the L/C Security Agreement.

The prohibition provided for in this Section 10.9 specifically includes, without limitation, any effort by any Loan Party, any Committee, or any other party-in-interest in the Chapter 11 Cases to prime or create *pari passu* to any claims or interest of the Agent or the Lenders any Lien (other than the Carve-Out up to the applicable Carve-Out Amount) regardless of whether those claims or interests may be "adequately protected."

*Section 10.10. Distributions.*  The Loan Parties will not at any time declare or make, or incur any liability to declare or make, any Distribution; provided that, if the Loan Parties are not in breach of or default under this Agreement and the Distributions will not cause the Loan Parties to be in breach or default under this Agreement (with notice, lapse of time, or otherwise), the Company may (a) make Distributions to LD Holdings from time to time in amounts sufficient to allow LD Holdings to pay franchise and other taxes payable by LD Holdings to maintain its corporate existence, provided the total amount of such Distributions shall not exceed $36,000 in the aggregate during the term of this Agreement (other than payments of up to $6,500 per month under the Macaluso Agreement and up to $1,300 per day and $6,500 per month under the Salvati Agreement), and (b) make payments of board fees to non-employee directors in an amount not greater than $6,250 per calendar month for each such outside director, together with reasonable and customary out-of-pocket expenses and arrangements in connection with such director's services to the Company (other than payments permitted in clause (a) above with respect to the Macaluso Agreement and the Salvati Agreement).

*Section 10.11. Restricted Investment.* None of the Loan Parties will make or authorize any Restricted Investments.

*Section 10.12. Merger, Consolidation, Etc.* None of the Loan Parties shall consolidate with or merge with any other corporation or convey, transfer, or lease substantially all of their respective assets in a single transaction or series of transactions to any Person.

*Section 10.13. Sale of Assets.* None of the Loan Parties shall make any Asset Disposition.

*Section 10.14. Issuance of Common Stock.* None of the Loan Parties shall issue any shares of capital stock of any class (or any options, warrants, convertible securities or rights with respect thereto) after the Agreement Date (except that LD Holdings may issue shares in

connection with a merger of LD Holdings with RV Acquisition as long as the merger does not trigger a Change in Control).

*Section 10.15. Sale-and-Leasebacks.*  None of the Loan Parties shall enter into any Sale-and-Leaseback Transaction.

*Section 10.16. Prohibition of Change in Fiscal Year and Accounting Methods.* The Loan Parties will not modify or change their respective fiscal year-ends for accounting purposes from December 31 of any year or their method of accounting (other than as may be required to conform to GAAP) or enter into, modify, or terminate any agreement currently existing, or at any time hereafter entered into with any third party for the preparation or storage of any Loan Party's or its Subsidiaries' accounting records without that third party agreeing to provide the Agent information regarding Loan Parties and their Subsidiaries' financial condition.

*Section 10.17. Sale or Discount of Receivable.*  The Loan Parties will not discount or sell any notes receivable or accounts receivable.

*Section 10.18. Subsidiaries.* The Company will not create or own any Subsidiary other than LDRV Holdings.  LD Holdings will not create or own any Subsidiary except for the Company.  RV Acquisition will not create or own any Subsidiary except for LD Holdings.  The Company will not contribute or otherwise transfer any assets to LDRV Holdings, and LDRV Holdings will not acquire any assets during the term of this Agreement.

*Section 10.19. Partnerships, Joint Ventures, and LLCs.* None of the Loan Parties will act or participate as a general or limited partner in any partnership or as a joint venturer in any joint venture or as a member of any limited liability company.

*Section 10.20. Margin Securities.* None of the Loan Parties will own, purchase, or acquire (or enter into any contract to purchase or acquire) any "*margin security*" as defined by any regulation of the Board of Governors of the Federal Reserve System as now in effect or as the same may hereafter be in effect other than Securities received by the Company from an Account Debtor that is the subject of any proceedings under the Bankruptcy Code or any other comparable bankruptcy or insolvency law applicable under the law of any other country or political subdivision thereof.

*Section 10.21. Payments of Debt.* The Loan Parties shall not, directly or indirectly or through any Affiliate, purchase, redeem, retire, acquire, advance, or pay any Debt of any Loan Party or deposit with any trustee in defeasance of any indenture under which such Debt may be outstanding, except: (a) the payment of the Debt evidenced by the Notes upon the terms and conditions provided for herein or therein or under any Security Document; (b) the payment of any amounts due with respect to the Existing Letters of Credit and the L/C Security Agreement; (c) amounts due with respect to the Epayables Program and the Epayables Security Agreement; and (d) Debt incurred within the limitations of Section 10.8(3).

53

     *Section 10.22. No Amendment of Articles of Incorporation or By-Laws.* The Loan Parties covenants that they will not permit any amendment to or modification of their respective Governing Documents.

     *Section 10.23. Guaranties.* None of the Loan Parties will become or be liable in respect of any Guaranty (except to the extent permitted by Section 10.8).

     *Section 10.24. Amendments to Other Documents.* The Company will not cause or permit, directly or indirectly, any amendment, waiver, consent, or modification of the Ground Lease, the Stockholders Agreement, the Noncompete Agreement, the Stock Purchase Agreement, or the Indenture or any related documents.

     *Section 10.25. Transactions with Affiliates.* No Loan Party will enter into, directly or indirectly, any Material transaction or Material group of related transactions (including without limitation the purchase, lease, sale, or exchange of properties of any kind or the rendering of any service and including the employment as an officer of any immediate family member of an Affiliate) with (i) Bruckmann, Rosser, Sherrill, & Co., any Affiliate of Bruckmann, Rosser, Sherrill, & Co., any of their respective officers, directors, partners, or shareholders, or any successor thereto, (ii) any other Loan Party or any officer, director, or shareholder of any other Loan Party (directly or indirectly), or (iii) any other Affiliate of the Loan Party; *provided* that (a) in the case of transactions with Affiliates described in clause 10.25(iii), such transactions are permitted if pursuant to the reasonable requirements of the Company's business and upon fair and reasonable terms no less favorable to the Company than would be obtainable in a comparable arm's-length transaction with a Person not an Affiliate of the Company, and (b) in the case of transactions with Affiliates described in clause 10.25(iii) or with any other Loan Party in clause 10.25(ii), such transactions are permitted if they are described in and required by the Reorganization Plan. Nothing in this Section 10.25 prohibits the Ground Lease or the payment of the amounts expressly permitted by Sections 10.6 and 10.10 (but only to the extent permitted by Section 10.10(e)). Without limiting the generality of the foregoing, no Loan Party (directly or indirectly) may enter into any employment, management, consulting, advisory, or similar arrangement with, or other contract or arrangement for the provisions of services by, or to provide compensation to, any investor or any other director, partner, or stockholder of the any Loan Party, BRS LP, or any Affiliate of any of them other than the Employment Agreement dated May 14, 2004, between the Company and John Horton.

     *Section 10.26. Line of Business.* The Loan Parties will not engage in any business other than businesses in which they are respectively engaged on the date of this Agreement and businesses ancillary and related thereto that do not, individually or in the aggregate, materially change the business of the Company from the business in which the Company is presently engaged and will not suspend or go out of a substantial portion of its business.

     *Section 10.27. Termination of Pension Plans.* No Loan Party will withdraw from any Multiemployer Plan or permit any employee benefit plan maintained by the Company or any other Loan Party to be terminated if such withdrawal or termination would (a) result in withdrawal liability (as described in Part I of Subtitle B of Title 1V of ERISA) that could reasonably be expected to have a Material Adverse Effect or (b) the imposition of a Lien on any

Property of a Loan Party pursuant to Section 4068 of ERISA. The Loan Parties will not maintain, contribute to, or have any liability with respect to, any defined benefit plan under ERISA or be subject to, or obligated under, any Multiemployer Plan.

Section 10.28.   *Collateral Base*.   The Loan Parties will not permit at any time the difference of (a) the Collateral Base less (b) the aggregate principal amount of Floor Plan Loans outstanding to be less than $0.00.  All calculations of the Collateral Base in connection with the preparation of any Collateral Base Certificate originally shall be made by the Company and certified to the Agent and the Lenders; provided that the Agent may review and adjust, in the exercise of its reasonable credit judgment and with advance notice to the Loan Parties, any such calculation to (i) reflect its reasonable estimate of declines in value of any of the Collateral described in the certificate, (ii) correct any mistakes in the outstanding principal balance of the Floor Plan Loans as of the date of the certificate or the calculation of the value of any of the Floor Plan Units included in the calculations, and (iii) to the extent that the calculation is otherwise not in accordance with this Agreement.

Section 10.29. *Minimum EBITDA*.   The Company will not permit the Company's cumulative EBITDA for the period beginning on June 1, 2009, through each date specified below to be less than the EBITDA set forth next the respective date:

| **Period** | **Minimum EBITDA** |
| --- | --- |
| September 30, 2009 | $(15,951,000) |
| December 31, 2009 | $(21,348,000) |
| March 31, 2010 | $(16,813,000) |
| June 30, 2010 | $(15,888,000) |
| September 30, 2010 | $(17,064,000) |
| December 31, 2010 | $(18,997,000) |

Section 10.30. *Pre-Petition Indebtedness*.   The Loan Parties shall not consent to any amendment, supplement, or other modification of any of the terms or provisions contained in, or applicable to, (a) any Order or (b) the Pre-Petition Indebtedness.  Except for (i) claims of employees for unpaid wages, bonuses, accrued vacation, tuition reimbursement, and personal time, business expenses, and contributions to employee benefit plans for the period immediately preceding the Petition Date and pre-petition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, (ii) cure payments made in accordance with Section 365(b)(1)(A) of the Bankruptcy Court, (iii) claims of "Utilities" (within the meaning of Section 355 of the Bankruptcy Code) for services provided before the Petition Date and in the ordinary course of the Loan Parties' (other than any disputed claims or any disputed portions thereof) and the Utilities' businesses, respectively, and utility deposits, if any, made in accordance with Section 366 of the Bankruptcy Code, and (iv) payments to "Critical Vendors," which shall include payments to all pre-petition vendors in the ordinary course of business, approved by the Bankruptcy Court, no Loan Party shall make any payment in respect of, or retire, redeem, defease, or repurchase any pre-petition indebtedness.

*Section 10.31.    Repayment of Indebtedness.*    Except pursuant to a confirmed reorganization plan that is acceptable to the Lenders in their sole discretion and except as specifically permitted in this Agreement, no Loan Party shall, without the express written consent of the Agent and the Lenders or pursuant to an order of the Bankruptcy Court, make any payment or transfer with respect to any Lien or Debt incurred or arising before the filing of the Chapter 11 Cases that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "Adequate Protection" under the Bankruptcy Code or otherwise.

*Section 10.32. Chapter 11 Claims.*  No Loan Party will incur, create, assume, suffer to exist, or permit any other super priority administrative claim that is *pari passu* with or senior to the claims of the Agent and the Lenders against the Loan Parties, except as set forth in Section 1.6.

SECTION 11.    EVENTS OF DEFAULT.

An "*Event of Default*" shall exist if any of the following conditions or events shall occur and be continuing:

(a)    the Company defaults in the payment of any principal of any Loan when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration or otherwise; or

(b)    the Company defaults in the payment of any interest on any Loan or of any fee or other Obligation payable by the Loan Parties (other than Obligations referred to in paragraph (a) of this Section 11) hereunder for more than three Business Days after the same becomes due and payable; or

(c)    a Loan Party defaults in the performance of or compliance with any term contained in:

(i)    Section 7.1(b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (m), or (n), Section 7.2, Section 7.3, Section 9.2(b)(i), (ii), (iii), (vi), or (xiv), Section 9.13, or any of Sections 10.1 through 10.27, and any of Sections 10.29 through 10.32 (for which there is no cure period for any of the foregoing sections or clauses); or

(ii)    Section 10.28, and such default is not remedied within two (2) Business Days after the Agent's receipt of any Collateral Base Certificate that indicates a violation of Section 10.28 or within two Business Days after a notice of the default is delivered to the Company; or

(iii)    Section 7.1(a) or Section 7.1(l), and such default is not remedied within 30 days after notice of the default is delivered to the Company; or

(d)    any Loan Party defaults in the performance of or compliance with any term contained herein applicable to such party (other than those referred to in paragraphs (a), (b) and (c) of this Section 11) or of any other Financing Document and such default is not remedied

within 10 days after the earlier of (i) a Responsible Officer of the Company obtaining actual knowledge of such default and (ii) the Company receiving written notice of such default from any Lender (any such written notice to be identified as a "*notice of default*" and to refer specifically to this paragraph (d) of Section 11); or

(e)        any representation or warranty made in writing by or on behalf of any Loan Party, as the case may be, or by any officer of the Company or a Loan Party, in each case in any Financing Document or in any writing by the Company, another Loan Party, or, as the case may be, any officer of the Company or Loan Party, furnished to any Lender in connection with the transactions contemplated hereby proves to have been false or incorrect in any Material respect on the date as of which made and shall remain Material; or

(f)        except for pre-petition defaults under the New Notes, Pre-Petition Credit Agreement, defaults occasioned by the filing of the Chapter 11 Cases, and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, (i) any Loan Party is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or make-whole amount or interest on any Debt that is outstanding, provided that such past-due Debt is in an aggregate principal amount of at least $500,000 beyond any period of grace provided with respect thereto, or (ii) any Loan Party is in default in the performance of or compliance with any term of any evidence of any Debt in an aggregate principal amount of at least $500,000 or of any mortgage, indenture, or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition such Debt has become, or has been declared, due and payable before its stated maturity or before its regularly scheduled dates of payment, or (iii) as a consequence of the occurrence or continuation of any event or condition (other than the passage of time or the right of the holder of Debt to convert such Debt into equity interests), any Loan Party has become obligated to purchase or repay Debt before its regular maturity or before its regularly scheduled dates of payment in an aggregate principal amount of at least $500,000; or

(g)        *Intentionally Omitted.*

(h)        *Intentionally Omitted.*

(i)        a default shall occur under, or an "*Event of Default*" as such term is defined in the Collateral Agency Agreement or any other Security Document shall occur and be continuing or any default shall occur under the Stock Purchase Agreement that reasonably could be expected to have a Material Adverse Effect on the Company or any other Loan Party; or

(j)        a final judgment or judgments for the payment of money aggregating in excess of $500,000 is rendered against any Loan Party and which judgment is not, within 60 days after entry thereof, bonded, discharged, or stayed pending appeal, or is not discharged within 60 days after the expiration of such stay; or

(k)        if (i) any Plan shall fail to satisfy the minimum funding standards of ERISA or the Code for any plan year or part thereof or a waiver of such standards or extension of any amortization period is sought or granted under Section 412 of the Code, (ii) a notice of intent to

terminate any Plan shall have been or is reasonably expected to be provided to participants in such Plan or filed with the PBGC, or the PBGC shall have instituted proceedings to terminate or appoint a trustee to administer any such Plan or the PBGC shall have notified a Loan Party or any ERISA Affiliate that such a Plan may become a subject of any such proceedings, (iii) the aggregate "*amount of unfunded benefit liabilities*" (within the meaning of Section 4001(a)(l8) of ERISA) under all Plans that are subject to Section 302 or Title IV of ERISA, determined in accordance with Title IV of ERISA, shall exceed $500,000, (iv) the Company, any other Loan Party, any ERISA Affiliate, or any trustee or plan administrator for the LDRV ESOP or the LDRV ESOT shall have incurred any liability pursuant to Title I (other than normal operating liabilities under a Plan) or IV of ERISA, the prohibited transactions tax provisions of Section 4975 of the Code or any other penalty or excise tax provisions of the Code relating to employee benefit plans, (v) the LDRV ESOP or the LDRV ESOT shall have violated the trust requirements of Section 403 of ERISA, (vi) the Company, any other Loan Party, or any ERISA Affiliate withdraws from any Multiemployer Plan, or (vii) the Company or any other Loan Party establishes or amends any employee welfare benefit plan that provides post-employment welfare benefits in a manner that would increase the liability of the Loan Party thereunder; and any such event or events described in clauses (i) through (vii) above, either individually or together with any other such event or events, could reasonably be expected to have a Material Adverse Effect; or

(l)        a Change in Control shall have occurred; or

(m)        the IRS or the Department of Labor provides written notification that it has determined, or a complaint is filed with a court of competent jurisdiction alleging, and such notification or such complaint has not been withdrawn or dismissed within 120 days, after the date of such notification or such complaint, that a breach of fiduciary duty under ERISA or a prohibited transaction under ERISA or the Code may have or has occurred with respect to the Lazy Days ESOP or the LDRV ESOP (or the Alliance ESOP, if the breach of fiduciary duty under ERISA or a prohibited transaction would have an adverse effect on the Company or the LDRV ESOP), if such occurrence could reasonably be expected to cause a Material Adverse Effect on the Company; or

(n)        the Company defaults in the performance of or compliance with the Ground Lease, that has not been cured within any applicable cure period provided by the Ground Lease; or

(o)        any Loan Party fails to maintain all its bank accounts, cash management accounts, checking accounts, savings accounts, and other accounts with the Agent, or fails to cause all remittances, receipts, and other funds (in every form and from every source) the Loan Party receives or obtains to be deposited into the Operating Account; or

(p)        the obligation of any Guarantor under any Related Party Guaranty is limited or terminated by operation of law, the Guarantor, or otherwise, at any time before the termination and payment in full of all amounts payable with respect to the Floor Plan Credit; or

(q)        the occurrence of any of the following in any of the Chapter 11 Cases:

(i)        the filing of a motion (or the support of any motion), taking of any action, or the filing of any plan of reorganization or disclosure statement attendant to any plan of reorganization by a Loan Party in any Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement (other than with respect to a financing used, in whole or in part, to repay in full the Secured Obligations so long as no further financing of the Loan Parties during or after the Chapter 11 Cases is to be provided by the Agent or any of the Lenders); (B) to grant any Lien other than Permitted Liens on or affecting any Collateral; (C) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral of the Agent under Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Required Lenders; or (D) to authorize any other action or actions adverse to the Agent or the Lenders, or their rights and remedies under this Agreement or any other Financing Document or their interests in the Collateral that would, individually or in the aggregate, have a Material Adverse Effect;

(ii)        the filing of any plan of reorganization (other than the Reorganization Plan) or any material amendment or supplement of the Reorganization Plan by a Loan Party or any other Person to which the Agent or the Lenders do not consent or otherwise agree to the treatment of their claims that adversely affects or could adversely affect the financial condition or performance of the Loan Parties or the reorganized Loan Parties or the ability of the reorganized Loan Parties to perform one or more of their respective obligations under the proposed Exit Facility (as defined in the Reorganization Plan), unless such plan provides for the payment in full of the Secured Obligations and the termination of the Commitments, provides for the payment in full of all obligations owed by the Loan Parties with respect to the Epayables Program and the termination of all commitments of BOA to fund under the Epayables Program, provides for the termination, cancellation, and return to BOA of the Existing Letters of Credit, and provides that no further financing of the Loan Parties during or after the Chapter 11 Cases is to be provided by BOA, the Agent, or any of the Lenders in any manner;

(iii)        the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for the termination of the Commitments and repayment in full in cash of all the Secured Obligations under this Agreement on or before the effective date of the plan or plans;

(iv)        the entry of an order staying, amending, vacating, supplementing, or otherwise modifying the Financing Documents or the Interim Order or the Final Order without the written consent of all the Lenders, or the entry of an order granting, or granting in part, a motion for reconsideration with respect to the Interim Order or the Final Order;

(v)        the Final Order is not entered promptly following the expiration of the Interim Order;

(vi)        the payment of, or application for authority to pay, a pre-petition claim without the Required Lenders' prior written consent or pursuant to an order of the

Bankruptcy Court after notice and hearing, unless otherwise permitted under this Agreement;

(vii)    the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any of the Collateral upon the entry of the Final Order;

(viii)    the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the business of a Loan Party (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code);

(ix)    the sale, without the Required Lenders' consent, of all or substantially all of a Loan Party's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in any Chapter 11 Case, or otherwise that does not provide for payment in full of the Obligations and the termination of the Commitments;

(x)    the dismissal of any of the Chapter 11 Cases, or the conversion of any of the Chapter 11 Cases to one under Chapter 7 of the Bankruptcy Code, or any Loan Party files a motion or other pleading seeking the dismissal of any of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise;

(xi)    the rejection of the Ground Lease;

(xii)    any adversary proceeding is brought in the Chapter 11 Case with respect to the Ground Lease or the Company breaches, defaults under, or otherwise violates the provisions of the Global Settlement and Lease Assumption Agreement;

(xii)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute on or enforce a Lien on any Collateral, or (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(xiv)    the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Secured Obligations owing under this Agreement or any other Financing Document;

(xv)    the failure in any material respect of any Loan Party to perform any of its obligations under the Interim Order or the Final Order;

(xix)    the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the Agent, on behalf of the Agent and the Lenders;

(xx)    the filing of any objection to the Reorganization Plan that is not dismissed, overruled, withdrawn, or resolved by the Bankruptcy Court in a manner acceptable to the Agent and the Lenders, in their sole discretion, within 45 days after the Petition Date;

(xxi)    a challenge by any person in any manner of any of the following that is not dismissed, overruled, withdrawn, or resolved by the Bankruptcy Court in favor the Agent or the Lenders before entry of the Confirmation Order: (A) any of the Pre-Petition Indebtedness, the Pre-Petition Credit Agreement or any related Financing Document (as defined in the Pre-Petition Credit Agreement), or the Liens or priority of the Liens or priority of the Liens in favor the Agent or the Lenders provided in those documents, (B) any of the Obligations, this Agreement, any other Financing Document, or the Liens or the priority of the Liens in favor of the Agent and the Lenders provided in those documents, or (C) the proposed Exit Facility (as defined in the Reorganization Plan) or the documents, Liens, or priority of Liens negotiated by the parties with respect to the proposed Exit Facility; or

(xxii)    the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against BOA, the Agent, the Lenders, the Pre-Petition Agent, or the Pre-Petition Lenders, that is not dismissed, overruled, withdrawn, or resolved in favor of BOA, the Agent, the Lenders, the Pre-Petition Agent, or the Pre-Petition Lenders before entry of the Confirmation Order, including without limitation, challenging the extent, amount, legality, validity, priority, perfection, or enforceability of, or asserting any offset, defense, or counterclaim to (A) the Secured Obligations or the security interests and Liens of the Agent in respect of the Secured Obligations, or (B) the Pre-Petition Floor Plan Loans, the Pre-Petition Credit Agreement, or the security interests and Liens of the Pre-Petition Agent and Pre-Petition Lenders in respect thereof, or asserting any claims or causes of action, including without limitation, any actions under Chapter 5 of the Bankruptcy Code against BOA, the Agent, the Lenders, the Pre-Petition Agent, or the Pre-Petition Lenders.

As used in this Section 11, the terms "*employee benefit plan*" and "*employee welfare benefit plan*" shall have the respective meanings assigned to such terms in Section 3 of ERISA.

SECTION 12.    REMEDIES ON DEFAULT, ETC.

*Section 12.1. Intentionally Omitted.*

*Section 12.2. Default.*    If any Event of Default has occurred and is continuing, the obligation of the Lenders to extend further credit hereunder shall be suspended unless and until the conditions set forth in Section 4.2 are satisfied or waived in accordance with Section 17. Additionally, if any Event of Default has occurred and is continuing, the Required Lenders, by notice to the Company, may take one or more of the following actions: (a) terminate the obligations of the Lenders to extend any further credit hereunder; or (b) declare all the Notes then outstanding and all fees, charges, and other Obligations payable to the Lenders hereunder to be immediately due and payable.

61

Additionally, the Required Lenders, by three Business Days' notice to the Company and the Bankruptcy Court, may, in addition to any other remedies to which they are entitled, enforce any and all rights and remedies available to it under the Financing Documents or applicable law and seek relief from the automatic stay under Section 362 of the Bankruptcy Code. During that three Business Day notice period, the Company may continue to use its cash Collateral strictly for the purpose of paying only ordinary and necessary operating expenses in the ordinary course of its business and consistent with its past practice. During that three Business Day period and at all other times, the Company and the other Loan Parties will not under any circumstance fail to maintain all their bank accounts, cash management accounts, checking accounts, savings accounts, and other accounts with the Agent, or fail to cause all remittances, receipts, and other funds (in every form and from every source) they receive or obtain to be deposited into the Operating Account.

*Section 12.3. No Waivers or Election of Remedies, Expenses, Etc.* No course of dealing and no delay on the part of any Agent or any Lender in exercising any right, power, or remedy shall operate as a waiver thereof or otherwise prejudice such Agent's or Lender's rights, powers, or remedies. No right, power, or remedy conferred by any Financing Document upon any Agent or Lender shall be exclusive of any other right, power, or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute, or otherwise. Without limiting the obligations of the Loan Parties under Section 15, the Loan Parties, jointly and severally, shall pay to each Lender on written demand such further amount as shall be sufficient to cover all costs and expenses of such Lender incurred in any enforcement or collection under this Section 12, including, without limitation, reasonable attorneys' fees, expenses, and disbursements (including those of common counsel to the Lenders).

*Section 12.4. Interest Upon Acceleration.* Upon any Note being accelerated or otherwise becoming due and payable pursuant to Section 12.2, the Company shall pay the unpaid principal amount thereof, together with all accrued and unpaid interest thereon.

*Section 12.5.  Effect of Termination.*  On the date of termination of this Agreement, all Obligations, other than contingent obligations not yet due and payable (but including contingent reimbursement obligations of the Company with respect to Existing Letters of Credit) immediately shall become due and payable without notice or demand.  On the termination of this Agreement, BOA will be entitled to continue to hold the L/C Security Account until the final expiration and termination of all the Existing Letters of Credit unless and until the Company causes all the Existing Letters of Credit to be returned to BOA or collateralizes the Existing Letters of Credit with one or more back-to-back letters of credit, in an amount equal to 105% of the face amount of the Existing Letters of Credit, in form and substance and issued by a commercial bank reasonably satisfactory to BOA.  On termination of this Agreement, BOA will be entitled to continue to hold the Epayables Security Account until it no longer has any obligation to extend credit under the Epayables Program and all indebtedness and other amounts payable by the Company with respect to the Epayables Program have been paid in full.

No termination of this Agreement, however, shall relieve or discharge the Company or the other Loan Parties of their duties, Obligations, or covenants hereunder or under any other Financing Documents, and the Agent's Liens in the Collateral shall remain in effect until all

Obligations have been paid in full and the Lenders' obligations to provide additional credit hereunder have been terminated. When this Agreement has been terminated and all of the Obligations have been paid in full and the Lenders' obligations to provide additional credit under the Financing Documents have been terminated irrevocably, the Agent will, at the Company's sole expense, execute and deliver any termination statements, lien releases, mortgage releases, re-assignments of trademarks, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Agent's Liens and all notices of security interests and liens previously filed by the Agent with respect to the Obligations.

SECTION 13.    [INTENTIONALLY OMITTED].

SECTION 14.    ACKNOWLEDGMENT AND CONSENT.

Each Loan Party hereby acknowledges that it has reviewed the terms and provisions of this Agreement and each other document, instrument, and agreement amended or supplemented hereby or referenced herein to the fullest extent it deems necessary after receiving advice of its own legal counsel. Each Loan Party hereby confirms that each Security Document and the Collateral Agency Agreement to which it or any other Loan Party is a party or otherwise bound and all Collateral (as defined in the Security Documents, as applicable) encumbered thereby will continue to guaranty or secure, as the case may be, to the fullest extent possible the payment and performance of all Obligations and Secured Obligations (as defined in this Agreement and the Security Documents), and obligations under the Financing Documents, including without limitation the payment and performance of all such Obligations or Secured Obligations or obligations arising under such Financing Documents in respect of the Obligations or Secured Obligations of the Loan Parties now or hereafter existing under or in respect of this Agreement. Each Loan Party acknowledges and agrees that all of the Security Documents to which it or any other Loan Party is a party or otherwise bound shall continue in full force and effect and that all of its and their respective obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of this Agreement.

The Company hereby confirms that the L/C Security Agreement, and all Collateral (as defined in the L/C Security Agreement) encumbered thereby will continue to secure, to the fullest extent possible, the payment and performance of all obligations of the Company with respect to the Existing Letters of Credit. The Company acknowledges and agrees that the L/C Security Agreement shall continue in full force and effect and that all of its obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of this Agreement.

The Company hereby confirms that the Epayables Security Agreement, and all Collateral (as defined in the Epayables Security Agreement) encumbered thereby will continue to secure, to the fullest extent possible, the payment and performance of all obligations of the Company with respect to the Epayables Program. The Company acknowledges and agrees that the Epayables Security Agreement shall continue in full force and effect and that all of its obligations thereunder shall be valid and enforceable and shall not be impaired or limited by the execution or effectiveness of this Agreement.

SECTION 15.    EXPENSES, INDEMNITY, ETC.

*Section 15.1. Transaction Expenses.* Whether or not the transactions contemplated hereby are consummated, the Loan Parties, jointly and severally, shall pay all costs and expenses (including reasonable attorneys' fees of legal counsel and, if reasonably required, local or other counsel) incurred by the Agents, any Lender, or the Collateral Agents in connection with such transactions and in connection with any amendments, waivers, or consents under or in respect of the Financing Documents, the Existing Letters of Credit, or the L/C Security Agreement (whether or not such amendment, waiver, or consent becomes effective), including, without limitation: (a) the costs and expenses incurred in enforcing or defending (or determining whether or how to enforce or defend) any rights under the Financing Documents, the Existing Letters of Credit, the L/C Security Agreement, or in responding to any subpoena or other legal process or informal investigative demand issued in connection with the Financing Documents, the Existing Letters of Credit, the L/C Security Agreement, or by reason of being Lender hereunder, (b) the costs and expenses, including financial advisors' fees, incurred in connection with the insolvency or bankruptcy of any Loan Party or in connection with any work-out or restructuring of the transactions contemplated hereby, by the Financing Documents, the Existing Letters of Credit, the L/C Security Agreement, the Epayables Program, or the Epayables Security Agreement, (c) the initial and ongoing fees of the Collateral Agent in connection with the Collateral Agency Agreement as agreed in writing with the Company, and (d) the initial and ongoing fees of BOA in connection with the Existing Letters of Credit, the L/C Security Agreement, the Epayables Program, and the Epayables Security Agreement, (e) the preparation and review of reports, documents, and pleadings related to the  Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings, or conferences related to the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code. The Loan Parties, jointly and severally, shall pay, and will save each Lender harmless from, all claims in respect of any fees, costs, or expenses, if any, of brokers and finders (other than those retained by a Lender). It is understood and agreed that if any Lender should pay any costs and expenses that are provided by this Section 15.1 to be paid by the Loan Parties, the Loan Parties shall upon written demand by the Agent (accompanied by reasonable documentation of the costs and expenses that are the subject of such demand) reimburse such Lender in the amount of any such payment together with interest thereon from the tenth Business Day following date of such demand to the date of reimbursement therefor at a rate per annum equal to 0.25% above the Prime Rate.

*Section 15.2. General Indemnity.* Each Loan Party, jointly and severally, shall defend, protect, indemnify, and hold harmless BOA, each Lender, each Agent, and each of their respective Affiliates, including, without limitation, their respective officers, directors, employees, attorneys, and agents (collectively, the "*Indemnitees*") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses, and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees (which shall not exceed one counsel for the Lenders, in their capacity as lenders and such local counsel as may be reasonably required) in connection with any investigative, administrative, or judicial proceeding, whether or

64

not such Indemnitees shall be designated a party thereto), imposed on, incurred by, or asserted against such Indemnitees (whether direct or indirect, consequential or otherwise, and whether based on any federal or state laws or other statutory regulations, including, without limitation, securities, commercial, Code, and ERISA laws and regulations, under common law or in equity, or based on contract or otherwise, including those relating to violation of any environmental, health or safety laws or regulations, the past, present, or future operations of any Loan Party or any of its predecessors in interest, or the past, present, or future environmental, health, or safety condition of any properties thereof) in any manner relating to or arising out of (a) any Financing Document (or any predecessor document) or any agreement contemplated thereby, (b) the Existing Letters of Credit, or the L/C Security Agreement, (c) any act, event or transaction related or attendant thereto, the making of the Loans or any other loans by the Lenders to one or more of the Loan Parties since July 15, 1999, or (d) the use or intended use of the proceeds thereof (collectively with respect to the foregoing clauses (a) through (d), the "*Indemnified Matters*"); *provided, however,* the Loan Parties shall have no obligation to an Indemnitee hereunder with respect to Indemnified Matters to the extent caused by or resulting from the willful misconduct or gross negligence of such Indemnitee. Without limiting the generality of the foregoing, *"Indemnified Matters"* includes the creation of the LDRV ESOP and LDRV ESOT, their qualification as an employee stock ownership plan for the purposes of Section 4975(e)(7) of the Code at all times, the extension by the Company to the LDRV ESOP of the ESOP Loan and the use of the proceeds of that loan, the merger of the LDRV ESOP with the Alliance ESOP, the transfer of the ESOP Loan from the LDRV ESOP to the Alliance ESOP, the spin-off of the LDRV ESOP from the Alliance ESOP and the separation of the accounts of the Company's employees and transfer of those accounts from the Alliance ESOT to the LDRV ESOT, the transfer of the ESOP Loan from the Alliance ESOP and the Alliance ESOT to the LDRV ESOP and the LDRV ESOT together with the transfer of associated employer securities credited to a suspense account and pledged as security for the ESOP Loan, the exchange of Alliance Holdings stock for the stock of the Company and/or the stock of LDRV Holdings Corp. subsequent to the spin-off of the LDRV ESOP and the LDRV ESOT from the Alliance ESOP and the Alliance ESOT, the consummation of the ESOP Stock Purchase, the payment or forgiveness of all amounts due under the ESOP Loan, ESOP Note, and the ESOP Loan Agreement, the distribution of assets by the LDRV ESOP, and the termination of the LDRV ESOP.

To the extent that the undertaking to indemnify, pay, and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Loan Parties shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees. Each Loan Party further agrees that the indemnities set forth in this Section 15.2 are in addition to, and shall not in any manner limit or act as a waiver of, any rights, including, without limitation, any rights to indemnification or contribution, that the Indemnitees may have under any other document, instrument, or agreement or any applicable law.

*Section 15.3. Pre-Petition Credit Agreement.* The Loan Parties acknowledge and agree that (a) this Agreement is separate and distinct from the Pre-Petition Credit Agreement and (b) the Pre-Petition Credit Agreement and related documents are in full force and effect against the Loan Parties. The Loan Parties further agree and acknowledge that, by entering into this

Agreement, the Agent and the Lenders do not waive any "Default" or "Event of Default" that may exist under the Pre-Petition Credit Agreement or related documents.

*Section 15.4. Survival.* The obligations of the Loan Parties under this Section 15 will survive the payment or transfer of any Note, the enforcement, amendment, or waiver of any provision of the Financing Documents, the Existing Letters of Credit, the L/C Security Agreement, the Epayables Program, the Epayables Security Agreement, and the termination of any of the Financing Documents, the Existing Letters of Credit, the L/C Security Agreement, the Epayables Program, or the Epayables Security Agreement.

SECTION 16.     SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT.

All representations and warranties contained herein shall survive the execution and delivery of the Financing Documents, the documents pertaining to the Epayables Program, and the L/C Security Agreement, the making of the Loans, the transfer by any Lender of any of its Notes or portion thereof or interest therein, the payment of any Note and the assignment by any Lender of any part of its rights and obligations under this Agreement, the termination of any Existing Letter of Credit, and all representations and warranties contained herein may be relied upon by BOA or any subsequent Lender regardless of any investigation made at any time by or on behalf of BOA or such Lender. All statements contained in any certificate or other instrument delivered by or on behalf of a Loan Party pursuant to the Financing Documents shall be deemed representations and warranties of each Loan Party under the Financing Documents. Subject to the preceding sentence, the Financing Documents embody the entire agreement and understanding among the Agent, the Lenders, and the Loan Parties and supersede all prior agreements and understandings relating to the subject matter hereof.

Nothing in this Agreement constitutes a waiver of any of the representations and warranties of the Alliance ESOP in the Master Agreement and the Alliance ESOT in each certificate and opinion delivered in connection with the Original Credit Agreement and those representations and warranties survive entry into this Agreement and the consummation of the transactions contemplated by it, including all Related Transactions (as defined in each amended and restated version of the Original Agreement since its inception).

SECTION 17.     AMENDMENT AND WAIVER.

*Section 17.1. Requirements.* This Agreement and the Notes may be amended, and the observance of any term hereof or of the Notes may be waived (either retroactively or prospectively), with (and only with) the written consent of the Company, the Agents, and the Required Lenders, except that without the consent of all Lenders no such amendment, modification, or waiver shall increase the amount or extend the term of any Lender's Commitment or reduce the amount of any principal of or interest rate applicable to, or extend the maturity of, any Obligation owed to it or reduce the amount of the fees to which it is entitled hereunder or release any material part of the collateral security afforded by the Security Documents, the Epayables Security Agreement, or the L/C Security Agreement (except in connection with a sale or other disposition required or permitted to be effected by the provisions hereof, the Security Documents, the Epayables Security Agreement, or the L/C Security

66

Agreement) or change this Section or change the definition of "*Required Lenders*" or the advance rates for Borrowings under Section 1.1 or the amount or frequency of curtailment payments under Section 8.2 or change the number of Lenders required to take any action hereunder or under any of the other Financing Documents.

### Section 17.2. Solicitation of Lenders.

(a)     *Solicitation.* The Loan Parties will provide each Agent (and the Agents shall promptly furnish to each Lender (irrespective of the amount of its Commitment)) with sufficient information, sufficiently far in advance of the date a decision is required, to enable the Agents and Lenders to make an informed and considered decision with respect to any proposed amendment, waiver, or consent in respect of any of the provisions hereof or of the other Financing Documents. The Loan Parties will deliver executed or true and correct copies of each amendment, waiver, or consent effected pursuant to the provisions of this Section 17 or the provisions of any other Financing Document to each Lender promptly following the date on which it is executed and delivered by, or receives the consent or approval of, the Required Lenders. The Loan Parties will cooperate with the Agents appointed under Section 19.1 in connection with the preparation and processing of any such amendment, waiver, or consent.

(b)     *Payment.* The Loan Parties will not directly or indirectly pay or cause to be paid any remuneration, whether by way of supplemental or additional interest, fee, or otherwise, or grant any security, to any Agent or Lender as consideration for or as an inducement to the entering into by any Agent or Lender of any waiver or amendment of any of the terms and provisions hereof or of the other Financing Documents unless such remuneration is concurrently paid, or security is concurrently granted, on the same terms, ratably to each Agent and Lender.

### Section 17.3. Binding Effect, Etc. Any amendment or waiver consented to as provided in this Section 17 applies equally to all Agents and Lenders and is binding upon them and upon each future Agent and Lender and upon each Loan Party. No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default, or Event of Default not expressly amended or waived or impair any right consequent thereon. No course of dealing between any Loan Party and the Agent or any Lender nor any delay in exercising any rights hereunder or under any Note or other Financing Document shall operate as a waiver of any rights of any Lender or Agent. As used herein, the term "*this Agreement*" and references thereto shall mean this Agreement as it may from time to time be amended, restated, or supplemented.

SECTION 18.   NOTICES.

Except as otherwise specified herein, all notices and communications provided for hereunder shall be in writing and sent (a) by telecopy if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by a recognized overnight delivery service (specifying next Business Day delivery, with charges prepaid). Any such notice must be sent:

(i)       if to the Agent or any Lender, to the Agent or such Lender at the address specified for such communications in <u>Schedule A</u>, or at such other address as such Lender shall have specified to the Company in writing; or

(ii)       if to the Company or any other Loan Party, at 6130 Lazy Days Boulevard, Seffner, Florida 33584 to the attention of John Horton, with copies to Bruckmann, Rosser, Sherrill & Co., Inc., 126 East 56th Street, New York, NY 10022, Attention: Thomas J. Baldwin, and to Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attention: Kim Taylor, or at such other address as those parties shall have specified to the Agent and the Lenders.

Notices under this Section 18 will be deemed given only when actually received.

SECTION 19.    THE AGENT.

*Section 19.1. Appointment and Authorization.* Each Lender hereby appoints and authorizes Bank of America, N.A. (in its capacity as administrative agent for the Lenders hereunder, the "*Administrative Agent*") to each take such action as agent on its behalf and to exercise such powers hereunder and under the other Financing Documents as are designated to the Administrative Agent by the terms hereof and thereof together with such powers as are reasonably incidental thereto. Each Lender acknowledges and agrees that Bank of America, N.A. (in its capacity as collateral agent for the Lenders hereunder, the "*Collateral Agent*") has been appointed as Collateral Agent pursuant to the Collateral Agency Agreement dated as of the Agreement Date, and each Lender acknowledges that the Collateral Agent is authorized to take such action as agent on its behalf and to exercise such powers hereunder and under the other Financing Documents as are designated to the Collateral Agent by the terms hereof and thereof. The following provisions of this Section 19 shall apply to each Agent except as otherwise expressly provided for in the other Financing Documents including, without limitation, the terms and provisions of Section 6 of the Collateral Agency Agreement.

The Lenders expressly agree that each Agent is not acting as a fiduciary of the Lenders in respect of the Financing Documents, any Loan Party, or otherwise, and nothing herein or in any of the other Financing Documents shall result in any duties or obligations on an Agent or any of the Lenders except as expressly set forth herein. An Agent may resign at any time by sending 30 days prior written notice to the Company and the Lenders. In the event of any such resignation, the Required Lenders may appoint a new agent, which shall succeed to all the rights, powers, and duties of such Agent hereunder and under the other Financing Documents. Any resigning Agent shall be entitled to the benefit of all the protective provisions hereof with respect to its acts as an agent hereunder, but no successor Agent shall in any event be liable or responsible for any actions of its predecessor. If an Agent resigns and no successor is appointed, the rights and obligations of such Agent shall be automatically assumed by the Required Lenders and (i) the Company shall be directed to make all payments due each Lender hereunder directly to such Lender and (ii) such Agent's rights, if any, in the Financing Documents shall be assigned without representation, recourse, or warranty to the Lenders as their interests may appear.

*Section 19.2. Rights as a Lender.* Each Agent has and reserves all of the rights, powers, and duties hereunder and under the other Financing Documents as any Lender may have and may exercise the same as though it were not the Agent and the terms "*Lender*" or "*Lenders*" as used herein and in all of such documents shall, unless the context otherwise expressly indicates, include such Agent in its individual capacity as a Lender.

*Section 19.3. Standard of Care.* The Lenders acknowledge that they have received and approved copies of the Financing Documents and such other information and documents concerning the transactions contemplated and financed hereby as they have requested to receive and/or review. The Agents make no representations or warranties of any kind or character to the Lenders with respect to the validity, enforceability, genuineness, perfection, value, worth, or collectability hereof or of the Notes or any of the other Obligations or of any of the other Financing Documents or of the Liens provided for thereby or of any other documents called for hereby or thereby or of the Collateral. Neither an Agent nor any director, officer, employee, agent, attorney, or representative thereof (including any Collateral Agent therefor) shall in any event be liable for any clerical errors or errors in judgment, inadvertence, or oversight, or for action taken or omitted to be taken by it or them hereunder or under the other Financing Documents or in connection herewith or therewith except for its or their own gross negligence or willful misconduct. No Agent shall incur any liability under or in respect of this Agreement or the other Financing Documents by acting upon any notice, certificate, warranty, instruction, or statement (oral or written) of anyone (including anyone in good faith believed by it to be authorized to act on behalf of the Company or any other Loan Party), unless it has actual knowledge of the untruthfulness of same. Each Agent may execute any of its duties hereunder by or through employees, agents, and attorneys-in-fact and shall not be answerable to the Lenders for the default or misconduct of any such agents or attorneys-in-fact selected with reasonable care. Each Agent shall be entitled to advice of counsel concerning all matters pertaining to the agencies hereby created and its duties hereunder, and shall incur no liability to anyone and be fully protected in acting upon the advice of such counsel. Each Agent shall be entitled to assume that no Default or Event of Default exists unless notified in writing to the contrary by a Lender or the Company. Each Agent shall in all events be fully protected in acting or failing to act in accord with the instructions of the Required Lenders. Upon the occurrence of an Event of Default hereunder, each Agent shall take such action with respect to the enforcement of the Liens on the Collateral and the preservation and protection thereof as it shall be directed to take by the Required Lenders; *provided* that such direction shall not conflict with the provisions of law or of the Financing Documents. Each Agent shall in all cases be fully justified in failing or refusing to act hereunder unless it shall be indemnified to its satisfaction by the Lenders ratably and severally (i.e., each Lender shall pay its ratable share regardless of whether the other Lenders pay their respective ratable shares) against any and all liability and expense that may be incurred by such Agent by reason of taking or continuing to take any such action. Each Agent may treat the owner of any Note as the holder thereof until written notice of transfer shall have been filed with such Agent signed by such owner in form satisfactory to the Administrative Agent. Each Lender acknowledges that it has independently and without reliance on any Agent or any other Lender and based upon such information, investigations, and inquiries as it deems appropriate made its own credit analysis and decision to extend credit to the Company. It shall be the responsibility of each Lender to keep itself informed as to the creditworthiness of the Loan Parties, and an Agent shall have no liability to any Lender with respect thereto.

*Section 19.4. Costs and Expenses.* Each Lender agrees to reimburse each Agent for all reasonable costs and expenses suffered or incurred by each Agent or in performing its duties hereunder and under the other Financing Documents, or in the exercise of any right or power imposed or conferred upon each Agent hereby or thereby, to the extent that such Agent is not promptly reimbursed for same by the Loan Parties or out of the Collateral, all such reasonable costs and expenses to be borne by the Lenders ratably in accordance with the amounts of their Commitments (or unpaid principal amount of Loans with respect to any Commitments that have expired or been terminated). Any such reimbursement by the Lenders to an Agent shall not eliminate the Loan Parties' respective obligation to reimburse such Agent and the Lenders for such expenses hereunder.

*Section 19.5. Indemnity.* The Lenders shall ratably (based on the aggregate of outstanding Loans and unused Commitments, if any) and severally indemnify and hold each Agent, and its directors, officers, employees, agents, and representatives (including as such any security trustee therefor) harmless from and against any liabilities, losses, costs, and expenses suffered or incurred by them hereunder or under the other Financing Documents or in connection with the transactions contemplated hereby or thereby, regardless of when asserted or arising, except to the extent they are promptly reimbursed for the same by a Loan Party or out of the Collateral and except to the extent that any event giving rise to a claim was caused by the gross negligence or willful misconduct of the party seeking to be indemnified.

*Section 19.6 Consultation with Experts.* Each Agent may consult with legal counsel, independent public accountants, and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants, or experts.

SECTION 20.    PARTICIPATIONS.

No Lender may assign to any other person any part of its Commitments and/or its rights and obligations under this Agreement. Any Lender may, upon notice to the Company, grant participations in its Commitment or Loans to any other Lender or other lending institution (a "*Participant*")*; provided* that (i) the amount of each such participation granted by such Lender shall be in an amount not less than $10,000,000, (ii) no Participant shall thereby acquire any direct rights under this Agreement (including any consent or waiver rights), (iii) no Lender shall agree with a Participant not to exercise any of such Lender's rights hereunder without the consent of such Participant except for rights that, under the terms hereof, may only be exercised by all Lenders, and (iv) no sale of a participation in extensions of credit shall in any manner relieve the selling Lender of its obligations hereunder.

SECTION 21.    MISCELLANEOUS.

*Section 21.1. Successors and Assigns.* All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent Lender) whether

so expressed or not; *provided, however,* that the Loan Parties shall not assign or transfer their respective rights or obligations hereunder.

Section 21.2. *Actions and Proceedings.* Any legal action or proceeding against any Loan Party with respect to this Agreement may be brought in such of the courts of competent jurisdiction of the State of New York in New York County, the City of New York or in the United States District Court for the Southern District of New York as any Lender or its successors and assigns, as the case may be, may elect, and by execution and delivery of this Agreement, each Loan Party irrevocably submits to the nonexclusive jurisdiction of such courts for purposes of legal actions and proceedings hereunder and, in the case of any such legal action or proceeding brought in the above-named New York courts, hereby irrevocably consents, during such time, to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered mail, postage prepaid, to the Loan Parties at their address as provided in Section 18 hereof, or by any other means permitted by applicable law. If it becomes necessary for the purpose of service of process out of any such courts, the Loan Parties shall take all such action as may be required to authorize a special agent to receive, for and on behalf of it, service of process in any such legal action or proceeding, and shall take all such action as may be necessary to continue said appointment in full force and effect so that the Loan Parties will at all times have an agent for service of process for the above purposes in New York, New York. To the extent permitted by law, final judgment (a certified copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness of the Loan Parties to any Lender) against a Loan Party in any such legal action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on an unsatisfied judgment. Each Loan Party hereby irrevocably waives and agrees not to assert, by way of motion, as a defense, or otherwise, in any legal action or proceeding brought hereunder in any of the above-named courts, (i) that it or any of its Property is immune from the above-described legal process (whether through service or notice, attachment before judgment, attachment in aid of execution, or otherwise), (ii) that such action or proceeding is brought in an inconvenient forum, that venue for the action or proceeding is improper, or that this Agreement or any other Financing Document may not be enforced in or by such courts, or (iii) any defense that would hinder or delay the levy, execution, or collection of any amount to which any party hereto is entitled pursuant to a final judgment of any court having jurisdiction. Nothing in these provisions shall limit any right of any Lender to bring actions, suits, or proceedings in the courts of any other jurisdiction.

Section 21.3. *Severability.* Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

Section 21.4. *Construction.* Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein and in the other Financing Documents, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant. Where any provision herein refers to action to be taken by any Person, or that such

Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.  All Schedules and Exhibits referred to in this Agreement are an integral part of this Agreement and are incorporated by reference into it.

Section 21.5. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

Section 21.6. *Payments Due on Non-Business Days.* Anything in this Agreement or in the Notes to the contrary notwithstanding, any payment of principal of or interest on any Note that is due on a date other than a Business Day shall be made on the next succeeding Business Day (including the additional days elapsed in the computation of the interest payable on such next succeeding Business Day).

Section 21.7. *Governing Law.*  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS OF THE PARTIES SHALL BE GOVERNED BY, THE LAW OF THE STATE OF NEW YORK EXCLUDING CHOICE-OF-LAW PRINCIPLES OF THE LAW OF SUCH STATE THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF A JURISDICTION OTHER THAN SUCH STATE BUT INCLUDING SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

Section 21.8. *Agreement of Lenders.* Each of the Lenders hereby agrees with each other Lender that if it should receive or obtain any payment (whether by voluntary payment, by realization upon collateral, by the exercise of rights of set-off or banker's lien, by counterclaim or cross action, or by the enforcement of any rights under this Agreement, any of the other Financing Documents, or otherwise) in respect of the Obligations in a greater amount than such Lender would have received had such payment been made to the Collateral Agent and been distributed among the Lenders as contemplated by Section 3.4 of the Collateral Agency Agreement in respect of proceeds and avails of collateral then in that event the Lender receiving such disproportionate payment shall purchase for cash without recourse from the other Lenders an interest in the Obligations of the Company to such Lenders in such amount as shall result in a distribution of such payment as contemplated by said Section 3.4. In the event any payment made to a Lender and shared with the other Lenders pursuant to the provisions hereof is ever recovered from such Lender, the Lenders receiving a portion of such payment hereunder shall restore the same to the payor Lender, but without interest.

Section 21.9. *Waiver of Trial by Jury.* EACH OF THE PARTIES HERETO HEREBY, TO THE FULLEST EXTENT PERMITTED BY LAW, WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT

**UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER FINANCING DOCUMENTS**.

    *Section 21.10. Reproduction of Documents.* For the purposes of this Section 21.10, this Agreement and the other Financing Documents and all documents relating thereto, including, without limitation, (a) consents, waivers, and modifications that may hereafter be executed, (b) documents received by the Lenders in connection with the transactions contemplated by this Agreement (except the Notes themselves), and (c) financial statements, certificates, and other information previously or hereafter furnished to the Lenders, may be reproduced by any Lender by any photographic, photostatic, microfilm, microcard, miniature photographic, or other similar process, and such Lender may destroy any original document so reproduced. Each Loan Party agrees and stipulates that, to the extent permitted by applicable law, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by any Lender in the regular course of business) and any enlargement, facsimile, or further reproduction of such reproduction shall likewise be admissible in evidence. This Section 21.10 shall not prohibit any Loan Party, any Agent, or any Lender from contesting any such reproduction to the same extent that it could contest the original, or from introducing evidence to demonstrate the inaccuracy of any such reproduction.

* * * * *

IN WITNESS WHEREOF, the parties hereto have caused this Post-Petition Credit Agreement to be executed and delivered (in each of their respective capacities (including agency capacities)) as of the day and year first above written.

**LAZY DAYS' R.V. CENTER, INC.**,
a Florida corporation, debtor,
and debtor-in-possession

By:_____
Randall Lay, Chief Financial Officer

**RV ACQUISITION, INC.**
a Delaware corporation, debtor,
and debtor-in-possession

BY:_____
Randall Lay, Chief Financial Officer

**LD HOLDINGS, INC.**
a Delaware corporation, debtor,
and debtor-in-possession

BY:_____
Randall Lay, Chief Financial Officer

**LDRV HOLDINGS CORP.**
a Florida corporation, debtor,
and debtor-in-possession

BY:_____
Randall Lay, Chief Financial Officer

74

**BANK OF AMERICA, N.A.**, as Administrative Agent, as Collateral Agent, and as Lender

By: _____

Its: _____

75

**KEYBANK NATIONAL ASSOCIATION, as Lender**


By:  _____
Its:  _____

**SCHEDULE A**
**TO**
**POST-PETITION CREDIT AGREEMENT**

NAME AND ADDRESS OF LENDERS

Notices:                          Bank of America, N.A.
                                  101 East Kennedy Blvd, 7th Floor
                                  Tampa, FL 33602-5179
                                  Attention:  Joseph M. Martens
                                  Telecopier No.  (704) 208-3135


Payments:                         Account No.: 375 320 7600 (re: LAZY DAYS R.V. CENTER, INC.)
                                  ABA No: 1110000012


Floor Plan Commitment:            $34,450,000; if the Termination Date does not occur before April 1, 2010, the
                                  Floor Plan Commitment will be reduced to $23,850,000


                                  _____


Notices:                          KeyBank National Association
                                  Mailcode: OH-01-49-0422
                                  4900 Tiedeman Road
                                  Brooklyn, OH 44144
                                  Attention: Brian McDevitt
                                  Telecopier No.: (216) 813-6414


Payments:                         Account No.: 3057 (re: LAZY DAYS R.V. CENTER, INC.)
                                  ABA No: 041001039


Floor Plan Commitment:            $30,550,000; if the Termination Date does not occur before April 1, 2010, the
                                  Floor Plan Commitment will be reduced to $21,150,000

Notices with respect
to payments:                      KeyBank National Association
                                  Specialty Finance Service
                                  Reference: Lazy Days' R.V. Center, Inc.
                                  Attn: Wavia Jones

77

SCHEDULE B
TO
POST-PETITION CREDIT AGREEMENT


GENERAL PROVISIONS

Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of any Financing Document, the same shall be done in accordance with GAAP, to the extent applicable, except where such principles are inconsistent with the express requirements of such Financing Document.

DEFINED TERMS

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term (such definitions to be equally applicable to the singular and the plural forms thereof):

*"Accepted Manufacturer"* shall mean a manufacturer or vendor listed on Schedule C to this Agreement, as amended in writing from time to time by the Agent and the Required Lenders, in their sole and absolute discretion, whose products are eligible for inclusion as Eligible New Inventory in the Collateral Base.

*"Account Debtor"* means each Person obligated in any way on or in connection with an Account.

*"Accounts"* is defined in the Security Agreement.

*"Additional Insureds"* is defined in Section 9.2(d).

*"Adequate Protection"* means the adequate protection set forth in the Orders.

*"Adjusted LIBOR Rate"* means a rate per annum determined in accordance with Section 2.1.

*"Adjusted Prime Rate"* means a rate per annum determined in accordance with Section 2.1.

*"Adjustment Date"* is defined in Section 2.1.

*"Administrative Agent"* is defined in Section 19.1.

*"Affiliate"* means, at any time, and with respect to any Person, (a) any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person, and (b) any Person beneficially owning or

holding, directly or indirectly, five percent or more of any class of voting or equity interests of such first Person or any Person of which such first Person beneficially owns or holds, in the aggregate, directly or indirectly, five percent or more of any class of voting or equity interests. As used in this definition, "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. All Related Persons shall be deemed Affiliates of one another. "*Related Person*" means any Person in which the specified Person owns any material economic interest, and any other Affiliate or Family Member of such specified Person. "*Family Member*" means a spouse, any natural or adoptive sibling of any spouse thereof, and any direct lineal descendant (natural or adoptive) of any of the foregoing. Unless the context otherwise clearly requires, any reference to an "*Affiliate*" is a reference to an Affiliate of any Loan Party.

"*Agent*" or "*Agents*" means and includes each of the agents referred to in Section 19.1.

"*Agent's Report*" is defined in Section 8.6.

"*Agreement*" means this Post-Petition Credit Agreement among the Loan Parties, the Agent, and the Lenders, as the same may be amended, restated, extended, or otherwise modified from time to time in accordance with its terms.

"*Agreement Date*" means the date as of which this Agreement is dated and executed by the Loan Parties, the Agent, and the Lenders.

"*Alliance ESOP*" and "*Alliance ESOT*" means the Alliance Holdings, Inc. Employee Stock Ownership Plan and Trust dated July 15, 1999.

"*Alliance Holdings*" means Alliance Holdings, Inc., a Pennsylvania corporation, and its permitted successors.

"*Allowed Professional Fees*" has the meaning ascribed to that term in Section 1.6(c).

"*Amended and Restated Articles of Incorporation*" means the Amended and Restated Articles of Incorporation of Lazy Days' R.V. Center, Inc. filed with the Florida Department of State on August 6, 2002, in accordance with the Florida Business Corporation Act.

"*Approved Vendor*" means a manufacturer or vendor of new Floor Plan Units that the Company requests (in writing) the Agent consider eligible for the Agent's direct floorplan funding program and who is approved by the Agent and remains eligible for such program, all as reasonably determined by the Agent.

"*Asset Disposition*" means any Transfer except a Transfer (so long as such Transfer is permitted under this Agreement or the Security Documents) made in the ordinary course of business and involving (i) property that is inventory held for sale or lease and (ii) *de minimus* Transfers in the ordinary course of business of worn, damaged, or obsolete property of the Company.

"*Authorized Representative*" means those persons shown on the list of officers provided by the Company on the Agreement Date or on any update of any such list provided by the Company to the Lenders, or any further or different officer of the Company so named by any Authorized Representative of the Company or any other Loan Party in a written notice to the Lenders.

"*Bankruptcy Code*" shall mean Title 11 of the United States Code, as the same may from time to time be amended, modified, or supplemented.

"*Bankruptcy Court*" has the meaning ascribed to that term in the preamble to this Agreement.

"*BOA*" means Bank of America, N.A., in its individual capacity as the issuer of the Existing Letters of Credit and the lender under the Epayables Program, and includes any of its affiliates that provide those services and financing to the Loan Parties.

"*Borrowing*" means the total of Loans made to the Company by all the Lenders on a single date. Borrowings of Loans are made ratably from each of the Lenders according to their Percentages of the applicable Commitments.

"*BRS LP*" means Bruckmann, Rosser, Sherrill & Co. II, L.P., a Delaware limited partnership and an affiliate of Bruckmann, Rosser, Sherrill & Co., Inc.

"*Business Day*" means any day other than a Saturday, a Sunday, or a day on which commercial banks in Alpharetta, Georgia, or Seffner, Florida, are required or authorized to be closed.

"*C-Level Management*" means the Chief Executive Officer and the Chief Financial Officer or the substantive equivalent thereof.

"*Capital Lease*" means, with respect to any Person, any lease by that Person that requires such Person to concurrently recognize the acquisition of an asset and the incurrence of a liability in accordance with GAAP.

"*Capital Lease Obligation*" means, with respect to any Person and a Capital Lease, the amount of the obligations of such Person as the lessee under such Capital Lease that would, in accordance with GAAP, appear as a liability on a balance sheet of such Person.

"*Carve-Out*" has the meaning ascribed to that term in Section 1.4(c).

"*Carve-Out Amount*" has the meaning ascribed to that term in Section 1.4(c).

"*Change in Control*" means any of the following events or circumstances: (without limiting the provisions of Sections 9 and 10):

(i)        the failure for any reason of LD Holdings to own and hold 100% of the outstanding shares of all capital stock of the Company, free and clear of any Liens, other than because of (A) a transfer by LD Holdings to RV Acquisition upon the dissolution and termination of LD Holdings or pursuant to a merger of LD Holdings with and into RV Acquisition (as long as, immediately thereafter, RV Acquisition then owns 100% of the outstanding shares of all capital stock of the Company, free and clear of any Liens other than Liens securing the Obligations) or (B) the dissolution of LD Holdings in accordance with the terms of the Reorganization Plan at or immediately before the confirmation of the Reorganization Plan by the Bankruptcy Court, so long as no Loan Party makes any Distributions or Asset Transfers in connection with the dissolution and, as a result of the dissolution, either RV Acquisition (if it has not been dissolved) or the shareholders of RV Acquisition (on a pro rata basis) then own 100% of the outstanding shares of all capital stock of the Company, free and clear of any Liens other than Liens securing the Obligations);

(ii)       the failure for any reason of RV Acquisition to own and hold, directly or indirectly, 100% of the outstanding shares of all capital stock of LD Holdings, free and clear of any Liens (A) other than because of a merger of LD Holdings with and into RV Acquisition (as long as, immediately thereafter, RV Acquisition or LD Holdings (whichever is the surviving corporation of the merger) then owns 100% of the outstanding shares of all capital stock of the Company, free and clear of any Liens other than Liens securing the Obligations) or (B) the dissolution of RV Acquisition in accordance with the terms of the Reorganization Plan at or immediately before the confirmation of the Reorganization Plan by the Bankruptcy Court, so long as no Loan Party makes any Distributions or Asset Transfers in connection with the dissolution and, as a result of the dissolution, either LD Holdings (if it has not been dissolved) or the shareholders of RV Acquisition (on a pro rata basis) then own 100% of the outstanding shares of all capital stock of the Company, free and clear of any Liens other than Liens securing the Obligations);

(iii)      after a merger of LD Holdings and RV Acquisition, the failure of the surviving corporation to own and hold 100% of the outstanding shares of all capital stock of the Company, free and clear of any liens other than the Liens securing the Obligations;

(iv)       before the effective date of the Confirmation Order, the failure for any reason of BRS LP to own in the aggregate shares of capital stock of RV Acquisition representing at least 51% of the voting rights associated with all outstanding shares of capital stock of RV Acquisition, other than as a result of a transfer by BRS LP to an Affiliate of BRS LP;

(v)        any public distribution of equity of any class of the Company, LD Holdings, or RV Acquisition pursuant to a registration statement declared effective by the Securities and Exchange Commission under the Securities Act;

(vi)     any sale of all or substantially all of the capital stock or assets of the Company, LD Holdings, or RV Acquisition regardless of whether or not in connection with the merger or consolidation; and

(vii)     any recapitalization of the Company (whether or not in connection with a merger or consolidation) under circumstances in which the holders of a majority in voting power of the outstanding capital stock of the Company (or its direct or indirect parent company), immediately before the transaction, own less than a majority in voting power of the outstanding capital stock of the Company (or its direct or indirect parent company) immediately after the transaction.

*"Chapter 11 Cases"* has the meaning ascribed to that term in the preamble to this Agreement.

*"Code"* means the Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

*"Collateral"* means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by the Loan Parties or their Subsidiaries in or upon which a Lien is granted in any of the Financing Documents or the Orders and includes, without limitation, the assets, interests in assets, and proceeds thereof defined as "Collateral" in the Collateral Agency Agreement, the Security Agreement, the Copyright Security Agreement, the Guarantor Security Agreement, the Mortgage, the Pledge Agreement, the Trademark Security Agreement, and the Collateral Assignment.

*"Collateral Agency Agreement"* means the Collateral Agency Agreement dated as of the Agreement Date between the Company and the Collateral Agent, and as thereafter amended and restated from time to time.

*"Collateral Agent"* means Bank of America, N.A., and its successors under the Collateral Agency Agreement.

*"Collateral Assignment"* means the Collateral Assignment of Stock Purchase Agreement executed and delivered by RV Acquisition in favor of the Agent, in form and substance satisfactory to the Agent and the Lenders.

*"Collateral Base"* shall mean the calculated amount that, at any date of calculation, shall be the sum of the following:

(a)     the sum of (i) ninety-five percent (95%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category I** Eligible New Inventory that is aged not more than three hundred sixty-five (365) days from date of delivery to the Company, (ii) eighty percent (80%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume

purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category I** Eligible New Inventory that is aged more than three hundred sixty-five (365) days, but not more than five hundred forty-five (545) days, from date of delivery to the Company, and (iii) seventy percent (70%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category I** Eligible New Inventory that is aged more than five hundred forty-five (545) days, but not more than seven hundred thirty (730) days, from date of delivery to the Company; plus

(b)      the sum of (i) eight-two percent (82%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category II** Eligible New Inventory that is aged not more than three hundred sixty-five (365) days from date of delivery to the Company, (ii) sixty-seven (67%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category II** Eligible New Inventory that is aged more than three hundred sixty-five (365) days, but not more than five hundred forty-five (545) days, from date of delivery to the Company, and (iii) fifty-seven percent (57%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category II** Eligible New Inventory that is aged more than five hundred forty-five (545) days, but not more than seven hundred thirty (730) days, from date of delivery to the Company; plus

(c)      the sum of (i) seventy-two percent (72%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category III** Eligible New Inventory that is aged not more than three hundred sixty-five (365) days from date of delivery to the Company, (ii) fifty-seven (57%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category III** Eligible New Inventory that is aged more than three hundred sixty-five (365) days, but not more than five hundred forty-five (545) days, from date of delivery to the Company, and (iii) forty-seven percent (47%) of the original invoice price (excluding freight and, to the extent included on the invoice, any earned volume purchase rebates, earned advertising rebates, verifiable price protection, and earned incentives, credits, or similar items) of **Category III** Eligible New Inventory that is aged more than five hundred forty-five (545) days, but not more than seven hundred thirty (730) days, from date of delivery to the Company; plus

(d)     the sum of (i) eighty percent (80%) of NADA Wholesale Value of Eligible Used Inventory that has been held by the Company for not more than one hundred eighty (180) days from the date of receipt, plus (ii) sixty percent (60%) of the NADA Wholesale Value of Eligible Used Inventory that has been held by the Company for more than one hundred eighty (180) days from the date of receipt, but not more than three hundred sixty-five (365) days; provided however, that the amount included in the Collateral Base on account of Eligible Used Inventory shall never exceed $20,000,000; plus

(e)     sixty percent (60%) of the net book value of Eligible Accounts; provided, however, that the amount includable in the Collateral Base on account of Eligible Accounts shall never exceed seven million dollars ($7,000,000).

No Property of the Company shall be included in the Collateral Base if (1) the Collateral Agent, for the benefit of the Lenders, does not have a first priority security interest under the Uniform Commercial Code, to the extent applicable, in such Property, (2) any other Person has a perfected purchase money security interest in such Property, regardless of whether such purchase money security interest is a Permitted Lien, or (3) any of the representations and warranties set forth in the Security Documents with respect to that Property are not true and correct. For purposes of the foregoing calculation, Category I, Category II, and Category III Eligible New Inventory will be as set forth on Schedule C from time to time.

*"Collateral Base Certificate"* means a certificate in the form of Exhibit 10.28 (or another form acceptable to the Agent and the Required Lenders), to be certified by a Senior Financial Officer of the Company, setting forth the calculation by the Company of the Collateral Base, including a calculation of each component of the Collateral Base, in sufficient detail or otherwise in such detail as is reasonably satisfactory to the Agent.

*"Commitments"* means the Floor Plan Commitments.

*"Committee"* means any committee formed, appointed, and approved by the Bankruptcy Court in the Chapter 11 Cases.

*"Company"* means Lazy Days' R.V. Center, Inc., a Florida corporation, debtor, and debtor-in-possession, and a party to this Agreement, and includes its successors and assigns (by operation of law or otherwise).

*"Confirmation Order"* means a final, nonappealable order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or any other procedure approved by the Bankruptcy Court, in form and content satisfactory to the Agent and the Lenders, in their sole discretion, from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless the Agent and the Lenders waive that requirement), together with all extensions, modifications, and amendments thereto, confirming the Reorganization Plan and, among other things, authorizing the Loan Parties to execute, deliver, and perform the exit financing documents contemplated by the Reorganization Plan and ordering and confirming the first lien or

84

security interest of the Agent in the Collateral and in the collateral described in the other Security Documents (as defined in the exit financing documents).

*"Consignment Unit"* means a recreational vehicle or towable owned by a Person other than the Company that is in the Company's possession for sale on a consignment basis.

*"Contract in Transit"* shall mean, at any date of calculation, an Account of the Company as to which a Retail Funding Source is the Account Debtor and that shall have arisen from:

> (a)      the Company's sale or sale and delivery of a unit of Eligible New Inventory or a unit of  Eligible Used Inventory to a customer in exchange for Retail Paper; and

> (b)      the Company's legally binding but unconsummated agreement with a Retail Funding Source to sell such Retail Paper to the Retail Funding Source, so that the Company will receive the purchase price to be paid by the Retail Funding Source when it closes on the purchase of the Retail Paper from the Company.

*"Copyright Security Agreement"* means the Copyright Security Agreement, dated as of the Agreement Date, and executed and delivered by each Loan Party and the Agent.

*"Current Assets"* is to be calculated in accordance with GAAP and means cash and cash equivalents, liquid assets, contracts in transit, accounts receivable (excluding amounts due from officers, directors, shareholders employees, or Affiliates of the Company), and inventories on a FIFO basis, but excludes all prepaid expenses and other amounts and all capitalized expenses.

*"Current Liabilities"* is to be calculated in accordance with GAAP, except that unearned income and deferred rent are to be excluded and the following amounts are to be included: (a) in 2010 and 2011, 40% of the Company's LIFO reserve, (b) to the extent not duplicative of inclusions in accordance with GAAP, Current Maturities of Funded Debt, and (c) amounts due to officers, directors, shareholders, employees, and Affiliates of the Company (unless specifically subordinated to Lenders in a writing acceptable to the Lenders (in their sole discretion)). Additionally, so long as the Company does not reduce the outstanding principal balance of any of the New Notes by paying any cash to the holders of the New Notes (directly or indirectly) or pay the accrued and unpaid interest under the New Notes in cash, no portion of the payments due under the New Notes will be included in Current Liabilities to the extent, and only to the extent, that they would be classified as long-term liabilities in the absence of a default under the New Notes (as defined in the New Notes).

*"Current Maturities of Funded Debt"* means, at any time and with respect to any item of Funded Debt, the portion of such Funded Debt outstanding at such time that by the terms of such Funded Debt or the terms of any instrument or agreement relating thereto is due on demand or within one year from such time (whether by sinking fund, other required prepayment or final payment at maturity) and is not directly or indirectly renewable, extendible, or refundable at the

option of the obligor under an agreement or firm commitment in effect at such time to a date one year or more from such time.

*"Current Ratio"* means the ratio of (a) Current Assets to (b) Current Liabilities.

*"Daily Loan Balance"* is defined in Section 8.6.

*"Debt"* means, with respect to any Person, all obligations of such Person that, in accordance with GAAP (other than those items excluded below), shall be classified upon a balance sheet of such Person as liabilities of such Person, and in any event shall include without duplication:

      (a)      its liabilities for borrowed money;

      (b)      its liabilities for the deferred purchase price of property acquired by such Person (excluding accounts payable and accrued liabilities arising in the ordinary course of business but including, without limitation, all liabilities created or arising under any conditional sale or other title retention agreement with respect to such property);

      (c)      its Capital Lease Obligations;

      (d)      all liabilities for borrowed money secured by any Lien with respect to any property owned by such Person (whether or not it has assumed or otherwise become liable for such liabilities, provided if such Person shall not have assumed or otherwise become liable for such liability, the amount of such liability shall be the then Fair Market Value of such property);

      (e)      all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money);

      (f)      Swaps of such Person; and

      (g)      any Guaranty of such Person with respect to liabilities of a type described in any of clauses (a) through (e) hereof.

Debt of any Person shall include all obligations of such Person of the character described in clauses (a) through (g) to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is deemed to be extinguished under GAAP.

*"Default"* means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

*"Disposition Value"* means, at any time, with respect to any property the book value thereof, valued at the time of such disposition in good faith by any Loan Party.

"*Distribution*" means:

       (a)     dividends or other distributions or payments on capital stock (including so-called phantom stock) of a Loan Party or any ERISA Affiliate (except distributions in such stock);

       (b)     the redemption or acquisition of such stock or of warrants, rights, or other options to purchase such stock (except when solely in exchange for such stock) unless made, contemporaneously, from the net proceeds of a sale of such stock;

       (c)     any payment to any partner or shareholder of the Company, LD Holdings, RV Acquisition, BRS LP, or any Affiliate of any of them whether in respect of services rendered to the Company or otherwise (except as expressly permitted by this Agreement); and

       (d)     any management, consulting, advisory, or other generally similar payment or fee to any Person, except as expressly permitted by this Agreement.

"*Early Termination Date*" means any date, before the Expiration Date, on which the Company terminates this Agreement pursuant to Section 8.3.

"*EBITDA*" means, with respect to any period, the sum of (a) Net Income less extraordinary items for such period, *plus* (without duplication and to the extent deducted in the determination of Net Income) (b) interest expense (excluding interest expense attributable to the Floor Plan Credit) for the period, (c) income taxes imposed for that period, (d) depreciation for the period, (e) amortization for the period, (f) fees, costs, and expenses associated with the restructuring of the Loan Parties in connection with the Chapter 11 Cases that are incurred in 2009 and are limited to a maximum, aggregate amount of $4,184,000, and *plus or minus* (g) the net change in the LIFO reserve; all consistently calculated and determined in accordance with GAAP from period to period.

"*Effective Date*" means the later of (a) the Agreement Date or (b) the first date on which all of the conditions set forth in Section 4.1 have been fulfilled.

"*Eligible Account*" shall mean an Account of the Company that:

       (a)     constitutes a Contract in Transit or other sum due from a Retail Funding Source, or is any other Account approved by the Required Lenders from time to time;

       (b)     is subject to a perfected, first priority Lien in favor of Collateral Agent for the benefit of the Lenders, free from any other Lien;

       (c)     is not restricted by its terms so that it can not be assigned or transferred by the Company or can be assigned or transferred only with the

consent of the Account Debtor or another Person and such consent has not been obtained;

      (d)     has not remained unpaid more than fifteen (15) days past the date of submission to the Retail Funding Source with respect to any Contract in Transit or other Account for which a Retail Funding Source is the Account Debtor;

      (e)     is not payable by an Account Debtor who has suspended business, has made an assignment for the benefit of creditors, is insolvent, or is the subject of a voluntary or involuntary proceeding under any bankruptcy law or other law for the relief of debtors;

      (h)     is not subject to any material condition, contingency, allowance, defense, dispute, or any offset or counterclaim;

      (i)     otherwise constitutes collateral reasonably acceptable to the Required Lenders for borrowing purposes; and

      (j)     is not classified as a discrepancy as a result of the audit activities performed by the Collateral Agent from time to time as specified in this Agreement.

"*Eligible New Floor Plan Units*" means all inventory of the Company consisting of Floor Plan Units that are new and unused and that the Agent, in its reasonable judgment, deems to be Eligible New Floor Plan Units; provided that in no event shall inventory be deemed Eligible New Floor Plan Units unless all representations and warranties set forth in the Security Documents with respect to such inventory are true and correct and such inventory:

      (a)     is an asset of the Company to which it has good and marketable title, is freely assignable, and is subject to a perfected, first priority Lien in favor of the Collateral Agent free and clear of any other Liens;

      (b)     except as is in transit, out for repair, or at a sales event in the ordinary course of business, is located at the Company's facilities at 6130 Lazy Days Boulevard, Seffner, Florida, or such other locations as are approved in writing by the Agent and the Collateral Agent and, in the case of facilities not owned by the Company, that are at all times subject to landlord waiver agreements in form and substance satisfactory to the Collateral Agent;

      (c)     is a Class A, Class B, or Class C recreational vehicle and/or towable as classified by Recreational Vehicle Industry Association and is of the then current model year or the previous model year;

      (d)     has not been owned or held by the Company for more than 12 months; and

(e)      is not obsolete or slow moving, and is of good and merchantable quality and complies in all respects with all governmental standards applicable thereto, free from any defects that might adversely affect the market value thereof.

"*Eligible New Inventory*" shall mean Floor Plan Units that (a) are owned by the Company, and are subject to a perfected, first priority Lien in favor of Collateral Agent for the benefit of the Lenders, free from any Lien, and to which the Company has good and marketable title, (b) are located at the Company's facilities at 6130 Lazy Days Boulevard, Seffner, Florida, or any other locations as are approved in writing by the Agent and the Collateral Agent and, in the case of facilities not owned by the Company, that at all times are subject to landlord waiver agreements in form and substance satisfactory to the Agent, (c) consist of complete Floor Plan Units that are new, unused, untitled, and purchased from Accepted Manufacturers, (d) do not constitute Used Inventory, (e) are not subject to Contracts in Transit, and (f) otherwise constitute collateral reasonably acceptable to the Required Lenders for purposes of calculating the Collateral Base.

"*Eligible Repurchase Agreement*" means an agreement between a supplier of Floor Plan Units to the Company and the Collateral Agent providing for the supplier's agreement to repurchase the Company's Floor Plan Units sold to the Company by such supplier on such terms and conditions acceptable to the Agent in its discretion.

"*Eligible Used Floor Plan Units*" means all inventory of the Company consisting of Floor Plan Units that are used (i.e., Floor Plan Units that have been previously sold at retail, have been registered, documented, or titled in any state or jurisdiction, or have been purchased or acquired by the Company from a source other than the manufacturer, including trade-in inventory) and that the Agent, in its reasonable judgment, deems to be Eligible Used Floor Plan Units; provided that in no event shall inventory be deemed Eligible Used Floor Plan Units unless all representations and warranties set forth in the Security Documents with respect to such inventory are true and correct and such inventory:

(a)      is an asset of the Company to which it has good and marketable title, is freely assignable, and is subject to a perfected, first priority Lien in favor of the Collateral Agent free and clear of any other Liens;

(b)      except as is in transit, out for repair, or at a sales event in the ordinary course of business, is located at the Company's facilities at 6130 Lazy Days Boulevard, Seffner, Florida, or such other locations as are approved in writing by the Agent and the Collateral Agent and, in the case of facilities not owned by the Company, that are at all times subject to landlord waiver agreements in form and substance satisfactory to the Collateral Agent;

(c)      is a Class A, Class B, or Class C recreational vehicle and/or towable as classified by Recreational Vehicle Industry Association and is of the then current model year or the previous ten model years;

(d)      has not been owned or held by the Company for more than 12 months; and

89

(e)      is not obsolete or slow moving, and is of good and merchantable quality and complies in all respects with all governmental standards applicable thereto, free from any defects that might adversely affect the market value thereof.

"*Eligible Used Inventory*" shall mean Floor Plan Units that (a) are Used Units, (b) are owned by the Company, and are subject to a perfected, first priority Lien in favor of Collateral Agent for the benefit of the Lenders, free from any Lien, and to which the Company has good and marketable title, (c) are located at the Company's facilities at 6130 Lazy Days Boulevard, Seffner, Florida, or any other locations as are approved in writing by the Agent and the Collateral Agent and, in the case of facilities not owned by the Company, that at all times are subject to landlord waiver agreements in form and substance satisfactory to the Agent, (d) do not constitute Eligible New Inventory, (e) are not subject to a Contract in Transit, and (f) otherwise constitute collateral reasonably acceptable to the Required Lenders for purposes of calculating the Collateral Base.

"*Environmental Laws*" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements, or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including but not limited to those related to hazardous substances or wastes, air emissions, and discharges to waste or public systems.

"*Epayables Program*" means the extensions of credit by BOA to the Company pursuant to its "epayables program" and its "p-card program," up to an aggregate, maximum amount of $700,000, pursuant to the terms and conditions of BOA's standard documentation for that program and the Epayables Security Agreement.

"*Epayables Security Account*" means an account maintained by the Company with BOA exclusively to secure its indebtedness and other obligations to BOA under the Epayables Program and subject to the Epayables Security Agreement.

"*Epayables Security Agreement*" means the Epayables Account Security Agreement dated as of the date of this Agreement, between the Company and BOA, as amended and restated from time to time.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that is treated as a single employer together with the Company.

"*ESOP Loan*" means the loan in the aggregate principal amount of $131,712,859 from the Company to the Lazy Days ESOT pursuant to the terms and provisions of the ESOP Loan

Agreement, which loan was subsequently transferred to the Alliance ESOT and was most recently transferred to the LDRV ESOT.

"*ESOP Loan Agreement*" means the ESOP Loan and Pledge Agreement dated as of July 15, 1999 between the Company and the Lazy Days ESOT, which was subsequently modified in connection with the transfer of the ESOP Loan to the Alliance ESOT and was most recently transferred to the LDRV ESOT in connection with the spin-off of the LDRV ESOP from the Alliance ESOP.

"*ESOP Note*" is defined in Section 5.25.

"*Event of Default*" is defined in Section 11.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Existing Letters of Credit*" means (a) Irrevocable Standby Letter of Credit No. 68017398, dated February 21, 2007, issued by BOA at the request of the Company, as applicant, in favor of FFVA Mutual Insurance Company, as beneficiary, in an amount of up to $75,000, (b) Irrevocable Standby Letter of Credit No. 3093147, dated May 7, 2008, issued by BOA at the request of the Company, as applicant, in favor of Liberty Mutual Insurance Company, as beneficiary, in an amount of up to $200,000, and (c) Irrevocable Standby Letter of Credit No. 68027365, dated July 2, 2008, issued by BOA at the request of the Company, as applicant, in favor of Tampa Electric Company, as beneficiary, in an amount of up to $218,600, in each case, as amended from time to time.

"*Expansion Capital Expenditures*" means, (a) all expenses incurred during such period by the Company in connection with capital replacements, additions, renewals, or improvements to any of the capital assets of the Company that are required to be capitalized on the books and accounts of the Company in accordance with GAAP and (b) the amount of Capital Lease Obligations relating to all Capital Leases entered into during such period by the Company, and, as to each of (a) and (b), are for expansion activities that have been designated to constitute "*Expansion Capital Expenditures*."

"*Expiration Date*" means the date that is 60 days after the Petition Date.

"*Fair Market Value*" means, at any time and with respect to any Property, the sale value of such Property that would be realized in an arm's-length sale at such time between an informed and willing buyer and an informed and willing seller (neither being under a compulsion to buy or sell).

"*Federal Funds Rate*" means, for any period, a fluctuating interest rate per annum for each day during such period equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day

that is a Business Day, the average of the quotations for such day on such transactions received by the Agent from three Federal Funds brokers of recognized standing selected by the Agent.

*"Fee Letter"* means a fee letter, dated as of the Agreement Date, between the Company and the Agent and the Lenders, in form and substance satisfactory to the Agent and the Lenders.

*"Final Order"* means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or any other procedure approved by the Bankruptcy Court, which order must be satisfactory in form and substance to BOA, the Agent, and the Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, no stay of the order is in effect or such appeal or motion to reconsider has been dismissed or denied (unless the Agent and the Lenders waive that requirement), together with all extensions, modifications, and amendments thereto, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur Debt, and grant Liens under this Agreement and the other Financing Documents, as the case may be, and provides for the super priority of BOA's, the Agent's and the Lenders' claims, and authorizes the Company to execute the L/C Security Agreement and all documents pertaining to the Epayables Program, and grant a Lien on the L/C Security Account and the Epayables Security Account to BOA as provided in the L/C Security Agreement and the Epayables Security Agreement, respectively.

*"Financing Documents"* means this Agreement, the Notes, the Security Documents, and all other instruments, documents, and agreements executed pursuant to this Agreement.

*"Floor Plan Commitments"* is defined in Section 1.1.

*"Floor Plan Credit"* is defined in Section 1.1 and includes all amounts advanced to the Company under Section 1.1.

*"Floor Plan Loans"* is defined in Section 1.1.

*"Floor Plan Notes"* is defined in Section 1.1.

*"Floor Plan Units"* means inventory of the Company consisting of recreational vehicles and/or towables that are owned and held for future sale or lease by the Company in the ordinary course of its business, it being acknowledged and agreed that Floor Plan Units shall not include supplies or spare parts inventory.

*"Forecast"* is defined in Section 7.1(b).

*"Funded Debt"* means, with respect to any Person, all Debt of such Person (including, without limitation, the New Notes, the Obligations hereunder, and any other Debt other than Debt of the type described in clause (f) of the definition of *"Debt"*).

*"GAAP"* means generally accepted accounting principles as in effect from time to time in the United States of America.

92

*"Global Settlement Agreement"* means the Global Settlement and Lease Assumption Agreement executed by Wallace, the Company, and the Landlord, in the form of Exhibit 4.1(p)(xvi).

*"Governing Documents"* means, with respect to any Person, the certificate or articles of incorporation, bylaws, and other organizational documents of the Person.

"*Governmental Authority*" means

     (a)     the government of

          (i)     the United States of America or any State or other political subdivision thereof, or

          (ii)     any jurisdiction in which the Company conducts all or any part of its business, or which asserts jurisdiction over any properties of the Company, or

     (b)     any entity exercising executive, legislative, judicial, regulatory, or administrative functions of, or pertaining to, any such government.

*"Ground Lease"* means that certain Ground Lease dated July 15, 1999 between the Company and I-4, and as amended as of May 14, 2004, and as of October 12, 2006.

*"Guarantor"* means each Subsidiary of the Company, RV Acquisition, and LD Holdings, and *"Guarantor"* means any one of them.

*"Guarantor Security Agreement"* means one or more security agreements executed and delivered by each Guarantor in favor of the Agent, in each case, in form and substance satisfactory to the Agent and the Lenders.

"*Guaranty*" means, with respect to any Person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such Person guaranteeing or in effect guaranteeing any indebtedness, dividend, or other obligation of any other Person in any manner, whether directly or indirectly, including (without limitation) obligations incurred through an agreement, contingent or otherwise, by such Person:

     (a)     to purchase such indebtedness or obligation or any property constituting security therefor;

     (b)     to advance or supply funds (i) for the purchase or payment of such indebtedness or obligation, or (ii) to maintain any working capital or other balance sheet condition or any income statement condition of any other Person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation;

(c)      to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other Person to make payment of the indebtedness or obligation; or

(d)      otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.

In any computation of the indebtedness or other liabilities of the obligor under any Guaranty, the indebtedness or other obligations that are the subject of such Guaranty shall be assumed to be direct obligations of such obligor.

"*Hazardous Material*" means any and all pollutants, toxic or hazardous wastes, or any other substances that might pose a hazard to health or safety, the removal of which may be required or the generation, manufacture, refining, production, processing, treatment, storage, handling, transportation, transfer, use, disposal, release, discharge, spillage, seepage, or filtration of which is or shall be restricted, prohibited, or penalized by any applicable law (including, without limitation, asbestos, urea formaldehyde foam insulation, and polychlorinated biphenyls).

"*Horton*" means John Horton, an individual.

"*Horton Employment Agreement*" means the Employment Agreement dated May 14, 2004, between Horton and the Company, as amended as of December 28, 2006.

"*I-4*" means I-4 Land Holding Company Limited, a Florida limited liability company.

"*Indemnified Matters*" is defined in Section 15.2.

"*Indemnitees*" is defined in Section 15.2.

"*Indenture*" means the Indenture dated May 14, 2004, between the Company and The Bank of New York, as trustee, pursuant to which the New Notes were issued and are governed.

"*Insolvency Proceeding*" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state, federal, or national bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"*Intercompany Subordination Agreement*" means a subordination agreement executed and delivered by each Loan Party, and the Agent and the Lenders, the form and substance of which is satisfactory to the Agent and the Lenders.

"*Interim Order*" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments to that order, in form and substance

satisfactory to the Agent, that, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform the Financing Documents to which they are a party, substantially in the form of Exhibit 4.1(s)(i), the Company to execute and perform the Epayables Program documents and Epayables Security Agreement, and the Company to execute and perform the L/C Security Agreement.

"*Inventory*" has the meaning provided in the Security Agreement.

"*Investment*" shall mean any investment, made in cash or by delivery of property, by a Loan Party (i) in any Person, whether by acquisition of stock, Debt, or other obligation or Security, or by loan, Guaranty, advance, capital contribution, or otherwise, or (ii) in any property.

"*IRS*" is defined in Section 5.12.

"*Landlord Agreement*" means the Estoppel Certificate dated as of the Agreement Date, made by I-4 to and for the benefit of the Agent and the Lenders, in form and substance satisfactory to the Agent and the Lenders.

"*Lazy Days ESOP*" means the Lazy Days R.V. Center Employee Stock Ownership Plan, and all amendments to it.

"*Lazy Days ESOT*" means the Lazy Days R.V. Center, Inc. Employee Stock Ownership Trust Agreement between LaSalle Bank, N.A., as the Trustee of the Lazy Days R.V. Center, Inc. Employee Stock Ownership Trust, and the Company, and all amendments to it.

"*L/C Disbursement*" means a payment or disbursement made by BOA pursuant to an Existing Letter of Credit.

"*L/C Security Account*" means an account maintained by the Company with BOA exclusively to secure the Existing Letters of Credit and subject to the L/C Security Agreement.

"*L/C Security Agreement*" means the L/C Account Security Agreement dated as of the Agreement Date, between the Company and BOA, as amended and restated from time to time.

"*LDH Acquisition*" means the purchase by RV Acquisition of the LDH Stock pursuant to the LDH Purchase Documents.

"*LD Holdings*" means LD Holdings, Inc., a Delaware corporation, debtor, debtor-in-possession, and a party to this Agreement, and a wholly owned subsidiary of RV Acquisition, and includes its successors and assigns (by operation of law or otherwise).

"*LDH Purchase Documents*" means the Stock Purchase Agreement and all other documents, agreements, and instruments entered into or delivered in connection with the Stock Purchase Agreement or the purchase by RV Acquisition of the Stock of LD Holdings pursuant to those documents.

95

*"LDH Stock"* means all of the issued and outstanding shares of Stock of LD Holdings.

*"LDRV ESOP"* is defined in Section 5.24.

*"LDRV ESOT"* is defined in Section 5.24.

*"LDRV Holdings"* means LDRV Holdings Corp., a Florida corporation, debtor, and debtor-in-possession, a party to this Agreement, and a wholly owned subsidiary of the Company, and includes its successors and assigns (by operation of law or otherwise).

*"Lenders"* means Bank of America, N.A., in its capacity as Lender hereunder, and KeyBank National Association (a national banking association).

*"LIBOR Rate"* means the rate of interest equal to the rate per annum equal to the British Bankers Association LIBOR Rate (the *"BBA LIBOR"*), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR, as selected by the Agent from time to time) as determined for each Adjustment Date at approximately 11:00 a.m. London time two (2) London Banking Days before the Adjustment Date, for U.S. Dollar deposits (for delivery on the first day of such interest period) with a term of one month; as adjusted from time to time in the Agent's sole discretion for reserve requirements, deposit insurance assessment rates, and other regulatory costs.  For purposes of the definition of LIBOR Rate, a *"London Banking Day"* is a day on which banks in London are open for business and dealing in offshore dollars.

*"Lien"* means, with respect to any Person, any restriction on the use or transfer of property or any claim or charge in any interest in property securing an obligation owed to or claimed by a Person other than the owner of the property, whether the claim or charge exists by reason of statute, contract, or common law, whether or not the interest is recorded or perfected, and irrespective of whether the interest in contingent on the occurrence of some future event or events or the existence of some future circumstance, and includes any mortgage, lien, pledge, charge, security interest, hypothecation, tax assessment, or other encumbrance, or any interest or title of any vendor, lessor, lender, or other secured party to or of such Person under any conditional sale or other title retention agreement or Capital Lease, upon or with respect to any property or asset of such Person (including in the case of stock, stockholder agreements, voting trust agreements, and all similar arrangements), any lien for damages, investigation costs, cleanup costs, and response costs incurred by any Governmental Authority under any Environmental Laws, and all reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Real Property.

*"Loan"* and *"Loans"* means the Floor Plan Loans.

*"Loan Party"* means the Company, LDRV Holdings, and any Guarantor.

"*Macaluso Agreement*" means the one-page consulting letter agreement dated October 13, 2005, between the Company and Charles Macaluso addressing certain advisory and consulting services to be provided by Mr. Macaluso to the Company, as amended.

"*Maintenance Capital Expenditures*" for the Company for any period of determination hereof shall mean, (a) all expenses incurred during such period by the Company in connection with capital replacements, additions, renewals, or improvements to any of the capital assets of the Company that are required to be capitalized on the books and accounts of the Company in accordance with GAAP and (b) the amount of Capital Lease Obligations relating to all Capital Leases entered into during such period by the Company; but excludes any Expansion Capital Expenditures.

"*Management Agreement*" means the Management Agreement dated as of May 14, 2004, among the Company, LD Holdings, RV Acquisition, and Bruckmann, Rosser, Sherrill & Co., L.L.C. and acknowledged by Wallace.

"*Master Agreement*" means the Agreement dated as of June 30, 1999, among Alliance Holdings, LD Holdings, the Alliance ESOT, the Company, Wallace, and the Lazy Days ESOT, as amended from time to time.

"*Material*" means material in relation to the business, operations, affairs, financial condition, assets, properties, or prospects of the applicable Loan Party.

"*Material Adverse Effect*" means a material adverse effect on (a) the business, operations, affairs, financial condition, assets, properties or prospects of a Loan Party or (b) the ability of a Loan Party to perform its payment or other obligations under any of the Financing Documents, or (c) the validity or enforceability of any of the Financing Documents.

"*Mortgage*" means the leasehold mortgage, security agreement, fixture filing, and financing statement, dated as of the Agreement Date, executed and delivered by the Company in favor of the Agent, in form and substance satisfactory to the Agent and the Lenders, that encumbers the Real Property Collateral and related improvements to that collateral.

"*Mortgage Policy*" is defined in Section 9.9.

"*Multiemployer Plan*" means any Plan that is a "*multiemployer plan*" (as such term is defined in Section 4001(a)(3) of ERISA).

"*Net Income*" means, with reference to any period, the net income (or loss) of the Company for such period (taken as a cumulative whole), as determined in accordance with GAAP, *provided* that there shall be excluded:

>    (a)    the income (or loss) of any Person, substantially all of the assets of which have been acquired in any manner, realized by such other Person before the date of acquisition,

(b)      the income (or loss) of any Person in which the Company has an ownership interest, except to the extent that any such income has been actually received by the Company in the form of cash dividends or similar cash distributions,

(c)      any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of income accrued during such period,

(d)      any aggregate net gain (but not any aggregate net loss) during such period arising from the sale, conversion, exchange or other disposition of capital assets (such term to include, without limitation, (i) all non-current assets and, without duplication, (ii) the following, whether or not current: all fixed assets, whether tangible or intangible, all inventory sold in conjunction with the disposition of fixed assets, and all Securities),

(e)      any gains resulting from any write-up of any assets (but not any loss resulting from any write-down of any assets),

(f)      any net gain from the collection of the proceeds of life insurance policies,

(g)      any gain arising from the acquisition of any Security, or the extinguishment, under GAAP, of any Debt, of the Company,

(h)      any net income or gain (but not any net loss) during such period from (i) any change in accounting principles in accordance with GAAP, (ii) any prior period adjustments resulting from any change in accounting principles in accordance with GAAP, (iii) any extraordinary items, or (iv) any discontinued operations or the disposition thereof,

(i)      any portion of such net income that cannot be freely converted into United States Dollars, and

(j)      any write-off of goodwill and intangibles.

"*Net Proceeds Amount*" means, with respect to any Transfer of any Property by any Person, an amount equal to the *difference* of

(a)      the aggregate amount of the consideration (valued at the Fair Market Value of such consideration at the time of the consummation of such Transfer) received by such Person in respect of such Transfer, minus

(b)      all ordinary and reasonable out-of-pocket costs and expenses actually incurred by such Person in connection with such Transfer.

"*New Notes*" means the unsecured 11 3/4% Senior Notes due 2012 dated May 14, 2004, and issued pursuant to and governed by the Indenture.

"*Noncash Charges*" means with respect to any Person, for any period, the aggregate depreciation (including rental depreciation), amortization, and other non-cash expenses of such Person and its Subsidiaries reducing Net Income of the Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charges constituting an extraordinary item or loss or any such charge that requires an accrual or a reserve for cash charges for any future period).

"*Noncompete Agreement*" means the Noncompete and Covenant Agreement among Wallace, the Company, and RV Acquisition dated May 14, 2004, as amended, restated, or modified from time to time.

"*Noteholder Estoppel Agreement*" means the Noteholder Estoppel Agreement to be executed by BlackRock, Inc., TD Asset Management, Inc., and Wayzata Investment Partners, LLC, in form and substance acceptable to the Agent and the Lenders, in their sole discretion.

"*Notes*" means the Floor Plan Notes.

"*Obligations*" means all indebtedness, obligations, and liabilities of the Loan Parties to the Lenders or the Agent arising from time to time under this Agreement or the other Financing Documents (including, but not limited to, all unpaid principal of, and premium, if any, and interest on the Notes and the Loans evidenced by the Notes (including without limitation interest accruing after the maturity date of the Loans or Notes and interest accruing after the filing of a petition in bankruptcy, or the commencement of any insolvency, reorganization, or like proceeding, relating to the Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding)), in each case whether now existing or hereafter arising, joint or several, direct or indirect, absolute or contingent, due or to become due, matured or unmatured, liquidated or unliquidated, arising by contract, operation of law, or otherwise, and howsoever evidenced, held, or acquired, accrued, unaccrued, primary, secondary, asserted, unasserted, and all obligations of each Loan Party to the Lenders or the Agent arising out of any renewal, extension, refinancing, or refunding of any of the foregoing and all costs incurred by the Lenders and the Agents in connection with the collection, enforcement, and administration of the Obligations and the Financing Documents (including without limitation all fees, charges, and disbursements of counsel to the Agent or any of the Lenders that are required to be paid by each Loan Party).

"*Officer's Certificate*" means a certificate of a Senior Financial Officer or of any other officer of the Company whose responsibilities extend to the subject matter of such certificate.

"*Operating Account*" means account number 004890202640 of the Company maintained with Bank of America, N.A.

"*Orders*" means the Interim Order and the Final Order.

"*Other Taxes*" is defined in Section 9.7.

"*Overdue Rate*" means the interest rate then applicable to the relevant Borrowing of Loans plus an amount equal to 2.50% per annum.

"*Participant*" is defined in Section 20.

"*PBGC*" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA or any successor thereto.

"*Percentage*" means, for each Lender, the percentage of the respective Commitments represented by such Lender's Commitment or, if the Commitments have been terminated, the percentage held by such Lender of the aggregate principal amount of all outstanding Obligations (and if adjusted, as adjusted, with respect to the Floor Plan Commitments, as provided in Section 1.1(g)).

"*Permitted Liens*" means any Lien permitted under Section 10.9.

"*Person*" means an individual, partnership, corporation, estate, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof.

"*Petition Date*" has the meaning ascribed to that term in the preamble to this Agreement.

"*Plan*" means an "*employee pension benefit plan*" (as defined in Section 3(2) of ERISA) that is or, within the preceding five years, has been established or maintained, or to which contributions are or, within the preceding five years, have been made or required to be made, by any Loan Party or solely with respect to an employee pension benefit plan subject to Title IV of ERISA, by any ERISA Affiliate (but excludes the LDRV ESOP, the LDRV ESOT, the Lazy Days ESOT, and the Lazy Days ESOP).

"*Pledge Agreement*" means a pledge agreement, in form and substance satisfactory to the Agent and the Lenders, executed and delivered by each Loan Party to the Agent.

"*Pre-Default Period*" is defined in Section 1.4(c).

"*Pre-Petition Agent*" means Bank of America, N.A., in its capacity as collateral agent and administrative agent under the Pre-Petition Credit Agreement and related financing documents.

"*Pre-Petition Credit Agreement*" means the Floor Plan Credit Agreement originally dated as of July 15, 1999, among the Company, Agent, and the Lenders, as amended and restated by the First Amended and Restated Credit Agreement, the Second Amended and Restated Credit Agreement, and the Third Amended and Restated Credit Agreement, which was thereafter amended by five amendments dated as of January 14, 2008, April 14, 2008, August 20, 2008, September 1, 2008, and December 31, 2008.

"*Pre-Petition Floor Plan Loans*" means the "Floor Plan Loans" under (and as defined in) the Pre-Petition Credit Agreement.

"*Pre-Petition Indebtedness*" means all Debt and other obligations of the Loan Parties to the Pre-Petition Agent or any Pre-Petition Lender on the Petition Date that arise under the Pre-Petition Credit Agreement, whether direct or indirect, absolute or contingent, or due or to become due, including without limitation, the Pre-Petition Floor Plan Loans, and all interest accruing on any of the foregoing after the Petition Date and all legal fees and collection expenses incurred before the date of this Agreement in collection that Debt.

"*Pre-Petition Lenders*" means those Person who were "Lenders" under (and as defined in) the Pre-Petition Credit Agreement as of the Petition Date.

"*Prime Rate*" means the annual rate of interest publicly announced from time to time by Bank of America, N.A. ("*B of A*") as its "*Prime Rate.*" The Prime Rate is set by B of A based on various factors, including B of A's costs and desired return, general economic conditions, and other factors and is used as a reference point for pricing some loans.

"*Prior Week*" is defined in Section 7.1(b).

"*Professionals*" has the meaning ascribed to that term in Section 1.6(c), and includes only Kirkland & Ellis, LLP, Young Conaway Stargatt & Taylor, LLP, Macquarie Capital, Crowe Chizak LLP, and Epiq.

"*Property*" or "*properties*" means, unless otherwise specifically limited, real or personal property of any kind, tangible or intangible, choate or inchoate.

"*Real Property*" means any estates or interests in real property now owned or hereafter acquired by any Loan Party and the improvements to those estates or interests.

"*Real Property Collateral*" means the parcel or parcels of Real Property identified on Schedule 9.9.

"*Receivables*" is defined in Section 1 of the Security Agreement.

"*Related Party Guaranty*" means a continuing and unconditional guaranty of the Company's obligations under the Floor Plan Credit that is executed by RV Acquisition, LD Holdings, and LDRV Holdings in favor of the Agent and the Lenders, in form and substance acceptable to the Agent and the Lenders.

"*Reorganization Plan*" means (a) the Joint Prepackaged Plan of Reorganization dated September 4, 2009, proposed by the Loan Parties in the Chapter 11 Cases, as amended or modified in a manner that does not cause a default under Section 11(q)(ii), and is confirmed by the Confirmation Order, (b) any plan of reorganization that is proposed by the Loan Parties in the Chapter 11 Cases and is confirmed by the Confirmation Order that provides for payment in full of the Secured Obligations and the termination of the Commitments, provides for the payment in

full of all obligations owed by the Loan Parties with respect to the Epayables Program and the termination of all commitments of BOA to fund under the Epayables Program, provides for the termination, cancellation, and return to BOA of the Existing Letters of Credit, and provides that no further financing of the Loan Parties during or after the Chapter 11 Cases is to be provided by BOA, the Agent or any of the Lenders in any manner, or (c) any other plan of reorganization that is proposed by the Loan Parties in the Chapter 11 Cases and confirmed by the Confirmation Order that either (i) does not cause a default under Section 11(q)(ii), or (ii) is in form and substance satisfactory to the Agent and each of the Lenders, in their sole discretion.

"*Required Lenders*" means the Lenders whose Percentages represent at least 66 2/3% of the aggregate Commitments or, if the Commitments have been terminated, the aggregate principal amount of all outstanding Obligations under or in respect of the Floor Plan Credit.

"*Responsible Officer*" means any Senior Financial Officer, Chief Operating Officer, and any other officer of a Loan Party with responsibility for the administration of the relevant portion of the subject Financing Document.

"*Restricted Investments*" means all Investments except the following:

(a) property to be used in the ordinary course of business of the Company;

(b) current assets arising from the sale or lease of goods and services in the ordinary course of business of the Company;

(c) Investments existing on the Agreement Date and disclosed in Schedule 5.15;

(d) Investments in United States Governmental Securities, provided that such obligations mature within 365 days from the date of acquisition thereof;

(e) Investments in certificates of deposit or banker's acceptances issued by an Acceptable Bank, provided that such obligations mature within 365 days from the date of acquisition thereof;

(f) Investments in commercial paper given the highest rating by a credit rating agency of recognized national standing and maturing not more than 270 days from the date of creation thereof;

(g) Investments in Repurchase Agreements;

(h) Investments in tax-exempt obligations of any state of the United States of America, or any municipality of any such state, in each case rated "*AA*" or better by S&P, "*Aa2*" or better by Moody's or an equivalent rating by any other credit rating agency of recognized national standing, *provided* that such obligations mature within 365 days from the date of acquisition thereof;

(i)       loans to officers and employees of the Company made in the ordinary course of business, so long as the outstanding amount of all such loans shall not at any time exceed $250,000, *provided* the outstanding amount of all unsecured loans to officers and employees shall not at any time exceed $100,000; and

(j)       Investments received in settlement of amounts due to the Company effected in the ordinary course of the Company's business or owing to the Company as a result of an insolvency proceeding or upon foreclosure or enforcement by the Company of any Lien in favor of the Company.

As used in this definition of "*Restricted Investments*":

"*Acceptable Bank*" means any bank or trust company (i) that is organized under the laws of the United States of America or any State thereof, (ii) that has capital, surplus, and undivided profits aggregating at least $250,000,000, and (iii) whose long-term unsecured debt obligations (or the long-term unsecured debt obligations of the bank holding company owning all of the capital stock of such bank or trust company) shall have been given a rating of "*A*" or better by S&P or "*A2*" or better by Moody's.

"*Acceptable Broker-Dealer*" means any Person other than a natural person (i) that is registered as a broker or dealer pursuant to the Securities Exchange Act of 1934, as amended, and (ii) whose long-term unsecured debt obligations shall have been given a rating of "*A*" or better by S&P or "*A2*" or better by Moody's.

"*Moody's*" means Moody's Investors Service, Inc.

"*Repurchase Agreement*" means any written agreement:

(a)       that provides for (i) the transfer of one or more United States Governmental Securities in an aggregate principal amount at least equal to the amount of the Transfer Price (defined below) to the Company from an Acceptable Bank or an Acceptable Broker-Dealer against a transfer of funds (the "*Transfer Price*") by the Company to such Acceptable Bank or Acceptable Broker-Dealer, and (ii) a simultaneous agreement by the Company, in connection with such transfer of funds, to transfer to such Acceptable Bank or Acceptable Broker-Dealer the same or substantially similar United States Governmental Securities for a price not less than the Transfer Price plus a reasonable return thereon at a date certain not later than 365 days after such transfer of funds,

(b)       in respect of which the Company shall have the right, whether by contract or pursuant to applicable law, to liquidate such agreement upon the occurrence of any default thereunder, and

(c)       in connection with which the Company, or an agent thereof, shall have taken all action required by applicable law or regulations to perfect a Lien in such United States Governmental Securities.

"*S&P*" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc.

"*Retail Funding Source*" shall mean a bank, a finance company, or another retail funding source that purchases from the Company Retail Paper that the Company originates in connection with its credit sales of Floor Plan Units to customers.

"*Retail Paper*" shall mean Chattel Paper (as defined in the Security Agreement) and other deferred payment instruments arising from the Company's sale or lease of goods or provision of services in the ordinary course of business, excluding drafts evidencing credit card transactions.

"*RV Acquisition*" means RV Acquisition, Inc., a Delaware corporation, debtor, and debtor-in-possession, and a party to this Agreement, and includes its successors and assigns (by operation of law or otherwise).

"*Sale-and-Leaseback Transaction*" means a transaction or series of transactions pursuant to which the Company or any other Loan Party shall sell or transfer to any Person any property, whether now owned or hereafter acquired, and, as part of the same transaction or series of transactions, the Company shall rent or lease as lessee (other than pursuant to a Capital Lease), or similarly acquire the right to possession or use of, such property or one or more properties that it intends to use for the same purpose or purposes as such property for a period of six months or longer.

"*Salvati Agreement*" means the one-page consulting letter agreement dated October 2006 between the Company and Michael Salvati addressing certain financial consulting services to be provided by Mr. Salvati to the Company.

"*Secured Obligations*" is defined in the Collateral Agency Agreement.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Security*" has the meaning set forth in Section 2(a)(l) of the Securities Act.

"*Security Agreement*" means the Security Agreement dated as of the Agreement Date, between the Company and the Collateral Agent, as thereafter amended and restated from time to time.

"*Security Documents*" means the Collateral Agency Agreement, the Security Agreement, the Copyright Security Agreement, the Guarantor Security Agreement, the Guaranties, the Mortgage, the Pledge Agreement, Collateral Assignment, and the Trademark Security Agreement, and, together with any agreement entered into at or after the Agreement Date, for the purpose of securing the Secured Obligations and/or preserving or protecting the Collateral or the Collateral Agent's interest therein.

"*Senior Financial Officer*" means the chief financial officer, principal accounting officer, chief operating officer, treasurer or comptroller of the applicable Loan Party.

"*Settlement*" means as of any time, the making of, or the receiving of payments, in immediately available funds, by the Lenders, to the extent necessary to cause each Lender's actual funded share of the outstanding amount of Loans (after giving effect to any Loan to be made on such day) to be equal to such Lender's ratable share (as hereinafter set forth) of the Loans then outstanding (after giving effect to any Loan to be made on such day), in any case where, before such event or action, such Lender's actual funded share of the Loans is not so equal. For purposes hereof, a Lender's "*ratable share*" of the outstanding Loans as of any time shall be a fraction of the Loans then outstanding, the numerator of which is such Lender's Commitment, and the denominator of which is the Commitments of all the Lenders.

"*Settlement Amount*" is defined in Section 8.6.

"*Settlement Date*" is defined in Section 8.6.

"*Stock*" means all shares, options, warrants, interest,, participations in, or other equivalents (regardless of how designated) of or in a Person, whether voting or nonvoting, including without limitation, common stock, preferred stock, or any other "equity security" (as that term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"*Stock Purchase Agreement*" means the Stock Purchase Agreement dated as of April 27, 2004, among LD Holdings, the Company, RV Acquisition, the LDRV ESOP, the LDRV ESOT, certain other shareholders of LD Holdings, and Oakridge Consulting, as amended from time to time.

"*Stockholders Agreement*" means the Stockholders Agreement dated May 14, 2004, among RV Acquisition and BRS LP, and each other signatory thereto, as amended from time to time.

"*Subsidiary*" means, as to any Person, any corporation, association, or other business entity in which such Person or one or more of its Subsidiaries or such Person and one or more of its Subsidiaries owns sufficient equity or voting interests to enable it or them, (as a group) ordinarily, in the absence of contingencies, to elect a majority of the directors (or Persons performing similar functions) of such entity, and any partnership or joint venture if more than a 50% interest in the profits or capital thereof is owned by such Person or one or more of its Subsidiaries or such Person and one or more of its Subsidiaries (unless such partnership can and does ordinarily take major business actions without the prior approval of such Person or one or more of its Subsidiaries).

"*Swaps*" means, with respect to any Person, payment obligations with respect to interest rate swaps, currency swaps, and similar obligations obligating such Person to make payments, whether periodically or upon the happening of a contingency. For the purposes of any Financing Document, the amount of the obligation under any Swap shall be the amount reasonably

anticipated to be payable by such Person thereunder, and in making such determination, if any agreement relating to such Swap provides for the netting of amounts payable by and to such Person thereunder or if any such agreement provides for the simultaneous payment of amounts by and to such Person, then in each such case, the amount of such obligation shall be the net amount so determined.

"*Taxes*" is defined in Section 9.7.

"*Termination Date*" means the first to occur of (a) the Expiration Date, (b) an Early Termination Date, upon 15 days' advance written notice by the Company, (c) the date of the termination of the Lenders' respective obligations to make Loans under Section 12.2, (d) the date that is 30 days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court by that date, unless the Interim Order has been extended with the Agent's and each Lender's written consent to a date that is acceptable to the Agent and each Lender, (e) the date upon which the Interim Order expires, unless the Final Order has been entered and becomes effective by that date, and (f) the date the Reorganization Plan becomes effective.

"*Total Assets*" shall mean, as of the date of any determination thereof, total assets of the Company determined in accordance with GAAP eliminating intercompany items.

"*Trademark Security Agreement*" means a trademark security agreement executed and delivered by the Company in favor of the Agent, the form and substance of which are satisfactory to the Agent and the Lenders.

"*Transfer*" means, with respect to any Person, any transaction in which such Person sells, conveys, transfers, or leases (as lessor) any of its property. For purposes of determining the application of the Net Proceeds Amount in respect of any Transfer, the Company may designate any Transfer as one or more separate Transfers each yielding a separate Net Proceeds Amount. In any such case, (a) the Disposition Value of any property subject to each such separate Transfer and (b) the amount of Total Assets attributable to any property subject to each such separate Transfer shall be determined by ratably allocating the aggregate Disposition Value of, and the aggregate Total Assets attributable to, all property subject to all such separate Transfers to each such separate Transfer on a proportionate basis.

"*Unfunded Approved Amounts*" means, at anytime, the aggregate amount then being reserved by the Agent under the Floor Plan Credit for the full payment of invoices for Eligible New Floor Plan Units to Approved Vendors for which the Agent has received a purchase order from the Company and notice of shipment or intent to ship from the Approved Vendor.

"*U.S.*" means the United States of America.

"*U.S. Governmental Authority*" means (a) the government of the United States of America or any State or other political subdivision thereof, or (b) any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government.

106

"*Used Inventory*" shall mean a Floor Plan Unit that has been (a) previously sold at retail, (b) registered or titled in any state or jurisdiction, or (c) purchased or acquired by the Company from a source other than the manufacturer.

"*Wallace*" shall mean Donald W. Wallace, an individual.

# SCHEDULE C
## TO
## POST-PETITION CREDIT AGREEMENT

## ACCEPTED MANUFACTURERS AND
## CATEGORIES OF ELIGIBLE NEW INVENTORY*

Category I Manufacturers of Eligible New Inventory:

Damon
Forest River
Four Winds
Itasca
Keystone
KZ
Tiffin
Winnebago

Category II Manufacturers of Eligible New Inventory:

American Coach (after reorganization sale to Fleetwood RV, Inc., an affiliate of AIP RV Acquisition Company, LLC)
Carriage
Fleetwood (after reorganization sale to Fleetwood RV, Inc., an affiliate of AIP RV Acquisition Company, LLC)
Glendale

Category III Manufacturers of Eligible New Inventory:

American Coach (before reorganization sale to Fleetwood RV, Inc., an affiliate of AIP RV Acquisition Company, LLC)
Beaver
Country Coach
Fleetwood (before reorganization sale to Fleetwood RV, Inc., an affiliate of AIP RV Acquisition Company, LLC)
Holiday Rambler
Monaco
Safari

_____

*This Schedule C merely identifies the manufacturers of Floor Plan Units for purposes of calculating the Collateral Base and does not provide any assurance or guaranty that the Lenders or the Agent will provide any Loans with respect to Floor Plan Units manufactured by those manufacturers.

## EXHIBIT 1.1A

STATE OF FLORIDA DOCUMENTARY STAMP TAXES ARE NOT PAYABLE WITH RESPECT TO THIS POST-PETITION FLOOR PLAN CREDIT NOTE BECAUSE THIS NOTE WAS EXECUTED AND DELIVERED IN THE STATE OF [_____]. THE COMPANY SHALL INDEMNIFY AND HOLD HARMLESS THE LENDERS AND THE AGENT FROM ANY AND ALL EXCISE TAXES DUE ON THE TRANSACTIONS EVIDENCED BY THIS NOTE, IF ANY.

### LAZY DAYS' R.V. CENTER, INC.
### POST-PETITION FLOOR PLAN CREDIT NOTE

$[_____]                                                [Date]

On the Termination Date, for value received, the undersigned, LAZY DAYS' R.V. CENTER, INC., a Florida corporation (the "*Company*"), hereby promises to pay to the order of [_____] (the "*Lender*"), at the office of the Administrative Agent or at such other place as the Lender may from time to time designate in writing to the Company, the principal sum of (i) [_____] and no/100 Dollars ($[_____]) or (ii) such lesser amount as may at the time of the maturity hereof, whether by acceleration or otherwise, be the aggregate unpaid principal amount of all Loans owing from the Company to the Lender under the Floor Plan Credit (such term and any other terms not defined herein shall have the respective meanings assigned thereto in that certain Post-Petition Credit Agreement dated as of [_____], 2009, among the Company, the Lenders that are now or may from time to time hereafter become parties thereto, and Bank of America, N.A., as Administrative Agent for the Lenders (said Credit Agreement, as the same may be amended, modified, or restated from time to time, being referred to herein as the "*Credit Agreement*")) provided for in the Credit Agreement.

This Note evidences Loans made and to be made to the Company by the Lender under the Floor Plan Credit provided for under the Credit Agreement, and the Company hereby promises to pay interest at the office described above on each Loan evidenced hereby at the rates and at the times and in the manner specified therefor in the Credit Agreement. All payments hereunder shall be due and payable absolutely and unconditionally and without defense (other than payment), set-off, reduction or counterclaim of any kind. Notwithstanding anything contained herein or in the Credit Agreement to the contrary, the outstanding principal hereof shall bear interest at the Overdue Rate if and so long as any Event of Default exists under the Credit Agreement.

This Note is issued by the Company under the terms and provisions of the Credit Agreement and is secured by, among other things, the Security Documents, and this Note and the holder hereof are entitled to all of the benefits and security provided for thereby or referred to therein, to which reference is hereby made for a statement thereof. This Note may be declared to be, or be and become, due before its expressed maturity, voluntary prepayments may be made hereon without premium or penalty except as may be required under the Credit Agreement, and certain prepayments are required to be made hereon, all in the events, on the terms and with the effects provided in the Credit Agreement.

The Company hereby promises to pay all costs and expenses (including reasonable attorneys' fees) suffered or incurred by the holder hereof in collecting this Note or enforcing any rights in any collateral therefor. The Company hereby waives presentment for payment and demand.

This Note shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would require the application of the laws of a jurisdiction other than such State.

**LAZY DAYS' R.V. CENTER, INC.**

By: _____
               Randy Lay
               Vice President

**EXHIBIT 4.1(d)**

**FORM OF OPINION OF KIRKLAND & ELLIS, LLP**

The closing opinion(s) of counsel for the Loan Parties that is called for by Section 4.1(d) of the Credit Agreement, shall be dated as of the Effective Date and addressed to the Agent and the Lenders, shall be satisfactory in scope and form to the Agent and the Lenders, and shall be to the effect that:

1.  Each Credit Party is a corporation, existing and in good standing under the laws of its jurisdiction of organization, as set forth in the first paragraph of this letter. For purposes of the foregoing opinions in this paragraph, we have relied exclusively upon the certificates issued by the governmental authorities in the relevant jurisdictions, and such opinions are not intended to provide any conclusion or assurance beyond that conveyed by such certificates.

2.  Each of the Credit Parties has the corporate or limited liability company, as the case may be, power to execute, deliver and, subject to the limitations set forth in the Interim Order, perform its obligations under the Credit Documents to which it is a party.

3.  Each of the Credit Parties has taken all corporate action necessary to authorize its execution, delivery and performance of the Credit Documents to which it is a party.

4.  Upon entry of the Interim Order entered by the Bankruptcy Court, after giving effect thereto and to the extent provided therein, (a) each Credit Document has been duly executed and delivered on behalf of each Credit Party that is party thereto and (b) each of the Credit Documents is a valid and binding obligation of each Credit Party that is a party thereto and is enforceable against such Credit Party in accordance with its terms. No opinion is expressed in this opinion letter as to the creation, perfection or priority of any Liens, and we note that the enforcement of any Liens may require filing with and the approval of the Bankruptcy Court.

5.  The execution and delivery by each Credit Party of the Credit Documents to which it is a party, and the performance of its obligations thereunder, will not violate any existing provision of such Credit Party's organizational documents.

6.  The execution and delivery by each Credit Party of the Credit Documents to which it is a party, the consummation of the transactions contemplated thereby as authorized by the Interim Order and compliance by each such Credit Party with the provisions thereof that are authorized by the Interim Order which are applicable to it will not constitute a violation by such Credit Party of any applicable provision of existing State of New York law, the FBCA, the DGCL or United States Federal statutory law or governmental regulation covered by this opinion letter.

111

7.      No consent, approval, waiver, license or authorization or other action by or filing with any New York or United States federal governmental authority, or under the DGCL or FBCA, is required in connection with the execution and delivery by any Credit Party of the Credit Documents to which it is a party or the consummation by any such Credit Party of the transactions contemplated thereby to the extent such transactions are authorized by the Interim Order (except that we express no opinion regarding actions or filings required in connection with the ordinary course conduct by each Credit Party of its business and ownership or operation by each Credit Party of its assets, to the extent that the same may be required by the Credit Documents).

8.      The Financing Statements to be filed are in proper form for filing in the filing office noted on each such Financing Statement (although we express no opinion whether the filing office or filing jurisdiction noted on any such Financing Statement is the correct filing office or filing jurisdiction for filing such Financing Statement or as to the effect of any such Financing Statement or the filing thereof).

9.      Based solely on our review of the Bankruptcy Court docket for the Chapter 11 Cases as of [October __, 2009 at _____ (am/pm)] New York City time, a copy of which is attached hereto as Schedule B, (i) the Interim Order, attached hereto as Schedule C, has been entered, is in full force and effect in accordance with its terms and (ii) no order has been entered by the Bankruptcy Court amending, granting reargument, staying, vacating or rescinding the Interim Order.


For purposes of the foregoing opinions:

"Credit Parties" means the Loan Parties.

 "Credit Documents" means this Post-Petition Credit Agreement and the Other Credit Documents.

"Other Credit Documents" means the Fee Letter, Guarantor Security Agreement, Related Party Guaranty, Intercompany Subordination Agreement, Pledge and Security Agreement, Collateral Assignment of Stock Purchase Agreement, Copyright Security Agreement, Trademark Security Agreement, L/C Security Agreement, Epayables Security Agreement, Collateral Agency Agreement, Security Agreement, Promissory Notes, Mortgage, and the Landlord's Agreement.


"FBCA" means the Florida Business Corporation Act.

"DGCL" means the Delaware General Corporation Law.

**EXHIBIT 4.1(S)(I)**

**INTERIM ORDER**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------x
                                                               :
In re                                                        :
                                                               :                    Chapter 11
LAZY DAYS' R.V. CENTER,
INC., *et al.*,                                           :                    Case No. 09-_____(__)
                                                                                     Joint Administration Requested
                     Debtors.           :                    Re: Docket No. _____


**INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO**
**OBTAIN POSTPETITION FINANCING FROM BANK OF AMERICA,**
**N.A., AS AGENT, AND BANK OF AMERICA, N.A., AND KEYBANK NATIONAL ASSOCIATION, AS**
**LENDERS; (B) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (C) AUTHORIZING USE OF**
**CASH COLLATERAL;  (D) MODIFYING THE AUTOMATIC STAY;  AND (E) SCHEDULING A FINAL**
**HEARING**

On November __, 2009, the Court heard the motion dated November __, 2009 (the "Motion"), of Lazy

Days' R.V. Center, Inc. (the "Company"), and the other debtors,[1] each as a debtor and debtor in possession (each

individually a "Debtor" and, collectively, the "Debtors"):

(i)        for authorization and approval, pursuant to sections 105, 361, 362, and 364 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for the Debtors to obtain postpetition financing (the "DIP Facility") from Bank

of America, N.A., as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and Bank of

America, N.A., and KeyBank National Association, as lenders (in such capacity, the "DIP Lenders"), pursuant to the

terms and conditions of the Post-Petition Credit Agreement dated as of November __, 2009, among the Debtors, the

DIP Agent, and the DIP Lenders (the "DIP Credit Agreement"), to obtain postpetition financing from BOA (as

defined below) with respect to certain Existing Letters of Credit and an Epayables Program (as defined in the DIP

Credit Agreement), and all instruments, documents, and agreements executed pursuant to the DIP Credit Agreement

(together with the DIP Credit Agreement and including without limitation all documents pertaining to the Existing

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are:  Lazy Days'
R.V. Center, Inc., a Florida corporation (4794); RV Acquisition Inc., a Delaware corporation (1630); LD Holdings,
Inc., a Delaware corporation (1834); and LDRV Holdings Corp., a Florida corporation (6915).

Letters of Credit and the Epayables Program, the "DIP Financing Documents") to: (a) provide floor plan financing for the Company, (b) to the extent permitted by the DIP Credit Agreement, fund the Company's working capital needs, (c) permit the Debtors to pay the prepetition loans and other prepetition claims and obligations owed to Bank of America, N.A., as administrative and collateral agent (the "Prepetition Agent"), and Bank of America, N.A., and KeyBank National Association, as lenders (the "Prepetition Lenders") under the Prepetition Credit Facility (as defined below), which amounts are stipulated by the Debtors to be secured by the prepetition "Collateral" (as defined in the Prepetition Credit Facility) (the "Prepetition Collateral"), (d) pay all fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Financing Documents (as defined below), (e) provide for the Company to secure the obligations of Bank of America, N.A. (individually, "BOA"), under the "Existing Letters of Credit" (as defined in the DIP Credit Agreement) by a security interest in the "L/C Security Account" (as defined in the DIP Credit Agreement) and indemnify BOA for losses arising from the Existing Letters of Credit, and (f) permit the Company to participate in the "Epayables Program" (as defined in the DIP Credit Agreement) offered by BOA, secure the Company's obligations under the Epayables Program with a security interest in the "Epayables Security Account" (as defined in the DIP Credit Agreement), and indemnify BOA for losses arising from that program;

(ii)       requesting, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the financing under the DIP Financing Documents: (a) have priority over any and all administrative expenses, including, without limitation, the kinds specified in sections 105, 326, 330, 331, 503(b), 506(c) (subject to approval in the Final Order), 507(b), and 726 of the Bankruptcy Code, except for the Carve-Out (as defined below) (the "DIP Facility Superpriority Claims"), and (b) be secured by first priority security interests in, and liens on (collectively, the "DIP Facility Liens") the assets of the Debtors constituting "Collateral" as defined in the respective DIP Financing Documents (but excluding any actions or proceeds of actions under Chapter 5 of the Bankruptcy Code and subject to any prior permitted liens under the Prepetition Credit Agreement), as provided for by section 364(c) and (d) of the Bankruptcy Code (all of the foregoing, collectively, the "Collateral");

(iii)       requesting, pursuant to section 363 of the Bankruptcy Code, authorization for the Debtors' use of "Cash Collateral" (as defined in section 363(a) of the Bankruptcy Code) pursuant to the DIP Credit Agreement and this Order;

(iv)     seeking modification of the automatic stay imposed by section 362 of the Bankruptcy Code as provided in this Order;

(v)     authorizing the Debtors, on an interim basis, to obtain under the DIP Facility from the DIP Agent and DIP Lenders the principal amount of up to $45,000,000 pursuant to the terms of the DIP Credit Agreement and the other DIP Financing Documents, to maintain the Existing Letters of Credit with BOA, and to obtain financing on an interim basis from BOA pursuant to the Epayables Program, to provide to BOA the "L/C Security Agreement" (as defined in the DIP Credit Agreement), to participate in the Epayables Program of BOA, and to provide to BOA the "Epayables Security Agreement" (as defined in the DIP Credit Agreement);

(vi)     requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing" be held for the Court to consider entry of an order approving the DIP Facility and the use of Cash Collateral on an interim basis; and

(vii)     requesting, pursuant to Bankruptcy Rule 4001, that a final hearing (the "Final Hearing") be held for this Court to consider entry of an order approving the DIP Facility on a final basis (the "Final Order"), as set forth in the Motion and the DIP Credit Agreement; and, pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the Interim Hearing having been provided by the Debtors as set forth below.

Having considered the Motion and the record made by the Debtors at the Interim Hearing, including without limitation the declarations of Randall Lay, Chief Financial Officer of the Company in support of the Debtors' Chapter 11 petitions and first day Motions and Ford R. Philips in support of the Motion, the Court finds as follows:

A.     On _____ (the "Petition Date"), the Debtors each commenced in this Court a case under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.     Pursuant to an order of this Court, the Debtors' chapter 11 cases (the "Chapter 11 Cases") have been consolidated for procedural purposes only and are being jointly administered.

C.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

D.      The Debtors acknowledge that (a) the Prepetition Agent, the Prepetition Lenders, and the Company are parties to a Third Amended and Restated Credit Agreement, originally dated as of July 15, 1999, as amended and restated as of July 31, 2002, May 14, 2004, and February 22, 2007, and as subsequently amended January 14, 2008, April 14, 2008, August 30, 2008, September 1, 2008, and December 31, 2008 (the "Prepetition Credit Agreement"), pursuant to which the Prepetition Agent and the Prepetition Lenders made available to the Company a revolving floor plan credit facility in an aggregate amount of up to $80,000,000 (the "Prepetition Credit Facility"), (b) BOA has issued the Existing Letters of Credit on behalf of the Company, and (c) BOA has extended credit to the Company pursuant to its Epayables Program.

E.       The Debtors acknowledge that events of default occurred under the Prepetition Credit Facility and Epayables Program, which resulted in all "Obligations" (as defined in the Prepetition Credit Agreement and the Epayables Program) becoming due and payable.  The Debtors acknowledge that, as of the Petition Date, (i) an aggregate principal amount of not less than $(_____) was outstanding in respect of loans and other extensions of credit made by the Prepetition Agent and the Prepetition Lenders to the Company pursuant to the Prepetition Credit Facility, plus interest, fees, and expenses as provided in the Prepetition Credit Agreement and all related documents (collectively, the "Prepetition Indebtedness"), and (ii) an aggregate principal amount of not less than $(_____) was outstanding in respect of the existing Epayables Program, plus interest, fees, and expenses with respect to that program (the "Prepetition Epayables Indebtedness").

F.      To secure the Prepetition Indebtedness, the Debtors acknowledge and agree that the Debtors granted to the Prepetition Agent and the Prepetition Lenders, pursuant to the Prepetition Credit Facility, liens and security interests in the Prepetition Collateral.

G.      The Debtors acknowledge and agree that the Prepetition Agent's and Prepetition Lenders' liens on and to the Prepetition Collateral constitute valid, binding, enforceable, and perfected liens on and to the Prepetition Collateral, having the priority set forth in the Prepetition Credit Facility, and are not subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors acknowledge and agree that the Prepetition Indebtedness constitutes the legal, valid, binding, and non-avoidable obligations of the

Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), and is not subject to any offset, defense, or counterclaim, and no portion of the Prepetition Indebtedness is subject to avoidance, subordination, or recharacterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors do not possess and will not assert any claim, counterclaim, offset, or defense of any kind, nature, or description, which would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Indebtedness.

H.      The Debtors acknowledge and agree that the Prepetition Epayables Indebtedness constitutes the legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), and is not subject to any offset, defense, or counterclaim, and no portion of the Prepetition Epayables Indebtedness is subject to avoidance, subordination, or recharacterization pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors do not possess and will not assert any claim, counterclaim, offset, or defense of any kind, nature, or description, which would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Epayables Indebtedness.

I.      The Debtors' businesses require the immediate availability of credit to finance the ordinary costs of their operations, and, without such credit, the Debtors would not be able to operate their businesses, and the Debtors' estates would be irreparably harmed.

J.      The Debtors are unable to obtain sufficient interim unsecured credit solely under section 503(b)(1) of the Bankruptcy Code as an administrative expense, and credit facilities in the amounts and on the terms provided by the DIP Facility and the DIP Financing Documents are unavailable to the Debtors without their granting (i) the DIP Facility Superpriority Claims, (ii) the DIP Facility Liens as provided herein and in the DIP Financing Documents, and (iii) the liens and security interests granted pursuant to the L/C Security Agreement and the Epayables Security Agreement.

K.      BOA, the DIP Agent, and the DIP Lenders have indicated a willingness to provide financing to the Debtors subject to (i) the entry of this Order, (ii) the terms and conditions of the DIP Financing Documents, (iii) the terms and conditions of all preliminary or "first-day orders" that are, in form and substance, reasonably satisfactory to BOA, the DIP Agent, and the DIP Lenders, and (iv) findings by the Court that such financing is essential to the Debtors' estates, that the terms of such financing were negotiated in good faith and at arm's length, and that BOA's,

the DIP Agent's, and the DIP Lenders' security interests, liens, encumbrances, claims, superpriority claims, and other protections granted pursuant to this Order and the DIP Financing Documents will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

L.      The Debtors provided notice of the hearing on the Motion and the entry of this Order by facsimile or electronic mail (or, where both of the foregoing were impracticable, overnight delivery) to (i) the twenty largest unsecured creditors listed in the Debtors' consolidated list of creditors, (ii) the Office of the United States Trustee for the District of Delaware, (iii) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy 1007(d), (iv) counsel to the DIP Agent and the Prepetition Agent, (v) the Internal Revenue Service, (vi) the Attorney General of the United States, (vii) the Securities and Exchange Commission, (viii) Bank of New York Mellon, as indenture trustee for the Debtors' 11.75% Senior Notes, (ix) counsel to the Ad Hoc Noteholders Committee, and (x) all creditors known to the Debtors who may have liens against the Debtors' assets or properties (collectively, the "Service Parties").  Under the urgent circumstances, requisite notice of the Motion and the relief requested thereby has been provided in accordance with Bankruptcy Rule 4001, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this Order.

M.      The Debtors have requested, and good cause has been shown for, the immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Order, the Debtors' estates will be immediately and irreparably harmed.

N.      The ability of the Debtors to finance their respective operations and the availability to the Debtors of sufficient working capital through the incurrence of new indebtedness for borrowed money and other financial accommodations, including credit support, is in the best interests of the Debtors and their respective creditors and estates.  The interim financing and other relief sought in the Motion is vital to avoid immediate, irreparable harm to the Debtors' estates and to allow the orderly continuation of the Debtors' businesses.

O.      Based upon the record presented by the Debtors to this Court:  (i) the terms of the DIP Facility and the provisions of the DIP Credit Agreement pertaining to security for the Existing Letters of Credit and Epayables Program are reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facility and the provisions of the DIP Credit Agreement

pertaining to security for the Existing Letters of Credit and Epayables Program have been negotiated in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, and BOA, and any credit extended, letters of credit issued, loans made, and other financial accommodations extended to the Debtors by the DIP Agent, the DIP Lenders, and BOA shall be deemed to have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1.      Grant of Motion.  The Motion is granted as set forth in this Order.  Any objection not previously withdrawn is overruled.  This Order is effective immediately upon entry.  To the extent that a conflict exists between the terms of this Order and the DIP Financing Documents, this Order shall control.

2.      Authorization to Borrow.  Upon finalizing and executing the DIP Credit Agreement, a copy of which was attached to the Motion, and the other DIP Financing Documents described in the DIP Credit Agreement and made available at the hearing, and provided that the Debtors are not in default under the terms of this Order, the Debtors are authorized to immediately  (a) borrow (and engage in the other credit accommodations provided under the DIP Facility) from the DIP Agent and the DIP Lenders on an interim basis the principal amount of up to $45,000,000 outstanding at any time pursuant to the terms of the DIP Credit Agreement for the Debtors to continue to operate their businesses, and (b) borrow (and engage in other credit accommodations provided by BOA with respect to the Existing Letters of Credit and the Epayables Program) for the Debtors to continue to operate their businesses.  Upon execution and delivery, the DIP Financing Documents shall constitute legal, valid, and binding obligations of the Debtors party thereto, enforceable against each such Debtor in accordance with their terms. Consistent with the terms of the DIP Credit Agreement and the other DIP Financing Documents, the Debtors may use advances under the DIP Facility as provided in the DIP Credit Agreement, including the payment of the Prepetition Indebtedness.

3.      DIP Facility Superpriority Claims.  For all of the Debtors' Obligations and indebtedness arising under the DIP Financing Documents ("DIP Facility Obligations"), BOA, the DIP Lenders, and the DIP Agent are granted, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Facility Superpriority Claims as described in subparagraph (ii)(A) of the first paragraph of this Order (which claims shall be payable from and have recourse to, in addition to the Collateral, any unencumbered post-petition property of the Debtors), with the seniority, scope, and effect set forth in that subparagraph.

4.     <u>DIP Facility Liens</u>.  As security for the DIP Facility Obligations, pursuant to sections 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, BOA and the DIP Agent, on behalf of itself and the DIP Lenders, are hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, financing statements, or otherwise) the DIP Facility Liens, all with the perfection, seniority, scope, and effect set forth in subparagraphs (ii)(b) and (c) of the first paragraph of this Order.  Without limiting the generality of the preceding sentence, BOA, the DIP Agent, and the DIP Lenders shall have first priority security interests, and liens on, all of the "Collateral" as defined in the DIP Credit Agreement and as further described in the other DIP Financing Documents.  In the event of the occurrence of an event of default or similar event under the DIP Financing Documents (an "Event of Default"), or an event that would constitute an Event of Default with the giving of notice or lapse of time or both (a "Default"), such security interests and liens shall be subject to the payment of the Carve-Out.

5.     <u>Letter of Credit and Epayables Liens</u>.  For all of the Debtors' obligations pertaining to the Existing Letters of Credit and arising under the Epayables Program, BOA shall have first priority perfected security interests in the L/C Security Account and in the Epayables Security Account, respectively, pursuant to the DIP Credit Agreement, the L/C Security Agreement, and the Epayables Security Agreement

6.     <u>Carve-Out</u>.  The DIP Facility Superpriority Claims, the DIP Facility Liens, and the Prepetition Lenders' liens in and to the Prepetition Collateral shall be subject only to the payment of the following fees and expenses (the "Carve-Out"):  (x) fees to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 and (y) subject in each case to a cumulative, maximum, aggregate amount set forth below as the "Carve-Out Amount," the unpaid and outstanding fees and disbursements actually incurred on or after the Petition Date by the Debtors' Professionals (as defined in the DIP Credit Agreement) and professionals for the official committee of unsecured creditors (the "Committee,"), if any, appointed in the Chapter 11 Cases (collectively, the "Professionals") and allowed by order of this Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"); *provided, however,* that the Carve-Out shall not include, apply to, or be available to any fees or expenses incurred by any party, including the Debtors or any Committee, in connection with any of the following:  (a) an assertion, a joinder in, or the support of (but excluding any investigation conducted prior to the assertion or joinder in) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against BOA, the DIP Agent, the DIP Lenders, the Prepetition

Agent, or the Prepetition Lenders including, without limitation, challenging the extent, amount, legality, validity, priority, perfection, or enforceability of, or asserting any offset, defense, or counterclaim to, (i) the DIP Facility Obligations or the security interests and liens of BOA or the DIP Agent in respect thereof, or (ii) the Prepetition Indebtedness, the Prepetition Credit Facility, the Prepetition Credit Agreement, or the security interests and liens of the Prepetition Agent and Prepetition Lenders in respect thereof, or asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against BOA, the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders, (b) a request to use Cash Collateral without the prior written consent of the DIP Agent and DIP Lenders, (c) a request for authorization to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from BOA or the DIP Lenders, as the case may be, without the prior written consent of BOA or the DIP Lenders, or (d) any act or omission to act adverse to BOA, the DIP Agent, the DIP Lenders, or their respective rights and remedies under the DIP Credit Agreement and the other DIP Financing Documents or their interests in the Collateral that would, individually or in the aggregate, have a Material Adverse Effect (as defined in the DIP Credit Agreement). The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and shall not affect the right of BOA, the Debtors, the DIP Agent, the DIP Lenders, any Committee, the Ad Hoc Noteholders Committee, the U.S. Trustee, or other parties in interest to object to the allowance and payment of such amounts. Any payment or reimbursement made either directly by or on behalf of BOA or the DIP Lenders at any time or by or on behalf of the Debtors on or after the occurrence of an Event of Default in respect of any Allowed Professional Fees or any other obligations relating to the Carve-Out shall, in either case, permanently reduce the Carve-Out on a dollar-for-dollar basis. The DIP Lenders' obligation to fund or otherwise pay the Carve-Out and any other claims entitled to payment under paragraphs 6 and 7 shall be added to and made a part of the DIP Facility Obligations, secured by the Collateral, and shall entitle BOA, the DIP Agent, and the DIP Lenders to all of the rights, claims, liens, priorities, and protections under this Order, the DIP Financing Documents, the Bankruptcy Code, and applicable non-bankruptcy law. Payment of any obligations relating to the Carve-Out, whether by or on behalf of BOA or the DIP Lenders, shall not and shall not be deemed to reduce the DIP Facility Obligations and shall not and shall not be deemed to subordinate any of the DIP Facility Liens or the DIP Facility Superpriority Claims to any junior prepetition or postpetition lien, interest, or claim in favor of any other party. Except as otherwise provided herein with respect to the Carve-Out and the other claims entitled to payment under paragraphs 6 and 7, BOA, the

DIP Agent, and the DIP Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Chapter 11 Cases or the Debtors' cases under any other chapter of the Bankruptcy Code, and nothing in this Order or otherwise shall be construed to obligate BOA, the DIP Agent, or the DIP Lenders, in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement.

7.    <u>Carve-Out Amount</u>.    For purposes of this order, the "Carve-Out Amount" for Allowed Professional Fees incurred on or after the Petition Date through the earlier of (a) the effective date of the Debtors' Prepackaged Plan of Reorganization (the "Plan") filed in these cases or (b) the date the DIP Agent issues a notice of an Event of Default (as defined in the DIP Credit Agreement) to any of the Debtors or their counsel (the "Pre-Default Period") is a maximum, cumulative, aggregate amount of $2,000,000, and after the DIP Agent issues any such notice of an Event of Default, is a maximum cumulative, aggregate amount of $500,000, less the amount of any retainer or other deposit or security held by any Professional at the time the notice of an Event of Default is issued. If during the Pre-Default Period the Debtors make one or more requests in writing to the DIP Agent that the DIP Agent and the DIP Lenders increase the Carve-Out Amount applicable during the Pre-Default Period by not more than 10% in any single request, specifying the proposed new Carve-Out Amount for that period and the reasons for the requested increase, and the DIP Agent in its discretion does not object to the request within five business days after receipt of the request, the Carve-Out Amount for the Pre-Default Period will increase to the amount so requested by the Debtors.

8.    <u>Allowance of Claims</u>.    Consistent with the terms of the Plan, the consent of any impaired classes of claims, and the Debtors' intent to seek confirmation of the Plan at the earliest possible time, the claims of the Prepetition Agent and the Prepetition Lenders under the Prepetition Credit Facility, as secured by the Prepetition Collateral are deemed to be allowed, subject to the provisions of paragraph 9 of this order, and shall be paid from advances under the DIP Facility.

9.    <u>Investigation Period</u>.    Notwithstanding anything herein or in the DIP Loan Documents to the contrary, the Committee, if any, or other party in interest (except the Debtors or other parties consenting to the entry of this order) shall have until no later than the earlier of (i) 75 days after the Petition Date, (ii) the deadline established by the court for the filing of objections to confirmation of the Plan, and (iii) for any Committee, if formed, 60 days after the date of such Committee's formation (the "Investigation Termination Date") to investigate

the validity, perfection, enforceability, extent of the Prepetition Indebtedness and Prepetition Liens, lender liability claims and causes of action, any actions, claims or defenses under chapter 5 of the Bankruptcy Code or any other claims or causes of action. Any challenge pursuant to this paragraph must be made by a party in interest with standing properly commencing an adversary proceeding on or before the Investigation Termination Date. If no such action is filed on or before the Investigation Termination Date, all holders of claims and interests as well as other parties in interest shall be forever barred from bringing or taking any action, and the Debtors' stipulations and acknowledgements made in paragraphs __ shall be binding on all parties in interest.

10.      <u>Payment of Administrative Claims</u>. So long as no Default or Event of Default shall have occurred, the Debtors shall be permitted to pay Allowed Professional Fees incurred and allowed and payable to under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable, subject to the Carve-Out and the Carve-Out Amount; *provided, however,* that nothing contained in this Order or otherwise shall be construed to obligate BOA, the DIP Agent, or the DIP Lenders in any way to lend or advance any additional funds to the Debtors or provide other financial accommodations to the Debtors, upon or after the occurrence of an Event of Default or Default.

11.      <u>Limitation on Additional Surcharges</u>. So long as the DIP Lenders are providing postpetition financing or otherwise allowing the use of Cash Collateral, with the exception of Carve-Out and fees payable pursuant to 28 U.S.C. § 1930 and to the Clerk of the Court, and subject to approval at the Final Hearing, neither the Collateral nor BOA, the DIP Agent, nor the DIP Lenders shall be subject to surcharge, pursuant to section 506(c) of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest, until all DIP Facility Obligations and Prepetition Indebtedness are indefeasibly paid in full in cash (or cash collateralized), without the prior written consent of BOA, the DIP Agent, and DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by BOA, the DIP Agent, or the DIP Lenders in this proceeding, including, but not limited to, funding of the Debtors' ongoing operations by BOA, the DIP Agent, or the DIP Lenders. Upon approval at the Final Hearing, none of BOA, the DIP Agent, or the DIP Lenders shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

12.      <u>Restrictions on Use of Proceeds</u>. The Debtors may use the proceeds of the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and other DIP Financing Documents. Notwithstanding anything set forth herein or in the DIP Financing Documents to the contrary, no proceeds of the

DIP Facility or any proceeds of the Collateral may be used by the Debtors or any other person or entity to (a) assert, join in, or support the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against BOA, the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders, including, without limitation, to challenge the amount, validity, extent, perfection, priority, or enforceability of, or assert any defense, counterclaim, or offset to, (i) the DIP Facility Obligations or the security interests and liens of BOA, the DIP Agent, and the DIP Lenders in respect thereof and/or (ii) the Prepetition Indebtedness or the security interests and liens of the Prepetition Agent and the Prepetition Lenders in respect thereof, or any other rights or interests of BOA, the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders, or assert any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against BOA, the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders, (b) request to use Cash Collateral (as defined in section 363 of the Bankruptcy Code) without the prior written consent of the DIP Lenders, (c) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code other than from BOA or the DIP Lenders without the prior written consent of BOA and the DIP Lenders, or (e) act or fail to act in a manner adverse to BOA, the DIP Agent, the DIP Lenders, or their rights and remedies under the DIP Credit Agreement or their interests in the Collateral, which act or failure to act would, individually or in the aggregate, have a Material Adverse Effect.

13.     <u>Commitment Termination Date</u>.  The DIP Facility Obligations shall be due and payable, without notice or demand, on the Termination Date (as defined in the DIP Credit Agreement) (the "Commitment Termination Date").

14.     <u>Fees and Expenses of BOA, the DIP Agent, and the DIP Lenders</u>.  The Debtors shall, promptly following receipt of a written invoice, reimburse BOA, the DIP Agent, and the DIP Lenders for all their costs, fees (including reasonable attorneys' fees), charges, and expenses incurred (whether incurred prior to or after the Petition Date) in connection with the DIP Facility, any of the Financing Documents, or the Chapter 11 Cases, and the DIP Agent shall have the option of making an advance for the account of the Debtors under the DIP Credit Agreement to pay such costs, fees, charges, and expenses.  None of such costs, fees, charges, and expenses shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court, provided that the Court shall have jurisdiction to determine any dispute concerning such invoices.

15.     <u>Restrictions on the Debtors</u>.  Other than the Carve-Out, no claim having a priority superior or *pari passu* with those granted by this Order to BOA, the DIP Agent, and the DIP Lenders shall be granted or permitted by any order of the Court heretofore or hereafter entered in the Chapter 11 Cases, while any portion of the DIP Facility Obligations (or refinancing thereof) or any commitment under the DIP Credit Agreement or any other DIP Financing Document remains outstanding.  Except as expressly permitted by the DIP Credit Agreement, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests, or liens in the Collateral or any portion thereof to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

16.     <u>Additional Perfection Measures</u>.  BOA, the DIP Agent, and DIP Lenders shall not be required to file financing statements, mortgages, deeds of trust, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Financing Documents and this Order (including, without limitation, the execution of any control, lock-box, deposit account, or similar documents or agreements).  Notwithstanding the foregoing, BOA, the DIP Agent, and DIP Lenders may, in their sole discretion, file (or require the Debtors to execute and file) such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm perfection of such liens, security interests, and mortgages without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, and all such documents shall be deemed to have been filed or recorded at the time of and on the Petition Date and all recording fees and expenses shall be borne by the Debtors.

17.     <u>Automatic Stay</u>.  Subject only to the provisions of the DIP Credit Agreement, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit BOA, the DIP  Agent, and DIP  Lenders, upon the occurrence and during the continuance of any Default or Event of Default, upon giving notice to the Company, counsel to the Ad Hoc Noteholders Committee, counsel to any Committee, and the U.S. Trustee, to take one or more of the following actions:  (a) terminate the obligations of the Lenders to extend any further credit under the DIP Credit Agreement  or the other DIP Financing Documents and (b) declare all outstanding obligations under the DIP Credit Agreement and the DIP Facility to be immediately due and payable.  Additionally, the DIP Agent and the DIP Lenders, by three business days' notice to the Company, the Ad Hoc Noteholders Committee, and the U.S. Trustee, may, in addition, to any other remedies to which they are entitled, enforce any and all rights and remedies available to the DIP Agent and DIP Lenders, and BOA under the Financing Documents or applicable law.  During that three-day period, (a) the Company may continue to us its cash

-13-

collateral strictly for the purpose of paying only usual and necessary operating expenses in the ordinary course of its business and consistent with its past practice; (b)    the Company and the other Debtors will not under any circumstances fail to maintain their bank accounts, cash management accounts, checking accounts, savings accounts, and other accounts with the DIP Agent, or fail to cause all remittances, receipts, and other funds (in every form and from every source) they receive or obtain to be deposited into their accounts with the DIP Agent; and (c)  the Debtors, any Committee, the Ad Hoc Noteholders Committee, or any other party in interest shall have the right to make an emergency application to the Court to seek a determination as to whether a Default or Event of Default has actually occurred and is continuing in accordance with the DIP Credit Agreement, any other DIP Financing Document, and this Order.  Notwithstanding the occurrence of an Event of Default or the Commitment Termination Date or anything herein, all of the rights, remedies, benefits, and protections provided to BOA, the DIP Agent, and DIP Lenders under the DIP Financing Documents and this Order shall survive the Commitment Termination Date.

18.    <u>Binding Effect</u>.  The provisions of this Order shall be binding upon and inure to the benefit of BOA, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Debtors, and their respective successors and assigns.  To the extent permitted by applicable law, this Order shall bind any trustee hereafter appointed for the estate of any Debtor, whether in these Chapter 11 Cases or in the event of the conversion of any Chapter 11 Case to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Order.

19.    <u>Survival</u>.  The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming any plan of reorganization in any of the Chapter 11 Cases; or (iii) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Order as well as the DIP Facility Superpriority Claims and the DIP Facility Liens granted pursuant to this Order and the DIP Financing Documents shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Order and the DIP Financing Documents and to the maximum extent permitted by law until all of the DIP Facility Obligations are indefeasibly paid in full and discharged (and, with respect to outstanding undrawn letters of credit issued pursuant to the DIP Credit Agreement, each collateralized in accordance with the provisions of the DIP Credit Agreement).

20.    <u>Dismissal of Cases</u>.  Unless all DIP Facility Obligations shall have been paid in full (and, with respect to outstanding undrawn letters of credit issued pursuant to the DIP Credit Agreement, cash collateralized in

-14-

accordance with the provisions of the DIP Credit Agreement), it shall constitute an Event of Default if any of the Debtors seek, or if there is entered, an order dismissing any of the Chapter 11 Cases.  If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that the superpriority claims, liens, and security interests, replacement security interests, and other protections granted to BOA, the DIP Agent, and/or the DIP Lenders pursuant to this Order and the DIP Financing Documents shall continue in full force and effect and shall remain their priorities as provided in this Order until all DIP Facility Obligations in respect thereof shall have been paid and satisfied in full (and that such superpriority claims, liens, and other protections, shall, notwithstanding such dismissal, remain binding on all parties in interest).

21.    <u>After Acquired Property</u>.  Except as otherwise provided in this Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including, without limitation, all Collateral pledged to the DIP Agent, on behalf of itself and the DIP Lenders, pursuant to the DIP Financing Documents and this Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date.

22.    <u>Access to the Debtors</u>.  Without limiting the rights of access and information afforded BOA, the DIP Agent, and DIP Lenders under the DIP Financing Documents, the Debtors shall permit representatives, agents, and employees of BOA, the DIP Agent, and DIP Lenders to have reasonable access to their premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses) and shall cooperate, consult with, and provide to such representatives, agents, and employees all such non-privileged information as they may reasonably request.

23.    <u>Authorization to Act</u>.  Each of the Debtors is authorized to do and perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages, and financing statements), and to pay fees and costs, which may be reasonably required or necessary for the Debtors' performance under the DIP Facility and this Order, including, without limitation:

(i)     the execution of the DIP Financing Documents;

(ii)    the modification or amendment of the DIP Credit Agreement or any other DIP Financing Document without further order of this Court, in each case, in such form as BOA, the Debtors, the DIP Agent, and the DIP Lenders may agree (except for any modification or amendment to shorten the maturity of the extensions of credit thereunder, or increase the rate of interest or the letter of credit fees payable thereunder); *provided, however,* that notice of any such modification or amendment shall be provided to any Committee, the Ad Hoc Noteholders Committee, and the U.S. Trustee, each of which will have five business days from the date of such notice within which to object in writing; *provided further, however,* that if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of the Court; and

(iii)    the non-refundable payment to BOA, the DIP Agent, or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement and the other Financing Documents and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable attorneys' and other professional fees and disbursements as provided in the DIP Financing Documents.

24.    <u>Insurance Policies</u>.  Upon entry of this Order, the DIP Agent and DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors which in any way relates to the Collateral.

25.    <u>DIP Agent Review of Corporate Governance and New Equity Commitment Documents; Plan Modifications</u>.  The DIP Agent, on behalf of itself, the DIP Lenders and the lenders providing exit financing under the Plan (the "Exit Lenders"), shall have the right to review the proposed forms of the Corporate Governance Documents (as defined in the Plan), the New Equity Commitment Documents (as defined in the Plan), and every proposed amendment or supplement to the Plan.  Each term in the Corporate Governance Documents and the New Equity Commitment Documents that adversely affects or could adversely affect the financial condition or performance of the reorganized Debtors or the ability of the reorganized Debtors to perform one or more of their respective obligations under the proposed Exit Facility (as defined in the Plan) must be acceptable to the DIP Agent, each DIP Lender, and each Exit Lender in the sole discretion of each.  In addition, each proposed material modification or supplement to the Plan (excluding the terms of the proposed Corporate Governance Documents and New Equity Documents that are included in a modification or supplement, which are subject solely to the review and approval rights in the foregoing sentence) that adversely affects or could adversely affect the financial condition

-16-

or performance of the reorganized Debtors or the ability of the reorganized Debtors to perform one or more of their respective obligations under the proposed Exit Facility, must be acceptable to the Agent, each DIP Lender, and each Exit Lender in the sole discretion of each.

26.     <u>Subsequent Reversal</u>.  If any or all of the provisions of this Order or the DIP Financing Documents are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of BOA, the DIP Agent, and the DIP Lenders:  (i) such modification, vacatur, amendment, or stay shall not affect the validity of any obligation to BOA, the DIP Agent, or DIP Lenders that is or was incurred prior to the effective date of such modification, vacatur, amendment, or stay (the "Effective Date"), or the validity and enforceability of any security interest, lien, or priority authorized or created by this Order and the DIP Financing Documents; and (ii) the DIP Facility Obligations pursuant to this Order and the DIP Financing Documents arising prior to the Effective Date shall be governed in all respects by the original provisions of this Order and the DIP Financing Documents, and the validity of any such credit extended or security interest granted pursuant to this Order and the DIP Financing Documents is protected by section 364(e) of the Bankruptcy Code.

27.     <u>Final Hearing</u>.  This Order is set for a Final Hearing at _____ (Prevailing Eastern Time) on _____ in this Court, at which time any party in interest may appear and state its objections.  The notice provided by the Debtors of the Interim Hearing was provided in accordance with Bankruptcy Rule 4001(c)(2).  The Debtors shall promptly mail copies of this Order and notice of the Final Hearing to the Service Parties. Any objection by a party-in-interest to the relief sought in the Final Order shall be made in writing and filed with the Court (with a courtesy copy to chambers) and served upon counsel for the Debtors, counsel for BOA, the DIP Agent, and the U.S. Trustee so as to be received no later than 5:00 p.m. (Prevailing Eastern Time) on _____.  If no objection is timely filed in accordance with the foregoing, the Court may grant the Motion and enter the Final Order without a hearing.

28.     <u>Finding of Fact and Conclusions of Law</u>.  This Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon the entry thereof.

29.     <u>Controlling Effect of Order</u>.  To the extent any provision of this Order conflicts with any provision of the Motion, any prepetition agreement, or any document executed in connection with the DIP Facility, the provisions of this Order shall control.

Dated:   Wilmington, Delaware

_____


_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 4.1(S)(III)**

**FIRST DAY ORDERS**

1.      Motion of The Debtors For Entry of An Order Directing Joint Administration of Related Chapter 11 Cases

2.      Motion of The Debtors For The Entry of An Order (A) Scheduling Combined Hearing On Disclosure Statement And Plan Confirmation And Setting The Deadline For Objecting To Disclosure Statement And Plan; (B) Approving Form And Notice of Combined Hearing On Disclosure Statement And Plan Confirmation; (C) Establishing Procedures For Objecting To The Plan And Disclosure Statement; (D) Approving Solicitation Procedures; And (E) Granting Related Relief

3.      Motion of The Debtors For The Entry of An Order Authorizing The Debtors To Pay Prepetition Claims of Certain Creditors In The Ordinary Course Of Business

4.      Motion of The Debtors For Entry of An Order Authorizing The Debtors To Retain And Employ Epiq Bankruptcy Solutions, LLC As Notice, Claims And Balloting Agent *Nunc Pro Tunc* To The Petition Date

5.      Motion of The Debtors For Entry of An Order Authorizing But Not Directing The Debtors To Continue Prepetition Insurance Coverage And Maintain Prepetition Premium Financing Agreements

6.      Motion of The Debtors For Entry of An Order (A) Authorizing, But Not Directing, The Debtors To Pay Certain Prepetition (I) Wages, Salaries And Other Compensation, (Ii) Reimbursable Employee Expenses And (Iii) Employee Medical And Similar Benefits And (B) Authorizing And Directing Banks And Other Financial Institutions To Honor All Related Checks And Electronic Payment Requests

7.      Motion For Entry of An Order Authorizing The Debtors To Continue To Use Existing Cash Management System

8.      Motion of The Debtors For The Entry of An Order Authorizing But Not Directing The Debtors To Honor Certain Prepetition Obligations To Customers And To Otherwise Continue Certain Customer Programs In The Ordinary Course Of Business

9.      Motion of The Debtors For Entry of An Order Authorizing But Not Directing The Debtors To Remit And Pay Certain Taxes And Fees And Authorizing And Directing Banks And Other Financial Institutions To Honor Related Checks And Electronic Payment Requests

10.      Motion of The Debtors For Entry of Interim And Final Orders Determining Adequate Assurance of Payment For Future Utility Services

11. Motion of The Debtors For Entry of Interim And Final Orders (A) Authorizing The Debtors To Obtain Postpetition Financing Pursuant To Section 364 of The Bankruptcy Code; (B) Granting Liens And Superpriority Claims; (C) Granting Adequate Protection To Prepetition Lenders; (D) Authorizing Use of Cash Collateral Pursuant To Section 363 of The Bankruptcy Code; (E) Modifying The Automatic Stay; And (F) Scheduling The Final Hearing On The Debtors' Motion

12.  Interim Order (a) authorizing the debtors to obtain postpetition financing from Bank of America, N.A., as Agent, and Bank of America, N.A., and KeyBank National Association, as Lenders, (b) granting liens and superpriority claims, (c) granting adequate protection, (d) authorizing the use of cash collateral, (e) modifying the automatic stay, and (f) scheduling a final hearing

**EXHIBIT 10.28**
**FORM OF COLLATERAL BASE CERTIFICATE**

**LAZY DAYS' R.V. CENTER, INC.**

**POST-PETITION CREDIT AGREEMENT**
**COLLATERAL BASE CERTIFICATE**

Lazy Days' R.V. Center, Inc. (the *"Company"*) furnishes this Collateral Base Certificate (this *"Certificate"*) to Bank of America, N.A., as Agent (the *"Agent"*), and Bank of America, N.A., and KeyBank National Association, as Lenders (the *"Lenders"*), pursuant to Section 7.1 of the Post-Petition Credit Agreement dated October [____], 2009, among the Company, the Lenders, the Agent, RV Acquisition, Inc., LD Holdings, Inc., and LDRV Holdings Corp. (as amended, modified, renewed, and restated from time to time, the *"Credit Agreement"*).  All capitalized terms used in this Certificate have the respective definitions attributed to them in the Credit Agreement, unless otherwise indicated. The Company hereby certifies to the Agent and each Lender as follows:

1.       The undersigned officer of the Company is the _____ of the Company and, solely in that capacity, [he/she] is authorized to execute and deliver this Certificate on behalf of the Company.

2.       For purposes of this Certificate, the date for which the Collateral Base is being calculated is _____, 2009 (the *"Calculation Date"*).

3.       The Collateral Base calculation, as of the Calculation Date, is attached to this Certificate as <u>Exhibit A</u>.

4.       The information contained in this Certificate and all attachments to it is true and complete in all respects.

5.       The Inventory included on <u>Exhibit A</u> as Eligible New Inventory and Eligible Used Inventory constitute Eligible New Inventory and Eligible Used Inventory, respectively, as defined in the Credit Agreement, and the Accounts included on <u>Exhibit A</u> as Eligible Accounts constitute Eligible Accounts as defined in the Credit Agreement.

6.       Attached to this Certificate are detailed Floor Plan Unit and Contracts in Transit receivable aging reports as of the Calculation Date.

7.       The representations and warranties contained in Section 5 of the Credit Agreement and in each of the other Financing Documents are true and correct on and as of the Calculation Date (except for those representations and warranties that expressly refer to an earlier date) with the same force and effect as if made on and as of such date.

8.       No Event of Default has occurred and is continuing.

9.       Since the date of the financial statements of the Company most recently delivered to the Agent and the Lenders pursuant to the Credit Agreement, there has been no Material Adverse Effect.

**EXECUTED:** _____, 2009                    **LAZY DAYS' R.V. CENTER, INC.**

By:_____
    Name:_____
    Title:_____

-21-

## COLLATERAL BASE CERTIFICATE

**Company:**

**Lazy Days R.V. Center, Inc., Debtor and Debtor-in-Possession**
**Seffner, Florida**

| | |
|---|---|
| **Amounts which appear below are as of :** | **00/00/2009** |
| **Certificate No:** | **2009 - 001** |

*Reconciliation of Collateral Base*

| | | | | | |
|---|---|---|---|---:|---:|
| **1.** | **TOTAL NEW INVENTORY** | | | | $10,000,000 |
| | Less:  Ineligible New Inventory | | | | |
| 1a | Eligible New Inventory - Category I, aged < = 365 days | 1,000,000 | 5.0% | 50,000 | |
| 1b | Eligible New Inventory - Category I, > 365 and < = 545 days | 1,000,000 | 20.0% | 200,000 | |
| 1c | Eligible New Inventory - Category I, > 545 and < = 730 days | 1,000,000 | 30.0% | 300,000 | |
| 1d | Eligible New Inventory - Category I, > 730 days | 500,000 | 100.% | 500,000 | |
| 1e | Eligible New Inventory - Category II, aged < = 365 days | 1,000,000 | 18.0% | 180,000 | |
| 1f | Eligible New Inventory - Category II, > 365 and < = 545 days | 1,000,000 | 33.0% | 330,000 | |
| 1g | Eligible New Inventory - Category II, > 545 and < = 730 days | 1,000,000 | 43.0% | 430,000 | |
| 1h | Eligible New Inventory - Category II, > 730 days | 500,000 | 100.% | 500,000 | |
| 1i | Eligible New Inventory - Category III, aged < = 365 days | 1,000,000 | 28.0% | 280,000 | |
| 1j | Eligible New Inventory - Category III, > 365 and < = 545 days | 1,000,000 | 43.0% | 430,000 | |
| 1k | Eligible New Inventory - Category III, > 545 and < = 730 days | 1,000,000 | 53.0% | 530,000 | |
| 1l | Eligible New Inventory - Category III, > 730 days | - | 100.% | - | |
| 1m | Other - Non eligible inventory | - | 100.% | - | 3,730,000 |
| 1n | **Total Eligible New Inventory Collateral** | 10,000,000 | | | **$ 6,270,000** |
| **2.** | **TOTAL USED INVENTORY** | | | | $ 5,000,000 |
| | Less:  Ineligible Used Inventory | | | | |
| 2a | Eligible Used Inventory, aged < = 180 days | 2,000,000 | 20.0% | 400,000 | |
| 2b | Eligible Used Inventory, aged > 180 and < = 365 days | 2,000,000 | 40.0% | 800,000 | |
| 2c | Eligible Used Inventory, aged > 365 days | 1,000,000 | 100.% | 1,000,000 | |
| 2d | Other - ineligible used inventory | - | 100.% | - | $ 2,200,000 |
| 2e | **Total Eligible Used Inventory Collateral** (not to exceed $20 million) | 5,000,000 | | | **$ 2,800,000** |
| **3.** | **TOTAL ELIGIBLE ACCOUNTS** | | | | $ 5,000,000 |
| | Less:  Ineligible Accounts | | | - | |
| 3a | Eligible Accounts, aged < = 15 days | 4,000,000 | 40.0% | 1,600,000 | |

| | | | | | |
|---|---|---|---|---|---|
| 3b | Eligible Used Accounts, aged > 15 days | 1,000,000 | 100.0% | 1,000,000 | 2,600,000 |
| 3c | Total Eligible Accounts Collateral (not to exceed $7 million) | | 5,000,000 | | **2,400,000** |
| **4.** | **ELIGIBLE COLLATERAL BASE** | | | | **11,470,000** |
| **5.** | **Less:  Floor Plan Loans** | | | | **10,000,000** |
| 6. | Surplus / (Shorfall) | | | | $ 1,470,000 |

**Lazy Days R.V. Center, Inc., Debtor and Debtor-in-Possession**

**By:**  _____

**Its:**  _____
                     (Authorized signature and title)

-2-