Lazy Days' R.V. Center, Inc. ("Lazy Days") and the other Debtors[1] (collectively, with Lazy Days, the "Company") are sending you this document and the accompanying materials (the "Disclosure Statement") because you may be a creditor entitled to vote to approve the *Joint Prepackaged Plan of Reorganization of Lazy Days' R.V. Center, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated September 4, 2009, as the same may be amended from time to time (the "Plan"). The Company is commencing the solicitation of your vote to approve the Plan (the "Solicitation") before the Company files voluntary cases under chapter 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code").

The Company has not commenced reorganization cases under chapter 11 of the Bankruptcy Code as of the date of this Disclosure Statement. If, however, the Company receives properly completed ballots indicating acceptance of the Plan in sufficient amount, but not necessarily in number, to meet the voting requirements prescribed by section 1126 of the Bankruptcy Code, it intends to file (but hereby expressly reserves the right not to file) with a United States Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code, and to seek, as promptly thereafter as practicable, confirmation of the Plan (the "Chapter 11 Cases"). Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code. If the Company files the Chapter 11 Cases, it will promptly seek an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

---

### DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED PLAN OF REORGANIZATION OF LAZY DAYS' R.V. CENTER, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

### DATED SEPTEMBER 4, 2009

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with or reviewed by the Bankruptcy Court, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "Commission") under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities law ("Blue Sky Law"). The Company is relying on sections 3(a)(9) and 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of certain new securities in connection with the Solicitation and the Plan.

The Plan has not been approved or disapproved by the Commission or any state securities commission and neither the Commission nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement and the information set forth herein is confidential. This Disclosure Statement contains material non-public information concerning the Company, its subsidiaries, and their respective securities. Each recipient hereby acknowledges that (a) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or

---

[1]  The Debtors, along with the last four digits of each Debtor's federal tax identification number, are:  Lazy Days' R.V. Center, Inc. (4794); LD Holdings, Inc. (1834); LDRV Holdings Corp. (6915); and RV Acquisition Inc. (1630).  The location of the Debtors' corporate headquarters and the service address for all Debtors is:  6130 Lazy Days Boulevard, Seffner, Florida 33584-2968.

cause any person to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

---

The deadline to accept or reject the Plan is **_5:00 p.m. (prevailing Eastern Time) on October 2, 2009_** (the "Voting Deadline"), unless the Company, in its discretion (in consultation with the Ad Hoc Noteholders Committee), and from time to time, extends the Voting Deadline. To be counted, the Ballot (or Master Ballot in the case of beneficial Holders of Notes Claims voting through a Nominee) indicating acceptance or rejection of the Plan must be received by Financial Balloting Group LLC, the Company's Balloting Agent, no later than the Voting Deadline.

The Board of Directors of the Company has approved the Plan and recommends Holders of 11.75% Senior Notes vote to accept it.

---

The Company cannot assure you that the Disclosure Statement, including any exhibits to the Disclosure Statement, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases will not contain different, additional, or material terms that do not appear in this Disclosure Statement. Therefore, making investment decisions based upon the information contained in this Disclosure Statement, the Plan, and the exhibits, is **_highly speculative_**. The Company urges each Holder of a Claim or Interest (a) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under Article IX of this Disclosure Statement, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan" and (b) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

---

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including, without limitation, those Holders of Claims or Interests who do not submit Ballots (or Master Ballots in the case of beneficial Holders of Notes Claims voting through a Nominee) to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

---

Prepared By:

|  |  |
|---|---|
| **KIRKLAND & ELLIS LLP** | **YOUNG CONAWAY STARGATT & TAYLOR, LLP** |
| David L. Eaton | Robert S. Brady (Bar No. 2847) |
| 300 North LaSalle Street | Edmon L. Morton (Bar No. 3856) |
| Chicago, Illinois 60654 | 1000 West Street, 17th Floor |
| Telephone: (312) 862-2000 | PO Box 391 |
| Facsimile: (312) 862-2200 | Wilmington, Delaware 19801 |
|  | Telephone: (302) 571-6600 |
| - and - | Facsimile: (302) 571-1253 |
| Jennifer L. Marines |  |
| Marc A. Lewinstein |  |
| 601 Lexington Avenue |  |
| New York, New York 10022 |  |
| Telephone: (212) 446-4800 |  |
| Facsimile: (212) 446-4900 |  |

Co-Counsel for the Debtors and Debtors in Possession

Dated: September 4, 2009

**TABLE OF CONTENTS**

**Page**

I.      **Introduction** ....................................................................................................................1

    A.      Purpose and Effect of the Plan ..................................................................................2

    B.      Overview of Chapter 11 ............................................................................................4

    C.      DIP Facility Claims, Administrative Claims, Priority Claims and Intercompany Claims ......................4

    D.      Summary of Classification, Treatment and Voting Rights of Allowed Claims and Interests Under the Plan................................................................................................6

    E.      Summary of Solicitation Package and Voting Instructions.......................................7

    F.      The Confirmation Hearing ........................................................................................8

    G.      Confirming and Consummating the Plan ..................................................................8

    H.      Rules of Interpretation...............................................................................................9

II.     **Background** ...................................................................................................................**10**

    A.      Overview of the Business of Lazy Days ..................................................................10

    B.      Lazy Days' Corporate Structure..............................................................................12

    C.      The Debtors' Debt Structure ...................................................................................13

III.    **The Chapter 11 Cases**.................................................................................................**16**

    A.      Events Leading To The Chapter 11 Cases ..............................................................16

    B.      Restructuring Initiatives..........................................................................................16

    C.      The Proposed Reorganization of the Debtors..........................................................17

    D.      Anticipated Events of the Chapter 11 Cases ..........................................................18

IV.     **Summary of the Joint Plan** ........................................................................................**21**

    A.      DIP Facility Claims, Administrative Claims, Priority Claims and Intercompany Claims ....................21

    B.      Classification and Treatment of Classified Claims and Interests ...........................23

    C.      Acceptance Requirements ........................................................................................26

    D.      Means for Implementation of the Plan ....................................................................27

    E.      Treatment of Executory Contracts and Unexpired Leases ......................................33

    F.      Provisions Governing Distributions ........................................................................35

    G.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims.............38

    H.      Conditions Precedent to Confirmation and Consummation of the Plan..................40

    I.      Settlement, Release, Injunction and Related Provisions ........................................42

    J.      Binding Nature of the Plan......................................................................................44

    K.      Retention of Jurisdiction .........................................................................................45

    L.      Modification, Revocation, or Withdrawal of the Plan.............................................46

M.      Miscellaneous Provisions ................................................................................. 47

**V.    Solicitation and Voting Procedures** .......................................................................... **51**

A.      The Solicitation Package .................................................................................. 51

B.      Voting Deadline ................................................................................................ 51

C.      Voting Instructions ........................................................................................... 52

D.      Voting Tabulation ............................................................................................. 54

**VI.   Valuation Analysis and Financial Projections** .......................................................... **56**

A.      Valuation of the Reorganized Debtors ............................................................. 56

B.      Valuation methodologies .................................................................................. 57

C.      Financial Projections ........................................................................................ 59

D.      Projected Financial Statements ........................................................................ 60

**VII.  Confirmation Procedures** ......................................................................................... **62**

A.      The Confirmation Hearing ................................................................................ 62

B.      Statutory Requirements for Confirmation of the Plan ..................................... 62

C.      Risk Factors ...................................................................................................... 65

D.      Identity of Persons to Contact for More Information ....................................... 66

E.      Disclaimer ......................................................................................................... 66

**VIII. Implementation of the Plan and Postpetition Governance of the Reorganized Debtors** .......................... **67**

A.      Board of Directors and Management ................................................................ 67

B.      Indemnification of Directors and Officers ....................................................... 67

C.      Management Incentive Program ....................................................................... 67

D.      Exit Financing ................................................................................................... 67

E.      Issuance of New Common Stock ...................................................................... 68

F.      Issuance of New Preferred Stock ..................................................................... 68

G.      Stockholders Agreement for New Stock .......................................................... 68

H.      Registration Rights Agreement ........................................................................ 68

**IX.   Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan** .................. **69**

A.      General .............................................................................................................. 69

B.      Certain Bankruptcy Law Considerations ......................................................... 69

C.      Factors Affecting the Company ........................................................................ 70

D.      Risk that the Information in this Disclosure Statement May be Inaccurate ...... 71

E.      Financial Information; Disclaimer .................................................................... 71

F.      Liquidation Under Chapter 7 ............................................................................ 72

ii

G.  Risk Factors That May Affect the Value of Securities to be Issued Under the Plan and/or Recoveries Under the Plan ...................................................................................72

H.  Disclosure Statement Disclaimer ...................................................................................74

**X.  Exemptions from Securities Act Registration ..........................................................................77**

A.  New Stock ...................................................................................................................77

B.  Issuance and Resale of New Stock Under the Plan ...........................................................77

C.  Registration of New Stock ............................................................................................78

**XI.  Certain U.S. Federal Income Tax Consequences of the Plan.....................................................80**

A.  Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors .........................81

B.  Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims ...................................................................................................................84

C.  Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims ...................................................................................................................87

D.  Withholding and Reporting ............................................................................................88

**XII.  Glossary of Defined Terms...........................................................................................90**

**XIII.  Recommendation ........................................................................................................92**

## **EXHIBITS**

EXHIBIT A       Joint Prepackaged Plan of Reorganization

EXHIBIT B       Financial Projections

EXHIBIT C       Liquidation Analysis

EXHIBIT D       Restructuring Term Sheet

# I.
## INTRODUCTION[2]

The Company is sending you this Disclosure Statement[3] because the Company is asking you to vote on approval of the Plan.  A copy of the Plan is attached hereto as **<u>Exhibit A</u>**.[4]  This Disclosure Statement describes certain aspects of the Plan, including the treatment of Holders of Claims and Interests, and also describes certain aspects of the Company's operations, financial projection, and other related matters.

**The Company is making the statements and financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specified.  Holders of Claims and Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the date set forth on the cover page of this Disclosure Statement.  Holders of Notes Claims entitled to vote to accept the Plan must rely on their own evaluation of the Company and their own analysis of the terms of the Plan, including, but not limited to, any risk factors cited herein, in deciding whether to vote to accept or reject the Plan.**

**The contents of this Disclosure Statement may not be deemed as providing any legal, financial, securities, tax, or business advice.  The Company urges each Holder of a Claim or Interest to consult with its own advisors with respect to any such legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby.  Furthermore, the Bankruptcy Court's approval of the adequacy of disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan.**

**Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  Rather, Holders of Claims and Interests should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings, and other pending or threatened litigation or actions.**

**Holders of Claims and Interests are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan and the matters described under Article IX of this Disclosure Statement, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan" prior to deciding whether to accept or reject the Plan.**

**The Company has not authorized any party to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Company has not authorized any representations concerning the Company or the value of its property other than as set forth in this Disclosure Statement.  Claimants should not rely upon any information, representations, or other inducements made to obtain acceptance of the Plan that are other than, or inconsistent with, the information contained herein and in the Plan.**

**The Company's management has reviewed the financial information provided in this Disclosure Statement.  Although the Company has used reasonable efforts to ensure the accuracy of this financial information, the**

---

[2]    This introduction is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in the Disclosure Statement.

[3]    Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement shall have the meanings ascribed to them in the Plan.

[4]    As set forth in this Disclosure Statement, all Holders of Class 3 Notes Claims who are entitled to vote on the Plan will receive this Disclosure Statement.  All other Holders of Claims and Interests will receive a notice of the Disclosure Statement, which will provide details on how to obtain copies of this Disclosure Statement.

**financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited.**

**The Company recommends that potential recipients of New Common Stock, including options to purchase New Common Stock, and of New Preferred Stock consult their own counsel concerning the securities laws consequences concerning the transferability of the New Stock.**

**This Disclosure Statement summarizes certain provisions of the Plan, certain other documents, and certain financial information.  The Company believes that these summaries are fair and accurate in all material respects; however, you should read the Plan in its entirety.  In the event of any inconsistency or discrepancy between a description contained in this Disclosure Statement and the terms and provisions of the Plan or the other documents or financial information to be incorporated herein by reference, the Plan, or such other documents, as applicable, shall govern for all purposes.**

**The Company is providing the information in this Disclosure Statement solely for purposes of soliciting the votes of Holders of Notes Claims entitled to vote to accept or reject the Plan or object to Confirmation. Nothing in this Disclosure Statement may be used by any person for any other purpose.**

**All exhibits to this Disclosure Statement are incorporated into and made a part of this Disclosure Statement as if set forth in full herein.**

## A.    PURPOSE AND EFFECT OF THE PLAN

The primary purpose of the Plan is the restructuring and recapitalization of the Company's capital structure in order to better-align it with the Company's present and future operating prospects, to provide the Company with greater liquidity and to ensure that the Company continues to provide the same superior service to the customers for which it is known.  In addition to the payment of all General Unsecured Claims in full in Cash in the ordinary course, the financial transactions under the Plan are more or less comprised of two distinct elements:   (i) the amendment and restatement of certain of the Company's equity and governance documents; and  (ii) the recapitalization and restructuring of the debt and equity of Lazy Days.

The Company as a whole must significantly de-leverage its balance sheet and obtain new capital to compete effectively in the challenging recreational vehicles market.  Presently, based on the current outlook, the funds expected to be generated by the Company's operation of its business and other sources will not be sufficient to meet the Company's debt service requirements and satisfy its debt obligations unless the transactions proposed under the Plan are consummated.  The Company believes that the recapitalization transactions under the Plan will reduce uncertainty with respect to its future and better position it to develop and maintain new customers.

### 1.    Recapitalization and Financial Restructuring Transactions Under the Plan

The following recapitalization and financial restructuring transactions of the debt and equity of the Company will be effectuated pursuant to the terms and conditions set forth in Article V of the Plan (as described in greater detail in Article IV herein):

- the Company will enter into a debtor-in-possession credit facility in an aggregate amount of $45 million, with seasonal limit increases to $65 million (the "DIP Facility"), to replace its prepetition floor plan credit facility and replace the DIP Facility with a credit facility in an aggregate amount of $45 million, with seasonal limit increases to $65 million (the "Exit Facility"), upon emergence from chapter 11**;**

- Reorganized Lazy Days will issue to each Holder of an Allowed Notes Claim its Pro Rata share of the common stock of Reorganized Lazy Days (the "New Common Stock") to be received by such Holder (in accordance with Article III of the Plan), and in exchange therefor such Holder will be

deemed to have surrendered its Notes Claim(s) to Reorganized Lazy Days, at which time each such Notes Claim shall be deemed cancelled;

- the New Equity Investors (or counter party under an Alternative Proposal) will contribute $10 million to the capital of Reorganized Lazy Days, and in exchange therefor Reorganized Lazy Days will issue to the New Equity Investors (or counter party under an Alternative Proposal) senior convertible preferred stock (the "New Preferred Stock");

- RV Acquisition and LD Holdings shall be dissolved and, in connection therewith, the Equity Interests in RV Acquisition and the Intercompany Interests held by RV Acquisition and LD Holdings shall be cancelled and extinguished;

- On the Effective Date, subject to delivery by the Debtors of a tax opinion acceptable to the Ad Hoc Noteholders Committee in its sole discretion, Reorganized Lazy Days will contribute, as a capital contribution, substantially all of its assets (other than its continuing interest in the capital stock of Reorganized LDRV Holdings) to Reorganized LDRV Holdings, and Reorganized LDRV Holdings will assume substantially all of the liabilities of Reorganized Lazy Days (including, without limitation, all liabilities and obligations of Reorganized Lazy Days under the Exit Facility Agreement, provided that Reorganized Lazy Days will remain obligated as a guarantor thereunder), other than the Notes Claims and the Section 510(b) Claims.

The Company believes that consummation of the recapitalization and financial restructuring transactions proposed under the Plan will provide the Company with the capital structure and liquidity necessary to continue operating as a going concern as a result of, among other things:  (a) the reduction of the Company's total prepetition funded debt by approximately $113.7 million; (b) significant reductions in ongoing interest expense which will improve cash flow; and (c) the investment of $10 million in new capital.  Indeed, the Company believes that the realization of these transactions on the terms outlined herein will enable the Company to exit chapter 11 appropriately capitalized and competitively positioned for future growth.

In connection with developing the Plan, the Company conducted a careful review of its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries of Holders of Allowed Claims and Interests in various liquidation scenarios.  As a result, the Company concluded that the recovery for Holders of Allowed Claims and Interests would be maximized by continuing to operate as a going concern.  The Company believes that its business and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part.  Consistent with the liquidation analysis described herein and other analyses prepared by the Company and its advisors, the value of the Company's assets would be considerably greater if the Company operates as a going concern as opposed to liquidating.  Moreover, the Company believes that any alternative to Confirmation of the Plan, such as an out-of-court restructuring, liquidation or attempts by another party in interest to file a plan of reorganization, would result in significant delays, litigation, execution risk and/or additional costs and, ultimately, would lower the recoveries for Holders of Allowed Claims and Interests.  Accordingly, the Company strongly recommends that you vote to accept the Plan, if you are entitled to vote.

2.    Securities to be Issued Under the Plan

Reorganized Lazy Days will issue the following equity securities pursuant to the terms and conditions set forth in Article V of the Plan (as described in greater detail in Article IV herein):

- the New Common Stock; and

- $10 million of New Preferred Stock, bearing an 8% annual PIK dividend, convertible at any time into 70% of the New Common Stock on a fully diluted basis.

**As a condition precedent to holding any newly issued equity security, each Holder thereof shall be required to enter into a Stockholders Agreement.  Such Stockholders Agreement will contain significant transfer**

**restrictions, including, without limitation, tag-along, drag-along and right of first refusal provisions, and limits on the number of record holders; govern access to information; and determine other rights of Holders of New Common Stock and will be filed prior to the Confirmation Hearing as part of the Plan Supplement.**

## B.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummation of a plan is the principal objective of a chapter 11 case.  The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization from affected creditors before filing for bankruptcy.  Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in more conventional bankruptcy cases.  Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

## C.    DIP FACILITY CLAIMS, ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS AND INTERCOMPANY CLAIMS

The following is a summary of the treatment of DIP Facility Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims and Intercompany Claims under the Plan.  For a more detailed description of the treatment of such Claims under the Plan, please see Article II of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims and Intercompany Claims, have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    DIP Facility Claims

Allowed DIP Facility Claims shall be paid in full in Cash on the Effective Date, in full, final and complete satisfaction of such Claims from the proceeds of the Exit Facility.

Notwithstanding anything in the Plan to the contrary, the DIP Facility Claims shall not be modified, impaired or discharged by the Plan or the Confirmation Order.  From and after the Effective Date, the DIP Lenders and the DIP Agent shall, at the sole cost and expense of the Reorganized Debtors, take all action reasonably necessary and requested by the Reorganized Debtors to confirm the removal of any claims, security interests and Liens that they hold in their capacity as DIP Lenders or DIP Agent on the properties or assets of the Debtors or the Reorganized Debtors.

2.      **Administrative Claims**

    (a)     <u>General Administrative Claims</u>

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (i) on or as soon as reasonably practicable after the Effective Date, (ii) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided, however,</u> that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

    (b)     <u>Fee Claims</u>

Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 45 days after the Effective Date; <u>provided</u> that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Confirmation Date; and <u>provided, further</u> that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order.  Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.  To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

3.      **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by the Debtors prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Priority Tax Claim, at the Debtors' option (after consultation with the Ad Hoc Noteholders Committee), each Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such claim shall be paid in full in cash in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

4.      **Other Priority Claims**

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors (after consultation with the Ad Hoc Noteholders Committee), one of the following treatments: (a) Cash in an amount equal to the amount of such Allowed Other Priority Claim; (b) Cash in an aggregate amount of such Allowed Other Priority Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

5.        **Intercompany Claims**

On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors, with the consent of the Ad Hoc Noteholders Committee.

6.        **Statutory Fees**

On the Distribution Date, Reorganized Lazy Days shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Confirmation Date, Reorganized Lazy Days shall pay the applicable U.S. Trustee fees until the entry of a final decree in each such Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

**D.        SUMMARY OF CLASSIFICATION, TREATMENT AND VOTING RIGHTS OF ALLOWED CLAIMS AND INTERESTS UNDER THE PLAN**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan.  For example, Holders of Claims and Interests not impaired by the Plan are presumed to accept the Plan under Section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Holders of Claims or Interests Impaired by the Plan and receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation.[5]  As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against or in a single consolidated Estate without regard to the separate identification of the Debtors.

The classification, treatment and voting rights of Claims against and Interests in the Debtors and the potential distributions to Holders of Allowed Claims and Interests under the Plan are summarized as follows:.[6]

| Class | Claim/Interest | Impairment | Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 2 | Prepetition Credit Agreement Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 3 | Notes Claims | Impaired | Entitled to Vote | 12.9%[7] |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |

---

[5]    Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases.

[6]    This chart is only a summary of the classification and treatment of Allowed Claims and Interests under the Plan.  Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Interests.

[7]    Reflects New Common Stock post-dilution from the conversion of New Preferred Stock.

| Class | Claim/Interest | Impairment | Voting Rights | Estimated Recovery |
|-------|----------------|------------|---------------|--------------------|
| 5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |
| 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100% |
| 7 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

For a detailed description of the Classes of Claims and Interests, as well as their respective treatment under the Plan, see Article III of the Plan.

**E.      SUMMARY OF SOLICITATION PACKAGE AND VOTING INSTRUCTIONS**

The following materials constitute the solicitation package (the "Solicitation Package"):

- a cover letter from Lazy Days;

- the appropriate Ballot[8] and applicable voting instructions (with a pre-addressed, postage pre-paid return envelope);

- the Solicitation version of the Disclosure Statement with all exhibits; and

- the Solicitation version of the Plan, and any other supplements or amendments to these documents.

The one Voting Class, Class 3, shall be served paper copies of the Disclosure Statement with all exhibits, including the Plan.  Any party who desires additional paper copies of these documents may request copies from the Balloting Agent by writing to Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017, or calling (646) 282-1800.  The Solicitation Package (except the Ballots) can also be obtained by accessing the Balloting Agent's website, http://www.fbgdocuments.com/lzd.   All parties entitled to vote to accept or reject the Plan shall receive a paper copy of each appropriate Ballot or Master Ballot.

The Company, has engaged Financial Balloting Group LLC as the Balloting Agent to assist in the balloting and tabulation process.  The Balloting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.  To be counted, Ballots cast by Holders of Class 3 Claims (or Master Ballots in the case of beneficial Holders of Notes Claims voting through a Nominee) must be received by the Balloting Agent by 5:00 p.m. (prevailing Eastern time) on October 2, 2009, the Voting Deadline.  Voting instructions are attached to each Ballot and Master Ballot.  Please see Article V, entitled "Solicitation and Voting Procedures" for additional information.

---

[8]      Master Ballots will be distributed to Nominees following the initial distribution of the Solicitation Package.

Unless the Company, in its discretion decides otherwise (in consultation with the Ad Hoc Noteholders Committee), any Ballot or Master Ballot received after the Voting Deadline shall not be counted. The Balloting Agent will process and tabulate Ballots and Master Ballots for each Class entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") prior to the Confirmation Hearing.

For answers to any questions regarding solicitation procedures, parties may contact the Balloting Agent directly, at (646) 282-1800, with any questions related to the solicitation procedures applicable to their Claims and Interests.

The Plan Supplement will be Filed by the Debtors no later than five days before the date of the Confirmation Hearing (the "Plan Supplement Filing Date"). When Filed, the Plan Supplement will be available in both electronic and hard copy form, although the Company will not serve paper or CD-ROM copies. Details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest at the commencement of the case.

**Any Ballot (or Master Ballot in the case of beneficial Holders of Notes Claims voting through a Nominee) that is properly executed by the Holder of a Claim (or Nominee), but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Class 3 Claim must vote all of its respective Claims either to accept or reject the Plan and may not split its votes. By signing and returning a Ballot (or Master Ballot in the case of beneficial Holders of Notes Claims voting through a Nominee), each Holder of a Notes Claim in Class 3 (or its Nominee) will certify to the Bankruptcy Court and the Company that no other Ballot or Master Ballot with respect to such Notes Claim has been cast or, if any other Ballots or Master Ballots have been cast with respect to such Class 3 Notes Claims, such other Ballots or Master Ballots are revoked.**

**All Ballots and Master Ballots are accompanied by voting instructions. It is important to follow the specific instructions provided with each Ballot and Master Ballot.**

**The Company is relying on sections 3(a)(9) and 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.**

F.      **THE CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

Following commencement of the Chapter 11 Cases, the Company intends to schedule promptly a Confirmation Hearing and will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

G.      **CONFIRMING AND CONSUMMATING THE PLAN**

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and the Ad Hoc Noteholders Committee, each in its sole discretion. Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of Article IX of the Plan and the Restructuring Term Sheet.

Following Confirmation, the Plan will be consummated on the Effective Date, the day that is the first Business Day following the Confirmation Date on which: (1) no stay of the Confirmation Order is in effect; and (2) all conditions specified in Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan.

For further information, see Article IX of the Plan, entitled "Conditions Precedent to Confirmation and Consummation of the Plan."

## H.    RULES OF INTERPRETATION

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan; (2) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (3) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (4) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (5) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement or to this Disclosure Statement; (7) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (8) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (10) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in Bankruptcy Code § 102 shall apply; (11) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or Allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America.

**II.**
**BACKGROUND**

**A.      OVERVIEW OF THE BUSINESS OF LAZY DAYS**

**1.      General Company Overview**

Lazy Days, located in Seffner, Florida, is the world's largest single site retailer of recreational vehicles ("RVs").  The dealership's "SuperCenter," which occupies 126 acres and attracts over 250,000 visitors annually, has available for sale more than 800 new and pre-owned RVs, covering 75 models from 18 manufacturers and ranging in price from less than $9,000 for basic, detachable units to more than $1 million for luxury motor homes.  In addition to cash flow from the sale of RVs, Lazy Days also generates revenue from (a) commissions earned on vehicle financing and insurance products it sells on behalf of third-party providers, (b) the service, maintenance and repair of RVs and (c) the collection of daily fees paid by customers who utilize Lazy Days' Rally Park campground facilities.

In 2008, Lazy Days generated $530.3 million in revenue, which is broken down by category in Figure 1 below:

Figure 1 – 2008 Revenue By Category

| Type | Percentage of Revenues |
|---|---|
| New Vehicle Sales | 57.52% |
| Pre-Owned Vehicle Sales | 35.85% |
| Service and Repair | 3.43% |
| Financing and Related Activities | 2.91% |
| RallyPark | 0.29% |

**2.      Vehicle Products**

Lazy Days sells two kinds of RV products: motor homes and towables.  Motor homes are self-contained, motorized units that are designed to provide a mobile living environment for recreational, travel or camping use.  Towables are wheeled units designed to be towed by another vehicle and, while similar to motor homes in use and features, are generally smaller than motor homes.  Lazy Days sells both new and pre-owned motor homes and towables.

*Motor Homes*

Lazy Days sells primarily "Class A" and "Class C" motor homes in the retail market.  The combined sale of motor homes represented 88% of Lazy Days' new vehicle revenue in 2008.  Class A motor homes are the largest and most luxurious units.  These high-end motor homes are built on specially designed chassis and often are outfitted with amenities such as washers/dryers, security systems, TVs, DVD players, satellite dishes and hydraulic leveling systems.  Newer Class A motor homes are generally equipped with multiple "slide-outs," which allow the owner to extend the exterior walls of the RV when parked to dramatically enlarge the interior space.  These motor homes range in length from 21 to 45 feet and range in retail price from approximately $75,000 (for standard, gas-powered units) to over $1 million (for high-line, diesel-powered units).

Class C motor homes, also known as "mini-motor homes," are constructed on an automotive manufactured van frame with an attached cab segment.  These RVs, which range in length from 20 to 32 feet, offer full kitchen, sleeping and dining facilities and are increasingly featuring slide-outs.  Class C motor homes range in price from $40,000 to $175,000.

10

*Towables*

Lazy Days sells both conventional travel trailers and fifth-wheel trailers in the retail market.  The combined sale of towables represented 12% of Lazy Days' new vehicle revenue in 2008.  Conventional travel trailers range in length from 12 to 39 feet and generally include all of the facilities found in a motor home.  Most of the newer conventional travel trailers can sleep up to eight people and range in cost from approximately $9,000 to $76,000.

Fifth-wheel trailers, which range in length from 21 to 42 feet, are similar to conventional travel trailers in terms of size and amenities, but differ in their attachment mechanism.  While a conventional travel trailer is designed to be mounted on a standard car, truck, or van hitch, a fifth-wheel trailer is attached to a pickup truck by a special hitch connected to the truck bed.  This design provides greater maneuverability and reduces the overall length of the combined vehicles.  Fifth-wheel trailers are priced from approximately $15,000 to $100,000.

*Pre-Owned Vehicles*

Approximately 66% of customers trade in their pre-owned RVs when purchasing a vehicle from Lazy Days, generating a steady, high-quality flow of available pre-owned inventory.  Lazy Days sells pre-owned vehicles to both retail customers and, on a wholesale basis, a network of RV and automotive dealers.  Of Lazy Days' total pre-owned vehicle revenues in 2008, retail sales of pre-owned Class A motor homes represented approximately 75%, retail sales of Class C pre-owned motor homes represented 8.5%, retail sales of pre-owned conventional and fifth–wheel trailers and other miscellaneous vehicles represented 9%, and wholesale sales represented 7.5%.

**3.      Service and Repairs**

Lazy Days operates 230 service bays, body, cabinet, chassis and windshield repair shops, through which the Company offers on-site maintenance and repair services.  The service and repair department is divided into two areas.  First, Lazy Days provides "make ready" services for deliveries of recently purchased new and pre-owned retail units.  Second, Lazy Days provides post-delivery services to its customers, including general RV maintenance and manufacturer paid work performed under warranty.  Lazy Days' service and repair department generated $18.2 million of revenue in 2008.

**4.      Financing and Related Services**

Lazy Days provides assistance to customers in arranging financing for their RV purchases through a variety of lenders.  Lazy Days also assists customers in obtaining extended warranty or insurance products in connection with their RV purchases.  Lazy Days receives a fee from the lenders and insurance underwriters, as applicable, in connection with these services.  Revenues from financing, warranty and extended warranty products and related services were $15.4 million in 2008.

**5.      Campground**

RallyPark is Lazy Days' full service RV campground capable of accommodating up to 299 RVs, a 12,000–square-foot rally center, dining facilities, a screened-in swimming pool, tennis courts and a learning center where visitors can enjoy complimentary seminars.  In 2008, revenues of $1.6 million in fees were generated from RallyPark visitors.

**6.      Suppliers**

Lazy Days has developed strong relationships with the industry's leading RV manufacturers.  Lazy Days is supplied primarily by nine major RV manufacturers.  These manufacturers rely on Lazy Days as a primary point of distribution.  For most product lines and manufacturers, Lazy Days is the leading dealership in terms of sales volume.  Lazy Days has won numerous supplier awards for excellence in sales and service.

Lazy Days has negotiated favorable long-term agreements and reasonable sales goals with its RV manufacturers. These agreements provide exclusive sales rights for manufacturers' products over extended geographic regions ranging from the local Tampa area to the southeastern United States.

### 7.    Sales, Marketing and Customer Services

Lazy Days' customers are frequently repeat purchasers, approximately 66% of whom have previously owned an RV. For these customers, RVs are not viewed as a luxury or recreational item, but as a lifestyle choice. The RV lifestyle includes frequent social interaction between RV enthusiasts that creates an environment in which word-of-mouth marketing becomes a powerful tool. Accordingly, Lazy Days expends significant time and resources to creating a unique purchasing experience in order to attract new customers and to maintain existing customers for life. To do so, Lazy Days offers its customers a 1,200–square-foot dealership that hosts the world's largest single-site RV inventory, a 230-bay RV servicing facility that includes a customer service center, complimentary Starbucks coffee, luxurious seating areas, flat-screen televisions and wireless internet connections, and a scenic campground with multiple amenities where visitors can enjoy things such as a complimentary meals at the Italian style café or a complimentary seminar at the learning center. In addition to the foregoing, Lazy Days employs a client-based, process-oriented approach to servicing its customers, which is reinforced throughout Lazy Days' corporate culture at every level. This unique customer-focused business model has resulted in a loyal customer base and an unrivaled reputation within the RV community. Indeed, Lazy Days' ability to generate a significant portion of its annual unit sales from repeat business and word-of-mouth referrals is testimony to the success of this approach.

While Florida is Lazy Days' primary market, the company has penetrated other markets as well, with unit sales to non-Florida residents reaching 43% of total retail deliveries in 2008. Lazy Days' U.S. market share in new Class A motor home unit sales in 2008 was approximately 7.5%.

## B.    LAZY DAYS' CORPORATE STRUCTURE

Lazy Days was founded by Donald W. Wallace in 1976 and began its operations in Tampa, Florida. In May 1976, the company relocated to a much larger dealership site in Seffner, Florida, which is 10 miles east of downtown Tampa. On May 14, 2004, RV Acquisition purchased all of the issued and outstanding shares of capital stock of LD Holdings, the direct parent of Lazy Days, for a total purchase price of $217.1 million (the "Acquisition"). In connection with the Acquisition, Lazy Days entered into a management services agreement with Bruckmann, Rosser, Sherrill & Co., II, L.P. ("BRS") whereby BRS agreed to provide general management services to Lazy Days. In exchange for these services, Lazy Days agreed to pay BRS an annual management fee.

RV Acquisition has issued and outstanding 4,994,680 shares of common stock, approximately 84.4% of which is held by BRS, approximately 10.6% of which is held by Donald Wallace, approximately 2.3% of which is held by the Debtors' officers, and directors, and the remaining approximately 2.7% of which is held by others. RV Acquisition also has issued and outstanding 61,927.563 shares of preferred stock. These preferred shares are not entitled to receive any dividends, the preferred stock has no voting rights, the preferred stockholders are entitled to a liquidation preference of $0.01 per share, and the preferred stock is redeemable at the sole discretion of RV Acquisition.

LD Holdings has issued and outstanding 100 shares of common stock. One-hundred percent of the issued and outstanding LD Holdings stock is held by RV Acquisition. Lazy Days has issued and outstanding 100 shares of common stock. One-hundred percent of the issued and outstanding Lazy Days stock is held by LD Holdings. RV Acquisition and LD Holdings have no assets or operations other than their investment in Lazy Days' common stock. Lazy Days has one wholly owned direct subsidiary, LDRV Holdings. LDRV Holdings has no operations, holds no assets and is currently in good standing. On the Effective Date, subject to delivery by the Debtors of a tax opinion acceptable to the Ad Hoc Noteholders Committee in its sole discretion, Reorganized Lazy Days will contribute, as a capital contribution, substantially all of its assets (other than its continuing interest in the capital stock of Reorganized LDRV Holdings) to Reorganized LDRV Holdings, and Reorganized LDRV Holdings will assume substantially all of the liabilities of Reorganized Lazy Days (including, without limitation, all liabilities and obligations of Reorganized Lazy Days under the Exit Facility Agreement**,** provided that Reorganized Lazy Days will remain obligated as a guarantor thereunder), other than the Notes Claims and the Section 510(b) Claims.

Figure 2 – Current Corporate Structure



## C.    THE DEBTORS' DEBT STRUCTURE

As of September 2, 2009, the Company has total outstanding funded debt in the aggregate principal amount of approximately $162.5 million, consisting of approximately $24.2 million in first lien bank debt, $137.8 million in unsecured bonds and approximately $518,000 of other debt obligations arising under or in connection with certain capital lease arrangements and issued but undrawn standby letters of credit.

1.      **Secured Bank Debt**

Lazy Days  is party to Amendment No. 5 to the Third Amended and Restated Credit Agreement, dated as of December 31, 2008 (as amended, restated, supplemented or otherwise modified, the "Prepetition Credit Agreement"), by and among Lazy Days , as borrower, Bank of America, N.A., as administrative agent and collateral agent (in such capacity, the "Prepetition Agent"), and Bank of America, N.A. and KeyBank National Association, each in their capacity as lenders (the "Prepetition Lenders").  The Prepetition Credit Agreement provides for financing as of March 2009 consisting of (a) an $80 million floor plan credit facility (the "Floor Plan Facility") and (b) a $15 million revolving credit facility (the "Revolving Facility").  Although the Debtors may not currently draw down on the Revolving Facility, they can access separately the $5 million sublimit for letters of credit provided for in the Prepetition Credit Agreement.

The Floor Plan Facility allows Lazy Days to finance both new and pre-owned RV inventory.[9]  Lazy Days' obligations under the Floor Plan Facility are collateralized by all vehicles purchased under the Prepetition Credit Agreement and all receivables generated from the sale of these vehicles.  The interest rate charged (4.53% on August 31, 2009) is based on the prime rate or LIBOR.  Principal is due upon the sale of the respective vehicle.  As of the Petition Date, the outstanding principal amount due under the Floor Plan Facility (together with accrued and unpaid interest thereon) was approximately $24.2 million.

Both the Floor Plan Facility and the Revolving Facility may be used by the Debtors for general working capital purposes.  Lazy Days' obligations under the Floor Plan Facility and the Revolving Facility are collateralized by a first priority perfected security interest in and lien on any and all of Lazy Days' assets and are guaranteed by each of RV Acquisition and LD Holdings.

Lazy Days is eligible to borrow under the Revolving Facility when its interest coverage ratio, as defined, exceeds 1.40 and Lazy Days' trailing twelve month net income, as defined, exceeds $500,000.  As of September 4, 2009, Lazy Days was not eligible to borrow under the Revolving Facility.  As of the Petition Date, the Revolving Facility is not drawn upon and approximately $518,000 is issued and outstanding under letters of credit.

2.      **Senior Unsecured Notes**

Lazy Days is party to that certain Indenture, dated May 14, 2004 (the "11.75% Senior Notes Indenture"), by and between Lazy Days and The Bank of New York Mellon, as trustee (the "Indenture Trustee") for the Holders of the 11.75% Senior Notes.  Pursuant to the 11.75% Senior Notes Indenture, Lazy Days  issued through a private placement $152 million in aggregate principal amount of its 11.75% Senior Notes due 2012.  On December 6, 2004, Lazy Days successfully completed an exchange of $137 million of its 11.75% Senior Notes.  The remaining $15 million of 11.75% Senior Notes were not eligible for exchange.  The 11.75% Senior Notes are unsecured obligations of Lazy Days.  As of September 2, 2009, approximately $137.8 million in aggregate principal amount of 11.75% Senior Notes remains outstanding.  The 11.75% Senior Notes rank equally in right of payment with all existing unsecured debt of Lazy Days and junior to all existing secured debt of Lazy Days  to the extent of the value of the liens securing such obligations.

Lazy Days had the option to redeem the 11.75% Senior Notes at any time after May 15, 2008, at a defined premium plus accrued and unpaid interest to the date of redemption.  Lazy Days is permitted to offer to repurchase 11.75% Senior Notes from all Holders, on a Pro Rata basis, to the extent of 50% of Lazy Days' free cash flow, as defined, for any six-month period ending on either June 30 or December 31 of any fiscal year, commencing with the six-month period ending December 31, 2004.  To the extent Lazy Days' free cash flow for any six-month period is less than $1.0 million, Lazy Days is permitted to elect not to make a free cash flow offer for such period and, in lieu thereof, add such free cash flow to the amount of free cash flow for the next succeeding six-month period.

---

[9]      The entire Floor Plan Facility may be used to purchase new RVs, but only $26 million of the Floor Plan Facility may be used to purchase pre-owned inventory.

The 11.75% Senior Notes Indenture includes covenants that limit the ability of Lazy Days to incur additional debt, including sale and leaseback transactions. Specifically, Lazy Days will not incur *pari passu* indebtedness if its fixed charge coverage ratio is less than or equal to 2.5 to 1.0.  In addition, the 11.75% Senior Notes Indenture's covenants limit  Lazy Days' ability to: pay dividends or distributions on its capital stock or repurchase capital stock; issue stock of subsidiaries; make certain investments; create liens on its assets to secure debt; enter into transactions with Affiliates; merge or consolidate with another company; and transfer and sell assets.

### III.
### THE CHAPTER 11 CASES

**A.      EVENTS LEADING TO THE CHAPTER 11 CASES**

**1.      U.S. Economic Recession and Other Macroeconomic Factors**

As has been widely reported, the U.S. economy is ensconced in the deepest recession in decades, compounded by continuing mortgage defaults, depressed real estate prices, falling equity value, illiquid credit markets, rising unemployment and depleted consumer wealth and confidence.  There is no doubt that this recent economic turmoil has had an adverse impact on the RV industry, where sales volume is directly related to consumer confidence and discretionary spending.  According to the Statistical Surveys, Inc., total industry-wide sales of new RVs decreased 26.8% from 308,447 units sold in 2007 to 225,541 units sold in 2008, with Class A motor homes having decreased 44.5%, Class C motor homes having decreased 36.9%, conventional travel trailers having decreased 24.1% and fifth-wheel towables having decreased 21.7%.  In line with industry trends, in 2008, Lazy Days sold 2,284 new vehicles (a decrease of 28% from 2007) and 2,642 used vehicles (a decrease of 24% from 2007).

**2.      Decreased Sales Volumes and Deliveries**

While Lazy Days has adjusted downward its level of inventory based on current consumer demand, the inventory of other dealers in the industry remains high relative to current retail sales volumes, resulting in lower pricing levels in an effort to avoid curtailments and generate cash.  In addition, manufacturer buy-backs of dealer inventory and retail repossessions compete with the sale of new units, further limiting new production demand and placing downward pricing pressure on new and used RVs.  Several of Lazy Days' manufacturers, such as Monaco, Fleetwood and Country Coach, have filed for protection under the Bankruptcy Code, while others have maintained extended periods of shut downs.

**3.      Tightening of Credit Markets**

With demand already constrained by lower levels of consumer confidence in an uncertain economic environment, higher interest rates for RV consumer loans and stricter credit terms have further reduced RV sales volumes.  RV retail lenders have introduced, in lieu of reliance on consumer credit score and payment history, tests of personal liquidity and source of income.  Documentation requirements and required down payments have been increased, while loan size relative to value has been significantly decreased.  The availability of funding has been further restricted as several lenders have abandoned the retail RV financing business.  As a result of the foregoing, the ability of consumers to qualify for and to obtain credit to purchase RVs has been severely compromised, if not eliminated entirely.  For those who can still qualify for financing, the RV industry has seen a shift from more costly motorized units to smaller, more affordable towable units and from new to pre-owned vehicles.

**4.      Weakened Operating Performance**

Despite Lazy Days' best efforts to retain liquidity, the combined impact of the factors described above negatively affected Lazy Days' operating performance and financial position in 2008.  Sales volume from the fourth quarter of 2008 declined by 634 units below 2007, which resulted in a $4.7 million reduction in sales EBITDA.  Lazy Days' net loss increased from $2.5 million in 2007 to $15.5 million in 2008.

**B.      RESTRUCTURING INITIATIVES**

To address the liquidity constraints caused by the tightening credit markets, decreased consumer demand and increased debt service carrying costs, since the beginning of 2008, Lazy Days' management, with the help of its advisors and other professionals, has been working with its banks and other constituencies to cut costs, restructure its business operations and address operational cash shortfalls.  These initiatives have included, among other things:

- a company-wide labor reduction of 185 employees in 2008;

- the renegotiation of benefit programs in an effort to lower costs (with employee pay portions increased);

- the suspension of Lazy Days' discretionary 401(k) plan matching;

- the implementation of a flat-rate pay program in its Service and Repair department, which resulted in a $3.3 million revenue increase from 2007; and

- the reduction of semi-variable and fixed costs, including lowering marketing expenditures and renegotiating general liability and corporate insurance contracts.

The result of Lazy Days' efforts has been positive. Lazy Days' market share of Class A and Class C RV sales was at a record high at the close of 2008. In addition, Lazy Days' performance in towable sales was extremely positive compared to the market trend in Florida. This data indicates that Lazy Days should be in a strong market position as the market recovers.

However, while Lazy Days' RV performance in 2008 surpassed that of the overall RV retail market, due to the current economic climate and ongoing credit crisis, Lazy Days concluded that its liquidity would continue to erode and would potentially be exacerbated by further declines in the RV market. In addition, Lazy Days determined that any new debt or equity investments would be unlikely unless it could restructure its existing debt, given the current amount of outstanding debt owed to the Prepetition Lenders and the Holders of the 11.75% Senior Notes. Lazy Days also concluded that it would need additional liquidity while it pursued its restructuring that it could only obtain through an infusion of capital.

Accordingly, beginning November 2008, Lazy Days, together with their financial advisor and legal counsel, engaged in intensive negotiations with the Prepetition Agent and an informal committee of unaffiliated Holders of the 11.75% Senior Notes (the ``"Ad Hoc Noteholders Committee") to reach a consensual agreement on restructuring Lazy Days' balance sheet through a prepackaged chapter 11 plan. On September 4, 2009, the parties entered into a Restructuring Term Sheet (a copy of which is attached hereto as **Exhibit D**), which sets forth the terms of the contemplated restructuring, and includes the commitment of the members of the Ad Hoc Noteholders Committee to support the proposed Plan, subject to the terms and conditions of the Restructuring Term Sheet.

Pursuant to the Restructuring Term Sheet, among other terms and conditions, the Debtors must commence solicitation of acceptances of the Plan by September 8, 2009, file these Chapter 11 Cases by October 7, 2009, obtain confirmation within 45 days of the Petition Date, and go effective within 60 days of the Petition Date. Failure to meet any of the foregoing deadlines is a "Termination Event" under the Restructuring Term Sheet.

## C.    THE PROPOSED REORGANIZATION OF THE DEBTORS

### 1.    Solicitation

The Plan and the Disclosure Statement are, in large part, the product of the Restructuring Term Sheet.

On or about September 1, 2009, the Debtors caused a copy of the Disclosure Statement with all exhibits, the Plan, and the appropriate Ballots and applicable voting instructions (with a pre-addressed, postage pre-paid return envelope), and any other supplements or amendments to these documents to be distributed to the Voting Class, Class 3, entitled to vote to accept or reject the Plan. The Debtors established October 2, 2009 at 5:00 p.m. (prevailing Eastern Time), as the Voting Deadline for the receipt of votes to accept or reject the Plan. Master Ballots will be distributed to Nominees following the initial distribution of solicitation documents.

2.    **Summary of the Plan**[10]

The Debtors have determined that prolonged Chapter 11 Cases would likely significantly damage their ongoing business operations and threaten their viability as a going concern.  In terms of treatment under the Plan, the Prepetition Lenders will be Unimpaired and repaid through the Exit Facility.  Holders of 11.75% Senior Notes will receive their Pro Rata share of 100% of New Common Stock of Reorganized Lazy Days.  Lastly, Holders of General Unsecured Claims will be Unimpaired and paid in the ordinary course of business.

## D.    ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### 1.    Voluntary Petitions

Lazy Days, RV Acquisition, LD Holdings and LDRV Holdings will file chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases.

### 2.    Expected Timetable of the Chapter 11 Cases

The Company expects the Chapter 11 Cases to proceed quickly.  The Company cannot assure you, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Company.  On the Petition Date, the Company will promptly request the Bankruptcy Court to set a hearing date to approve this Disclosure Statement and to confirm the Plan.  If the Plan is confirmed, the Effective Date of the Plan is projected to be approximately 11 days after the date the Bankruptcy Court enters the Confirmation Order.  The Company is projected to emerge from protection under chapter 11 within 60 days of the Petition Date.

### 3.    First Day Relief

In order to facilitate the Chapter 11 Cases and minimize disruption to the Company's operations, the Company intends to present certain motions to the Bankruptcy Court on the Petition Date seeking certain relief, including but not limited to, the relief summarized below.  The relief sought will facilitate the administration of the Chapter 11 Cases, including the authority to pay Unimpaired Claims and prepetition General Unsecured Claims as they arise in the ordinary course of business.

The Company will not seek to pay the total aggregate amount of Unimpaired Claims and General Unsecured Claims outstanding as of the Petition Date; rather, the Company will seek authority only to pay such amounts as they become due in their ordinary course of business.  Such relief is typical in chapter 11 cases; however, there is no guarantee that the Bankruptcy Court will grant any or all of the requested relief.  The pleadings filed by the Debtors on the Petition Date may include, but are not necessarily limited to, the following:

(a)    Approval of Solicitation Procedures and Scheduling of Combined Disclosure Statement Approval and Confirmation Hearing

To expedite the Chapter 11 Cases, the Company intends to seek an immediate order setting a date for a combined hearing to (i) approve the Solicitation, and (ii) approve the adequacy of the Disclosure Statement and confirm the Plan.  The Company will seek the earliest possible date permitted by the applicable rules and the Bankruptcy Court's calendar for such hearings.

(b)    Debtor in Possession Financing and Use of Cash Collateral

The Company expects to seek authority to enter into the DIP Credit Agreement to obtain a $45 million DIP Facility (with a seasonal limit increase to $65 million).  The Company believes that the committed amount of the

---

[10]    This summary is qualified by reference to the provisions of the Plan.  To the extent there is any inconsistency between this summary and the Plan, the terms of the Plan shall control.

DIP Facility will meet the Company's financing needs during the Chapter 11 Cases. The Company will also seek authority to use its cash collateral.

(c)      Trade/Supply Chain Obligations

The Company will seek authority to pay Allowed, fixed, liquidated, non-contingent and undisputed prepetition amounts due in the ordinary course and owed to General Unsecured Creditors consistent with the terms of such obligations existing on the Petition Date. This relief will allow the Company to avoid needless disruptions to the Company's operations.

(d)      Employees

The Company will seek authority to pay employee compensation and, additionally, the Company intends to continue all prepetition benefit programs, including, among others, the medical, dental and 401(k) plans to the extent applicable. This relief will allow the Company to maintain employee morale and prevent costly distractions and retention issues.

(e)      Customer Obligations and Programs

The Company will seek authority to pay any unpaid obligations owed to its customers and, additionally, to otherwise continue certain customer programs and practices in the ordinary course of business. The Company intends to obtain authority to honor, exercise, and perform all its respective rights and obligations (whether prepetition or postpetition) arising in the ordinary course of business under, in connection with and in furtherance of the Company's existing customer agreements or other arrangements. The Company feels such relief is necessary to stabilize its customer base at the outset of these Chapter 11 Cases and to avoid needless disruptions of the Company's ongoing operations.

(f)      Unsecured Tax Claims

The Company will seek authority to pay certain sales, use, and franchise taxes in the ordinary course of business. Certain of these taxes impose personal liability on the Company's officers if they are not paid. Thus, in order to prevent costly distractions to management, the Company will seek authority to pay those taxes in the ordinary course of business.

(g)      Use of Existing Cash Management System

The Company will seek authority to maintain its prepetition cash management systems after commencement of the Chapter 11 Cases, including intercompany transfers and use of bank accounts. This facilitates the efficient operation of the Company by not requiring it to shut down its existing account and needlessly create a nearly identical system for each Debtor for the limited duration of the Chapter 11 Cases. Furthermore, continued use of the Debtors' existing cash management system is a condition precedent to funding the DIP Facility.

(h)      Utilities

The Company will move the Court on the Petition Date to enter orders approving procedures for, among other things, determining adequate assurance for utility providers, prohibiting utility providers from altering, refusing, or discontinuing services and determining that the Company is not required to provide any additional adequate assurance pending entry of a Final Order. The Company believes that uninterrupted utility services are essential to the Company's ongoing operations and, therefore, to the success of the Company's reorganization.

       (i)       <u>Motion for Extension and Waiver of Filing a Statement of Financial Affairs and Schedules of Assets and Liabilities</u>

The Company will request an extension of the requirement to file a Statement of Financial Affairs and Schedules of Assets and Liabilities pursuant to the Bankruptcy Code, and request that if the Plan is confirmed prior to the extended deadline, the requirement to file such statement and schedules would be waived.

       (j)       <u>Insurance Motion</u>

The Company will seek authority to continue to maintain and administer prepetition insurance policies and revise, extend, renew, supplement or change such policies, as needed; pay or honor obligations outstanding on account of prepetition insurance policies, including amounts due, owing and outstanding in respect of workers' compensation coverage and; continue to maintain premium financing agreements and revise, extend, renew, supplement or change such agreements, as needed.

**IV.**
**SUMMARY OF THE JOINT PLAN**

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan, and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein.

The Plan itself and the documents therein control the actual treatment of Claims against, and Interests in, the Company under the Plan and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims against and Interests in the Company, the Debtors' Estates, the Reorganized Debtors, all parties receiving property under the Plan and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document shall control.

A.    DIP FACILITY CLAIMS, ADMINISTRATIVE CLAIMS, PRIORITY CLAIMS AND INTERCOMPANY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims and Intercompany Claims, have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    DIP Facility Claims

Allowed DIP Facility Claims shall be paid in full in Cash on the Effective Date, in full, final and complete satisfaction of such Claims from the proceeds of the Exit Facility.

Notwithstanding anything in the Plan to the contrary, the DIP Facility Claims shall not be modified, impaired or discharged by the Plan or the Confirmation Order. From and after the Effective Date, the DIP Lenders and the DIP Agent shall, at the sole cost and expense of the Reorganized Debtors, take all action reasonably necessary and requested by the Reorganized Debtors to confirm the removal of any claims, security interests and Liens that they hold in their capacity as DIP Lenders or DIP Agent on the properties or assets of the Debtors or the Reorganized Debtors.

2.    Administrative Claims

(a)    General Administrative Claims

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the later of: (i) on or as soon as reasonably practicable after the Effective Date, (ii) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed, and (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

(b)        Fee Claims

Professionals or other Entities asserting a Fee Claim for services rendered before the Confirmation Date must File and serve on the Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Fee Claim no later than 45 days after the Effective Date; provided that the Reorganized Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Confirmation Date; and provided, further that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professional Order.  Objections to any Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.   To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims.

**3.        Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by the Debtors prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed Priority Tax Claim, at the Debtors' option (after consultation with the Ad Hoc Noteholders Committee), each Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such claim shall be paid in full in cash in accordance with the terms of any agreement between the Debtors and such holder, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**4.        Other Priority Claims**

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors (after consultation with the Ad Hoc Noteholders Committee), one of the following treatments: (a) Cash in an amount equal to the amount of such Allowed Other Priority Claim; (b) Cash in an aggregate amount of such Allowed Other Priority Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

**5.        Intercompany Claims**

On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors, with the consent of the Ad Hoc Noteholders Committee.

**6.        Statutory Fees**

On the Distribution Date, Reorganized Lazy Days shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Confirmation Date, Reorganized Lazy Days shall pay the applicable U.S. Trustee fees until the entry of a final decree in each such Debtor's Chapter 11 Case or until such Chapter 11 Case is converted or dismissed.

**B.      CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

**1.      Classification of Claims and Interests**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

**2.      Substantive Consolidation of the Debtors**

The Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation.[11]  As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against or in a single consolidated Estate without regard to the separate identification of the Debtors.

**3.      Summary of Classification**

The classification of Claims in and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Prepetition Credit Agreement Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Notes Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

---

[11]    Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases.

4.      **Treatment of Claims and Interests**

(a)      <u>Class 1 - Other Secured Claims</u>

      (i)      *Classification*:  Class 1 consists of all Other Secured Claims.

      (ii)      *Treatment*:  The legal, equitable and contractual rights of the Holders of Other Secured Claims will not be altered by the Plan.  Except to the extent a Holder of an Other Secured Claim has been paid by the Debtors prior to the Effective Date or the Holder of an Allowed Other Secured Claim and the Debtors agree otherwise, each Holder of an Allowed Other Secured Claim (including any Claim for postpetition interest accrued until the Confirmation Date at the non-default rate provided in the applicable contract or, if there is no contract, then at the Federal Judgment Rate, to the extent permissible under Bankruptcy Code section 506(a)) shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Other Secured Claim, in the discretion of the Debtors (after consultation with the Ad Hoc Noteholders Committee), one of the following alternative treatments:

      (A)      payment of the Allowed Class 1 Claim in full in Cash on the later of the Distribution Date or as soon as practicable after a particular Claim becomes Allowed;

      (B)      delivery to the Holder of the Allowed Class 1 Claim of the collateral securing such Allowed Class 1 Claim;

      (C)      such other treatment as may be agreed to by the applicable Debtor and the Holder; or

      (D)      the Holder shall retain its Lien on such property and such Allowed Class 1 Claim shall be reinstated pursuant to section 1129 of the Bankruptcy Code.

      (iii)      *Voting*:  Class 1 is Unimpaired, and Holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Other Secured Claims are not entitled to vote to accept or reject the Plan.

(b)      <u>Class 2 - Prepetition Credit Agreement Claims</u>

      (i)      *Classification*:  Class 2 consists of all Prepetition Credit Agreement Claims.

      (ii)      *Treatment*:  To the extent not rolled up or refinanced from a the DIP Facility on or prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Prepetition Credit Agreement Claim that remains outstanding as of the Effective Date, if any, each Holder of a Prepetition Credit Agreement Claim shall be indefeasibly paid in full in Cash from the proceeds of the Exit Facility upon the closing thereof on the Effective Date.

      (iii)      *Voting*:  Class 2 is Unimpaired, and Holders of a Class 2 Prepetition Credit Agreement Claim are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Prepetition Credit Agreement Claims are not entitled to vote to accept or reject the Plan.

(c)    <u>Class 3 - Notes Claims</u>

(i)    *Classification*:  Class 3 consists of all Notes Claims which are Allowed in the amount of not less than $137.8 million plus any accrued and unpaid interest, fees, charges and expenses.

(ii)    *Treatment*:  On or as soon as reasonably practicable after the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Notes Claim (inclusive of principal, fees and interest accrued through the Petition Date), each Holder of such Notes Claim shall receive, on a Pro Rata basis, 100% of the New Common Stock, subject to dilution on account of the Management Incentive Program and the Conversion Equity.

(iii)    *Voting*:  Class 3 is Impaired, and Holders of Class 3 Notes Claims are entitled to vote to accept or reject the Plan.

(d)    <u>Class 4 - General Unsecured Claims</u>

(i)    *Classification*:  Class 4 consists of all General Unsecured Claims.

(ii)    *Treatment*:   Except to the extent that a Holder of a General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each General Unsecured Claim, on or as soon as practicable after the Effective Date or when such obligation becomes due in the ordinary course of business in accordance with applicable law or the terms of any agreement that governs such General Unsecured Claim, whichever is later, each Holder of such General Unsecured Claim shall be paid in full in Cash, or otherwise receive such treatment as to render such Holder Unimpaired.

(iii)    *Voting*:  Class 4 is Unimpaired and Holders of a Class 4 General Unsecured Claim are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such General Unsecured Claims are not entitled to vote to accept or reject the Plan.

(e)    <u>Class 5 - Section 510(b) Claims</u>

(i)    *Classification*:  Class 5 consists of all Section 510(b) Claims.

(ii)    *Treatment*:  On the Effective Date, all Section 510(b) Claims shall be deemed canceled and extinguished, and shall be of no further force and effect.

(iii)    *Voting*:  Class 5 is Impaired, and Holders of a Class 5 Section 510(b) Claim are conclusively presumed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

(f)    <u>Class 6 - Intercompany Interests</u>

(i)    *Classification*:  Class 6 consists of all Intercompany Interests.

(ii)    *Treatment*:  Intercompany Interests shall be retained and the legal, equitable and contractual rights to which Holders of such Allowed Intercompany Interests are entitled shall remain unaltered, except as provided in the Plan.

(iii)    *Voting*:  Class 6 is Unimpaired, and Holders of Class 6 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of Class 6 Intercompany Interests are not entitled to vote to accept or reject the Plan.

(g)    Class 7 - Equity Interests

(i)    *Classification*:  Class 7 consists of all Equity Interests.

(ii)    *Treatment*:  On the Effective Date, all Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect.

(iii)    *Voting*:  Class 7 is Impaired, and Holders of Class 7 Equity Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Equity Interests are not entitled to vote to accept or reject the Plan.

**5.        Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or Reorganized Debtors' rights and defenses in respect of any Claim or Interest that is Unimpaired under the Plan, including, without limitation, all rights in respect of (a) legal and equitable defenses to, (b) setoff or recoupment against or (c) counter-claims with respect to any such Unimpaired Claims and Interests.

**6.        Discharge of Claims**

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Interests that are not expressly provided for and preserved in the Plan shall be extinguished upon Confirmation.  Upon Confirmation, the Debtors and all property dealt with in the Plan shall be free and clear of all such claims and interests, including, without limitation, liens, security interests and any and all other encumbrances.

**C.        ACCEPTANCE REQUIREMENTS**

**1.        Acceptance or Rejection of the Plan**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims has accepted the applicable Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of Allowed Claims in such Class Claims actually voting have voted to accept the applicable Plan.

(a)        Voting Classes

Class 3 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

(b)        Presumed Acceptance of Plan

Classes 1, 2, 4 and 6 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

(c)        Presumed Rejection of the Plan

Classes 5 and 7 are Impaired and shall receive no distribution under the Plan and are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

2.      **Confirmation of the Plan Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class.  The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126(c) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Article XIII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

3.      **Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests), is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

D.      **MEANS FOR IMPLEMENTATION OF THE PLAN**

1.      **Exit Facility/Incurrence of New Indebtedness**

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Facility, the terms, conditions and covenants which shall be acceptable to (a) the Debtors, (b) the Exit Lenders and (c) the Ad Hoc Noteholders Committee, each in its sole discretion, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person.

2.      **New Equity Facility**

On the Effective Date, the Reorganized Debtors are authorized to execute and deliver those documents necessary or appropriate to obtain the New Equity Facility, the terms, conditions and covenants which shall be acceptable to the Ad Hoc Noteholders Committee in its sole discretion, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person.

In order to consummate the New Equity Facility, the following conditions precedent shall have been satisfied or waived by the Ad Hoc Noteholders Committee in its sole discretion:

(a)      Neither the Debtors or any of their directors, officers, employees or advisors shall solicit Alternative Proposals to the New Equity Facility;

(b)      The Debtors shall provide prompt notice of and delivery to the New Equity Investors of any unsolicited Alternative Proposal;

(c)      Should the Debtors and their directors determine, in good faith, that an Alternative Proposal is more favorable to their creditors and other parties to whom they owe fiduciary duties than the New Equity Facility, the Companies shall provide prompt notice of such determination to the New Equity Investors.  The New Equity Investors shall have ten business days after notification to modify the New Equity Facility so that it contains terms comparable to the Alternative Proposal; provided, however, that the New Equity Investors are not obligated to agree to any modification of the New Equity Facility; and

(d)      The New Equity Investors shall receive, in cash, a fee equal to 3% of the initial principal amount of the New Equity Facility should the Debtors determine to accept an Alternative Proposal in lieu of the New Equity Facility after satisfying the notice and timing requirements set forth above, with such payment earned immediately upon the acceptance

of such Alternative Proposal and payable upon the consummation of such Alternative Proposal.

### 3.        Sources of Cash for Plan Distributions and Transfers of Funds Among Debtors

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant to the Plan shall be obtained from the New Equity Facility, the Exit Facility or other Cash from the Debtors, including Cash from business operations.  Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

### 4.        Issuance of New Stock

The issuance of the New Stock, including the shares of the New Common Stock, New Preferred Stock, options, or other equity awards reserved for the Management Incentive Program and Conversion Equity by Reorganized Lazy Days is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests.  On the Effective Date, the New Common Stock and the New Preferred Stock shall be issued to Holders of Notes Claims and New Equity Investors, respectively.  The New Board will determine the amount of New Common Stock, if any, to be issued pursuant to the Management Incentive Program.

All of the shares of New Stock issued pursuant to the Plan shall be duly authorized, validly issued and fully paid and non-assessable.  Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 5.        Stockholders Agreement

Upon the Effective Date, the Stockholders Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms.  The Stockholders Agreement shall contain provisions governing the rights of Holders of New Common Stock, including, without limitation, access to information regarding the Reorganized Debtors and certain transfer restrictions such as drag-along and tag-along rights, a right of first refusal and limits on the number of record holders.  Moreover, each Holder of an Allowed Class 3 Notes Claim shall be required to execute and be bound by the Stockholders Agreement as a condition precedent to receiving its allocation of New Common Stock.

### 6.        Listing of New Stock and Transfer Restrictions

Other than as provided in the Registration Rights Agreement, the Reorganized Debtors shall not be obligated, and do not intend, to list the New Stock on a national securities exchange.  In order to ensure that the Reorganized Debtors will not become subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Certificate of Incorporation and the Stockholders Agreement will impose certain trading restrictions to limit the number of record holders thereof.  The New Stock will be subject to certain transfer and other restrictions pursuant to the Stockholders Agreement and the New Certificates of Incorporation.  On the Effective Date, Reorganized Lazy Days will enter into the Registration Rights Agreement.

### 7.        Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan:  (a) the obligations of the Debtors under the Prepetition Credit Facility, the 11.75% Senior Note Indenture and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or

obligations of the Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan as provided in the Plan; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, the 11.75% Senior Note Indenture shall continue in effect solely for the purposes of: (a) allowing Holders of the Notes Claims to receive distributions under the Plan; and (b) allowing and preserving the rights of the Indenture Trustee to (i) make distributions in satisfaction of the applicable Notes Claims, (ii) exercise its charging lien against any such distributions, and (iii) seek compensation and reimbursement for any fees and expenses incurred in making such distributions; provided, further, however, that the preceding provisos shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors.

8.    **Securities Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any New Common Stock contemplated by the Plan and all agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration before the offering, issuance, distribution, or sale of securities.  In addition, under section 1145 of the Bankruptcy Code, any New Common Stock contemplated by the Plan and any and all agreements incorporated therein will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (c) the restrictions on the transferability of such securities and instruments, including those set forth in Article V.F of the Plan, the Stockholders Agreement and the New Certificates of Incorporation; and (d) applicable regulatory approval.  Notwithstanding the foregoing, the shares of New Preferred Stock that will be issued to the New Equity Investors pursuant to the New Equity Facility will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the private placement exemption under Section 4(2) of the Securities Act or Regulation D promulgated thereunder.

9.    **Restructuring Steps and Transfer of Reorganized Lazy Days Assets and Liabilities to Reorganized LDRV Holdings**

On the Effective Date or, in the case of step (g) below, as soon as reasonably practicable thereafter, the following transactions shall occur in the order specified:

(a)    RV Acquisition and LD Holdings shall be dissolved and, in connection therewith, the Equity Interests in RV Acquisition and the Intercompany Interests held by RV Acquisition and LD Holdings shall be cancelled and extinguished.

(b)    Reorganized Lazy Days and Reorganized LDRV Holdings will enter into the Exit Facility Agreement as co-borrowers.

(c)    Reorganized Lazy Days will draw down on the Exit Facility and use the proceeds thereof to repay the DIP Facility in full.

(d)    Subject to delivery by the Debtors of a tax opinion acceptable to the Ad Hoc Noteholders Committee in its sole discretion, Reorganized Lazy Days will contribute, as a capital contribution, substantially all of its assets (other than its continuing interest in the capital stock of Reorganized LDRV Holdings) to Reorganized LDRV Holdings, and Reorganized LDRV Holdings will assume substantially all of the liabilities of

Reorganized Lazy Days (including, without limitation, all liabilities and obligations of Reorganized Lazy Days under the Exit Facility Agreement, provided that Reorganized Lazy Days will remain obligated as a guarantor thereunder), other than the Notes Claims and the Section 510(b) Claims.

(e)    Reorganized Lazy Days will issue to each Holder of an Allowed Notes Claim its Pro Rata share of the New Common Stock to be received by such Holder (in accordance with Article III of the Plan), and in exchange therefor such Holder will be deemed to have surrendered its Notes Claim(s) to Reorganized Lazy Days, at which time each such Notes Claim shall be deemed cancelled.

(f)    The New Equity Investors (or counter party under an Alternative Proposal) will contribute $10 million to the capital of Reorganized Lazy Days, and in exchange therefor Reorganized Lazy Days will issue to the New Equity Investors (or counter party under an Alternative Proposal) the New Preferred Stock.

(g)    Each of Reorganized Lazy Days and Reorganized LDRV Holdings will change its jurisdiction of incorporation from Florida to Delaware.

## 10.    Corporate Existence

Reorganized Lazy Days and Reorganized LDRV Holdings shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).  RV Acquisition and LD Holdings shall be dissolved and shall cease to exist after the Effective Date.

Notwithstanding the foregoing, on or as of the Effective Date or as soon as practicable thereafter and without need for any further action, the Reorganized Debtors (with the consent of the Ad Hoc Noteholders Committee) may:  (a) cause any or all of the Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated; (b) cause the transfer of assets between or among the Reorganized Debtors; or (c) engage in any other transaction in furtherance of the Plan.

## 11.    New Certificates of Incorporation and New By-Laws

On or immediately before the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

## 12.    Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the New Board shall consist of five (5) directors consisting of the chief executive officer of Lazy Days and four members selected by the Ad Hoc Noteholders Committee.  The members of the New Board, to the extent known, shall be identified in the Plan Supplement.

13.    **Management Incentive Program**

As soon as practical after the Effective Date, the New Board will adopt and implement the Management Incentive Program, which will provide for the issuance of New Common Stock and/or options to purchase shares of New Common Stock.  Issuances made under the Management Incentive Program will dilute the interests of the common stockholders of Reorganized Lazy Days.  In connection with the distribution of New Common Stock to current or former employees of the Debtors, if any, the Reorganized Debtors may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New Common Stock and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

14.    **BRS Director Group Fees**

Lazy Days and Reorganized Lazy Days, as applicable, will pay in the ordinary course during these Chapter 11 Cases amounts, when due, pursuant to the BRS Director Agreements: (a) not to exceed $6,500 per month with respect to the Macaluso Agreement, and (b) not to exceed $1,300 per day and $6,500 per month with respect to the Salvati Agreement; provided that Lazy Days and Reorganized Lazy Days, as applicable, shall not pay any amounts (i) payable to any or all members of the BRS Director Group, other than as set forth in (a) and (b) above, or (ii) pursuant to the BRS Director Agreements, including any amounts resulting from any Claims arising from the termination thereof on the Effective Date.  Each Debtor shall continue to pay the fees and reimburse the expenses of the directors of such Debtor through the Effective Date, in their capacities as such and in amounts consistent with prior filings with the Commission.

15.    **Indenture Trustee and Ad Hoc Noteholders Committee Fees Expenses**

All outstanding fees and expenses of the (a) Indenture Trustee and its counsel and (b) the Ad Hoc Noteholders Committee and its professionals shall be paid in Cash no later than the Effective Date by the Debtors or the Reorganized Debtors as an Administrative Expense Claim, without the need for application to, or approval of, the Bankruptcy Court.  To the extent that the Indenture Trustee in its capacity as trustee under the 11.75% Senior Notes Indenture provides Disbursing Agent services with respect to distributions pursuant to the Plan, the Indenture Trustee will be paid by the Reorganized Debtors, without Bankruptcy Court approval, the reasonable compensation for such services and reimbursement of reasonable expenses incurred in connection therewith, and such payments to be made on terms under the 11.75% Senior Notes Indenture.

16.    **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the Exit Facility).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

17.    **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties

agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (d) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### 18.    Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity.

### 19.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 20.    Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 21.    Employee and Retiree Benefits

On and after the Effective Date, the Reorganized Debtors may: (a) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in each case to the extent disclosed in the Disclosure Statement or the Debtors' pleadings filed on the Petition Date, for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that

term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 22.    Preservation of Rights of Action

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the Debtors provided by Article X of the Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person or Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

## E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party, unless such contract or lease: (a) was assumed or rejected previously by the Debtors; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to reject filed on or before the Confirmation Date; or (d) is set forth in the Schedule of Executory Contracts and Unexpired Leases.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Notwithstanding the foregoing, the Debtors (with the consent of the Ad Hoc Noteholders Committee) shall have the right to amend the Schedule of Executory Contracts and Unexpired Leases at any time before the Effective Date. In addition, notwithstanding the foregoing, the Reorganized Debtors shall have the right to terminate, amend, or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

### 2.    Assumption of I-4 Lease Agreement

The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume the I-4 Lease Agreement pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of the I-4 Lease Agreement.

### 3.    Rejection of BRS Director Agreements

On the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, shall reject the BRS Director Agreements and, in exchange for the releases described in Sections I.2 and I.3 of this Article and Sections X.B and X.C of the Plan, each member of the BRS Director Group shall waive any and all Claims each may have against the Debtors or the Reorganized Debtors, as the case may be, including amounts accrued and payable

pursuant to the BRS Director Agreements other than those amounts specified in Section D.13 of this Article and Section V.N of the Plan.

### 4. Assumption of Indemnification Provisions

The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the Indemnification Provisions in place on and before the Effective Date for Indemnified Parties for Claims related to or in connection with any actions, omissions or transactions occurring before the Effective Date.

### 5. Assumption of the D&O Insurance Policies

The Debtors, and upon the Effective Date, the Reorganized Debtors, shall assume all of the D&O Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Insurance Policies.

### 6. Payments Related to Assumption of Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; provided, however, that the Debtors or the Reorganized Debtors may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

### 8. Rejection Damages Claims

All proofs of Claim with respect to Claims arising from the rejection (if any) of Executory Contracts or Unexpired Leases must be filed with the clerk of the Bankruptcy Court and served upon counsel for the Reorganized Debtors within thirty days of the occurrence of the Effective Date. Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 4 General Unsecured Claim, as applicable. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed within the time required by this section and Article VI.H of the Plan will be forever barred from assertion against the Debtors, the Reorganized Debtors, the Estates, or property of the Debtors or Reorganized Debtors.

### 9. Contracts and Leases Entered Into After the Petition Date

On and after the Effective Date, the Debtors may continue to perform under contracts and leases entered into after the Petition Date by any Debtor in the ordinary course of business, including any Executory Contracts and Unexpired Leases assumed by such Debtor.

10.     **Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date**

Intercompany Contracts, contracts, and leases entered into after the Petition Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

11.     **Modifications, Amendments, Supplements, Restatements, or Other Agreements**

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, extension rights, purchase rights and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

12.     **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

13.     **Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting Executory Contracts or Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

F.     **PROVISIONS GOVERNING DISTRIBUTIONS**

1.     **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2.        **Disbursing Agent**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  In the event that a Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors. The Indenture Trustee shall be the Disbursing Agent for distributions made to the Holders of Notes Claims.

3.        **Rights and Powers of Disbursing Agent**

(a)        Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan;  (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)        Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

4.        **Distributions on Account of Claims Allowed After the Effective Date**

(a)        Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

(b)        Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties:  (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claims have been Allowed.

5.        **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)        Delivery of Distributions in General

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims (i) at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; (ii) at the address set forth on any proof of Claim filed by such Holder or (iii) in the case of Notes Claims, to the Indenture Trustee for ultimate distribution to the Holder of such Notes Claim; provided, however, that the manner of such distributions with respect to the foregoing subsections (i) and (ii) shall be determined at the discretion of the Reorganized Debtors.

(b)    Minimum Distributions

The Reorganized Debtors shall not be required to make partial distributions or payments of fractions of shares of New Stock and such fractions of shares shall be deemed to be zero.

(c)    Undeliverable Distributions and Unclaimed Property

(i)    Failure to Claim Undeliverable Distributions

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

(ii)    Failure to Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 180 days after the issuance of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

(iii)    Failure to Execute Stockholders Agreement

The failure by a Holder of a Notes Claim to execute the Stockholders Agreement within 180 days of the Effective Date shall result in the forfeiture of such Holder's allocation of New Common Stock.  After such date, all forfeited New Common Stock shall revert to the Reorganized Debtors and the Notes Claim of any Holder to such New Common Stock shall be discharged and forever barred.

**6.    Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

7.        **Surrender of Canceled Instruments or Securities**

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Prepetition Credit Agreement Claim or a Notes Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentations shall be deemed to be canceled pursuant to Article V of the Plan, except to the extent otherwise provided in the Plan.

8.        **Claims Paid or Payable by Third Parties**

(a)        Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)        Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)        Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

G.        **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

1.        **Allowance of Claims and Interests**

Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date. All Claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

2.          **Prosecution of Objections to Claims**

The Debtors (after consultation with the Ad Hoc Noteholders Committee) or the Reorganized Debtors, as applicable, shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The Debtors (after consultation with the Ad Hoc Noteholders Committee) also reserve the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

3.          **Procedures Regarding Disputed Claims**

(a)          No Filing of Proofs of Claim

Except as otherwise provided in the Plan, Holders of Claims shall not be required to File a proof of claim, and no parties should File a proof of claim.  The Debtors do not intend to object to the allowance of Claims Filed; provided, however, that the Debtors (after consultation with the Ad Hoc Noteholders Committee) and the Reorganized Debtors, as applicable, reserve the right to object to any Claim that is entitled, or deemed to be entitled, to a distribution under the Plan or is rendered Unimpaired under the Plan.  Instead, the Debtors intend to make distributions, as required by the Plan, in accordance with the books and records of the Debtors.  Unless disputed by a Holder of a Claim, the amount set forth in the books and records of the Debtors shall constitute the amount of the Allowed Claim of such Holder.  If any such Holder of a Claim disagrees with the Debtors' books and records with respect to the Allowed amount of such Holder's Claim, such Holder must so advise the Debtors in writing, in which event the Claim will become a Disputed Claim.  The Debtors intend to attempt to resolve any such disputes consensually or through judicial means outside the Bankruptcy Court.  Nevertheless, the Debtors may, in their discretion, file with the Bankruptcy Court (or any other court of competent jurisdiction) an objection to the allowance of any Claim or any other appropriate motion or adversary proceeding with respect thereto.  All such objections will be litigated to Final Order; provided, however, that the Debtors may compromise, settle, withdraw, or resolve by any other method approved by the Bankruptcy Court any objections to Claims.

(b)          Claims Estimation

Any Debtor (after consultation with the Ad Hoc Noteholders Committee) or Reorganized Debtor, as applicable, may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (after consultation with the Ad Hoc Noteholders Committee) or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

4.          **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

5.          **Distributions After Allowance**

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably

practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## H.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan shall have been approved in the Confirmation Order:

(a)    This Plan and Disclosure Statement shall have been filed on the Petition Date;

(b)    On the Petition Date (or as soon as practicable thereafter), the Debtors shall have filed any other pleadings necessary to effectuate the confirmation of the Plan on an expedited and efficient basis;

(c)    An order scheduling a combined hearing seeking approval of the Disclosure Statement and confirmation of the Plan shall have been entered within three days of the Petition Date;

(d)    The Disclosure Statement and Plan, including any exhibits, appendices and related documents, acceptable to the Ad Hoc Noteholders Committee, in its sole discretion, shall have been approved by an order of the Bankruptcy Court, in form and substance acceptable to the Ad Hoc Noteholders Committee in its sole discretion, within forty-five days of the Petition Date.

(e)    The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the other contracts, instruments, releases, leases and other agreements or documents created in connection with or described in the Plan;

(f)    One or more of the Chapter 11 Cases shall not have been converted to a case under Chapter 7 of the Bankruptcy Code, unless such conversion is made with the prior written consent of the Ad Hoc Noteholders Committee, which consent shall be provided or withheld in the Ad Hoc Noteholders Committee's sole discretion;

(g)    There shall not have been the appointment of a trustee, receiver or examiner with expanded powers in one or more of the Chapter 11 Cases unless such appointment is made with the prior written consent of the Ad Hoc Noteholders Committee, which consent shall be provided or withheld in the Ad Hoc Noteholders Committee's sole discretion; and

(h)    The Debtors shall not have submitted any amendment, modification or filing seeking to amend or modify this Plan, Disclosure Statement or any documents related to the foregoing, including motions, notices, exhibits, appendices and orders thereto, in any manner not acceptable to the Ad Hoc Noteholders Committee, in its sole discretion.

### 2.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions are approved or waived pursuant to the provisions of Article IX.C of the Plan:

(a)     The Plan and Plan Supplement, including any amendments, modifications, or supplements thereto shall be acceptable to the Ad Hoc Noteholders Committee in its sole discretion, except for the Exit Facility Agreement and the Schedule of Executory Contracts and Unexpired Leases, which shall be acceptable to the Debtors and the Ad Hoc Noteholders Committee, each in its sole discretion;

(b)     The Effective Date shall have occurred within sixty days of the Petition Date;

(c)     Within 60 days of the Petition Date, the Confirmation Order shall be a Final Order in form and substance acceptable to the Debtors and the Ad Hoc Noteholders Committee, each in its sole discretion.  The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan;

(d)     The Exit Facility shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof;

(e)     The New Equity Facility or Alternative Proposal, as applicable, shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof;

(f)     All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws;

(g)     Allowed General Unsecured Claims against the Debtors shall not exceed $7 million in the aggregate;

(h)     The Companies shall not have experienced a material adverse event. For such purposes, a "material adverse event" shall mean any circumstance, change, effect, event, occurrence, state of facts or development, either alone or in combination that has had or is reasonably likely to have a short term or long term material adverse effect on the financial condition or operations of the Companies; provided, however, that a material adverse event shall not include any circumstance, change, effect, event, occurrence, state of facts or development occurring solely as a result of the implementation of the Restructuring; and

(i)     The Debtors shall have paid the fees and expenses incurred by the advisors to the Ad Hoc Noteholders Committee, including Akin Gump Strauss Hauer & Feld LLP, in accordance with the terms of their respective engagement agreements.

(j)     The Debtors shall have delivered a tax opinion in connection with certain transactions contemplated by this Plan, which opinion shall be satisfactory to the Ad Hoc Noteholders Committee in its sole discretion.

**3.      Waiver of Conditions**

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors with the consent of the Ad Hoc Noteholders Committee (which consent shall be

given in its sole discretion) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### 4.        Effect of Nonoccurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## I.        SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### 1.        Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

### 2.        Releases by the Debtors

**To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to  any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any Causes of Action of any Debtor: (a) Against a Released Party arising from any contractual obligations owed to the Debtors; (b) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents; or (c) arising from claims for fraud, gross negligence, willful misconduct or criminal conduct.**

### 3.        Releases by Holders of Claims and Interests

**To the extent permitted by applicable law and approved by the Bankruptcy Court, as of the Effective Date, each Holder of a Claim or an Interest, except Holders of any Claims or Interests: (a) who vote to reject the Plan and who submit a Release Opt-Out indicating their decision to not participate in the release set forth in Article X.C of the Plan; (b) who do not vote to accept or reject the Plan but who timely submit a Release Opt-Out indicating their decision to not participate in the release set forth in this Article X.C of the Plan; or (c) who are in a Class that is deemed to reject the Plan, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and**

the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date; **provided**, **however**, that the foregoing release shall not operate to waive or release any Causes of Action of any releasing party: (x) against a released party arising from any contractual obligations owed to the releasing party; (y) expressly set forth in and preserved by the Plan, the Plan Supplement or related documents; or (z) arising from claims for fraud, gross negligence, willful misconduct or criminal conduct. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

4.      Exculpation

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for fraud, gross negligence, willful misconduct, or criminal misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

5.      Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a proof of Claim or Interest based upon such Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

6.      Injunction

Except as otherwise expressly provided in the Plan, the Plan Supplement or related documents, or for obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties are permanently enjoined, from taking any of the following actions against the Debtors or the Reorganized Debtors:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a proof of Claim or Interest or otherwise that such

**Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity will:  (i) waive all Claims against the Debtors or Reorganized Debtors, the Reorganized Debtors, and the Estates related to such action and (ii) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

7.      **Setoffs**

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

8.      **Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

9.      **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**J.      BINDING NATURE OF THE PLAN**

**The Plan shall bind all holders of Claims against and Interests and Intercompany Interests in the Debtors to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (1) will receive or retain any property or interest in property under the Plan, (2) has filed a proof of Claim or Interest in the Chapter 11 Cases or (3) failed to vote to accept or reject the Plan or voted to reject the Plan.**

## K.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article VI of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.    Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.    Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.    Adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.    Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.    Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.    Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article X of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII of the Plan;

14.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.    Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.    Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.    Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.    Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.    Enforce all orders previously entered by the Bankruptcy Court; and

24.    Hear any other matter not inconsistent with the Bankruptcy Code.

**L.    MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

**1.    Modification and Amendments**

Effective as of the date hereof and subject to the limitations and rights contained in the Plan:  (a) the Debtors (with the consent of the Ad Hoc Noteholders Committee) reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**2.    Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Revocation or Withdrawal of the Plan

The Debtors (after consultation with the Ad Hoc Noteholders Committee) reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors (after consultation with the Ad Hoc Noteholders Committee) revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## M. MISCELLANEOUS PROVISIONS

### 1. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 2. Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

### 3. Further Assurances

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### 4. Payment of Fees and Expenses of the Ad Hoc Noteholders Committee

The Debtors shall promptly pay in Cash in full the fees and expenses incurred by the advisors to the Ad Hoc Noteholders Committee, including Akin Gump Strauss Hauer & Feld LLP, as counsel to the Ad Hoc Noteholders Committee, in accordance with their respective engagement letters, in connection with the restructuring, including, without limitation, in connection with the negotiation, documentation and consummation the Plan, the Plan Supplement, and all other documents related to the Plan and the restructuring.

5.     **Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

Lazy Days' R.V. Center, Inc.
6130 Lazy Days Boulevard
Seffner, Florida 33584-2968
Attn:  Randy Lay

**with copies to:**

Kirkland & Ellis LLP
300 N. La Salle Street
Chicago, Illinois 60654
Attn:  David L. Eaton

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Jennifer L. Marines

-and-

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Attn: James Savin and David Dunn

6.     **Dissolution of Committee**

On the Effective Date, the Committee(s), if any, shall dissolve automatically, whereupon its members, Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except for purposes of filing applications for Professional compensation in accordance with Section II.B of the Plan.

7.     **Nonseverability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided that any such alteration or interpretation must be in form and substance acceptable to the Ad Hoc Noteholders Committee in its sole discretion; provided, further, that the Debtors and the Ad Hoc Noteholders Committee (as applicable) may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without (i) the Debtors' consent and (ii) the consent of the Ad Hoc Noteholders Committee; and (c) nonseverable and mutually dependent.

8. **Return of Security Deposits**

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date shall be returned to the Reorganized Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

9. **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

10. **Entire Agreement**

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

11. **Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Balloting Agent's web site at http://www.fbgdocuments.com/lzd or the Bankruptcy Court's web site at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

12. **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

13. **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

14. **Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

15.        **Filing of Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

# V.
## SOLICITATION AND VOTING PROCEDURES

The following summarizes briefly the procedures to accept or reject the Plan.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

## A.    THE SOLICITATION PACKAGE

The following materials constitute the Solicitation Package:

- a cover letter from Lazy Days;

- the appropriate Ballots[12] and applicable voting instructions (with a pre-addressed, postage pre-paid return envelope);

- the Solicitation version of the Disclosure Statement with all exhibits; and

- the Solicitation version of the Plan, and any other supplements or amendments to these documents.

The Voting Class, Class 3, entitled to vote to accept or reject the Plan shall be served paper copies of the Disclosure Statement with all exhibits, including the Plan.  Any party who desires additional paper copies of these documents may request copies from the Balloting Agent by writing to Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, NY  10017, or calling (646) 282-1800.  The Solicitation Package (except the Ballots and  Master  Ballots)  can  also  be  obtained  by  accessing  the  Balloting  Agent's  website, http://www.fbgdocuments.com/lzd.  All parties entitled to vote to accept or reject the Plan shall receive a paper copy of each appropriate Ballot or Master Ballot.

The Plan Supplement will be filed no later than five days before the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest.  The Plan Supplement will include the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be Filed by the Debtors, as it may thereafter be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Plan and in accordance with the Bankruptcy Code and the Bankruptcy Rules, and additional documents Filed with the Bankruptcy Court before the Effective Date as amendments to the Plan Supplement, comprising of, without limitation, the following:  (1) to the extent known, the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (2) the Corporate Governance Documents; (3) the New Equity Commitment Documents, (4) the Exit Facility Agreement; and (5) the Schedule of Executory Contracts and Unexpired Leases.

## B.    VOTING DEADLINE

The period during which Ballots and Master Ballots with respect to the Plan will be accepted by the Company will terminate at 5:00 p.m. (prevailing Eastern time) on October 2, 2009, unless the Company, in its sole discretion, extends the date until which Ballots and Master Ballots will be accepted.  Except to the extent the Company so determines or as permitted by the Bankruptcy Court, Ballots and Master Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Company in connection with the Company's request for Confirmation of the Plan (or any permitted modification thereof).

---

[12]    Master Ballots will be distributed to Nominees following the initial distribution of the Solicitation Packages.

The Company reserves the absolute right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots and Master Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline.  The Company will give notice of any such extension in a manner deemed reasonable to the Company in its discretion.  There can be no assurance that the Company will exercise its right to extend the Voting Deadline.

## C.    VOTING INSTRUCTIONS

Only the Holders of Allowed Class 3 Notes Claims are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided.  (If you have received a return envelope addressed to your bank, broker or other nominee (each a "Nominee"), please allow additional time for your vote to be included on a Master Ballot and sent to the Balloting Agent by the Voting Deadline.  The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan, and such abstentions will not be counted as votes for or against the Plan.  Voting instructions are attached to each Ballot and Master Ballot.

The Company is providing the Solicitation Package to Holders of Notes Claims whose names appear as of the Voting Record Date in the records maintained by the Company.

The Company, has engaged Financial Balloting Group LLC as the Balloting Agent to assist in the balloting and tabulation process.  The Balloting Agent will process and tabulate Ballots and Master Ballots for Class 3, the sole Class entitled to vote to accept or reject the Plan and will File the Voting Report prior to the commencement of the Confirmation Hearing.

The Voting Deadline by which the Balloting Agent must receive your Ballot or Master Ballot is 5:00 p.m. (prevailing Eastern time), on **October 2, 2009**.

| BALLOTS AND MASTER BALLOTS |
|---|
| 1.    Ballots and Master Ballots must be actually received by the Balloting Agent by the Voting Deadline. |
| 2.    Please send your completed Ballot in the envelope provided.  If you have received a return envelope addressed to your Nominee, please allow additional time for your vote to be included on a Master Ballot and sent to the Balloting Agent by the Voting Deadline. |
| 3.    Ballots and Master Ballots to be returned directly to the Balloting Agent may also be sent by First Class Mail, Overnight Courier, or Personal Delivery to: |
| **Financial Balloting Group LLC**<br>**757 Third Avenue,**<br>**3rd Floor**<br>**New York, NY  10017**<br>**Attn: Lazy Days Tabulation** |
| If you have any questions on the procedures for voting on the Plan, please call the Balloting Agent at the following telephone number: |
| **(646) 282-1800** |

**Any Ballot (or Master Ballot in the case of beneficial Holders of Notes Claims voting through a Nominee) that is properly executed by the Holder of a Claim (or Nominee), but which does not clearly indicate an**

**acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**All Ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each Ballot and Master Ballot.**  If you are returning your Ballot to your Nominee, you must return your Ballot with sufficient time for your vote to be included by your Nominee on a Master Ballot and sent to the Balloting Agent by the Voting Deadline.

By signing and returning a Ballot (or Master Ballot in the case of beneficial Holders of Notes Claims voting through a Nominee), each Holder of a Notes Claim in Class 3 (or its Nominee) will be certifying to the Bankruptcy Court and the Company that, among other things:

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has voted all of its Notes Claims within Class 3 either to accept or reject the Plan and cast the same vote with respect to all Claims in Class 3;

- no other Ballot or Master Ballot with respect to the same Claim has been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots or Master Ballots are thereby revoked.

### 1.    Beneficial Owners

A beneficial owner holding 11.75% Senior Notes as a record holder in its own name should vote on the Plan by completing and signing the enclosed applicable Ballot and returning it directly to the Balloting Agent on or before the Voting Deadline using the enclosed self-addressed, post pre-paid return envelope.

Any beneficial owner holding 11.75% Senior Notes in a "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such beneficial owner's Nominee):

- Complete and sign the enclosed beneficial owner Ballot.  Return the Ballot to the Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return it to the Balloting Agent on a Master Ballot by the Voting Deadline.  If no self-addressed, postage pre-paid envelope was enclosed for this purpose, the Nominee must be contacted for instructions.

- Complete and sign the pre-validated Ballot (as described below) provided to the Holder by the Nominee.  The Holder will then return the pre-validated Ballot to the Balloting Agent by the Voting Deadline using the enclosed self-addressed, postage pre-paid envelope.

Any Ballot returned to a Nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Balloting Agent that ballot (properly validated) or a Master Ballot that reflects the vote of such beneficial owner.

### 2.    Nominees

A Nominee that on the Voting Record Date is the registered Holder of 11.75% Senior Notes for a beneficial owner should obtain the vote of such beneficial owner of such 11.75% Senior Notes, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

(a)    Pre-validated Ballots

A Nominee may pre-validate a Ballot by: (i) signing the Ballot; (ii) indicating on the Ballot the name of the registered Holder and the amount of 11.75% Senior Notes held by the Nominee; and (iii) forwarding such ballot together with the Solicitation Package and other materials requested to be forwarded, to the beneficial owner for voting. The beneficial owner must then review and complete the information requested in the Ballot, and return the Ballot directly to the Balloting Agent in the pre-addressed, postage pre-paid envelope so that it is received by the Balloting Agent before the Voting Deadline. A list of the beneficial owners to whom "pre-validated" Ballots were delivered should be maintained by the Nominee for inspection for at least on year from the Voting Deadline.

(b)    Master Ballots

A Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Ballots, together with the Disclosure Statement, a return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such beneficial owner must then indicate its vote on the Ballot, review and complete the information requested in the Ballot, execute the Ballot, and return the Ballot to the Nominee. After collecting the Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Ballot, execute the Master Ballot, and deliver the Master Ballot to the Balloting Agent so that it is received by the Balloting Agent before the Voting Deadline. All Ballots returned by beneficial owners should either be forwarded to the Balloting Agent (along with the Master Ballot) or be retained by Nominees for inspection for at least one year from the Voting Deadline.

> EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE BALLOTING AGENT SO THAT IT IS RECEIVED BY THE BALLOTING AGENT BEFORE THE VOTING DEADLINE.

(c)    Securities Clearing Agencies

The Company expects that The Depository Trust Company, as a Nominee Holder of 11.75% Senior Notes, will arrange for its participants to vote by executing a letter of authorization in favor of such participants. As a result of such letter, each such participant will be authorized to vote its Voting Record Date positions held in the name of such securities clearing agencies; although the Balloting Agent will in any event rely upon the listing of record date participants.

## D.    VOTING TABULATION

The Ballot or Master Ballot does not constitute, and shall not be deemed to be, a proof of claim or an assertion or admission of a Claim or Interest. Only Holders of Claims in the Voting Class shall be entitled to vote with regard to such Claims.

The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (1) any Ballot that is illegible, contains insufficient information to permit the identification of the Holder, or is not on the form provided; (2) any Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan; (3) any Ballot received after the Voting Deadline, except as described below; (4) any unsigned Ballot; (5) any Ballot that is not marked to accept or reject the Plan, or marked both to accept and reject the Plan; (6) any Ballot cast by a party that holds a Claim in a Class that is entitled to vote, but did not hold the Claim on the Voting Record Date; and/or (7) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan for any reason.

Unless the Company decides otherwise, Ballots and Master Ballots received after the Voting Deadline may not be counted. The method of delivery of the Ballots or Master Ballots to be sent to the Balloting Agent is at the election and risk of each Holder of a Notes Claim. Except as otherwise provided in the Solicitation Procedures, a Ballot or Master Ballot will be deemed delivered only when the Balloting Agent actually receives the original

executed Ballot or Master Ballot.  No Ballot or Master Ballot should be sent to the Company, the Company's agents (other than the Balloting Agent), or the Company's financial or legal advisors.  The Company (with the consent of the Ad Hoc Noteholders Committee) expressly reserves the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications).  The Bankruptcy Code may require the Company to disseminate additional solicitation materials if the Company makes material changes to the terms of the Plan or if the Company waives a material condition to Plan Confirmation.  In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

If multiple Ballots are received from the same Holder with respect to the same Notes Claim prior to the Voting Deadline, the last Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Holders must vote all of their Notes Claims either to accept or reject the Plan and may not split their vote.  Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the Class of Notes Claims, the Company may, in its discretion, and to the extent possible, aggregate the Notes Claims of any particular Holder within the Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Company will File with the Bankruptcy Court, prior to the commencement of the Confirmation Hearing, the Voting Report prepared by the Balloting Agent.  The Voting Report shall, among other things, delineate every Ballot or Master Ballot that does not conform to the applicable voting instructions or that contains any form of irregularity (each an "Irregular Ballot") including, but not limited to, those Ballots or Master Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or e-mail or damaged.  The Voting Report also shall indicate the Company's intentions with regard to such Ballots or Master Ballots that do not conform to the applicable voting instructions or that contains any form of irregularity.  Neither the Company nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots or Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

# VI.
# VALUATION ANALYSIS AND FINANCIAL PROJECTIONS

## A.    VALUATION OF THE REORGANIZED DEBTORS

### 1.    Introduction

In conjunction with formulating the Plan, the Company has determined that it is appropriate to estimate a post-Confirmation going concern value for the Reorganized Debtors (the "Estimated Reorganized Debtors' Enterprise Value").  Accordingly, the Company has directed Macquarie Capital (USA) Inc. ("Macquarie") to prepare such a valuation.  The valuation was prepared solely by Macquarie at the direction of the Company.

### 2.    Valuation

Macquarie estimates the Estimated Reorganized Debtors' Enterprise Value to be between approximately $62.2 million to $75.4 million, with a midpoint of $68.8 million as of October 31, 2009, which is the assumed and anticipated effective date of the plan.  The values are based upon information available to, and analyses undertaken by, Macquarie as of August 31, 2009.  This value does not give effect to, among other things, the potentially dilutive impact of any shares issued upon exercise of options, if any, granted to the Management Incentive Program.

The Estimated Reorganized Debtors' Enterprise Value (ascribed as of the date of this Disclosure Statement) reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty today as to the achievement of the Company's financial projections (the "Financial Projections" attached hereto as **Exhibit B**), which are set forth below.  It should be understood that, although subsequent developments may affect Macquarie's conclusions, Macquarie does not have any obligation to update, revise, or reaffirm its estimate.

The foregoing valuation also reflects a number of assumptions, including a successful reorganization of the Company's business and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the amount of available cash, market conditions, and the Plan becoming effective with exit financing in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein.  The estimates of value represent hypothetical enterprise values of the Reorganized Debtors as the continuing operator of its business and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely on behalf of the Board of Directors for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as the Company's business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business.

In preparing the Estimated Reorganized Debtors' Enterprise Value, Macquarie:  (a) reviewed certain historical financial information of the Company for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Company, including the Financial Projections developed by management relating to their business and prospects; (c) met with certain members of senior management of the Company to discuss the Company's operations and future prospects; (d) reviewed the Financial Projections as prepared by the Company; (e) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Company; (f) reviewed publicly available information regarding the financial terms of certain comparable transactions; (g) considered certain economic and industry information relevant to the Company's operating businesses; (h) visited certain of the Company's facilities; and (i) conducted such other analyses as Macquarie deemed appropriate.  Although Macquarie conducted a review and analysis of the Company's business, operating assets and liabilities, and business plans, Macquarie relied on the accuracy and completeness of all:  (i) financial and other information furnished to it by the Company, including the Financial Projections, and (ii) publicly available information.  No independent evaluations or appraisals of the Company's assets were sought or were obtained in connection therewith.

B.        VALUATION METHODOLOGIES

In performing its analysis, Macquarie used comparable public company trading multiples, precedent transactions, and discounted cash flow methodologies. These valuation techniques reflect both the market's current view of the Company's strategic initiatives and operations, as well as a longer-term focus on the intrinsic value of the cash flow from the Financial Projections associated with Company's current strategic initiatives. The valuation multiples and discount rates used by Macquarie to arrive at the going concern value of the Company's business were based on the public market valuation of selected public companies deemed generally comparable to the operating businesses of the Company and general capital market conditions. In selecting such comparable companies, Macquarie considered factors such as the operational and strategic focus of the comparable companies' businesses, the exposure to consumer spending levels, and the maturity of its business. The set of comparable companies includes automotive and watercraft retailers deemed generally comparable to the Debtors. There are no other publicly traded recreational vehicle retailers directly comparable to the Debtors. As the valuation analysis was performed in a time of atypical industry performance, traditional multiple analysis does not provide as meaningful an indication of value, as standard metrics such as multiples of EBITDA and cash flow would yield negative results. Thus, the most relevant comparable company valuation methodology that provides a meaningful result is utilizing a multiple of historical revenue. For precedent transactions, Macquarie reviewed publicly available information regarding announced merger and acquisition transactions for companies in similar lines of businesses to the Company. Given that the Debtors represent one of the largest operations in its industry, there are few comparable acquisitions to use as a basis for a valuation. The majority of transactions in the industry involve the roll-up of smaller, privately held retailers for which acquisition data is not available; thus Macquarie was unable to discover sufficient acquisition data to derive a valuation based upon a comparable universe of transactions. Consequently, Macquarie's valuation analysis is weighted heavily in favor of the discounted cash flow analysis described below.

An estimate of total enterprise value is not entirely mathematical, but rather it involves considerations and judgments concerning various factors that could affect the value of an operating business. Moreover, the value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, neither the Company, Macquarie, nor any other person assumes responsibility for their accuracy. Depending on the results of the Company's operations or changes in the financial markets, Macquarie's valuation analysis as of the Effective Date may differ from that disclosed herein.

The following is a brief summary of certain financial analyses performed by Macquarie to arrive at its range of Estimated Reorganized Debtors' Enterprise Value. Macquarie performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of the Debtors on which such analyses were based. Macquarie's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion.

1.        Comparable Company Analysis

Comparable company analysis estimates the value of a company based upon the implied valuations of other similar companies that are publicly traded. Under this methodology, enterprise values for selected public companies are typically expressed as multiples of various income statement items. The primary valuation metric applied in this analysis is typically a multiple of enterprise value to EBITDA; however, as noted above, due to the financial performance of comparable companies and the Debtors in this business cycle, this metric does not provide a meaningful result. Consequently, Macquarie has focused on enterprise value to revenues as the most indicative ratio.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Company. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks including exposure to similar commodity inputs and consumer spending levels, growth prospects, maturity of businesses, location, and market presence. The selection of truly comparable companies is typically difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for

relative value, which, when coupled with other approaches, presents a foundation for determining firm value. As noted above, Macquarie selected a set of automotive and watercraft retailers deemed generally comparable to the Debtors. Macquarie selected the publicly traded companies on the basis of general comparability to the Company by way of one or more of the factors described above.

Macquarie calculated enterprise value to revenues multiples by dividing the enterprise values of each comparable company as of August 31, 2009 by its latest twelve months' revenues. Macquarie then applied the average multiple for the group of publicly traded comparable companies to the Company's historical revenues to determine an estimate of enterprise value.

### 2.    Precedent Transactions Analysis

Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to the Company. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Company. As noted above, given the limited universe of comparable companies and the fact that most transactions in the Debtors' industry involve privately held companies of much smaller scale for which acquisition data is not available, there were insufficient precedent transactions to form the basis of such an analysis.

### 3.    Discounted Cash Flow Analysis

The Discounted Cash Flow ("DCF") analysis values a business by determining the current value of estimated future cash flows to be generated by that business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based upon its capital structure.

The value of the firm is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows provided in the Financial Projections plus an estimate for the value of the firm beyond the period of 2009 to 2014 (the "Projection Period") known as the terminal value. The terminal value is derived by utilizing two different methodologies: (i) applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period and discounting this value back to October 31, 2009 and (ii) by applying a perpetual growth rate to the Debtors' projected free cash flows in the final year of the Projection Period and discounting this value back to October 31, 2009.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. Macquarie calculated its DCF valuation using a range of Discount Rates between 16.7% and 18.7%, and terminal values using both an EBITDA multiple range of 3.5x to 4.5x, and a perpetual free cash flow growth rate range of 1.5% to 2.5%.

In applying the above methodology, Macquarie utilized management's detailed Financial Projections for the years ended 2009 through 2014 to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as capital expenditures, the New Equity Financing and changes in working capital. For purposes of the DCF, the Reorganized Debtors are assumed to pay cash taxes on an annual basis. These cash flows, along with the terminal value, are discounted back to October 31, 2009 using the range of Discount Rates described above to arrive at a range of enterprise values.

Given the limited relevant ratio analysis provided by the comparable company analysis and the dearth of precedent transactions, the Estimated Reorganized Debtors' Enterprise Value is weighted heavily towards the DCF methodology.

## C.      FINANCIAL PROJECTIONS

As a condition to plan confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that confirmation is not likely to be followed by either a liquidation or the need to further reorganize the debtor.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Company's management has, through the development of the Financial Projections, analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources to conduct their businesses.  The Financial Projections will also assist each Holder of a Notes Claim in determining whether to accept or reject the Plan.

The Company prepared the Projections in good faith, based upon estimates and assumptions made by the Company's management.

The estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies.  They also are based on factors such as industry performance, general business, economic, competitive, regulatory, market, and financial conditions, all of which are difficult to predict and generally beyond the Company's control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Company expects that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections.  No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guaranty or other assurance of the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Company considered or considers the Financial Projections to reliably predict future performance.  The Financial Projections are subjective in many respects, and thus are susceptible to interpretations and periodic revisions based on actual experience and recent developments.  The Company does not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

**The Company did not prepare the Financial Projections with a view towards complying with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants. The Company's independent auditor has neither compiled nor examined the accompanying prospective financial information to determine the reasonableness thereof and, accordingly, has not expressed an opinion or any other form of assurance with respect thereto.**

**The Company does not, as a matter of course, publish projections of their anticipated financial position, results of operations or cash flows.  Accordingly, neither the Company nor the Reorganized Debtors intend to, and each disclaims any obligation to: (a) furnish updated projections to Holders of Allowed Claims and Interests prior to the Effective Date or to Holders of New Stock or to any other party after the Effective Date; (b) include any such updated information in any documents that may be required to be filed with the Commission; or (c) otherwise make such updated information publicly available.**

**The Company periodically issues press releases reporting financial results and Holders of Claims and Interests are urged to review any such press releases when, and as, issued.**

### 1.      Significant Assumptions

The Company prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors.

Although the forecasts represent the best estimates of the Company, for which the Company believes they have a reasonable basis as of the date hereof, of the results of operations and financial position of the Company after giving effect to the reorganization contemplated under the Plan, they are only estimates and actual results may vary considerably from forecasts.  Consequently, the inclusion of the forecast information herein should not be regarded

as a representation by the Company, the Company's advisors, or any other person that the forecast results will be achieved.

After the Effective Date, the Company does not intend to update or otherwise revise the Financial Projections to reflect circumstances existing since their preparation in September 2009, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

The Financial Projections were not prepared with a view toward general use, but rather for the limited purpose of providing information in conjunction with the Plan. Also they have been presented in lieu of *pro forma* historical financial information. Reference should be made to Article IX, entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan" for a discussion of the risks related to the Plan.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by the assumed Effective Date. Any significant delay in the assumed Effective Date of the Plan may have a significant negative impact on the operations and financial performance of the Company including, but not limited to, an increased risk of inability to meet sales forecasts and higher reorganization expenses.

**D.    PROJECTED FINANCIAL STATEMENTS**

**1.    Projected Income Statements**

(a)    Fiscal Years

The Company's fiscal year ends on December 31 of each year.

(b)    Revenues

Revenues are estimated to grow 25.3% in fiscal year 2010 to $409.6 million. Revenues are projected to increase by approximately 45.2% in fiscal year 2011 due to pent up demand for vehicle sales, 15.6% in fiscal year 2012 as vehicle sales continue to return to historical levels, 3.3% in fiscal year 2013, and then to continue to grow 3.9%, reaching $737.5 million in fiscal year 2014. Other revenue streams are expected to grow relatively steadily over the Projection Period.

(c)    Gross Margin

Gross margin (excluding depreciation and amortization) is projected to be 13.8% in fiscal year 2010, decreasing to 12.8% in fiscal year 2011, remaining relatively flat in fiscal year 2012, increasing to 13.1% in fiscal years 2013 and 2014 based on an increase in vehicle margins, continued improvement in service profitability and a recovery in credit conditions driving improvement in finance and insurance penetration.

(d)    Selling, General and Administrative Expenses

Selling, general and administrative expenses include salaries, commissions and benefits, which typically comprise the majority of these expenses. Selling, general and administrative expenses as a percentage of revenues is projected to decline from 18.9% for fiscal year 2009 to 14.5% for fiscal year 2010, 11.1% for fiscal year 2011, 10.4% for fiscal year 2012, 10.4% for fiscal year 2013 and 10.3% for fiscal year 2014.

(e)    Interest Expense

Interest expense assumptions are based upon the terms of the Exit Facility.

(f)      <u>Income Tax Provision</u>

The Company expects that its existing tax net operating losses ("<u>NOLs</u>") will be eliminated as a result of cancellation of indebtedness income ("<u>COD Income</u>") from the exchange of the 11.75% Senior Notes into equity and, therefore, will not be available to offset future taxable income of the Reorganized Debtors.  The Company also expects to reduce the tax basis in certain assets which may create an additional tax expense.  The Financial Projections include the related impact of the foregoing anticipated tax consequences.

(g)      <u>Taxable Income from Gain on Cancellation of Indebtedness</u>

For purposes of this projection, no taxable income from gain on the exchange of the 11.75% Senior Notes into equity is included.  It is anticipated that any taxable gain on the exchange of debt will be largely offset by NOLs but will also reduce the tax basis in certain assets.

**2.      Projected Balance Sheet and Statement of Cash Flow**

(a)      <u>Capital Expenditures</u>

Capital expenditures increase from $800,000 in 2009 to $3 million in 2010 and 2011 and $4.5 million in 2012 as the Company attends to deferred maintenance and will decline to $2 million in 2013 and 2014.

(b)      <u>Working Capital</u>

Net working capital is expected to be $12.9 million for the year ended December 31, 2009, increasing to $54.2 million in 2014. Changes in working capital are driven primarily by the impact of increases in volume and by inventory management policies.

(c)      <u>Post-Reorganization Debt</u>

The Financial Projections assume that the only debt upon emergence will be that incurred under the Exit Facility, which is estimated to be approximately $48.3 million as of October 31, 2009.

## VII.
## CONFIRMATION PROCEDURES

### A.    THE CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold the Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.  On the Petition Date, the Company will promptly seek an order of the Bankruptcy Court scheduling a combined hearing to consider the approval of the prepetition procedures for the Solicitation, adequacy of this Disclosure Statement and Confirmation of the Plan.  Notice of the Confirmation Hearing will be provided in the manner prescribed by the Bankruptcy Court, and will also be available at the Balloting Agent's website, http://www.fbgdocuments.com/lzd.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied.  If so, the Bankruptcy Court shall enter the Confirmation Order. The Company believes that the Plan satisfies or will satisfy the applicable requirements, which are, among others, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Company, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment:  (1) made before the Confirmation of the Plan is reasonable; or (2) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each Holder of an Impaired Claim or Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims and Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, Other Priority Tax Claims, Intercompany Claims, Other Secured Claims, Prepetition Credit Agreement Claims (to the extent any such claims have not been indefeasibly repaid in full in Cash from the proceeds of the DIP Facility prior to the Effective Date), General Unsecured Claims and Intercompany Interests will be paid in full on the Effective Date.

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

The Company believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of chapter 11; and (3) the Plan has been proposed in good faith. To the extent that the Court does not approve the restructuring steps and transactions described in Article V.I of the Plan and Article IV.D hereof, the Company does not believe that this will impact the best interests of creditors nor the feasibility of the Plan. The proposed restructuring steps and transactions merely serve to further enhance the attributes of the Plan.

### 1.    Best Interests of Creditors Test/Liquidation Analysis

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The analysis under the "best interests" test requires that the Bankruptcy Court determine what Holders of Allowed Claims and Interests in each Impaired Class would receive if the Chapter 11 Cases were converted to liquidation cases under chapter 7 of the Bankruptcy Code, and the Bankruptcy Court appointed a chapter 7 trustee to liquidate all of the assets into Cash. The Company's "liquidation value" would consist primarily of unencumbered and unrestricted Cash held by the Company at the time of the conversion to chapter 7 cases, and the proceeds resulting from the chapter 7 trustee's sale of the Company's remaining unencumbered assets. The gross Cash available for distribution would be reduced by the costs and expenses incurred in effectuating the chapter 7 liquidation and any additional Administrative Claims incurred during the chapter 7 cases.

The Bankruptcy Court then must compare the value of the distributions from the proceeds of the hypothetical chapter 7 liquidation of the Company (after subtracting the chapter 7-specific claims and administrative costs) with the value to be distributed to the Holders of Allowed Claims and Interests under the Plan. It is possible that in a chapter 7 liquidation, Claims and Interests may not be classified in the same manner as set forth in the Plan. In a hypothetical chapter 7 liquidation of the Company's assets, the rule of absolute priority of distribution would apply, i.e., no junior creditor would receive any distribution until payment in full of all senior creditors, and no Holder of an Interest would receive any distribution until all creditors have been paid in full. Therefore, in a hypothetical chapter 7 liquidation, the Company's available assets generally would be distributed to creditors and Interest Holders in the following order: Prepetition Credit Agreement Claims, DIP Facility Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, Notes Claims, General Unsecured Claims, Intercompany Claims, Section 510(b) Claims, Equity Interests and Intercompany Interests.

Of the foregoing groups of Claims, the Prepetition Credit Agreement Claims; DIP Facility Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, General Unsecured Claims, Intercompany Claims and Intercompany Interests are either unclassified or "Unimpaired" under the Plan, meaning that the Plan generally leaves their legal, equitable, and contractual rights unaltered. As a result, Holders of such Claims and Interests are presumed to accept the Plan. Notes Claims are "Impaired" under the Plan and are entitled to vote on the Plan. Equity Interests and Section 510(b) Claims are to receive no distribution under the Plan and, therefore, are deemed to reject the Plan. Because the Bankruptcy Code requires that impaired creditors either accept the Plan or receive at least as much under the Plan as they would in a hypothetical chapter 7 liquidation, the operative "best interests" inquiry in the context of the Plan is whether in a chapter 7 liquidation, after accounting for recoveries by Secured, Administrative, and Priority creditors, the impaired creditors and interest Holders will receive more or less than under the Plan. If the probable distribution to impaired creditors and interest Holders under a hypothetical

chapter 7 liquidation is greater than the distributions to be received by such Holders under the Plan, then the Plan is not in the best interests of impaired creditors and interest Holders.

As described in more detail in the liquidation analysis set forth in **Exhibit C** hereto (the "Liquidation Analysis"), the Company believes that the value of any distributions in a chapter 7 case would be less than the value of distributions under the Plan. In particular, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the debtor's liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan contemplates a Plan in which virtually all creditors will be paid in full, and the Company's balance sheet will become materially deleveraged. In addition, the Company will secure a commitment for an Exit Facility and the New Equity Facility, and, therefore, sufficient funds will exist to make all payments required by the Plan. For these reasons, the Company believes that the Plan meets the financial feasibility requirement.

### 3. Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims and Interests that is impaired under the Plan accept the Plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such Class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or interest entitles the holder of that claim or interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the Holder of the claim or interest receives cash equal to the Allowed amount of that claim or, with respect to any interest, any fixed liquidation preference to which the interest holder is entitled or any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their Ballots (or Master Ballots in the case of beneficial Holders of Notes Claims voting through a Nominee) in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted the plan if holders of such interests holding at least two thirds in amount actually voting have voted to accept the plan.

The Claims and Interests in Classes 1, 2, 4, and 6 are not Impaired under the Plan, and as a result the Holders of such Claims and Interests are presumed to have accepted the Plan.

Notes Claims in Class 3 are Impaired under the Plan. The Voting Class will have accepted the Plan if the Plan is accepted by at least two thirds in amount and a majority in number of the Claims of such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

The members of Classes 5 and 7 will not receive a distribution under the Plan and are deemed to reject, and, therefore, are not entitled to vote on, the Plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all Impaired Classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one Impaired Class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an Impaired Class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims and Interests that is Impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to the treatment of other classes of equal rank. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including whether the discrimination has a reasonable basis, whether the debtor can carry out a plan without such discrimination, whether such discrimination is proposed in good faith, and the treatment of the class discriminated against. Courts have also held that it is appropriate to classify unsecured creditors separately if the differences in classification are in the best interest of the creditors, foster reorganization efforts, do not violate the absolute priority rule, and do not needlessly increase the number of classes.

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of Unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the Allowed amount of such Claim; or (b) the Holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Interests includes the requirements that either: (a) the plan provides that each Holder of an Interest in that Class receives or retains under the plan, on account of that Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the Allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Interests junior to the non-accepting Class may receive a distribution under the plan.

The Plan provides that if any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cram down" provisions of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Company will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any exhibit or schedule to the Plan, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

The Company submits that if the Company "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.

## C.    RISK FACTORS

Prior to deciding whether and how to vote on the Plan, each Holder of a Class 3 Claim should consider carefully all of the information in this Disclosure Statement, and should particularly consider the Risk Factors described in Article IX entitled "Plan-Related Risk Factors and Alternatives to Confirming and Consummating the Plan."

**D.      IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION**

Any interested party desiring further information about the Plan should contact:  Counsel for the Debtors: Jennifer L. Marines, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, via e-mail at jennifer.marines@kirkland.com, or by phone at (212) 446-4800.

**E.      DISCLAIMER**

In formulating the Plan, the Company has relied on financial data derived from books and records.  The Company, therefore, represents that everything stated in the Disclosure Statement is true to the best of their knowledge.   The Company nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Moreover, the Bankruptcy Court has not yet determined whether the Plan is confirmable and, therefore, does not recommend whether you should accept or reject the Plan.

The discussion in the Disclosure Statement regarding the Company may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.   The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.   The liquidation analyses, distribution projections, and other information are estimates only, and the timing and amount of actual distributions to creditors may be affected by many factors that cannot be predicted.   Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Company for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys, accountants, advisors, and other professionals employed by the Company have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business, and accounting data found in the books and records of the Company, they have not independently verified such information and make no representations as to the accuracy thereof.   The attorneys, accountants, advisors, and other professionals employed by the Company shall have no liability for the information in the Disclosure Statement.**

**The Company and its professionals also have made a diligent effort to identify in this Disclosure Statement pending litigation claims and projected objections to claims.  However, no reliance should be placed on the fact that a particular litigation claim or projected objection to claim is, or is not, identified in the Disclosure Statement.**

## VIII.
## IMPLEMENTATION OF THE PLAN AND POSTPETITION
## GOVERNANCE OF THE REORGANIZED DEBTORS

**A.      BOARD OF DIRECTORS AND MANAGEMENT**

      **1.      Reorganized Debtors' Board of Directors**

On the Effective Date, the New Board shall take office.  The New Board shall have five members, consisting of the chief executive officer of the Reorganized Company and four members selected by the Ad Hoc Noteholders Committee.  The Company will disclose the identities, to the extent known, of the individuals comprising the New Board in an exhibit to the Plan Supplement.  Each such director shall serve from and after the Effective Date pursuant to applicable law and the terms of the New Certificates of Incorporation and New By-Laws.  The existing board of directors of the Company will be deemed to have resigned on and as of the Effective Date.

      **2.      The Reorganized Debtors' Officers**

The Company will disclose the identities, to the extent known, of the individuals comprising the officers of the Reorganized Debtors in an exhibit to the Plan Supplement.

**B.      INDEMNIFICATION OF DIRECTORS AND OFFICERS**

The Reorganized Debtors' articles of incorporation or formation, as applicable, will authorize the Reorganized Debtors to indemnify and exculpate their respective officers, directors or managers, and agents to the fullest extent permitted under the applicable state law.

**C.      MANAGEMENT INCENTIVE PROGRAM**

The Plan provides that equity awards in the form of New Common Stock or options to purchase shares of New Common Stock (on a fully diluted basis) of the Reorganized Debtors may be granted to designated members of senior management of the Debtors by the New Board, with pricing, vesting and exercise terms to be determined by the New Board.  If granted, such equity awards shall be on terms reflective of a policy of rewarding the contribution of management to the long-term financial performance of the Reorganized Debtors.

**D.      EXIT FINANCING**

On the Effective Date, the Reorganized Debtors will enter into the Exit Facility.  Confirmation shall be deemed approval of the Exit Facility (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Facility documents and such other documents as the Exit Facility Lenders may require to effectuate the treatment afforded to such lenders pursuant to the Exit Facility Agreement.  The Reorganized Debtors may use the Exit Facility for any purpose permitted thereunder.

Upon the satisfaction or waiver of the conditions precedent to effectiveness set forth in the Exit Facility Agreement, the DIP Credit Agreement and related documents shall be deemed to have been superseded and replaced, and the commitments under the DIP Credit Agreement shall be deemed to have been terminated. Notwithstanding the foregoing, all obligations of the Debtors to the DIP Agent and the DIP Lenders under the DIP Credit Agreement which are expressly stated in the DIP Facility as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.

Upon the date the Exit Facility Agreement becomes effective, (1) the Debtors and the Reorganized Debtors are authorized to execute and deliver the Exit Facility Agreement and all other related agreements, documents or

instruments to be executed or delivered in connection therewith and perform their obligations thereunder including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages or indemnities; (2) the Exit Facility Documents shall constitute the legal, valid and binding obligations of the Reorganized Debtors which are parties thereto, enforceable in accordance with their respective terms; and (3) no obligation, payment, transfer or grant of security under the Exit Facility Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim.  The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any liens and security interests to secure the obligations under the Exit Facility Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence of perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

### E.    ISSUANCE OF NEW COMMON STOCK

The issuance of the New Common Stock, including the shares of the New Common Stock, options, or other equity awards, if any, reserved for the Management Incentive Program, by Reorganized Lazy Days is authorized without the need for any further corporate action or without any further action by Holders of Claims or Interests.  On the Effective Date, the New Common Stock shall be issued to the Holders of Notes Claims.

All of the shares of New Common Stock and Conversion Equity issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable.  Each distribution and issuance referred to in Article III of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### F.    ISSUANCE OF NEW PREFERRED STOCK

The issuance of the New Preferred Stock by Reorganized Lazy Days is authorized without the need for any further corporate action or without any further action by Holders of Claims or Interests.  On the Effective Date, the New Preferred Stock will be issued to the New Equity Investors.

All of the shares of New Preferred Stock issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable.  Each distribution and issuance referred to in Article III of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### G.    STOCKHOLDERS AGREEMENT FOR NEW STOCK

Upon the Effective Date, the applicable Stockholders Agreement will be deemed to become valid, binding and enforceable in accordance with its terms.  The Stockholders Agreement shall contain provisions governing the rights of Holders of New Common Stock, including, without limitation, access to information regarding the Reorganized Debtors and certain transfer restrictions such as drag-along and tag-along rights, a right of first refusal provision and limits on the number of record holders.  Moreover, each Holder of an Allowed Class 3 Notes Claim shall be required to execute and be bound by the Stockholders Agreement as a condition precedent to receiving its allocation of New Stock.

### H.    REGISTRATION RIGHTS AGREEMENT

The Registration Rights Agreement will provide for registration rights of the New Common Stock and New Preferred Stock, as applicable, the form of which will be acceptable to the Ad Hoc Noteholders Committee in its sole discretion and included in the Plan Supplement.

IX.

**PLAN-RELATED RISK FACTORS AND ALTERNATIVES**
**TO CONFIRMING AND CONSUMMATING THE PLAN**

**Prior to voting to accept or reject the Plan, all Holders of Class 3 Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced in this Disclosure Statement.**

**A.      GENERAL**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote for or against the Plan, Holders of Class 3 Claims entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in the Company's various Commission filings, all of which are incorporated herein.

**B.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

**1.      Parties in Interest May Object to the Company's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Company believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created seven Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**2.      The Company May Fail to Satisfy the Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Company intends to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Company may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

**3.      The Company May Not Be Able to Secure Confirmation of the Plan**

The Company cannot ensure that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirements that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes; confirmation is not likely to be followed by a liquidation or a need for further financial reorganization; and the value of distributions to non-accepting Holders of claims and interests within a particular Class under the Plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  While the Company believes that the Plan complies with section 1129 of the Bankruptcy Code, there can be no assurance that these requirements will be met.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Interests would receive with respect to their Allowed Claims and Interests.

The Company, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior thereto, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4.      The Company May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan and the final DIP financing order, the Company (in consultation with the Ad Hoc Noteholders Committee) and the Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 5.      Risk of Non-occurrence of the Effective Date

Although the Company believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 6.      Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan

The Distributions available to Holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

## C.      FACTORS AFFECTING THE COMPANY

### 1.      Market Risks

The Company is exposed to market risk related to changes in interest rates, foreign currency exchange rate and credit risk. The Company does not use derivative financial instruments for speculative or trading purposes.

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents and trade receivables. The Company's cash and cash equivalents are concentrated primarily in several United States banks. At times, such deposits may be in excess of insured limits. The Company's management believes that the financial institutions which hold its financial instruments are financially sound and, accordingly, minimal credit risk exists with respect to these financial instruments.

### 2.      Decreased Sales Volumes and Deliveries

While Lazy Days has adjusted downward its level of inventory based on current consumer demand, the inventory of other dealers in the industry remains high relative to current retail sales volumes, resulting in lower pricing levels in an effort to avoid curtailments and generate cash. In addition, manufacturer buy-backs of dealer inventory and retail repossessions compete with the sale of new units, further limiting new production demand and placing downward pricing pressure on new and used RVs.

### 3.      Bankruptcy Filings and Potential Bankruptcy Filings of the Company's Suppliers Could Negatively Affect Cash Flow

Several of Lazy Days' manufacturers, such as Monaco, Fleetwood and Country Coach, have filed for protection under the Bankruptcy Code, while others have maintained extended periods of shut downs. The

Company is staying informed about the at-risk status of its suppliers, and is making diligent efforts to incorporate the impact of any suppliers' bankruptcies into its own operations plans.

### 4. Limited Retail Financing

RV retail lenders have introduced, in lieu of reliance on consumer credit score and payment history, tests of personal liquidity and source of income. Documentation requirements and required down payments have been increased, while loan size relative to value has been significantly decreased. The availability of funding has been further restricted as several lenders have abandoned the retail RV financing business.

### 5. Legal Proceedings

In the normal course of business, the Company is subject to various legal proceedings and claims. Based on the facts currently available the Company's management believes that the ultimate amount of liability from these pending actions will not have a material adverse effect on the Company's financial position, results of operations, or liquidity; however, the Company may be subject to products liability claims or product recalls which the Company's insurance and indemnification agreements may be inadequate to cover.

### 6. Adverse weather conditions

Weather conditions can have a significant impact on the Company's sales. The Company is located on a single site near Tampa, Florida and the Gulf of Mexico. Florida has experienced severe tropical storms and hurricanes, which, should they occur again, could disrupt the Company's operations.

## D. RISK THAT THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY BE INACCURATE

The statements contained in this Disclosure Statement are made by the Company as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change since that date in the information set forth herein. The Company may subsequently update the information in this Disclosure Statement, but it has no duty to update this Disclosure Statement unless ordered to do so by the Court. Further, the performance and prospective financial information contained herein, unless otherwise expressly indicated, is unaudited. Finally, neither the Commission nor any other governmental authority has passed upon the accuracy or adequacy of this Disclosure Statement, the Plan, or any Exhibits thereto.

## E. FINANCIAL INFORMATION; DISCLAIMER

Although the Company has used its reasonable best efforts to ensure the accuracy of the financial information provided in this Disclosure Statement, some of the financial information contained in this Disclosure Statement has not been audited and is based upon an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement. While the Company believes that such financial information fairly reflects the financial condition of the Company, the Company is unable to warrant or represent that the information contained herein and attached hereto is without inaccuracies.

### 1. Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning:  (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) consumer preferences continuing to support the Debtors' business plan.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will *not* be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

## F.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Company's Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests and the Debtors' liquidation analysis is set forth in Article VII above and **Exhibit C to this Disclosure Statement**.

**These risk factors contain certain statements that are "forward looking statements" within the meaning of Section 21E of the Securities Exchange Act and are made pursuant the safe harbor provisions thereof.  These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of the Company, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity, or other financing to fund operations, currency exchange rate fluctuations, terrorist actions or acts of war, operating efficiencies, labor relations, actions of governmental bodies, and other market and competitive conditions.  Holders of Claims and Interests are cautioned that the forward looking statements speak as of the date made and are not guarantees of future performance.  Actual results or developments may differ materially from the expectations expressed or implied in the forward looking statements and the Debtors undertake no obligation to update any such statements.**

## G.    RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN

### 1.    The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court

The approximate midpoint equity value of the Reorganized Debtors is $68.8 million.  Parties in interest in these Chapter 11 Cases may oppose Confirmation of the Plan by alleging that the midpoint equity value of the Reorganized Debtors is higher or lower than $68.8 million and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan.  At the Confirmation Hearing, the Bankruptcy Court will hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors.  Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

### 2.    A Liquid Trading Market for the New Stock May Not Develop

The Reorganized Debtors are not obligated, and do not intend, to list the New Stock on a national securities exchange, and the New Stock will be issued without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Article X herein, titled "Exemptions from Securities Act Registration." Thus, at least in the short-term, it is not likely that a liquid trading market for the New Stock will develop.  Even if a liquid trading market for the New Stock were to develop, the liquidity of any market therefore will depend upon, among other things, the number of Holders of New Stock, the Reorganized Debtors' financial performance and the

market for similar securities, none of which can be determined or predicted.  Therefore, the Company cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be.

3.      **The Reorganized Debtors May Not Be Able to Achieve Projected Financial Results, Meet Their Post-Reorganization Debt Obligations and/or Fund Their Operating Expenses, Working Capital Needs and/or Capital Expenditures**

The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs.  Any one of these failures may preclude the Reorganized Debtors from, among other things:  (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures.  Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital.  The Reorganized Debtors may not be able to obtain such working capital when it is required.  Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms.  For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of operations and the financial condition of the Reorganized Debtors.  If any such required capital is obtained in the form of equity, the equity interests of the Holders of the then-existing New Stock could be diluted.  Although the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

4.      **Neither the Estimated Valuation of the Reorganized Debtors and the New Stock nor the Estimated Recoveries to Holders of Allowed Claims and Interests are Intended to Represent the Private Sale Value of the New Common Stock or the New Preferred Stock**

The estimated recoveries to Holders of Allowed Claims and Interests set forth herein are not intended to represent the private sale values of the Reorganized Debtors' securities.  Instead, the estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation:  (a) the successful reorganization of the Company; (b) an assumed date for the occurrence of the Effective Date; (c) the Company's ability to achieve the operating and financial results included in the Financial Projections; (d) the Company's ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

5.      **A Small Number of Equity Holders Will Control the Reorganized Debtors**

Consummation of the Plan will result in a small number of Holders owning a significant percentage of the shares of outstanding New Stock.  These Holders will, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors.

6.      **Potential Shareholder Action**

Certain shareholders of the Company have expressed dissatisfaction with the proposed Plan.  As of the date hereof, the Company does not express any views with respect to the outcome of potential shareholder actions.  It is possible that such actions could lead to modifications to the Plan.  It is also possible that such actions could impact the Company's business operations.

7.      **The Issuance of Equity Interests to Management Will Dilute the Equity Ownership Interest of Other Holders of New Stock**

The Management Incentive Program contemplates equity-based awards to senior management. If the Reorganized Debtors distribute equity interests, or options to acquire such equity interests, to senior management, such distributions will dilute the equity interests issued to Holders of Allowed Claims and Equity Interests under the Plan and the corresponding ownership percentage represented by the New Common Stock distributed under the Plan.

8.      **The Issuance of Conversion Equity May Dilute the Equity Ownership Interest of Other Holders of New Stock**

The New Equity Facility contemplates the issuance to the New Equity Investors of $10 million of New Preferred Stock, bearing an 8% annual PIK dividend, convertible at any time into 70% of the New Common Stock of Reorganized Lazy Days on a fully diluted basis. If the New Equity Investors convert the New Preferred Stock to Conversion Equity, the issuance of the Conversion Equity will dilute the equity interests issued to Holders of Allowed Class 3 Claims under the Plan and the corresponding ownership percentage represented by the New Common Stock distributed under the Plan.

9.      **Certain Tax Implications of the Company's Reorganization May Increase the Tax Liability of Reorganized Debtors**

Holders of Claims in the Voting Class should carefully review Article XI below, entitled "Certain U.S. Federal Income Tax Consequences of the Plan" to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

**H.      DISCLOSURE STATEMENT DISCLAIMER**

1.      **The Information Contained Herein Is for Soliciting Votes Only**

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

2.      **This Disclosure Statement Was Not Approved by the Securities and Exchange Commission**

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3.      **The Debtors Relied on Certain Exemptions from Registration Under the Securities Act**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws. The offer of New Stock to Holders of Claims in Class 3 has not been registered under the Securities Act or similar Blue Sky Law. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Stock or any shares reserved for issuance under the Management Incentive Program, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, Rule 701 promulgated under the Securities Act or a "no sale" under the Securities Act as described herein.

4.      **This Disclosure Statement Contains Forward Looking Statements**

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of

historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

5.      **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal or tax advice to you.** The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      **No Admissions Are Made by This Disclosure Statement**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests or any other parties in interest.

7.      **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, File and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Objections to Claims.

8.      **Nothing Herein Constitutes a Waiver of any Right to Object to Claims or Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

9.      **The Information Used Herein Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10.     **The Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable

business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**11.        No Representations Made Outside the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Ad Hoc Noteholders Committee and the U.S. Trustee.

**X.**
**EXEMPTIONS FROM SECURITIES ACT REGISTRATION**

**A.    NEW STOCK**

The Plan provides for the Company to issue (1) the New Common Stock and (2) the New Preferred Stock.

The Company believes that all of the New Stock constitutes "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code, and applicable Blue Sky Law.  The Company further believes that the offer and sale of the New Stock pursuant to the Plan are, and subsequent transfers of the New Stock by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and state securities laws.

**B.    ISSUANCE AND RESALE OF NEW STOCK UNDER THE PLAN**

**1.    Exemption from Registration**

Section 3(a)(9) of the Securities Act provides that, except for securities exchanged in a case under chapter 11 of the Bankruptcy Code, the registration requirements of section 5 of the Securities Act shall not apply to securities exchanged by an issuer with its existing security Holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange.  By virtue of section 18 of the Securities Act, section 3(a)(9) also provides that any state Blue Sky Law requirements shall not apply to such exchange.

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state Blue Sky Law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the offer and sale of the New Stock will not be registered under the Securities Act or any state Blue Sky Law.

To the extent that the issuance of the New Stock is covered by section 1145 of the Bankruptcy Code, the New Stock may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the New Stock generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the New Stock are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

If the New Stock is not covered by section 1145 of the Bankruptcy Code, the New Stock will be considered "restricted securities" as defined by Rule 144 promulgated under the Securities Act and may not be resold under the Securities Act and applicable state Blue Sky Law absent an effective registration statement under the Securities Act or pursuant to an applicable exemption from registration, including Rule 144 promulgated under the Securities Act.

77

Recipients of the New Stock are advised to consult with their own legal advisors as to the applicability of section 1145 to the New Stock and the availability of any exemption from registration under the Securities Act and state Blue Sky Law in the event that section 1145 is not applicable to the New Stock.

### 2.    Resales of New Stock; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; or (b) offers to sell securities offered or sold under a plan for the Holders of such securities; or (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the New Stock by Persons deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Holders of New Stock who are deemed to be "underwriters" may be entitled to resell their New Stock pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Company does not presently intend to make publicly available the requisite current information regarding the Company, and as a result, Rule 144 will not be available for resales of New Stock by persons deemed to be underwriters. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Stock. In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell New Stock. Accordingly, the Company recommends that potential recipients of New Stock consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and state securities laws.

## C.    REGISTRATION OF NEW STOCK

The Company shall not be obligated, and does not intend, to list the New Common Stock or the New Preferred Stock on a national securities exchange. In order to ensure that the Company will not become subject to the reporting requirements of the Securities Exchange Act except in connection with a public offering, the New Stock will be subject to certain trading restrictions to limit the number of record Holders thereof as shall be more fully described in the Plan Supplement.

The Company is relying on sections 3(a)(9) and 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and Blue Sky Law the offer and sale of new securities in connection with the Solicitation and the Plan.

## XI.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders and Non-U.S. Holders (each as defined below) of claims.  The following summary does not address the U.S. federal income tax consequences to Holders of claims who are unimpaired or otherwise entitled to payment in full in cash under the Plan.  This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

For purposes of this discussion, the term "U.S. Holder" means a holder of a claim or New Common Stock that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or entity treated as a corporation, organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election to be treated as a U.S. person for U.S. federal income tax purposes or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" means a holder of a claim or New Common Stock that is, for U.S. federal income tax purposes, (i) a nonresident alien individual, (ii) a non-U.S. corporation or (iii) a non-U.S. estate or non-U.S. trust.  This summary does not address all aspects of U.S. federal income taxes that may be relevant to Non-U.S. Holders in light of their personal circumstances, and does not deal with federal taxes other than the federal income tax or with non-U.S., state, local or other tax considerations.  Special rules, not discussed here, may apply to certain Non-U.S. Holders, including U.S. expatriates, controlled foreign corporations, passive foreign investment companies and corporations that accumulate earnings to avoid U.S. federal income tax. Such Non-U.S. Holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.  In the case of a holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner and the partnership. If you are a partner of a partnership that is a holder of a claim or New Common Stock, then you should consult your own tax advisors.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding, or who will hold, claims or New Common Stock as part of a hedge, straddle, conversion or constructive sale transaction).  In addition, the U.S. tax considerations described herein may differ for a holder of a claim that purchases New Preferred Stock pursuant to the Plan, or for a holder of a claim that is considered to be "related" to the Debtors or to the Reorganized Debtors for U.S. federal income tax purposes.  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  The following discussion assumes that each holder of a claim holds its claim and the New Common Stock, as applicable, as a "capital asset" within the meaning of Section 1221 of the IRC.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT**

THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC.   TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS**

    1.    **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including New Common Stock) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to Section 108 of the IRC.  In general, tax attributes will be reduced in the following order:  (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC, though it has not been determined whether the Debtors would make this election.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.  The Debtors are not consolidated for federal income tax purposes and anticipate that the Reorganized Debtors will not be consolidated for federal income tax purposes from and after the Effective Date.

As a result of the Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced.  Because the Plan provides that holders of Allowed Class 3 Notes Claims will receive shares of the New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock.  This value cannot be known with certainty until after the Effective Date.  Following this tax attribute reduction, the Debtors expect that, subject to the limitations discussed herein and subject to whether the Debtors decide to reduce first the basis in their depreciable assets, Reorganized Lazy Days will not have NOL carryforwards or significant tax basis in its assets remaining after emergence from chapter 11.  However, on the Effective Date, subject to delivery by the Debtors of a tax opinion acceptable to the Ad Hoc Noteholders Committee in its sole discretion, Reorganized Lazy Days will contribute, as a capital contribution, substantially all of its assets (other than its continuing interest in the capital stock of Reorganized LDRV Holdings) to Reorganized LDRV Holdings and Reorganized LDRV Holdings will assume substantially all of the liabilities of Reorganized Lazy Days (including, without limitation, all liabilities and obligations of Reorganized Lazy Days under the Exit Facility Agreement, provided that Reorganized Lazy Days will remain obligated as a guarantor thereunder), other than the Notes Claims and the Section 510(b) Claims.  The Debtors believe that the attribute reduction rule described above will require Lazy Days to reduce its tax basis in the stock of Reorganized LDRV Holdings but not in the tax basis of the assets so contributed.

In addition to the attribute reduction rule described above, when assets are contributed to a controlled corporation in a transaction described in Sections 351 or 118 of the IRC and those assets have a basis higher than their fair market value, the controlled corporation generally is required to reduce the basis of those assets to their fair market value, unless the contributor agreed to reduce its basis in the stock. On the contribution by Reorganized Lazy Days of substantially all its assets to Reorganized LDRV Holdings, Reorganized LDRV Holdings and Reorganized Lazy Days will jointly elect to reduce Reorganized Lazy Days' basis in Reorganized LDRV Holdings stock, rather than have Reorganized LDRV Holdings reduce the basis of the assets received from Reorganized Lazy Days.

If the IRS were to successfully challenge the characterization of the contribution of substantially all of Reorganized Lazy Days' assets to Reorganized LDRV Holdings as a tax-free contribution to capital under Section 351 or 118 of the IRC, the transaction likely would be treated as a taxable sale or exchange. In such case, the basis of the assets held by Reorganized LDRV Holdings would be reduced or increased to fair market value. Reorganized Lazy Days would recognize gain, if any, on the transaction, but any recognized losses would be deferred under related party transaction rules. Reorganized Lazy Days could offset any such gain to the extent of its NOLs.

The American Recovery and Reinvestment Act of 2009 permits the Debtors to elect to defer the inclusion of COD Income, with the amount of COD Income becoming includible in the income of the electing Debtors ratably over a five-taxable year period beginning in the fifth taxable year after the COD Income arises. The collateral tax consequences of making such election are complex. The Debtors currently are analyzing whether to make the deferral election.

## 2.        Limitation of NOL Carryforwards and Other Tax Attributes

Following the implementation of the Plan, the Company anticipates that any remaining NOLs, tax credit carryforwards, built-in losses, and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to limitation under Section 382 of the IRC as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock and New Preferred Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses (which may include built-in losses) will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

(a)        General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4.48% for the month of September 2009). The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock and the New Preferred Stock, along with the cancellation of existing Equity Interests in the Company through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date. This limitation is

independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.  Moreover, since the NOLs were incurred by Lazy Days, and Reorganized Lazy Days would not be filing a consolidated return with Reorganized LDRV Holdings, Reorganized Lazy Days could not use its NOLs to offset the income of Reorganized LDRV Holdings.  Even were they to agree to file a consolidated return at a future date, the losses would be subject to additional limitations.

(b)        <u>Special Bankruptcy Exceptions</u>

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "<u>382(l)(5) Exception</u>").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "<u>382(l)(6) Exception</u>").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors currently do not expect that they will qualify for the 382(l)(5) Exception.  In that case, the Debtors expect that their use of their built-in losses recognized during the five-year period beginning on the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

**3.      Alternative Minimum Tax**

In general, an alternative minimum tax is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  Alternative minimum taxable income is generally equal to regular taxable income with certain adjustments.  For purposes of computing alternative minimum taxable income, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's alternative minimum taxable income, only 90% of a corporation's alternative minimum taxable income may be offset by available alternative tax NOL carryforwards.  Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for alternative minimum tax purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.  Reorganized Lazy Days and Reorganized LDRV Holdings (as anticipated successor to the Reorganized Lazy Days assets on the Effective Date) may have a net unrealized built-in loss in their respective assets for alternative minimum tax purposes immediately after the ownership change and therefore could be impacted by these alternative minimum tax rules.

B.    **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO U.S. HOLDERS OF ALLOWED CLAIMS**

1.    **Consequences to U.S. Holders of Class 3 Notes Claims**

The following discussion assumes that the obligation underlying each allowed Class 3 Notes Claim is properly treated as debt (rather than equity) of the applicable Debtor.  Pursuant to the Plan, each holder of an allowed Class 3 Notes Claim shall receive such holder's *pro rata* share of New Common Stock (as further described in this Disclosure Statement above).  Whether a U.S. Holder of an allowed Class 3 Notes Claim recognizes gain or loss as a result of the exchange of its claim for New Common Stock depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the allowed Class 3 Notes Claim surrendered is treated as a "security" for the reorganization provisions of the IRC and other factors, and/or qualifies as an exchange described in Section 351 of the IRC (a "Section 351 Exchange") (b) the U.S. Holder has previously included in income any accrued but unpaid interest with respect to the allowed Class 3 Notes Claim, (c) the U.S. Holder has claimed a bad debt deduction or worthless security deduction with respect to such allowed Class 3 Notes Claim and (d) the U.S. Holder uses the accrual or cash method of accounting for tax purposes.

(a)    Treatment of a Debt Instrument As a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. The 11.75% Senior Notes have an original term of approximately eight years. Each U.S. Holder of an allowed Class 3 Notes Claim should consult with its own tax advisor to determine whether or not the debt underlying such Class 3 Notes Claim is a "security" for U.S. federal income tax purposes.

(b)    Treatment of a U.S. Holder of an Allowed Class 3 Notes Claim If the Exchange of Its Claim Is Treated as a Reorganization or a Section 351 Exchange

If a debt instrument constituting an allowed Class 3 Notes Claim is treated as a "security" for U.S. federal income tax purposes, the surrender of a U.S. Holder's allowed Class 3 Notes Claim in exchange for New Common Stock should be treated as a recapitalization, and therefore a reorganization, under the IRC. In addition, the exchange may qualify as a Section 351 Exchange even if the applicable Class 3 Notes Claim is not treated as a security.  If the exchange is treated as a reorganization or a Section 351 Exchange, a U.S. Holder of a surrendered allowed Class 3 Notes Claim will recognize gain, but not loss, on the exchange. Specifically, the U.S. Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) (A) in the case of a reorganization, the amount of "other property" (i.e., property that is not a "security" for U.S. federal income tax purposes, and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received or (B) in the case of a Section 351 Exchange, the amount of property other than stock (treating as non-stock for this purpose certain nonqualified preferred stock), and (b) ordinary interest income to the extent that the New Common Stock is treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the allowed Class 3 Notes Claim (see discussion of "Accrued Interest" below).  In such case, a U.S. Holder's tax basis in its New Common Stock should be equal to the tax basis of the obligation constituting the allowed Class 3 Notes Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" received (in the case of a reorganization) and property other than qualified stock received (in the case of a Section 351 Exchange)), and a U.S. Holder's holding period for its New Common Stock should include the holding period for the obligation constituting the surrendered allowed Class 3 Notes Claim; provided that the tax basis of any New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the

amount of such accrued but untaxed interest, and the holding period for any such New Common Stock should not include the holding period of the debt instrument constituting the surrendered allowed Class 3 Notes Claim.

(c)    Treatment of a U.S. Holder of an Allowed Class 3 Notes Claim If the Exchange of Its Claim Is Not Treated as a Reorganization or a Section 351 Exchange

If a debt instrument constituting a surrendered allowed Class 3 Notes Claim is not treated as a "security" for U.S. federal income tax purposes and if the exchange does not qualify as a Section 351 Exchange, a U.S. Holder of such a claim should be treated as exchanging its allowed Class 3 Notes Claim for the New Common Stock in a fully taxable exchange. A U.S. Holder of an allowed Class 3 Notes Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock that is not allocable to accrued but untaxed interest, and (ii) the U.S. Holder's adjusted tax basis in the obligation constituting the surrendered allowed Class 3 Notes Claim. Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long-term capital gain or loss if the debts constituting the surrendered allowed Class 3 Notes Claim were held for more than one year. To the extent that a portion of the New Common Stock is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below). A U.S. Holder's tax basis in the New Common Stock should equal its fair market value. A U.S. Holder's holding period for the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

(d)    Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered allowed claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the U.S. Holder's gross income, such amount should be taxable to the U.S. Holder as ordinary interest income. Conversely, a U.S. Holder of a surrendered allowed claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a U.S. Holder of a surrendered allowed claim will be attributable to accrued interest on the debts constituting the surrendered allowed claim is unclear. Certain U.S. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed claims shall be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

(e)    Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its allowed claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that

accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that Allowed Class 3 Notes Claims that were previously acquired with market discount are exchanged for New Common Stock in a tax-free reorganization, any market discount that accrued on such debts but was not previously recognized by the U.S. Holder may be required to be carried over to the New Common Stock received therefore, and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such New Common Stock may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.  To the extent that the Allowed Class 3 Notes Claims that were previously acquired with market discount are exchanged for New Common Stock in a Section 351 Exchange, but not a tax-free reorganization, any such market discount not previously recognized is treated as ordinary income to the U.S. Holder at the time of such exchange.

(f)     Limitation on Use of Capital Losses

A U.S. Holder of a claim who recognizes a capital loss as a result of the distributions under the Plan will be subject to limits on its use of capital losses.  For a U.S. Holder other than a corporation, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  A U.S. Holder other than a corporation may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For a corporate U.S. Holder, losses from the sale or exchange of capital assets may only be used to offset capital gains.  A corporate U.S. Holder may only carry over unused capital losses for the five years following the capital loss year, but is allowed to carry back unused capital losses to the three years preceding the capital loss year.

**2.     Consequences to U.S. Holders of Class 5 Claims and Equity Interests**

Pursuant to the Plan, on the Effective Date, all Class 5 Section 510(b) Claims and Equity Interests shall be deemed canceled and extinguished, and shall be of no further force and effect.  Section 165(g) of the IRC permits a "worthless security deduction" for any "security" (as defined for purposes of such section) that is a capital asset that becomes worthless within the taxable year.  A U.S. Holder of Equity Interests should be entitled to a worthless security deduction.  The rules governing the timing, amount and character (capital or ordinary) of a worthless security deduction place considerable emphasis on the facts and circumstances of the holder, the issuer, and the instrument with respect to which the deduction is claimed; U.S. Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

**3.     Consequences to U.S. Holders of Holding New Common Stock**

(a)     Dividends on New Common Stock

Any distributions made on the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Lazy Days as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to certain exceptions, dividends received by non-corporate U.S. Holders prior to 2011 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met. Any such dividends received after 2010 will be taxed at the rate applicable to ordinary income.

Dividends paid to a U.S. Holder that is a corporation generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

The benefit of the dividends-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the IRC, which may require the corporate recipient to reduce its adjusted tax basis in its shares by the amount excluded from income as a result of the dividends-received deduction. The excess of the excluded amount over adjusted tax basis may be treated as gain. A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period as one dividend, or (2) it exceeds 20% of the holder's adjusted tax basis in the stock, treating all dividends having ex dividend dates within a 365-day period as one dividend.

(b)    Sale, Redemption or Repurchase of New Common Stock

Unless a non-recognition provision applies, subject to the "market discount" rules discussed above, a U.S. Holder generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of the New Common Stock.

## C.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO NON-U.S. HOLDERS OF ALLOWED CLAIMS

### 1.    Consequences to Non-U.S. Holders of the Exchange

Any gain or interest income realized by a Non-U.S. Holder on the exchange of its claim generally will be exempt from U.S. federal income or withholding tax, provided that:

- such Non-U.S. Holder does not own, actually or constructively, 10 percent or more of the total combined voting power of all classes of the voting stock of Lazy Days, is not a controlled foreign corporation related, directly or indirectly, to Lazy Days through stock ownership and is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC;

- the statement requirement set forth in Section 871(h) or Section 881(c) of the IRC has been fulfilled with respect to the beneficial owner, as discussed below;

- such Non-U.S. Holder is not an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; and

- such gain or interest income is not effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

The statement requirement referred to in the preceding paragraph will generally be fulfilled if the beneficial owner of the property or cash received on the exchange certifies on IRS Form W-8BEN (or such successor form as the IRS designates) under penalties of perjury that it is not a U.S. person and provides its name and address.  The Non-U.S. Holder must provide the form to the Debtors or their paying agent, or in the case of a note held through a securities clearing organization, bank or other financial institution holding customers' securities in the ordinary course of its trade or business, to such organization, bank or other financial institution, which must in turn provide to the Debtors or their paying agent a statement that it has received the form and furnish a copy thereof; provided, that a non-U.S. financial institution will fulfill this requirement by filing IRS Form W-8IMY if it has entered into an agreement with the IRS to be treated as a qualified intermediary. These forms must be periodically updated.

If a Non-U.S. Holder is engaged in a trade or business in the United States, and if any gain or interest income realized on the exchange of its claim is effectively connected with the conduct of such trade or business, the Non-U.S. Holder, although exempt from the withholding tax discussed in the preceding paragraphs, will generally be subject to regular U.S. federal income tax on such gain or interest income in the same manner as if it were a U.S. Holder. In lieu of the certificate described in the preceding paragraph, such a Non-U.S. Holder will be required to

provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates), in the manner described above, in order to claim an exemption from withholding tax. In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

##### 2. Consequences to Non-U.S. Holders of Holding the New Common Stock

This summary assumes that no item of income or gain in respect of the New Common Stock at any time will be effectively connected with a U.S. trade or business conducted by the Non-U.S. Holder.

(a)    Dividends on New Common Stock

Dividends paid to a Non-U.S. Holder (to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes) generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

To claim the benefit of a tax treaty a Non-U.S. Holder must provide a properly executed IRS Form W-8BEN (or such successor form as the IRS designates), in the manner described above, prior to the payment of the dividends. A Non-U.S. Holder that is eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund from the IRS of any excess amounts withheld by filing timely an appropriate claim for refund with the IRS.

(b)    Sale, Redemption or Repurchase of New Common Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale, redemption or other taxable disposition of New Common Stock, unless:

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

- Reorganized Lazy Days is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

Reorganized Lazy Days is not, and does not anticipate that it will become, a "U.S. real property holding corporation" for U.S. federal income tax purposes.

## D.    WITHHOLDING AND REPORTING

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident. Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## XII.
## GLOSSARY OF DEFINED TERMS

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

1.    "*Acquisition*" means the May 14, 2004 purchase of all of the issued and outstanding shares of capital stock of LD Holdings by RV Acquisition.

2.    "*Blue Sky Law*" means state securities law.

3.    "*COD Income*" means cancellation of indebtedness income.

4.    "*Company*" means the Debtors.

5.    "*Estimated Reorganized Debtors' Enterprise Value*" means the estimated post-Confirmation going concern value for the Reorganized Debtors.

6.    "*Exit Facility Documents*" means the Exit Facility Agreement and all other related agreements, documents or instruments to be executed or delivered in connection therewith.

7.    "*Floor Plan Facility*" means the $80 million floor plan credit facility provided for by the Prepetition Credit Agreement.

8.    "*IRC*" means the Internal Revenue Code of 1986, as amended.

9.    "*IRS*" means the U.S. Internal Revenue Service.

10. "*Master Ballot*" means the master ballot accompanying the Disclosure Statement upon which Nominees holding 11.75% Senior Notes for and voting on behalf of beneficial Holders of Class 3 Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

11. "*NOLs*" means net operating losses.

12. "*Nominee*" means the bank, broker or other nominee voting on behalf of a beneficial Holder of a Notes Claim.

13. "*Plan Supplement Filing Date*" means the date that is no later than five days before the date of the Confirmation Hearing.

14. "*Revolving Facility*" means the $15 million revolving credit facility provided for by the Prepetition Credit Agreement.

15. "*RVs*" means recreational vehicles.

16. "*Solicitation*" means the solicitation of votes to approve the Plan.

17. "*Solicitation Procedures*" means the procedures approved by the Bankruptcy Court for soliciting, receiving and tabulating votes on the Plan and for filing objections to the Plan.

18. "*Voting Report*" means the voting report filed by the Balloting Agent prior to the Confirmation Hearing reflecting the tabulation of Ballots and Master Ballots for each Class entitled to vote to accept or reject the Plan.

## XIII.
### RECOMMENDATION

In the opinion of the Company, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Company's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller Distributions than that which is proposed under the Plan.  Accordingly, the Company recommends that parties entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Respectfully submitted,

*/s/ Randall Lay*
_____

Lazy Days' R.V. Center, Inc.
(for itself and on behalf of each of the Debtors)

By:        Randall Lay

Title:     Chief Financial Officer

Dated:    September 4, 2009

Prepared by:

**KIRKLAND & ELLIS LLP**
David L. Eaton
300 N. La Salle Street
Chicago, Illinois 60654
Telephone:  (312) 861–2000
Facsimile:   (312) 861–2200

 - and -

Jennifer L. Marines
Marc A. Lewinstein
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900