# EXHIBIT A

## Proposed Order

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAZY DAYS' R.V. CENTER, INC., et al.,[1] | ) | Case No. 09-13911 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Ref. Docket No. _____** |

## ORDER AUTHORIZING THE DEBTORS TO
## EMPLOY AND RETAIN MACQUARIE CAPITAL (USA) INC.
## AS THEIR FINANCIAL ADVISOR, *NUNC PRO TUNC* TO THE PETITION DATE

Upon the application (the "Application")[2] of the above-captioned debtors and debtors-in-possession (collectively the "Debtors") for entry of an order (this "Order"), pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Code for the District of Delaware (the "Local Rules"), authorizing the Debtors to employ and retain Macquarie Capital (USA) Inc. ("Macquarie") as their financial advisor in connection with the above-captioned Chapter 11 Cases, *nunc pro tunc* to the Petition Date, on the terms set forth in that certain letter agreement, dated November 25, 2008, as amended and restated on September 3, 2009 (the "Agreement"), a copy of which is annexed as **Exhibit C** to the Application; and the Court having reviewed the Application and the declaration of Ford Phillips, Managing Director of Macquarie,

---

[1] The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Lazy Days' R.V. Center, Inc. (4794); LD Holdings, Inc. (1834); LDRV Holdings Corp. (6915); and RV Acquisition Inc. (1630). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 6130 Lazy Days Boulevard, Seffner, Florida 33584-2968.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Application.

submitted by the Debtors in support thereof (the "Phillips Declaration"); and the Court having

found that Macquarie is a "disinterested person," as such term is defined in section 101(14) the

Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and does not hold or

represent any interest adverse to the Debtors' estates; and the Court having found that the terms

and conditions of Macquarie's employment by the Debtors pursuant to the Agreement, including

the terms of compensation and indemnification in the Agreement, are reasonable, appropriate,

and customary; upon the *Declaration of Randall Lay, Chief Financial Officer of Lazy Days' R.V.*

*Center, Inc., in Support of the Debtors' Chapter 11 Petitions and First Day Motions*; and the

Court having found that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C.

§§ 157(b)(2); and the Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and the Court having found that the relief requested is in the best interests of the Debtors'

estates, their creditors and other parties in interest; and due and proper notice of this Motion

having been provided; and the Court having found that no other or further notice need be

provided; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED:

1.      The Application is granted *nunc pro tunc* to the Petition Date.

2.      The Debtors are authorized to employ and retain Macquarie as their financial

advisor, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rule

2014(a) and Local Rules 2014-1, in accordance with the terms and conditions set forth in the

Agreement.

3.      The Agreement is approved pursuant to section 328(a) of the Bankruptcy Code, and the Debtors are authorized to pay, reimburse and indemnify Macquarie in accordance with the terms and conditions and at the times specified in the Agreement. The Debtors are hereby authorized to amend the Agreement without further order of the Court as long as any such amendments do not materially increase the Debtors' obligations under the Agreement.

4.      Macquarie shall be compensated and reimbursed pursuant to the standard of review under section 328(a) of the Bankruptcy Code and not subject to review under section 330 of the Bankruptcy Code in accordance with the terms of the Agreement, and subject to the procedures set forth in the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and any other applicable orders of this Court.

5.      Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, other orders of this Court or any guidelines regarding submission and approval of fee applications, Macquarie and its professionals shall be excused from maintaining or filing time records in connection with the services to be rendered pursuant to the Agreement.

6.      The indemnification provisions of the Agreement are approved, but only subject to the following modifications during the pendency of the Debtors' bankruptcy cases:

a.      Macquarie shall not be entitled to indemnification, contribution, or reimbursement pursuant to the Agreement for services other than those described in the Agreement, unless such services and indemnification therefor are approved by the Bankruptcy Court;

b.      The Debtors shall have no obligation to indemnify Macquarie, or provide contribution or reimbursement to Macquarie, for any claim or expense that is either:   (i) judicially determined (the determination having become final) to have arisen from Macquarie's gross negligence or willful misconduct; (ii) for a contractual dispute in which the Debtors allege the breach of Macquarie's contractual obligations unless the Court determines that indemnification, contribution or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by the Court, after notice

3

and a hearing to be a claim or expense for which Macquarie should not receive indemnity, contribution or reimbursement under the terms of the Agreement as modified by this Order; and

c.  If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), and (ii) the entry of an order dismissing or closing these Chapter 11 Cases, Macquarie believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the Agreement (as modified by this Order), including without limitation the advancement of defense costs, Macquarie must file an application therefor in this Court, and the Debtors may not pay any such amounts to Macquarie before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time under which the Court shall have jurisdiction over any request for fees and expenses by Macquarie for indemnification, contribution or reimbursement, and not a provision limiting the duration of the Debtors' obligation to indemnify Macquarie. All parties in interest shall retain the right to object to any demand by Macquarie for indemnification, contribution or reimbursement.

7.  Attachment A to the Agreement is approved, provided, however, that during the pendency of these Chapter 11 Cases, the limitation of liability provisions, set forth in paragraphs 2 and 5 of Attachment A to the Agreement, shall be stricken and of no force and effect.

8.  All time periods set forth in this Order shall be calculated in accordance with rule 9006(a) of the Bankruptcy Rules.

9.  The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

10.  Notwithstanding the possible applicability of Bankruptcy Rules 6004, 7062 and 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

11.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Application in these Chapter 11 Cases, the terms of this Order shall govern.

DB02:8908196.1

068731.1001

12.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.


Dated: November _____, 2009
        Wilmington, Delaware

_____
Kevin Gross
United States Bankruptcy Judge

DB02:8908196.1

068731.1001

# EXHIBIT B

## Phillips Declaration

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LAZY DAYS' R.V. CENTER, INC., et al.,[1] | ) | Case No. 09-13911 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DECLARATION OF FORD PHILLIPS IN SUPPORT OF
## APPLICATION OF THE DEBTORS FOR ENTRY OF
## AN ORDER AUTHORIZING THE DEBTORS TO RETAIN
## AND EMPLOY MACQUARIE CAPITAL (USA) INC.
## AS THEIR FINANCIAL ADVISOR, *NUNC PRO TUNC* TO THE PETITION DATE

I, Ford Phillips, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge:

1.      I am a managing director of Macquarie Capital (USA), Inc. ("Macquarie") and am duly authorized to make this declaration (the "Declaration") on behalf of Macquarie. The facts set forth in this Declaration are personally known to me and, if called as a witness, I could and would testify thereto.

2.      This Declaration is submitted in support of the Application[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for authorization to retain and employ Macquarie as their financial advisor, *nunc pro tunc* to the Petition Date, at the expense of the Debtors' estates.

---

[1]     The Debtors, along with the last four digits of each Debtor's federal tax identification number, are: Lazy Days' R.V. Center, Inc. (4794); LD Holdings, Inc. (1834); LDRV Holdings Corp. (6915); and RV Acquisition Inc. (1630). The location of the Debtors' corporate headquarters and the service address for all Debtors is: 6130 Lazy Days Boulevard, Seffner, Florida 33584-2968.

[2]     All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Application.

3.     This Declaration is also submitted as the statement required pursuant to Bankruptcy Rule 2014(a).

## Macquarie's Qualifications

4.     Macquarie is a member firm of the Macquarie Group ("MG"), a diversified international provider of specialist investment, advisory, trading and financial services in select markets around the world. Headquartered in Sydney, Australia, MG is a global investment bank and the leading Australian investment bank. MG employs over 11,000 people in 24 countries. In the United States, MG operates through a number of subsidiaries, including Macquarie, an SEC registered broker-dealer and member of the FINRA. Such subsidiaries are further arranged into different business divisions. The Macquarie professionals advising the Debtors in these Chapter 11 Cases sit within the Capital Advisors division of Macquarie. Furthermore, Macquarie Group Limited, the parent company of MG, is a top 20 company listed on the Australian Stock Exchange with a market capitalization of approximately $15 billion as of October 31, 2009 and total assets under management exceeding $195 billion. Macquarie, through its Capital Advisors division, is a distinguished leader in providing advisory services to companies, creditors and stakeholders in financially distressed situations.

5.     Macquarie's employees have been leading advisors to debtors, creditors' committees, bondholder groups, secured and unsecured creditors, acquirers, and other parties-in-interest involved in financially troubled companies both in and outside bankruptcy. Macquarie's engagements have included providing financial advisory services to the debtors in *In re Delta Air Lines, Inc., et al.,* [Case No. 05-17923], the chapter 11 trustee in *In re Sentinel Management Group, Inc.,* [Case No. 07-14987], the senior lenders in *In re Refco, Inc., et al.,* [Case No. 05-60006], and the statutory committees of unsecured creditors in *In re Enron Corp.,* [Case No. 01-

2

16034] and *In re USG Corporation, a Delaware Corporation, et al.,* [Case No. 01-2094].[3] Through its role in these and other restructuring engagements, the Macquarie team has developed considerable expertise in many of the issues that will be present in this engagement.

### Services to be Provided by Macquarie

6. Subject to the Court's approval of the Application, Macquarie has agreed to provide investment banking services to the Debtors pursuant to that certain letter agreement dated November 25, 2008, as amended and restated on September 3, 2009 (the "Agreement"), a copy of which is annexed as **Exhibit C** to the Application and incorporated by reference as though fully set forth herein. The professionals presently expected to have primary responsibility for providing services to the Debtors in connection with these Chapter 11 Cases are Michael Bruder and me.

7. It is my belief that the resources, capabilities and experience of Macquarie in advising the Debtors have been and continue to be crucial to the Debtors' successful restructuring. Broadly speaking, Macquarie has and will continue to concentrate its efforts on (a) advising the Debtors with respect to the execution of the restructuring, (b) advising the Debtors in preparation for, meeting with and presenting information to interested parties and their respective advisors, (c) providing the necessary support and financial advice to the Debtors throughout the Chapter 11 Cases, and (d) providing any necessary relevant testimony in support of the Debtors' plan of reorganization.

---

[3] On April 13, 2007 the Macquarie Group acquired the business of Giuliani Capital Advisors LLC. The restructuring experience of the Macquarie team, including the services in certain of these proceedings refers to transactions completed prior to the acquisition. Professionals that worked on those transactions are now employed by Macquarie.

DB02:8908196.1 068731.1001

## Macquarie's "Disinterestedness"

8.  To my knowledge, based on reasonable inquiry, neither I, Macquarie, nor any of its professionals or employees participating in or connected with Macquarie's engagement with the Debtors: (a) is related to the Debtors or any other party in interest herein, any United States Bankruptcy Judge sitting in the District of Delaware, the United States Trustee for the District of Delaware or anyone employed in the United States Trustee's Office for this District; (b) has any connection with (other than as set forth on the schedules attached hereto) or holds or represents any interest adverse to the Debtors, their estates, their creditors or any other Potential Parties In Interest (as defined below) or their respective attorneys in the matters on which Macquarie is proposed to be retained; or (c) has advised any Potential Parties In Interest, except for the Debtors, in connection with these Chapter 11 Cases. In addition, Macquarie does not believe that any relationship that Macquarie or any of its professionals or employees participating in or connected with Macquarie's engagement with the Debtors may have with any Potential Parties In Interest in connection with any unrelated matter will interfere with or impair Macquarie's representation of the Debtors in these Chapter 11 Cases.

9.  As such, I believe Macquarie is "disinterested," as such term is defined in section 101(14) the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, in that Macquarie:

   a. is not a creditor, an equity security holder, or an insider;

   b. is not and was not within two years before the date of the filing of the petition, a director, officer, or employee of the Debtors; and

   c. does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

DB02:8908196.1

068731.1001

10.     In connection with its proposed retention by the Debtors in these Chapter 11

Cases, Macquarie undertook to determine whether it had any potential conflict or other

relationships to ensure its compliance with the Bankruptcy Code, and the Bankruptcy Rules and

the Local Bankruptcy Rules regarding the employment of professionals by the Debtors under the

Bankruptcy Code.

11.     To determine whether Macquarie has any potential conflicts of interest or other

relationships, compliance staff in Macquarie's Capital Advisors division researched the master

record database of clients used for its global Capital Advisors conflicts clearance process (the

"Conflicts Register") and a central customer database ("Central Customer Database") that MG

maintains to keep track of trading counterparties and certain other customers of MG to determine

whether Macquarie had, within the past two (2) years, any relationship with parties in interest in

these Chapter 11 Cases.  Specifically, Macquarie and/or MG undertook the following review:

    a.    Based on the retention checklist(s) provided to Macquarie by the Debtors, Macquarie compiled a comprehensive list of the Debtors, its non-debtor affiliates, subsidiaries, directors and officers, significant creditors and equity security holders, and other entities with significant relationships with the Debtor (the "Potential Parties In Interest").  A list of the Potential Parties In Interest is set forth on **Schedule 1** annexed hereto.

    b.    MG compared each of the Potential Parties In Interest to MG's Conflicts Register, consisting of the names of clients and certain other parties in connection with its Capital Advisors businesses.  It is the policy of MG that no new Capital Advisors matter may be accepted or opened without first completing and submitting to those charged with maintaining the conflict check system information necessary to check each such matter for conflicts, including the identity of the prospective client.

    c.    MG compared each of the Potential Parties In Interest to MG's Central Customer Database, consisting of trading counterparties and certain other customer relationships.

    d.    In connection with any matches between the Conflict Register or the Central Customer Database and the list of Potential Parties In Interest, MG personnel

knowledgeable about the current or former matters, where appropriate, were contacted to ascertain whether the matter is related to these Chapter 11 Cases.

e.      Macquarie also compared each of the Potential Parties In Interest against lists maintained by it including (i) lenders that have provided loans in connection with transactions it has completed, (ii) lawyers, accountants, consultants and advisors paid in excess of $250,000 by Macquarie during the period from August 2007 to August 2009 and (iii) landlords. Macquarie also maintains a list of those entities in which it and its affiliates have an equity interest and lenders to its ultimate parent, and compared each of these entities against the list of Potential Parties In Interest.

12.      To the extent that the research of connections with the Potential Parties In Interest indicated that Macquarie has a connection with any such entity, or certain affiliates and/or subsidiaries thereof, the identities of such entities are set forth on **Schedule 1** attached hereto. These connections may include any of the types of relationships described in paragraph 11 hereof, but none is such that Macquarie holds or represents an interest adverse to the Debtors or materially adverse to any class of the Debtors' creditors or equity security holders. Additionally, MG checked the list of Potential Parties In Interest and determined that none of them is a company controlled by MG.

13.      In the ordinary course of its business as a global securities trading firm, MG may be involved in transactions with respect to securities of Potential Parties In Interest. For the reasons described below, none of these relationships constitutes interests of Macquarie that are adverse to the Debtors or materially adverse to any class of the Debtors' creditors or equity security holders.

(a)      MG and its affiliates regularly engage in trading securities. These trades may include trades of securities of Potential Parties In Interest and/or trades with Potential Parties In Interest for the account of MG or its customers (including Potential Parties In Interest).

(b)      MG and its affiliates may also trade indexes, portfolios or baskets of securities that may include securities of the Potential Parties In Interest for the account of a member of MG or its customers.

    

(c)    The business units engaging in the trading activities referred to in the clauses above are separate from the business unit that will be providing services to the Debtors in these Chapter 11 Cases. None of the professionals who will be providing services to the Debtors in these Chapter 11 Cases will be involved in any such trading activities. In addition, the information barrier described below restricts disclosure of material confidential information by persons in the business unit providing services to the Debtors in these Chapter 11 Cases to persons in the trading business units.

(d)    In addition, MG has affiliates, joint ventures and other businesses other than Macquarie's Capital Advisors division, which are separated by permanent information barriers from Macquarie's Capital Advisors division, that may maintain relationships that may not be captured in the Central Customer Database or Conflicts Register (maintained for the Capital Advisors business and not all businesses at MG) described above that have not been reviewed against the Potential Parties In Interest list described above.

14.    Macquarie has maintained and will maintain the following internal ethical wall procedures ("Ethical Wall Procedures"), which are consistent with MG's global, group-wide internal information barrier procedures (subject to the qualifications set forth in the paragraphs outlined below):

(a)    each professional advising the Debtors in these Chapter 11 Cases has received (or will receive prior to providing services on behalf of Macquarie with respect to this engagement) training with respect to the Ethical Wall Procedures;

(b)    the professionals advising the Debtors in these Chapter 11 Cases will not directly or indirectly share any non-public information generated by, received from or relating to the Debtors with any other employees, representatives or agents of Macquarie or MG, except on a strictly confidential basis with other Macquarie employees, representatives or agents who need to know such information for purposes of advising the Debtors;

(c)    professionals advising the Debtors in these Chapter 11 Cases will be located in areas that are physically separated from the MG business units engaged in trading securities;

(d)    professionals advising the Debtors in these Chapter 11 Cases will not receive any information regarding MG trading in securities;

(e)     MG's compliance team will review employee trades to determine if there is any reason to believe that such trades were not made in compliance with the Ethical Wall Procedures and maintains records of such reviews; and

(f)     MG's compliance team will monitor a sampling of e-mails from all professionals to ensure compliance with SEC and FINRA laws and regulations. The sampling will include a percentage of each professionals' e-mails, as well as messages that have been identified through a filtering process based on specific words and phrases. The filtering process will be modified within Macquarie's Capital Advisors ethical wall to ensure that it captures any e-mails in connection with these Chapter 11 Cases.

15.     Notwithstanding the foregoing description, pursuant to the Ethical Wall Procedures, the professionals advising the Debtors in these Chapter 11 Cases may share information with (i) members of senior management of Macquarie who, due to their duties and responsibilities, have a legitimate need to know such information, provided that such individuals (x) otherwise comply with the Ethical Wall Procedures described in the foregoing paragraph and (y) use such information only in connection with their senior managerial responsibilities; (ii) regulatory authorities; and (iii) legal, compliance, internal audit and other internal control functions within Macquarie that need to know such information for purposes of carrying out their control functions.

16.     As part of their practices, Macquarie and/or its affiliates may appear in cases, proceedings and transactions involving many different attorneys, accountants and financial advisors, some of which may represent or be claimants and/or parties in interest in these cases. To the best of my knowledge, Macquarie and/or its affiliates are not representing such attorneys, accountants and financial advisors in these Chapter 11 Cases and do not have any relationship with such entities that would cause Macquarie to be adverse to the Debtors or materially adverse to any class of the Debtors' creditors or equity security holders.

17.     MG is a global investment banking firm with broad activities including, among another things, financial advisory services, funds management and securities trading. With

DB02:8908196.1                                                                                 068731.1001

customer accounts and investment banking and financial advisory clients around the world, it is possible that one or more of MG's clients or counter-parties to transactions with the MG may hold a claim or otherwise be a Potential Party In Interest in these Chapter 11 Cases. Furthermore, as a market maker in equity securities in certain jurisdictions, as well as a trader of corporate bonds and convertible securities, MG regularly enters into securities transactions with other registered broker-dealers (or equivalents in other jurisdictions) as part of its daily activities. Some of these counterparties may be creditors in these Chapter 11 Cases. Macquarie submits that none of these business relationships constitutes interests of Macquarie that are adverse to the Debtors or materially adverse to any class of the Debtors' creditors or equity security holders.

18. To the best of my knowledge, information and belief formed after reasonable inquiry, none of the services rendered by Macquarie to the entities set forth on **Schedule 1** hereto has been performed in connection with these Chapter 11 Cases. Macquarie believes that its relationships with these parties will not impair Macquarie's ability to perform professional services objectively on behalf of the Debtors. Macquarie will not accept any engagement that would require Macquarie to represent an interest adverse to the Debtors or materially adverse to any class of the Debtors' creditors or equity security holders.

19. Despite the efforts described above to identify and disclose connections with parties in interest in these cases, because the Debtors and Macquarie are large enterprises with numerous creditors and other relationships, Macquarie is unable to state with certainty that every client representation or other connection has been disclosed. In this regard, as stated above, if Macquarie discovers additional information that requires disclosure, Macquarie will file supplemental disclosures with the Court as promptly as possible.

20.     Pursuant to the Agreement, Macquarie has received payment of $1,344,757 in fees and expenses as of the Petition Date (approximately $66,667 of which is payment for services to be rendered pursuant to the Agreement during the Chapter 11 Cases).  No other payments have been made to Macquarie for services rendered, or to be rendered, in connection with these Chapter 11 Cases.

21.     To the best of my knowledge, information and belief formed after reasonable inquiry, Macquarie has not shared or agreed to share any of its compensation in connection with this engagement with any third party.  If any such agreement is entered into, Macquarie undertakes to amend and supplement this Declaration to disclose the terms of any such agreement.

22.     No promises have been received by Macquarie, or by any employee thereof, as to compensation in connection with these Chapter 11 Cases other than in accordance with the provisions of the Bankruptcy Code.

23.     I am generally familiar with the Bankruptcy Code and the Bankruptcy Rules, and Macquarie will comply with them, subject to the orders of this Court.


I declare under penalty of perjury that the foregoing is true and correct.


Dated:  November 9, 2009                    By: */s/ Ford R. Phillips*
                                                Ford R. Phillips
                                                Title: Managing Director

DB02:8908196.1                                                             068731.1001

# Schedule 1

Macquarie Capital (USA) Inc.
Schedule 1

| Party | Macquarie Relationship |
|---|---|
| **Debtors** | |
| Lazy Days' R.V. Center, Inc. | X |
| LD Holdings, Inc. | |
| LDRV Holdings Corp. | |
| RV Acquisition, Inc. | |
| | |
| **Attorney to the Debtors** | |
| Kirkland & Ellis LLP | X |
| Young, Conaway, Stargatt & Taylor LLP | |
| | |
| **Debtor's Officers and Directors** | |
| Charles Macaluso | |
| John Horton | |
| Linda Stephens | |
| Michael Salvati | |
| Nicholas Sheppard | |
| Randall Lay | |
| Thomas A. Donnelly | |
| Thomas A. Millner | |
| Thomas J. Baldwin | |
| | |
| **Shareholders** | |
| AGI Holding Corp. KEYSOP | |
| American Express Financial Advisors, Inc. FBO Ronald J. Wos IRA | X |
| Ameriprise Trust Company FBO Dana I. Philip, IRA | |
| Ameriprise Trust Company FBO Danny W. Lassetter, IRA | |
| Ameriprise Trust Company FBO Forrest Heidel, IRA | |
| Ameriprise Trust Company FBO Kathleen Bachtel, IRA | |
| Ameriprise Trust Company FBO Linda Roddy, IRA | |
| Ameriprise Trust Company FBO Mark J. Baiss, IRA | |
| Ameriprise Trust Company FBO N.J. Bolton, Jr., IRA | |
| Ameriprise Trust Company FBO Sara McNab, IRA | |
| Bruckmann, Rosser, Sherrill & Co. II, L.P. | |
| Bruckmann, Rosser, Sherrill & Co., L.P. | |
| Charles Macaluso | |
| Charles Schwab & Co., Inc. Custodian, Christopher J. Trapeni IRA | |
| Charles Schwab & Co., Inc. Custodian, Joel P. Lodes IRA | |
| Charles Schwab & Co., Inc. Custodian, Kenneth M. Stumpe IRA | |
| Charles Schwab & Co., Inc. Custodian, Robert E. Grady IRA | |
| Charles Schwab & Co., Inc. Custodian, Steven Ratcliffe IRA | |
| Charles Schwab & Co., Inc. Custodian, Tina Heflin IRA | |
| Danny Moore | |
| Donald W. Wallace | |
| First Clearing LLC FBO Charles Thibault | |
| Harold Oehler | |
| John Horton | |
| Julie Frist | |
| Marilena Tibrea | |
| Michael Salvati | |
| Padley Living Trust Agreement | |
| Raymond James & Associates CSDN FBO Arlene Scolaro | |

| Party | Macquarie Relationship |
|---|---|
| Raymond James & Associates CSDN FBO Elizabeth Adamo IRA | |
| Raymond James & Associates CSDN FBO Patric Overby IRA | |
| Raymond James & Associates CSDN FBO Victor Davis IRA | |
| Thomas Millner | |
| | |
| **Secured Lenders** | |
| Bank of America, NA | X |
| Key Bank National Association | X |
| | |
| **Bondholders** | |
| Anthony Melatino | |
| BlackRock Advisors, Inc. | X |
| Chartwell Investment Partners | |
| David Milevich (MBS Financial Services) | |
| Donald W. Wallace (LazyDays) | |
| Elaine Bond | |
| Jim Walford | |
| John Horton (LazyDays) | |
| Michelle Holland (Morgan Stanley broker) | |
| Milton Andrew Peck | |
| Robin Prever (wife of Anthony Melatino) | |
| TD Asset Management, Inc. (subsidiary of Toronto-Dominion) | X |
| Wayzata Investment Partners | |
| | |
| **Litigants** | |
| I-4 Land Holding Limited Company | |
| Dale and Barbara Brockelbank | |
| John Schalmo, et al | |
| Mobile One | |
| National General Assurance a/s/o Daniel Hurst | |
| National Interstate Co. f/o/b/o Gerald L. Auck | |
| State Farm a/s/o Miller | |
| Valley Chevrolet | |
| William and Maureen Andresen | |
| Yale Freeman | |
| | |
| **Retail Lenders** | |
| Bank of America Specialty Group | X |
| Bank of The West | |
| Branch Banking & Trust Co. (BB&T) | X |
| Firstar Bank N.A. (US Bank) | X |
| KeyBank National America | X |
| Marine One Acceptance Corp. | |
| Medallion Bank | X |
| Mid Florida Federal Credit Union | |
| Sebrite Corp. | |
| Thor Credit Corp. | X |
| | |
| **Landlords** | |
| I-4 Land Holding Limited Company | |
| | |

Macquarie Capital (USA) Inc.
Schedule 1

| Party | Macquarie Relationship |
|---|---|
| **Insurers** | |
| AON Corp | X |
| Arch Specialty Ins. Co. | X |
| AXIS Surplus Lines Ins. Co. | X |
| Commerce and Industry (AIG) | X |
| Excalibur | X |
| Executive Risk Indemnity (Chubb) | X |
| Humana | X |
| Ironshore | |
| Krauter | |
| Lexington (AIG) | X |
| Liberty Mutual | |
| National Union Fire Ins. Co. | |
| New Hampshire (AIG) | X |
| North Pointe Ins. Co. | X |
| Reynolds & Reynolds | X |
| Wells Fargo | X |
| Westchester Surplus Lines | X |
| | |
| **Issuers of surety bonds & LOCs** | |
| American Contractors Indemnity Co. | X |
| Bank of America | X |
| Platte River Insurance Co. | X |
| | |
| **Indenture Trustees** | |
| The Bank of New York | X |
| | |
| **Contract Counterparties** | |
| Accu-Pave Paving | |
| Akamai Technologies, Inc. | X |
| Allied Barton Securitie Services | |
| Anchor Computer, Inc. | |
| Angus Systems Group, Inc. | |
| Bob Grady (Retention Agreement) | |
| Bruckmann, Rosser, Sherrill & Co. LLC | |
| C & S Pump Repair | |
| Camping World (CWI, Inc.) | |
| Canon Financial Security Services LLC | X |
| Carriage, Inc. | |
| Charles Macaluso | |
| Chuck Thibault | |
| Cintas Corporation | X |
| Club Car, Inc. | X |
| Coach-Net Services Group, Inc. | |
| Cornerstone Tree Farm, Inc. | |
| Corporate Express/Staples | X |
| Country Coach, Inc. | |
| Country Inn & Suites | |
| Damon Corporation | X |
| Edith Wallace | |
| Fleetwood Enterprises, Inc. | X |

| Party | Macquarie Relationship |
|---|---|
| Forest River, Inc. | X |
| Four Winds International Corporation | |
| Ganster & Company | |
| Glendale Recreational Vehicles | |
| GMAC Insurance | |
| Guarantee Trust Life Insurance Co. | |
| Hampton Inn & Suites | |
| Harold Oehler (Retention Agreement) | |
| I-4 Land Holding Limited Company | |
| Iron Mountain | X |
| Joe Wiley (Retention Agreement) | |
| John Horton (LazyDays) | |
| John Horton (Retention Agreement) | |
| Keystone RV Company | |
| KZRV L.P. | |
| Landmark Engineering | |
| Linda Stephens (Retention Agreement) | |
| Microsoft Licensing, GP | X |
| Mike Salvati | |
| Millennium Lawn and Landscape, Inc. | |
| Mitchell International, Inc. | |
| Monaco Coach Corporation | X |
| National Warranty of Florida, Inc. | |
| Nuccio Heating & Air Conditioning, Inc. | |
| Progressive Casualty Insurance Co. | X |
| Progressive Direct Insurance Co. | X |
| Qwest Communications Corp. | X |
| Randall Lay (Retention Agreement) | |
| Robertson Electrical Services | |
| Sayyah's Cleaning, Inc. | |
| Steve Ratcliff (Retention Agreement) | |
| Sundial LTD, Inc. | |
| Thomas A. Donnelly (LazyDays) | |
| Thomas Wegge (General Release) | |
| Thor Credit Corp. | X |
| Tiffin Motor homes, Inc. | |
| Title Tec | |
| Total Loss Coverage (Wildfire Enterprises) | |
| Tyron Automotive Group (Runflat America) | |
| United States Warranty Corp. | |
| Wade RV | |
| Waste Management | X |
| Wendy's Wagon | |
| Westlaw | X |
| Winnebago Industries | X |
| Workhorse Sales Corp. | |
| Yamaha Motor Corporation USA | X |
| | |
| **Vendors with Purchase Orders** | |
| Advance Auto Parts Commercial | X |
| Best Buy/HRS USA | X |
| BOCC - Hill County Water | |

| Party | Macquarie Relationship |
|---|---|
| Boulevard Tire Center | |
| Camping World, Inc./Corporate HQ | |
| Coach Distribution System | |
| Coach Glass | |
| Coast Distribution System | X |
| Cummins Power South | X |
| Cumpton Welding Supply | |
| Dometic | |
| Dow Electronics | |
| DTI | X |
| DTI/Stag-Parkway, Inc. | X |
| Duncan Systems, Inc. | |
| Famous Tate | |
| Fleet Products, Inc. | |
| Fleetpride | |
| Florida Asphalt | |
| Florida Fleet Services, Inc. | |
| Freightliner of Tampa, Inc. | |
| Gator Ford | |
| Girard/Wells Fargo Bus Credit | X |
| Hillsborough Sheet Metal | |
| HWH Corporation | |
| Interstate Battery | |
| JN Electric of Tampa Bay, Inc. | |
| Kimball Midwest | X |
| KVH Industries, Inc. | X |
| Lightning RV Supply | |
| Molding By Design | |
| NAPA Auto Parts | X |
| Norcold | |
| Olin Mott Tire & Service | |
| Power Gear | |
| Qwest | X |
| Redneck Trailer Supply | |
| Resource Flooring | |
| River Park, Inc. | |
| Sherwin-Williams | X |
| Spartan Motors Chassis | X |
| Sprint | X |
| SSI | |
| Stag-Parkway, Inc. | |
| Suncoast Office Systems | |
| Tampa Electric | X |
| Tampa Pavement Constructor, Inc. | |
| Tracstar Systems | X |
| Verizon Florida | X |
| Waste Management | X |
| Wingfoot Commercial Tire - TMP | X |
| Work Horse | |
| Wurth USA | |
| WW Grainger | X |
| | |

| Party | Macquarie Relationship |
|---|---|
| **Professionals** | |
| Akin, Gump, Strauss, Hauer & Feld LLP | X |
| Automotive Industry Center for Excellence LLC | |
| Banker, Lopez, Gassler | |
| Berman, Hopkins, Wright & Laham | |
| Boardman, Suhr, Curry & Field | |
| Christopher Price (Ind. Contractor) | |
| Constangy, Brooks & Smith, LLC | |
| Crowe Chizek and Company LLC | |
| Duff & Phelps, LLC | X |
| Epiq Bankruptcy Solutions | |
| Fowler, White, Boggs | |
| Glen Rasmussen | |
| Grown Man | |
| Holland & Hart | |
| Hudson Cook LLP | |
| Jeff Thiel (Ind. Contractor) | |
| Judith Clark (Ind. Contractor) | |
| Kass, Shuler, Solomon, Spector, Foyle & Singer, P.A | |
| KBA Engineering, Inc. | |
| Kekst and Company, Inc. | X |
| Kirkland & Ellis LLP | X |
| Macfarlane, Ferguson & McMullen | |
| Macquarie Capital (USA) Inc. | X |
| Nate Vaughn | |
| Paula Greenberg (Ind. Contractor) | |
| Powell & Pearson LLP | |
| Quarles & Brady LLP | |
| Richardson & Patel | |
| Ruden McClosky | |
| Salazar Consulting Group, Inc. | |
| Schiff Law Group | |
| Thompson, Sizemore & Gonzalez | |
| Young, Conaway, Stargatt & Taylor LLP | |
| | |
| **Top Unsecured Vendors** | |
| Allied Barton Security Service | |
| Bank of America | X |
| Bank of America - Interest | X |
| Bank of America, N.A. | X |
| Camping World Inc/Corporate HQ | |
| Carriage, Inc. | |
| Country Coach International | |
| Damon Corporation | X |
| First Insurance | X |
| Fleetwood American Coach | X |
| Fleetwood Enterprises | X |
| Flying J, Inc. | |
| Forest River, Inc. | X |
| Four Winds International | |
| Humana | X |
| I-4 Land Holding Limited Co. | |

Macquarie Capital (USA) Inc.
Schedule 1

| Party | Macquarie Relationship |
|---|---|
| Keystone RV Company | |
| KZRV, LP | |
| Monaco Coach Corporation | X |
| Sundial Ltd, Inc. | |
| Tampa Electric Company | X |
| The Bank of New York | X |
| Tiffin Motor Homes | |
| Winnebago | X |

# EXHIBIT C

## Agreement

**Macquarie Capital (USA) Inc.**
A Member of the Macquarie Group of Companies

| 125 West 55th Street | Telephone | 1 212 231 1000 |
| New York NY 10019 | Tollfree | 1 800 648 2878 |
| UNITED STATES | Facsimile | 1 212 231 1717 |
| | Internet | www.macquarie.com |

September 3, 2009

STRICTLY CONFIDENTIAL



MACQUARIE

Mr. Randall Lay
Chief Financial Officer
Lazy Days' R.V. Center, Inc.
6130 Lazy Days Boulevard
Seffner, FL 33584-2968

Dear Mr. Horton:

Reference is made to the letter agreement dated November 25, 2008 (the "Original Letter Agreement") between Lazy Days' R.V. Center, Inc. (the "Company" or "you") and Macquarie Capital (USA) Inc. ("MCUSA" or "we") with regard to the engagement of MCUSA to provide certain restructuring advisory services ("Restructuring Advisory Services") to the Company. This letter agreement is an amendment and restatement of the Original Letter Agreement (the Original Letter Agreement, as amended and restated by this letter agreement, this "Letter Agreement").

**MCUSA's Services**

Subject to the terms and conditions of this Letter Agreement, MCUSA's services will consist of the following:

1. Advise the Company with respect to available capital restructuring, sale or transaction alternatives, including recommending specific courses of action and assisting with the design, structuring and negotiation of alternative restructuring and/or transaction structures; provided, however, that notwithstanding anything else in this agreement, MCUSA shall not conduct any solicitation of votes in connection with such restructurings, sales or transaction alternatives;

2. Advise the Company in preparing for, meeting with, and presenting information to interested parties and their respective advisors, specifically including the Company's senior lenders, holders of the 11.75% Senior Notes, due May 15, 2012 (the "Senior Notes") and their respective advisors;

3. Advise the Company in the development of a restructuring plan, including a potential exchange offer for the Senior Notes, and negotiation with parties-in-

Macquarie Capital (USA) Inc. is not an authorized deposit-taking institution for the purposes of the Banking Act 1959 (Commonwealth of Australia), and its obligations do not represent deposits or other liabilities of Macquarie Bank Limited ABN 46 008 583 542. Macquarie Bank Limited does not guarantee or otherwise provide assurance in respect of the obligations of Macquarie Capital (USA) Inc.

interest; <u>provided</u>, <u>however</u>, that notwithstanding anything else in this agreement, MCUSA shall not conduct any solicitation of votes in connection with such exchange offering;

4. Advise the Company in preparing certain financial information and other materials (the "Materials") that may be required by the Company's creditors and other stakeholders in connection with the potential pursuit of a restructuring plan;

5. Advise the Company in determining an enterprise valuation range for the Company; and

6. Other services as may be reasonably requested in writing from time to time by the Company or its counsel and agreed to by MCUSA.

While they are employed by MCUSA, MCUSA agrees that Ford Phillips and Michael Bruder will lead the MCUSA team and have primary responsibility for this engagement.

Notwithstanding the services provided by MCUSA, you will retain complete and final control of all key decisions in connection with the restructuring program, including those decisions concerning:

1. Business plans, cash flow forecasts, financial projections and cash flow reporting, including strategic content, specific action plans and related assumptions;

2. Specific courses of action, including the design, negotiation and implementation of alternative restructuring and/or transaction structures;

3. Business operations and financing;

4. All information presented to third parties;

5. The entry into one or more definitive agreement(s); and

6. Any Materials.

The Company will be the issuer of and shall be responsible for any Materials, and such Materials shall be based exclusively upon information provided by the Company. The Company shall be exclusively responsible for the accuracy and completeness of the Materials and MCUSA may rely upon the accuracy and completeness of all such information without independent verification. The Company shall indemnify MCUSA and its affiliates, officers, directors, members, employees and agents with respect to, any liability, cost or expense arising from or related to a misrepresentation or omission by the Company or any of its officers, directors, employees or agents.

MCUSA's area of expertise is in financial advisory matters. The Company will be responsible for obtaining its own professional advice on legal, accounting, taxation, and other specialist matters outside MCUSA's area of expertise.

This Letter Agreement does not constitute an underwriting agreement, a commitment on the part of MCUSA to subscribe for securities or to provide debt or a commitment to invest in any way in any transaction contemplated herein. Any commitment to underwrite an issue of securities or to provide any debt financing will be

subject to, among other things, MCUSA's internal approval processes, suitable market conditions, regulatory framework and the execution of an underwriting or other agreement subject to such conditions precedent, termination and other provisions as are agreed. MCUSA's capacity to place or underwrite debt or equity securities in the United States is limited to dealings with institutional customers. Brokerage services provided by MCUSA or any of its affiliates will be subject to the opening of an appropriate account and will be further subject to separate terms and conditions, including fees. Arranging of tax efficient structures, including domestic or cross border leases, will be subject to separate terms and conditions including fees.

This Letter Agreement is not intended to and does not create an agency or fiduciary relationship between the Company and MCUSA, and neither party has the authority to bind the other. The Company acknowledges that MCUSA will be acting pursuant to a contractual relationship on an arm's length basis and in no event do the parties hereto intend that MCUSA act or be responsible as a fiduciary to the Company, its management, stockholders, creditors or any other person. Each of the parties hereby expressly disclaims any fiduciary relationship and agrees that it is responsible for making its own independent judgment with respect to any transaction contemplated hereby.

The Company acknowledges and agrees that the Company, along with its legal counsel, is solely responsible for ensuring that the Company complies with all applicable law, including without limitation, that any offer or sale of securities made in connection with any financing, sale, restructuring or recapitalization of the Company is made in compliance with the registration requirements of the Securities Act of 1933 and the requirements of any applicable state securities laws or qualifies for an exemption from such registration requirements and/or such state securities laws.

**Professional Fees and Expenses; Termination**

Our fees for the services provided under this Letter Agreement will include a Monthly Advisory Fee and a Project Fee, each as defined below. Additionally, the Company will be responsible for the reimbursement of MCUSA's reasonable out-of-pocket expenses incurred in connection with providing services under this Letter Agreement as described below.

Upon November 26, 2008, and at the end of each successive thirty day period thereafter until termination of this Letter Agreement, MCUSA shall fully earn and be paid a monthly advisory fee (the "Monthly Advisory Fee") of $125,000. Effective May 1, 2009, the Monthly Advisory Fee was reduced to $100,000, which such reduction was effective May 1, 2009 and the payment for the period including May 1, 2009 was reduced pro rata to account for such reduction;

Upon the earlier to occur of (i) December 31, 2009 and (ii) the consummation of a Transaction (as defined herein), the Company shall pay MCUSA a fee in the amount of $1,400,000 (the "Project Fee") regardless of whether or not a Transaction has occurred. "Transaction" is defined as the consummation of any of the following: (a) a restructuring,

refinancing, recapitalization, exchange offer or other material modification of the Senior Notes, including (without limitation) pursuant to a repurchase or an exchange transaction, a plan of reorganization (including with respect to a prepackaged or prearranged plan of reorganization or other plan pursuant to chapter 11, title 11 of the United States Code (the "Bankruptcy Code")), (b) a merger or sale of all or substantially all of the stock (or other equity interests) or assets of the Company (regardless of the form that such transaction shall take) during the term of this Letter Agreement or (c) the effective date of a plan of reorganization under the Bankruptcy Code. Fifty percent (50%) of the aggregate amount of all Monthly Advisory Fees received by MCUSA under this Letter Agreement will be credited against the Project Fee.

In addition to the fees that are or may be payable to MCUSA under this Letter Agreement, MCUSA's reasonable out-of-pocket expenses incurred prior to any termination of this Letter Agreement in connection with its activities under this Letter Agreement will be payable by the Company on a monthly basis. Such expenses will include, but not be limited to, costs directly associated with this Letter Agreement, (excluding attorneys' fees and expenses), including out of pocket expenses incurred in connection with travel, out-of-town accommodations and meals, overnight delivery, and database access charges. Monthly expenses are payable by the Company within five (5) days of receipt of an invoice for such expenses from MCUSA, subject to the local rules of any bankruptcy court having jurisdiction over bankruptcy cases of the Company, if any (the "Bankruptcy Court"), applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or any other guidelines or further orders of any Bankruptcy Court regarding professional compensation. Individual expenses in excess of $2,500 will require prior written approval of the Company. The provisions of this paragraph shall not in any way limit the Company's obligations pursuant to Attachment A to this Letter Agreement.

All payments due to MCUSA under this Letter Agreement shall be quoted and payable in cash in U.S. dollars net of any withholding, value added or other taxes. If any such taxes are payable by MCUSA, the Company agrees to pay MCUSA such additional amount as is necessary to ensure that MCUSA will receive the full amount of the relevant payment as if such tax had not been payable.

As further consideration for the services provided, the Company agrees to the provisions of Attachment A, the terms of which are incorporated herein in full. Attachment A is an integral part of this Letter Agreement and shall survive any termination or expiration of this Letter Agreement.

To the extent that the Company requests that MCUSA perform additional services not contemplated by this Letter Agreement, the scope and fees for such services shall be mutually agreed upon by MCUSA and the Company, in writing, in advance of any performance of such services.

MCUSA cannot guarantee that this engagement will result in a transaction or that a transaction will be consummated. MCUSA's engagement under this Letter Agreement

may be terminated at any time by either MCUSA or the Company with immediate effect, upon written notice to that effect to the other party; provided that the provisions contained in this Letter Agreement set forth in the sections entitled "Professional Fees and Expenses," "Information; Confidentiality," "Other Provisions," and "Attachment A" hereto shall survive any termination of this Letter Agreement. In the event of termination of this Letter Agreement by the Company, MCUSA shall be entitled to the Project Fee as if the Transaction occurred during the term of this Letter Agreement; provided, that no such Project Fee shall be payable in the event that this Letter Agreement is terminated by the Company as a result of (i) a breach of MCUSA's obligation to provide the services of Ford Phillips and Michael Bruder as described above or (ii) repeated failure by MCUSA to perform the services as requested by the Company.

## Application for Retention

If a case is commenced under the Bankruptcy Code, the Company shall promptly apply to the Bankruptcy Court for approval pursuant to sections 327 and 328(a) of the Bankruptcy Code of this Letter Agreement and the retention of MCUSA by the Company under the terms of the Letter Agreement, nunc pro tunc to the date of commencement of such chapter 11 cases, and for this Letter Agreement to be subject to the standard of review under section 328(a) of the Bankruptcy Code and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall provide MCUSA and its counsel with a draft of such application and a proposed order authorizing such retention sufficiently prior to the filing of such documents with the Bankruptcy Court for review and comment by MCUSA and its counsel. Following any commencement of a case under the Bankruptcy Code, MCUSA shall have no obligations under this Letter Agreement unless and until this Letter Agreement in its entirety (including Attachment A) and the retention of MCUSA under the terms of this Letter Agreement are so approved by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to MCUSA in all respects.

The Company acknowledges and agrees that MCUSA's restructuring expertise and experience were important factors in determining the amount of the fees set forth herein, and that the ultimate benefit of MCUSA's services hereunder could not be measured merely by reference to the number of hours to be expended by MCUSA's professionals in the performance of such services, the results achieved, or the ultimate benefit to the Company of the work performed. Each party hereto also acknowledges and agrees that the various fees set forth herein have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of MCUSA and that the actual time and commitment required of MCUSA and its professionals to perform its services hereunder may vary substantially from week to week or month to month. Given the numerous issues the Company anticipates may arise in connection with any Transaction and/or similar transaction, the time and effort necessary to address all such issues as they arise, and the market prices for MCUSA's services for engagements of this nature in an out-of-court context, each party hereto agrees that the fee and expense arrangements set forth hereunder are reasonable under all applicable

legal standards. The Company further agrees that the fees, expenses and other amounts payable to MCUSA hereunder (including Attachment A hereto) shall be entitled to priority as administrative expenses under sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and any and all such expenses and other amounts shall be entitled to the benefit of any "carve-outs" for professional fees and expenses in effect in any case commenced by the Company under the Bankruptcy Code pursuant to any financing orders and/or cash collateral orders now or hereafter in effect. The terms of this paragraph are for the benefit of MCUSA and may be waived, in whole or in part, only by MCUSA.

## Information; Confidentiality

The Company will furnish or arrange to have furnished to MCUSA such information as MCUSA believes appropriate to its engagement under this Letter Agreement (all such information so furnished being the "Information"). The Company acknowledges and agrees that MCUSA (i) will rely on the Information and other publicly available information in fulfilling the terms of its engagement under this Letter Agreement without any obligation to independently verify the same, (ii) does not assume responsibility for the accuracy or completeness of the Information or such other information, (iii) has no obligation to undertake an independent evaluation or appraisal of any assets or liabilities of the Company or any other party, (iv) has no obligation to investigate the accuracy or completeness of the Information, and (v) with respect to any financial forecasts (including costs, savings and synergies) that may be furnished to or discussed with us by the Company, will assume that they have been reasonably prepared and reflect the best then-currently available estimates and judgment of the Company's management. The Information will not be audited by MCUSA and, accordingly, MCUSA will express no opinion thereon. The Company further agrees to notify MCUSA promptly of any material change in any Information provided by the Company.

The Company represents that, to its knowledge, the Information and any other information or documents (including the Materials) furnished by or on behalf of the Company to third parties (i) will not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances in which they were made, not be false or misleading, and (ii) will be true, complete and correct in all material respects.

MCUSA agrees to keep all Information confidential; provided that Information may be disclosed (i) to affiliates of MCUSA and (ii) to the extent necessary for MCUSA to perform its duties under this Letter Agreement. Information shall not be considered confidential to the extent that: (a) it is or becomes publicly available through a source other than MCUSA by a source not known to MCUSA to be in breach of a confidentiality obligation; (b) it was known to MCUSA at the time such Information was furnished to MCUSA; (c) it is independently developed by MCUSA without reference to the Information; (d) it is subsequently learned from a third party that does not impose an obligation of confidentiality upon MCUSA by a source not known to MCUSA to be in breach of a confidentiality obligation; (e) it is required to be disclosed pursuant to

applicable law or regulation, stock exchange or self regulatory organization requirements, government authority, duly authorized subpoena or court order or directive (provided that MCUSA will, other than where disclosure is requested or required in connection with a governmental or regulatory examination, first have given notice to the Company and shall cooperate with the Company to obtain a protective order); or (f) is approved for disclosure by prior consent of the Company. The obligations of MCUSA under the immediately preceding two sentences shall terminate upon the third anniversary following the completion of the work contemplated under this Letter Agreement.

MCUSA's role as advisor to the Company (and the terms and conditions of this Letter Agreement) may not be disclosed by the Company nor may any references to MCUSA be made without the prior written consent of MCUSA. Any advice, analysis or documentation (whether written or oral) rendered or provided by MCUSA in its role as advisor to the Company will be solely for the confidential use of the Company and its Board of Directors and may not be disclosed, quoted, reproduced, summarized, described or referred to without the prior written consent of MCUSA.

MCUSA may, at its option and expense, (i) disclose to any party or publicly announce its role as exclusive financial advisor to the Company and/or (ii) place "tombstone" advertisements in financial and other publications and media describing its services to the Company under this Letter Agreement.

**Other Provisions**

As you know, MCUSA and its affiliates are engaged in a broad range of securities activities and financial advisory services. MCUSA and its affiliates carry on a range of businesses on their own account and for their clients, including providing stockbroking, investment advisory, investment management, proprietary financings and custodial services. It is possible that the various divisions, business groups and affiliates of MCUSA which provide these services may hold long or short positions in securities of companies which are or may be involved in any transaction contemplated hereby and effect transactions in those securities for their own account or for the account of their clients. The Company agrees that these divisions, business groups and affiliates may hold such positions and effect such transactions without regard to the Company's interests in any transaction contemplated hereby. Nothing contained in this Letter Agreement shall prevent MCUSA from performing the same or similar engagements for other clients in your industry. MCUSA represents that, as of the date of this Letter Agreement, it has in place ethical walls aimed at preventing, among other things, unauthorized use of material non public information in connection with the purchase and sale of securities. MCUSA agrees that it will have in place similar ethical walls at any time that MCUSA is engaged in activities described above that would affect the Company's interests in any transaction contemplated hereby.

MCUSA, as a registered broker-dealer, member FINRA, is required to obtain, verify and record certain information regarding the individuals or entities with which MCUSA does business. The Company agrees to provide MCUSA with the Company's

tax identification number and/or other identifying information, as MCUSA may request, to enable MCUSA to comply with applicable law or regulation. The Company may also be asked to provide documents to verify its identity, including a copy of its constituent documents (i.e., articles of incorporation, partnership agreement, limited liability company agreement, trust agreement or government-issued business license).

MCUSA may prepare one or more financial models (any such models prepared by MCUSA, "Models") in the course of this engagement. MCUSA will retain all of its intellectual property rights in relation to these Models, including copyright and rights to confidential information (but excluding any Company or other third party intellectual property rights). However, MCUSA will grant the Company a royalty free license to use the Models in relation to the Transaction. In particular, the Company may insert other variables or assumptions to consider alternative scenarios or outcomes. However, MCUSA will not be responsible for failure of a Model or for output errors resulting from incorrect or inappropriate inputs by Company.

The Company may not use, reproduce or adapt any Model other than in relation to the Transaction without MCUSA's prior written consent. In addition, data, outcomes and estimates and forecasts contained in or derived from Models may not be disclosed to any person (other than the Company's directors, officers, employees and advisers to whom disclosure is necessary for purposes of the Transaction) or referred to in any public document without MCUSA's prior written consent.

Estimates and forecasts derived from a Model will always be subject to significant uncertainties and contingencies. Accordingly, MCUSA does not represent that estimates or forecasts derived from any Model will actually be achieved or that the assumptions, variables and other inputs used in any Model are reasonable, reliable or accurate. The Company should make its own investigations and enquiries regarding the uncertainties and contingencies which may be relevant to its analysis of the Transaction and the impact that any change in any assumptions, variables or other inputs may have on the Transaction.

The trade names and trademarks "Macquarie", "Macquarie Capital", "Macquarie Bank", "Macquarie Group" or any similar mark or variations or derivations thereof (collectively, the "Marks"), shall not be used by the Company without MCUSA's prior written consent and upon any termination of this Letter Agreement, the Company shall have no right to use or exploit the Marks. Nothing in this Letter Agreement shall be deemed to give the Company any right, title or interest in or to any of the Marks or MCUSA's trade names, trademarks or service marks.

The addresses for delivery of all notices to the parties under this Letter Agreement are as follows:

If to the Company:                                        If to MCUSA:

Attn: John Horton                                         Attn: Ford Phillips

Lazy Days' R.V. Center, Inc.
6130 Lazy Days Boulevard
Seffner, FL 33584-2968

Telephone: (813) 246-4000
Facsimile:(813) 630-2438

And to:

Kirkland & Ellis LLP
Attn: Kim Taylor
153 East 53rd Street
New York, NY 10022

Telephone: 212-446-4915
Facsimile: 212-446-6460

Macquarie Capital (USA) Inc.
233 S. Wacker Dr.
Suite 5300
Chicago, IL 60606

Telephone: (312) 756-3870
Facsimile: (312) 756-3810

And to:

Attn: Legal Department
Macquarie Capital (USA) Inc.
125 West 55th Street
New York, NY 10019

Telephone: 212-231-1000
Facsimile: 212-231-1717

This Letter Agreement constitutes the entire agreement between the Company and MCUSA relating to this engagement, and supersedes any and all prior agreements between the parties relating to this engagement. Except as amended and restated hereby, the Original Letter Agreement shall remain unchanged and in full force and effect. No waiver, amendment or other modification of this Letter Agreement shall be effective unless in writing and signed by each party intended to be bound thereby.

The Company acknowledges that MCUSA may carry out the services contemplated hereunder through or in conjunction with one or more affiliates so long as the same lead personnel are involved and such affiliate provides substantially the same skill set as MCUSA. Any such services performed by any such affiliate shall be subject to the terms and conditions of this Letter Agreement. MCUSA shall be primarily liable for the acts and omissions of any such affiliate. The contracting parties, however, shall be and remain the Company and the MCUSA.

This Letter Agreement may not be assigned by the Company or MCUSA, except with the written consent of the non-assigning party; provided that MCUSA may assign its rights and obligations hereunder to any affiliate of MCUSA upon written notice to the Company of such assignment. Any attempted assignment in violation of the provisions hereof shall be void and of no effect. The benefits of this Letter Agreement shall inure to the Company, MCUSA, the Indemnified Parties (as defined in Attachment A) and their respective successors and assigns and representatives, and the obligations and liabilities assumed in this Letter Agreement by the parties hereto shall be binding upon their respective successors and assigns.

MCUSA does not charge for its services on an hourly basis and, accordingly, does not maintain time records in support of costs and expenses. The Company shall, as a part

of any application or order submitted to the Bankruptcy Court for approval of this Letter Agreement and authorizing the retention of MCUSA as contemplated in this Letter Agreement, seek a waiver from the Bankruptcy Court of any requirement of MCUSA to maintain and/or submit time records notwithstanding anything to the contrary in the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, local rules of the Bankruptcy Court, or any other guidelines or further orders of the Bankruptcy Court.

The Company acknowledges and agrees that MCUSA has been retained to act solely as financial advisor to the Company. In such capacity, MCUSA shall act as an independent contractor, and any duties of MCUSA arising out of its engagement pursuant to this Letter Agreement shall be owed solely to the Company. Neither this Letter Agreement nor the delivery of any advice in connection with this Letter Agreement is intended to confer rights upon any person not a party hereto (including security holders, employees or creditors of the Company) as against MCUSA or its affiliates or their respective officers, directors, employees and agents.

If any portion of this Letter Agreement is held to be void, invalid or otherwise unenforceable, in whole or in part, the remaining portions of this Letter Agreement shall remain in effect.

This Letter Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement. In addition, facsimile signatures shall be valid, enforceable, and effective as if they were originals.

This Letter Agreement shall be governed by, and construed in accordance with, the laws of the state of New York applicable to contracts executed in and to be performed in that state. The Company hereby (i) irrevocably consents to personal jurisdiction (a) in the event the Company commences a case under the Bankruptcy Code and to the extent the Company's bankruptcy cases are then pending, or if not then pending the relevant bankruptcy court shall have retained exclusive jurisdiction over the subject matter of such suit or proceeding, in the Bankruptcy Court, or (b) in all other cases, the Supreme Court of the State of New York in New York County, Commercial Part, or any Federal court sitting in the Southern District of New York, for the purposes of any suit, action or other proceeding arising out of this Letter Agreement or any of the agreements or transactions referred to herein or contemplated hereby, which is brought by or against the Company, (ii) waives any objection to venue with respect thereto, (iii) agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court, and that such courts shall have jurisdiction over any claims arising out of or relating to the Letter Agreement or such agreements or transactions, and (iv) agrees not to commence any suit, action or proceeding arising out of or relating to the Letter Agreement except in such court. The Company hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Company at its address set forth above, such service to become effective ten (10) days after such mailing. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY

CLAIM OR ACTION ARISING OUT OF THIS LETTER AGREEMENT OR
CONDUCT IN CONNECTION WITH THIS ENGAGEMENT IS HEREBY WAIVED.

\* \* \* \* \*

Signature Page Follows

This engagement is important to us and we appreciate the opportunity to be of service to you. If you are in agreement with the terms set forth herein, please indicate by signing and returning the enclosed copy of this Letter Agreement to us. If you have any questions about this Letter Agreement or wish to discuss these matters further, please contact Ford Phillips at (312) 756-3870.

Very truly yours,

MACQUARIE CAPITAL (USA) INC.

By: _Ford R. Phillips_
    Name: Ford R. Phillips
    Title: Managing Director

By: _Andrew A. Krop_
    Name: Andrew A. Krop
    Title: Vice President

Agreed to and Accepted as of
the date first written above by:

LAZY DAYS' R.V. CENTER, INC.

By: _____
    Name:
    Title: CFO

Enclosure/Attachment

**Indemnification and Limitation of Liability Provisions**

The Company agrees to indemnify and hold harmless MCUSA and its affiliates, and their respective directors, officers, managers, members, partners, employees, agents and controlling persons (MCUSA and each such person being an "Indemnified Party") from and against any losses, claims, damages, liabilities or expenses ("Claims," and each a "Claim"), joint or several, to which any Indemnified Party may become subject in connection with the restructuring, restructuring services, any transactions contemplated by this Letter Agreement or the engagement of MCUSA pursuant to, and the performance by MCUSA of the services contemplated by, this Letter Agreement. The Company will also reimburse any Indemnified Party for all expenses (including reasonable fees and expenses of legal counsel) as such expenses are incurred in connection with investigating, preparing to defend, or defending such Claims, whether or not such Indemnified Party is a party and whether or not such Claim is initiated or brought by or on behalf of the Company; provided that the Company will not be required to pay the fees and disbursements of more than one outside counsel (in addition to local counsel) for all Indemnified Parties in any jurisdiction in respect of any single action or proceeding. The Company will not, however, be responsible for any Claim (or expenses relating thereto) to the extent that it is finally judicially determined that such Claim resulted from the gross negligence or willful misconduct of an Indemnified Party. The reimbursement and indemnity obligations under this paragraph and the following paragraph shall be in addition to any liability the Company may otherwise have and shall inure to the benefit of the Indemnified Parties and their respective successors and assigns.

If the indemnification of an Indemnified Party provided for in this Letter Agreement is for any reason held unenforceable, the Company agrees to contribute to the Claims for which such indemnification is held unenforceable (a) in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and the Indemnified Parties, on the other hand, of the restructuring, transaction or comparable transaction as contemplated (whether or not the restructuring or comparable transaction is consummated) or (b) if (but only if) the allocation provided for in clause (a) of this paragraph is for any reason held unenforceable, in such proportion as is appropriate to reflect not only the relative benefits referred to in such clause (a) but also the relative fault of the Company, on the one hand, and the Indemnified Parties, on the other hand, as well as any other relevant equitable considerations; provided that in no event shall the Indemnified Parties be required to contribute an aggregate amount in excess of the aggregate fees actually paid to, and retained by, MCUSA under this Letter Agreement except to the extent that it is finally judicially determined that such Claims resulted from the gross negligence or willful misconduct of an Indemnified Party. The Company agrees that for the purposes of this paragraph the relative benefits to the Company and the Indemnified Parties of the transaction or comparable transaction as contemplated shall be deemed to be in the same proportion that the total value paid or contemplated to be paid or received or contemplated to be received by the Company or its security holders, as the

case may be, as a result of or in connection with the restructuring, transaction or comparable transaction bears to the fees paid or to be paid to MCUSA under this Letter Agreement.

The Company agrees that, without MCUSA's prior written consent (not to be unreasonably withheld), it will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which indemnification could be sought under the indemnification provisions of this Letter Agreement (whether or not MCUSA or any other Indemnified Party is an actual or potential party to such claim, action or proceeding), unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding.

In the event that any Indemnified Party is requested or authorized by the Company or is required by government regulation, subpoena, or other legal process to produce MCUSA's documents as evidence or personnel as witnesses with respect to MCUSA's services for the Company, the Company will, so long as MCUSA is not a party to the proceeding in which information is sought, reimburse MCUSA for its professional time and expenses, as well as the reasonable fees and expenses of its counsel, incurred in responding to such requests; provided that the Company will not be required to pay the fees and disbursements of more than one outside counsel (in addition to local counsel) for all Indemnified Parties in any jurisdiction in respect of any single action or proceeding.

In no event, regardless of the legal theory advanced, shall the aggregate liability of the Indemnified Parties to any person or entity, including the Company, exceed the amount of fees actually paid to, and retained by, MCUSA under this Letter Agreement except to the extent that such liability is finally judicially determined to have resulted from the gross negligence or willful misconduct of an Indemnified Party. Neither party shall be liable to the other for consequential, incidental, indirect, punitive or special damages (including loss of profits, data, business or goodwill), regardless of the legal theory advanced or of any notice given as to the likelihood of such damages; provided that (i) this provision shall not limit an Indemnified Party's indemnity or contribution rights as provided for in this Letter Agreement or applicable law and (ii) damages required to be paid by an Indemnified Party to any third party that is not an Indemnified Party may be considered direct damages to such Indemnified Party. The Company's recourse with respect to any liability or obligation of MCUSA hereunder shall be limited to the assets of MCUSA, and the Company shall have no recourse against, and expressly waives its right to bring any claim against, any other Indemnified Party or any of their assets.